**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
DOROTHY CHAPPELL-JOHNSON,         :
                                  :
            Plaintiff,            :
                                  :
      v.                          : Civil Action No.
                                  : 06-1074 (RCL)
MARTIN J. GRUENBERG,              :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - x

                        Washington, D.C.

                        Friday, November 16, 2007

Deposition of

                   SUSAN BOOSINGER

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before MAK,

Notary Public in and for the District of Columbia, in

the law offices of Swick & Shapiro, P.C., 1225 Eye

Street, N.W., Suite 1290, Washington, D.C., commencing

at 10:10 a.m.

                Diversified Reporting Services, Inc.
                     (202) 467-9200

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 2

        APPEARANCES:


            On Behalf of the Plaintiff:

                    JAMES SIMPSON, ESQ.

                    Swick & Shapiro, P.C.

                    1225 Eye Street, N.W., Suite 1290

                    Washington, D.C.



            On Behalf of the Defendant:


                    WILLIAM JONES, ESQ.

                    3501 Fairfax Dr., Room E-6006

                    Arlington, VA  22226

                    (703) 562-2362

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 3

C O N T E N T S

EXAMINATION BY:                                            PAGE

        Counsel for Plaintiff                             4


        Counsel for Defendant(s)                          94

BOOSINGER DEPOSITION EXHIBITS:

1 - Vacancy announcement                                  31

2 - Position description                                  44

3 - E-mail from Taylor to Boosinger                       69

4 - 8/2005 affidavit                                      77

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 4

1                        P R O C E E D I N G S

2    Whereupon,

3                        SUSAN BOOSINGER

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7              BY MR. SIMPSON:

8        Q    **Good morning, Ms. Boosinger.**

9              **Would you state and spell your full name,**

10   **please, for the record?**

11       A    My name is Susan Boosinger, S-u-s-a-n,

12   B-o-o-s-i-n-g-e-r.

13       Q    **Okay.  And if you could state your address for**

14   **the record.  Your residence.**

15       A    My residence.

16       Q    **Yes, ma'am.**

17       A    2102 Lang, L-a-n-g, Drive, Crofton,

18   C-r-o-f-t-o-n, Maryland  21114.

19       Q    **Is that in the triangle?**

20       A    Yes, it is.

21       Q    **In the "L" section?  We used to live in the**

22   **"H" section years ago.**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 5

1          Ms. Boosinger, have you ever given a

2    deposition before?

3        A    No.

4        Q    No.  This is your first one.

5             Well, let me just, if I may, cover a couple of

6    administrative matters.

7             I'm going to be asking you a series of

8    questions, and if you don't understand a question,

9    please ask me to repeat it or to rephrase it, because

10   if you answer a question that I ask, I'm going to

11   assume that the answer that you're giving to me is

12   based on your understanding of the question and that it

13   responds to the question that I have asked.  Do you

14   understand that?

15       A    Yes.

16       Q    If I ask a question that requires a simple yes

17   or no answer, I would ask that you state that yes or no

18   one-word answer, as opposed to nodding your head or

19   muttering some other response, because the court

20   reporter has to accurately reflect what your testimony

21   is.  Do you understand that?

22       A    Yes.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 6

1        Q    For the sake of the -- the court reporter, I

2    would also ask that you speak up as loud as you are

3    comfortably able to do so that, again, she can pick up

4    what your responses are.

5            If, at any time during this deposition, you

6    need to take a break, just let me know, and certainly

7    we'll take a break, but I would only ask that if I have

8    a question that I have asked previous to your wanting

9    to take a break, that we take care of getting an answer

10   to that question before we break.  Understand?

11       A    Yes.

12       Q    Now, the questions -- there will be questions

13   that I am going to likely ask you that, as I start

14   asking the question, you may think you know where the

15   question is going to end, and you may want to start

16   answering the question before I finish asking it.  I

17   would ask -- let me finish the question before you

18   start answering, because the court reporter cannot pick

19   up two conversations at the same time very well, and

20   likewise, when you start answering a question, I will

21   make my best effort to ensure that I don't ask another

22   question before you're finished with that question.  Do

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                            Page 7

1    you understand that?

2         A    Yes.

3         Q    Very well.  Do you have any questions of me

4    before we continue?

5         A    No.

6         Q    Ms. Boosinger, are you currently taking any

7    medications?

8         A    Yes.

9         Q    What medications are you taking?

10        A    Lisinopril.

11        Q    Can you spell that for the court reporter?

12   Lisinopril.

13        A    Zestril.  Z-e-s-t-r-i-l.  It's the same thing.

14        Q    And what is --

15        A    High blood pressure.

16        Q    High blood pressure.

17        A    Synthroid.

18        Q    Synthroid.

19        A    S-y-n-t-h-r-o-i-d.

20        Q    And that's for?

21        A    Thyroid.

22        Q    Okay.  Anything else?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 8

1     A    Yes.  I have to think.  Oh.  Calcium.

2     **Q    A vitamin?**

3     A    Uh-huh.

4     **Q    Okay.**

5     A    And vitamins.

6     **Q    Okay.  Any other medications?**

7     A    No.

8     **Q    Okay.  The taking of any of these medications,**

9    **to your knowledge -- will they affect your ability to**

10    **truthfully and honestly answer the questions that will**

11    **be asked today?**

12     A    No.

13     **Q    Thank you.  Ms. Boosinger, do you have a**

14    **college degree?**

15     A    Yes.

16     **Q    What is your degree in?**

17     A    English.

18     **Q    Is it a Bachelor of Arts?**

19     A    Yes.

20     **Q    And where did you receive this degree?**

21     A    University of Maryland.

22     **Q    When?**

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                            Page 9

1        A    1970.

2        Q    And up to the point -- while you were pursuing

3    this degree, did you pursue this degree as a full-time

4    student?

5        A    Yes.

6        Q    Okay.  So, you would have attended Maryland in

7    the traditional four-year --

8        A    Yes.

9        Q    -- period, roughly 1967 to '70?

10       A    Roughly.

11       Q    Do you have any other college degrees?

12       A    No.

13       Q    Do you have any credit work towards a higher

14   degree other than a Bachelor's?

15       A    No.

16       Q    And you graduated from high school in 1967?

17       A    Six.

18       Q    In 1966.  What high school?

19       A    Lareine.

20       Q    And that's located where?

21       A    In Suitland, Maryland.

22       Q    Okay.  Are you currently employed?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 10

1          A    Yes.

2          **Q    And where are you employed?**

3          A    The Federal Deposit Insurance Corporation.

4          **Q    Okay.  And what's your current position?**

5          A    I am a work life program manager, senior human

6     resource specialist.

7          **Q    Senior human resources specialist?**

8          A    Right.

9          **Q    And what's your grade?**

10         A    Fourteen.

11         **Q    When did you get your 14?**

12         A    May of 2005.

13         **Q    And in May of 2005, when you became a GS-14,**

14    **was that also when you became a work life program**

15    **manager?**

16         A    That's correct.

17         **Q    And you were selected for that position?**

18         A    Yes.

19         **Q    It was a competitive process.  You**

20    **applied -- you applied for that position?**

21         A    Yes.

22         **Q    You were interviewed?**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 11

1          A     Yes.

2          Q     And selected.  And who selected you?

3          A     Kathleen Tesi.

4          Q     And you were selected for that position in May

5     of 2005?

6          A     Roughly.

7          Q     At the same time that you became a GS-14.

8          A     Yes.

9          Q     Okay.  And Kathleen Tesi hired you.  Is that

10    who you worked -- was that your first-line supervisor

11    in that job?

12         A     Yes.

13         Q     Is she still your first-line supervisor?

14         A     Yes.

15         Q     Is Ms. Tesi -- what is her position?

16         A     She is -- I believe her title is benefits

17    operations manager.

18         Q     Do you know what her grade is?

19         A     CM-1, I believe.

20         Q     And the work life program falls under her as

21    the benefits operations manager?

22         A     Yes.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 12

1         Q    Okay.  And who is your second-line supervisor?

2         A    Greg Tally.

3         Q    And his position?

4         A    I'm sort of struggling here.  I just don't

5    know his exact title.  I would be guessing.

6         Q    Okay.  Do you know what his grade is?

7         A    CM-2, I believe.

8         Q    And has he been your second-line supervisor

9    since you were selected for the position in May of

10   2005?

11        A    Yes.

12        Q    Okay.  Now, the positions of human resource

13   specialist within FDIC -- some of those positions

14   contain a sub-specialty in their title, correct?

15        A    Yes.

16        Q    Do you have a sub-specialty in your title of

17   H.R. specialist?

18        A    I really don't know.

19        Q    All right.

20             Prior to becoming work life program

21   manager -- and by the way, that would be a CG-14,

22   correct?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 13

1        A    Yes.

2        **Q    Yes.  Okay.  Prior to assuming that position,**

3   **what was your prior position?**

4        A    Prior to that, I was a human resource

5   specialist, same division, office.

6        **Q    You were still in the benefits operations**

7   **section?**

8        A    I would have to think about that for a moment,

9   because there was quite a bit of organizational change,

10  and I'm not exactly sure what it was under at that

11  time.

12       **Q    Okay.  And you were -- obviously, prior to**

13  **being selected for a CG-14, you were a CG-13.**

14       A    Correct.

15       **Q    And do you recall if you had a specialty, a**

16  **parenthetical specialty for --**

17       A    I did.

18       **Q    And what was that?**

19       A    Employee development.

20       **Q    And who was your first-line supervisor in that**

21  **position?**

22       A    When I left that position, my first-line

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 14

1      supervisor was Nelly Bertram.

2          **Q     Nelly --**

3          A     -- Bertram, B-e-r-t-r-a-m.

4          **Q     And do you recall what her position title was?**

5          A     Assistant director, career management.

6          **Q     Do you recall her grade?**

7          A     CM-1.

8          **Q     Okay.  And do you recall who your second-line**

9      **supervisor in that position was?**

10         A     Miguel Torrado.

11         **Q     And do you recall when you became a human**

12     **resource specialist, employee development,**

13     **parenthetical, CG-13?**

14         A     Do I recall when?

15         **Q     Yes, ma'am.**

16         A     I was converted.

17         **Q     What were you --**

18         A     Sometime --

19         **Q     Continue.**

20         A     Sometime within two or three years of -- let's

21     see -- 2003, maybe.

22         **Q     So, approximately 2003 --**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 15

1        A      Approximately.

2        Q      -- you were converted to a human resources

3    specialist employee development at the CG-13 level.

4        A      Right.

5        Q      That conversion -- was that just a change in

6    your duty position?

7        A      Title change.

8        Q      Title change.

9               What was it changed from?

10       A      Management specialist.

11       Q      So, you were changed from a management

12   specialist to a human resource specialist,

13   parenthetical, employee development, correct?

14       A      Correct.

15       Q      But that did not change your grade, did it?

16       A      No.

17       Q      And did you fundamentally sit in the same

18   position --

19       A      Yes.

20       Q      -- despite the change in title?  It didn't

21   change your -- your work location.

22       A      That's correct.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                                Page 16

1          Q    Did not change your supervisory chain?

2          A    That's correct.

3          Q    Okay.  Do you recall when you first became a

4     management specialist?

5          A    Yes.

6          Q    When was that, please?

7          A    Maybe 1993 or 1994.

8          Q    Was that while you were in -- employed by the

9     Federal Deposit Insurance Corporation?

10         A    It was RTC/FDIC.

11         Q    FDIC or its predecessor organization, RTC,

12    correct?

13         A    Yes.

14         Q    Okay.  And I'm sorry, you became a

15    management -- I may have mis-spoken.  I said management

16    assistant, I think.

17         A    Specialist.

18         Q    Management specialist.  And do you recall when

19    you were promoted to the CG-13?

20         A    It was a step position, so it was a 12/13.

21         Q    Okay.  When were you hired as a management

22    specialist 12/13?  Do you recall that?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 17

1       A    It was a promotion.  It was roughly 1993 or

2    1994.

3       Q    Very good.  And you spent one year as a CG-12

4    and then became a CG-13?

5       A    Yes.

6       Q    It was a career ladder.

7       A    Yes.

8       Q    So, you didn't have to compete for the 13.

9       A    That's correct.

10       Q    Okay.  And do you recall who selected you in

11    approximately 1993-94 for the management specialist

12    12/13 position?

13       A    Charlie Barbera.

14       Q    And do you remember the spelling of Mr.

15    Barbera's last name?

16       A    I do not.

17            MR. JONES:  I'll help there.  B-a-r-b-e-r-a.

18            MR. SIMPSON:  One "a".

19            MR. JONES:  Two a's.  B-a-r-b-e-r-a.

20            MR. SIMPSON:  But not a double "r" at the end.

21            MR. JONES:  Right.

22            MR. SIMPSON:  Okay.  Thank you, Mr. Jones.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 18

1              BY MR. SIMPSON:

2        Q    Was Mr. Barbera also your first-line

3    supervisor after the selection?

4        A    No.

5        Q    Was he your second-line supervisor?

6        A    Yes.

7        Q    Who would have been your first-line

8    supervisor?

9        A    Grant Moy.

10       Q    Grant Moy?

11       A    M-o-y.

12       Q    M-o-y.  Okay.

13            When did you first start work with the FDIC or

14    its predecessor organization, RTC?

15       A    1991.

16       Q    And was that with the Resolution Trust

17    Corporation?

18       A    Yes.

19       Q    RTC.  And how much Federal service do you have

20    as of today?

21       A    Twenty years last month.

22       Q    Twenty years plus?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 19

1          A    Right.

2          Q    So, you had Federal service prior to being

3    hired in the RTC?

4          A    I did.

5          Q    Who did you work for?

6          A    DOJ.

7          Q    Do you remember the time-frame you worked for

8    DOJ?

9          A    Yes.

10         Q    And what was that time-frame?

11         A    I barely remember my birthday sometime.  I

12   mean I'm going to have to go back -- I want to say

13   1985, 1986.  No, that's not right.  How about the late

14   '80s?

15         Q    And how many years did you work for them?

16         A    Just under two.

17         Q    Okay.  All right.

18              Ms. Boosinger, do you know Lorinda Potucek?

19         A    I do.

20         Q    And how do you know Ms. Potucek?

21         A    I know her from -- as a colleague at the FDIC.

22         Q    Have you ever worked for Lorinda Potucek?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 20

1        A    Yes.

2        **Q    When did you work for her?**

3        A    For a two-month period, the end of 2004.

4        **Q    The end of 2004 being November-December,**

5   **October-November-December time-frame?**

6        A    Something like that.  Could even have been a

7   little bit earlier than that.  It was just a very short

8   time.

9        **Q    And what were the circumstances surrounding**

10  **the fact that you went to work for Lorinda Potucek for**

11  **approximately two months in 2004?**

12       A    Lorinda was acting.

13       **Q    Acting in what capacity?**

14       A    Assistant -- assistant director of career

15  management.

16       **Q    And that was prior to Nelly Bertram?**

17       A    Yes.

18       **Q    And do you recall -- was Lorinda**

19  **Potucek -- did she have more than one position in**

20  **addition to the acting assistant director for career**

21  **management?**

22       A    I don't know.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                         Page 21

1        Q    Do you know that, at any time, Ms. Potucek was

2    the Conanan consent decree compliance officer for FDIC?

3        A    I do.

4        Q    Could she also have been performing that duty

5    while she was the acting assistant director of career

6    management?

7        A    She could have been.

8        Q    But you don't know for sure.

9        A    I don't know.

10       Q    Okay.  So, other than working for Ms. Potucek

11   for an approximate two-month period and knowing her as

12   a colleague, have you had any other dealings with

13   Lorinda Potucek?

14       A    Yes.

15       Q    What?

16       A    We have had occasion to collaborate on

17   training issues.

18       Q    What would be the time period that you would

19   have collaborated with her on training issues?

20       A    September of 2007.

21       Q    For how long of a period?

22       A    Couple weeks.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 22

1       Q    Any other collaborations?

2       A    No.

3       Q    Okay.  So, other than knowing her as a

4    colleague, working for her temporarily for a two-month

5    period, and working with her in a collaborative effort

6    in training areas, any other dealings with Ms. Potucek?

7       A    No business dealings.

8       Q    Okay.  Do you know Dorothy Chappell-Johnson?

9       A    I do.

10      Q    And how do you know Ms. Chappell-Johnson?

11      A    We are in the same section.

12      Q    In benefits operations?

13      A    Yes.

14      Q    Okay.

15      A    Benefits at large.

16      Q    Okay.  You work near Ms. Chappell-Johnson?

17      A    I do.

18      Q    How close do you work in terms of distance,

19   your office to hers?

20      A    It takes me about 30 seconds to get to her

21   desk.

22      Q    And how long have you and Ms. Chappell-Johnson

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 23

1    been in the same general section?

2         A    Since I became work life program manager.

3         Q    In May of 2005.

4         A    Right.  Approximately.

5         Q    Have you had occasions to have personal

6    conversations with Ms. Chappell-Johnson?

7         A    Sure.

8         Q    And what did those conversations involve of a

9    personal nature?  What do they -- what do they --

10        A    Just casual conversations, asking about how

11   we're doing.

12        Q    Have you and Ms. Chappell-Johnson ever had a

13   conversation about her filing EEO complaints?

14        A    No.

15        Q    The topic has never come up in any of the

16   discussions you've had with Ms. Chappell-Johnson.

17        A    Never.

18        Q    Has the subject of Ms. Chappell-Johnson filing

19   EEO complaints while at the FDIC come up in any

20   conversations you've had with anyone else in FDIC?

21             MR. JONES:  Excluding us?

22             BY MR. SIMPSON:

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 24

1        Q    To the extent that you may have had

2    conversations with the legal division of FDIC, yes.

3        A    Can you reframe that?

4        Q    Yes, ma'am.

5             Have you had conversation or discussion with

6    anyone other than the legal division about Dorothy

7    Chappell-Johnson filing EEO complaints while she's been

8    at the FDIC?

9        A    No.

10       Q    None.

11       A    None.

12       Q    Are you aware that Dorothy Chappell-Johnson

13   has filed EEO complaints against the FDIC?

14       A    I have recently heard that.

15       Q    How recently?  When?

16       A    Since the inception of this case.

17       Q    Okay.  And what were the circumstances of you

18   learning about the fact that Dorothy Chappell-Johnson

19   had filed EEO complaints against the FDIC?  How did you

20   come to find out?

21       A    I understood that that was part of the

22   original complaint.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**                                    Page 25
**(No. 06-1074-RCL)**

1          Q      You came to understand that was part of --

2          A      -- the complaint.

3          Q      What complaint?

4          A      In this case.

5          Q      Okay.  And when did you find out -- when did

6     that become your understanding?

7          A      I don't remember.

8          Q      Would it have been in 2005?

9          A      No.

10         Q      2006?

11         A      No.  2007, I would -- I would imagine.

12         Q      Okay.  So, you were -- you were -- prior to

13    2007, you were not aware that Ms. Chappell-Johnson had

14    filed an EEO complaint.

15         A      No.

16         Q      Okay.  In your close proximity of your office

17    to Dorothy Chappell-Johnson's office since at least May

18    of 2005, have you had the opportunity observe her duty

19    performance?

20         A      I need to correct your understanding that I

21    have been within walking distance of Dorothy's office

22    since May of 2005.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                   Page 26

1        Q    Okay.

2        A    I moved to Virginia Square location October of

3    2005.

4        Q    Okay.

5        A    So, prior to that time, I was not in that same

6    building or space.

7        Q    So, since October of 2005.

8             Very good.  Thank you for that correction.

9             Have you had the occasion to observe Dorothy

10   Chappell-Johnson's duty performance?

11       A    I don't interact with Dorothy's duty

12   performance.

13       Q    Okay.  You've had no collaborative efforts

14   with you and Ms. Chappell-Johnson since October 2005?

15       A    No.

16       Q    Before that?

17       A    No.

18       Q    Did you know Dorothy Chappell-Johnson prior to

19   the May through October, at the earliest, the

20   May-October 2005 time-frame?  Did you know her before

21   that?

22       A    By sight.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 27

1         Q    By sight.   Okay.   Would those interactions be

2    casual, as well, any interactions you would have had

3    prior to that time?

4         A    Yes.

5         Q    Okay.   Okay.   Has anyone -- have you

6    ever -- have you had conversations with anyone about

7    Ms. Chappell-Johnson's performance of her duties?

8         A    No.

9         Q    Now, I had asked you earlier if you understood

10   that human resources specialists within the FDIC may

11   also have kind of sub-specialty indications in their

12   duty position, and you said yes, correct?

13        A    That's correct.

14        Q    And in fact, at some point back in about 2003,

15   you became a human resources specialist with a

16   parenthetical employee development specialty, if you

17   will, correct?

18        A    Correct.

19        Q    Okay.   Are you aware of the human resources

20   specialist information systems and compensation

21   position?

22        A    Yes.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 28

1          Q     How are you aware of that position?

2          A     I'm aware of it because I know it to be a part

3    of the H.R. organizational structure.

4          Q     Do you know specific employees within the FDIC

5    who are filling positions requiring a human resources

6    specialist information systems and compensation person?

7          A     Compensation?

8          Q     Yes, ma'am.

9          A     Repeat it, then, please.

10         Q     As a parenthetical, a human resource

11   specialist, parentheses, information systems and

12   compensation, close -- close parentheses --

13         A     Uh-huh.

14         Q     -- as a duty position -- are you aware that

15   those duty positions exist in the FDIC?

16         A     I'm aware that I have seen that on an org

17   chart.

18         Q     On an org chart.

19               Do you happen to know any FDIC employees that

20   are human resource specialists, parentheses,

21   information systems and compensation?

22         A     I -- I must.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 29

1          Q    Can you think of any at this point?

2          A    Not with certainty.

3          Q    Okay.  Just as you had converted from a

4    management specialist sometime in approximately 2003 to

5    become a human resource specialist, parentheses,

6    employee development, are you aware that other

7    positions within FDIC were converted to a human

8    resource specialist duty title with a specialty in the

9    parentheses?  Are you aware that that occurred to more

10   than just your position?

11         A    I am not.

12         Q    Okay.  Have you ever heard of a payroll

13   personnel systems specialist position?

14         A    Sounds familiar.

15         Q    You've never served as a payroll personnel

16   systems specialist, have you?

17         A    No.

18         Q    Do you happen to recall if you've ever worked

19   with a payroll/personnel systems specialist while

20   you've been at the FDIC in the human resources

21   division?

22         A    No, I have not.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 30

1          Q    And just so I understand your answer to an

2     earlier question, you have not had any discussions with

3     Lorinda Potucek about Dorothy Chappell-Johnson's duty

4     performance?

5          A    No.

6          Q    Shirley Pernell?

7          A    No.

8          Q    Jo Rita Campbell?

9          A    No.

10         Q    Roger Little?

11         A    No.

12         Q    Greg Tally?

13         A    No.

14         Q    Okay.  Have you had conversations with Lorinda

15     Potucek about Roger Little?

16         A    Only with respect to the interviews.

17         Q    Only with respect to the interviews.  Okay.

18     We'll get to that.

19              Conversations with Jo Rita Campbell about

20     Roger Little?

21         A    Same answer.

22         Q    Okay.  You wouldn't happened to have had a

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 31

1    conversation with Lorinda Potucek about Dorothy

2    Chappell-Johnson as it related to the interview

3    process, would you?

4        A    No.

5        Q    And no discussions about Dorothy

6    Chappell-Johnson with Jo Rita Campbell during the

7    interview process?

8        A    Only with respect to the interview.

9        Q    Okay.  Conversations with Shirley Pernell

10   about Roger Little?

11       A    No.

12       Q    None.

13       A    No.

14       Q    Any conversations with Greg Tally about Roger

15   Little?

16       A    No.

17       Q    Let's mark as Exhibit 1 --

18                        (Exhibit No. 1 was marked for

19                         identification.)

20            The court reporter has handed you a document

21   labeled Exhibit 1 to this deposition.  I'd ask you to

22   take a look at it and advise me whether you've seen

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 32

1    this document before or not.

2         A    I can't be sure.

3         Q    Okay.  You would agree that the document you

4    were just handed by the court reporter is a vacancy

5    announcement, number 2004-HQ-2637 at the top, correct?

6         A    I can see that, yes.

7         Q    And it's for a human resources specialist,

8    parenthetical, info systems and compensation,

9    CG-0201-07/09/11, correct?

10        A    Correct.

11        Q    And you don't recall whether you've seen this

12   before.

13        A    It doesn't stand out among the many that I've

14   seen.

15        Q    The many that you've seen.  What cause would

16   you have to see vacancy announcements within the FDIC?

17        A    Personally, I've applied for positions.  I've

18   seen vacancy announcements.  So -- I've taught a

19   structured interview course, so I saw vacancy

20   announcements as part of training.

21        Q    Okay.  So, other than personally viewing

22   vacancy announcements for potential positions that you

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 33

1    might want to apply for and the -- the role of vacancy

2    announcements in teaching the structured interview

3    classes, any other exposure to vacancy announcements?

4        A    Yes.  I've been asked to write up structured

5    interview questions.

6        Q    Based on vacancy announcements.

7        A    Correct.

8        Q    So, in addition to using a vacancy

9    announcement in teaching the structured interview

10   courses, you also will -- in writing questions for

11   interview panels, you would review vacancy

12   announcements, correct?

13       A    Correct.

14       Q    Any other reasons that you would review, other

15   than the ones we've just talked about, vacancy

16   announcements?

17       A    Conducting interviews.

18       Q    As part of a structured interview panel?

19       A    As part of a panel.

20       Q    Okay.  So, if you were serving on -- as a

21   member of a structured interview panel, you would have

22   reviewed the vacancy announcement for the position that

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 34

1    you were serving on the panel for, correct?

2        A    Right.

3        Q    Okay.  So, it would be fair to say that if you

4    served on a structured interview panel for this

5    position that's being advertised, you would have seen

6    this vacancy announcement, correct?

7        A    That's correct.

8        Q    Okay.  Now, are you familiar with the duties

9    of a human resource specialist, parenthetical, info

10   systems and compensation, close paren, position?

11       A    At this time, I am not familiar with the

12   duties.

13       Q    If you would turn to page two of Exhibit 1,

14   there is a section, "Summary of Duties," correct, on

15   page two?

16       A    Correct.

17       Q    And I'd ask that you take a look at the

18   summary of duties.

19       A    Okay.

20       Q    Having reviewed the summary of duties on page

21   two of Exhibit 1, other than the information that you

22   just read, would that encompass your knowledge of the

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 35

1    duties of an H.R. specialist info systems compensation

2    position?

3              You'd have no independent knowledge of the

4    duties other than as are listed here on page two?

5         A    I have nothing independent, no.

6         Q    Okay.  By the way, in your time with the FDIC,

7    have you had the occasion to work with the Corporate

8    Human Resource Information System, CHRIS, the automated

9    personnel payroll system for FDIC?  Have you had the

10   occasion to work with CHRIS?

11        A    Yes.

12        Q    And in your current position as the work life

13   program manager, do you have the occasion to use the

14   CHRIS system?

15        A    I use CHRIS like every FDIC employee uses

16   CHRIS, to record my time and attendance.

17        Q    Okay.  So, any other interface or use of CHRIS

18   that you would have other than time and attendance?

19        A    No.

20        Q    Would that include the entire time that you've

21   been at FDIC, that CHRIS has been in existence, that

22   you would have only used it for time and attendance

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 36

1    entry?

2        A    No.

3        Q    What other interfaces or uses of CHRIS would

4    you have had?

5        A    I believe I had access to CHRIS as a -- in an

6    acting position as a manager, so I could look at my

7    employees.

8        Q    Acting position as a manager in what position?

9        A    Assistant director of career management.

10       Q    And when did -- that was an acting position,

11   correct?

12       A    Correct.

13       Q    And when did you serve as the acting assistant

14   director, career management?

15       A    Roughly?  It was a 60-day position,

16   appointment, 90 days.  I think I served November,

17   December, and January.  That would be 2004 through

18   2005.

19       Q    And what would have been the circumstances

20   resulting in you serving as the acting assistant

21   director for career management?  Had the incumbent

22   retired or left?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 37

1        A    It was part of the reorganization where career

2    management and training split.

3            So, the office divided.  Part of us stayed

4    with training.  Part of us stayed with -- went with

5    human resources.

6            My superior, my direct report, went to the

7    training section.  So, her position was vacant.

8        Q    **And you filled -- and you served as the acting**

9    **assistant director until someone permanently could be**

10   **hired, correct?**

11       A    Yes.

12       Q    **Okay.  But you served -- you served actually**

13   **90 days or 60 days?**

14       A    I believe I served 90 days, but as a -- with

15   the title for 60 days.

16       Q    **Okay.  And did you actually perform managerial**

17   **functions in that time period?**

18       A    I did.

19       Q    **Did you rate employees?**

20       A    No.

21       Q    **What management functions did you perform as**

22   **the acting assistant director for career management?**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 38

1          A    I managed the work of the section, the

2     projects that were to be completed during the time.  I

3     continued my own position that I had prior to becoming

4     acting, and I took care of the time and attendance

5     function, approving leave and so forth.

6          **Q    Any other management functions other than**

7     **managing the overall workload, priorities, time and**

8     **attendance?**

9          A    No.

10         **Q    And you continued to serve as an H.R.**

11    **specialist, employee development, during that time**

12    **period?**

13         A    It was an acting position, so there was a

14    temporary -- I'm trying to think of the word -- change

15    in title and pay.

16         **Q    Okay.  Did you continue to perform your duties**

17    **as an H.R. specialist, employee development?**

18         A    Yes, I did.

19         **Q    And you also were temporarily promoted to what**

20    **grade?**

21         A    Fourteen.

22         **Q    Okay.  For a 90-day period?**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 39

1          A     For a 60-day period.

2          **Q     So, you were paid for 60 days, but you**

3     **actually served in the position for 90.**

4          A     That's correct.

5          **Q     And when was an actual assistant director for**

6     **career management hired?**

7          A     March, roughly, 2005.

8          **Q     Did one of your colleagues serve in the acting**

9     **position for the February-March time-frame before a new**

10    **person was hired for that position?**

11         A     No.

12         **Q     It just went vacant?**

13         A     Basically, I stayed there until -- in that

14    position until the new person came on-board.

15         **Q     So, you actually served between the period**

16    **November '04 through March of '05, correct?**

17         A     It's rough.  It was roughly 90 days.  It might

18    be the end of November through December, January, and

19    part of February.

20               I believe that the new person came on in

21    March.

22         **Q     All right.**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 40

1          A    Close as I can get.

2          Q    **In the period of time that you've worked for**

3     **the FDIC, have you had the necessity to interface with**

4     **the National Finance Center as part of your duties with**

5     **the FDIC?**

6          A    Not as part of my duties.

7          Q    **Certainly as part of being an employee, there**

8     **may be a need, but nothing related to your specific**

9     **duties.**

10         A    No.

11         Q    **Okay.  As you review the summary of duties for**

12    **the H.R. specialist position, information systems**

13    **compensation, at Exhibit 1, on page two, is there**

14    **anything in the summary of duties that indicates that**

15    **the person in this position would develop software?**

16         A    I have no idea.

17         Q    **Read it.**

18         A    I don't see anything related to software in

19    the summary.

20         Q    **Do see anything below that, under the quality**

21    **ranking factors, the desirable knowledge, skills, and**

22    **abilities that mentions software?**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 41

1        A    Before you said developing software.  Now

2    you're asking me if it mentions software?

3        **Q    Or developing software.**

4        A    It would be my interpretation that personnel

5    automated systems would mean that you are dealing with

6    software.

7        **Q    And that's in the KSA section?  Number two?**

8        A    Yes.

9        **Q    Ability to use personnel automated systems?**

10   **Is that what you're referencing, Ms. Boosinger?**

11       A    Yes.

12       **Q    You read that to mean that they're working**

13   **with software?**

14       A    I said I believe that that could be.

15       **Q    Could be.**

16       A    Uh-huh.

17       **Q    But you'd agree, Ms. Boosinger, that nothing**

18   **in the KSAs include the words "software" or "developing**

19   **software," correct?**

20       A    The word "software" does not appear in any of

21   these.

22       **Q    Either in the summary of duties or under the**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 42

1    KSAs, correct?

2        A    Correct.

3        Q    Okay.  Okay.  Now, you were not involved in

4    any way in the development of this vacancy announcement

5    at Exhibit 1, were you?

6        A    I was not.

7        Q    Okay.  Have you been involved in preparing any

8    other vacancy announcements while you've been at FDIC,

9    preparing the vacancy announcements?

10       A    I've contributed to information that might

11   have been made a part of a vacancy announcement.  I am

12   not a classification specialist.

13       Q    Okay.  And what would that involvement have

14   been, providing information that would be part of a

15   vacancy announcement?

16       A    If I wanted a position that didn't exist.

17       Q    If you -- you being Susan Boosinger.

18       A    Right.

19       Q    Okay.

20       A    So, I would provide information to personnel

21   to say this is what I'm -- what I -- the position I'd

22   like to have filled, and if that -- and then

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                        Page 43

1    they -- the personnel -- the personnelist would be

2    responsible for drafting the vacancy announcement.

3         **Q    And what you've just shared with me is a**

4    **hypothetical, if you, Susan Boosinger, as an employee,**

5    **had wanted to create a new position, correct?  Has that**

6    **ever happened?**

7         A    I'm going back to RTC days, when we were

8    hiring legal technicians, and I remember providing

9    information to the personnel office at that time,

10   asking them to create legal technician positions for

11   helping us with an automated system.

12        **Q    And that would have been roughly in the early**

13   **'90s, correct?**

14        A    Right.

15        **Q    Because RTC actually went away, was absorbed**

16   **into or merged into the FDIC in 1995?**

17        A    '95 or '96 was our sunset.

18        **Q    So, it would have been in the early half of**

19   **the '90s decade, correct?**

20        A    Yes.

21        **Q    Any since then?**

22        A    No.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 44

1          Q      Okay.

2                 MR. SIMPSON:  Mark that as number 2.

3                          (Exhibit No. 2 was marked for

4                          identification.)

5                 BY MR. SIMPSON:

6          Q      The court reporter has handed you what's been

7     marked as Exhibit 2.

8                 I'd ask you to take a look at it, please, if

9     you would, Ms. Boosinger.

10         A      (Examining.)

11         Q      Okay?

12         A      Uh-huh.

13         Q      It's a position description for a human

14    resources specialist, information systems compensation,

15    CG-7, correct?

16         A      That's correct.

17         Q      Okay.  Have you seen this position description

18    before?

19         A      I don't recall.

20         Q      Did you have any input in the development of

21    this position description that you're looking at?

22         A      No.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 45

1      Q    Have you had the occasion to be involved in

2  the development of a position description for any other

3  position within FDIC?

4      A    Likely.

5      Q    Do you recall any?

6      A    Not specifically.

7      Q    Would you have assisted in the development of

8  a P.D. for the legal advisors or technicians that you

9  were looking to hire back in the --

10     A    Likely.

11     Q    -- the early '90s?  And since then?

12     A    No.

13     Q    Okay.  All right.

14          Is it your understanding that the summary of

15  duties in a vacancy announcement are generally derived

16  from the duties in a position description?

17     A    One more time?

18     Q    Is it your understanding that the summary of

19  duties contained in a vacancy announcement is developed

20  from a position description or multiple position

21  descriptions for that same --

22     A    I think that's correct.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 46

1          Q    That's your understanding.

2          A    Yes.

3          Q    Okay.  But you don't recall for sure having

4     seen this particular document before.

5          A    I do not.

6          Q    Okay.  Now, Ms. Boosinger, other than -- other

7     than teaching a class for the structured interview

8     panel process or developing potential questions for a

9     particular structured interview panel, have you ever

10    served on a structured interview panel before?

11         A    Yes.

12         Q    How often?

13         A    Once.

14         Q    Only once in your FDIC career?

15         A    Only once have I served on a structured

16    interview panel.

17         Q    Okay.  And do you recall when the FDIC

18    implemented the structured interview panel process?

19         A    In 2003 and 2004.

20         Q    And do you know what that was based upon, why

21    the FDIC developed the structured interview panel

22    process?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                            Page 47

1        A    Yes.

2        Q    **Why?**

3        A    Because of the Conanan consent decree.

4        Q    **Okay.  So, prior to that, do you know whether**

5    **the FDIC had such a thing as a interview panel process?**

6        A    Prior to that, I don't know.

7        Q    **Prior to the implementation of the structured**

8    **interview panel process, did you serve on an interview**

9    **panel?**

10       A    Yes.

11       Q    **When?**

12       A    I can't give you specific dates.  I can give

13    you general --

14       Q    **I'm looking for your recollection, ma'am.**

15       A    I know that I served -- I served on a panel

16    for at least two employees in career management.  I

17    can't tell you when.

18       Q    **Would those have been human resource**

19    **specialist positions?**

20       A    I hesitate because I don't remember whether it

21    was before or after the reorganization.

22       Q    **Okay.  That would have been serving on an**

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 48

1    interview panel while you were a part of the career

2    development office, correct?

3        A    That's correct.

4        Q    Okay.  And that would have been up -- or prior

5    to May of 2005, correct?

6        A    Yes.

7        Q    Any other interview panel participation other

8    than those two?

9        A    I don't recall.

10       Q    Okay.  What about serving as an interviewer

11   for a vacant position, other than being on a panel?

12   Have you performed that duty?

13       A    How do you distinguish that?

14       Q    A one-on-one.

15       A    Just one-on-one?

16       Q    Yes, ma'am.

17       A    Yes.

18       Q    When?

19       A    Early 1997.

20       Q    And what would that have been for?

21       A    A position in career management.

22       Q    Would you have been the hiring official for

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 49

1    that position?

2       A    No.

3       Q    What were the circumstances under which you

4    served as an interviewer to fill a position in career

5    development in 1997?  What caused you to be the person

6    to interview?

7       A    I was directed to conduct the interviews by my

8    superior.

9       Q    Okay.  Multiple interviews?

10      A    Yes.

11      Q    Do you recall how many?

12      A    No.

13      Q    And who was your superior at that time?

14      A    Terry Zack.

15      Q    Terry Zack.

16           Did Terry Zack tell you why you were being

17   directed to conduct the interviews?

18      A    No.

19      Q    Did you ask?

20      A    No.

21      Q    Okay.  So, other than conducting one-on-one

22   interview with one or more candidates in 1997 in the

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                            Page 50

1    career development -- career development area, as

2    ordered by -- or as directed by Terry Zack, have you

3    served as -- in a capacity as an interviewer for any

4    other position?

5         A    To the best of my knowledge, no.

6         Q    Okay.  All right.  And only one time on the

7    structured interview panel since the implementation of

8    that process.

9         A    That's correct.

10        Q    Okay.

11        A    I just recently served on a panel.

12        Q    When?

13        A    Maybe summer 2007.

14        Q    Do you remember what the position was?

15        A    It was a benefits specialist position.

16        Q    Grade?

17        A    Twelve.

18        Q    And why were you asked to serve on that

19   structured interview panel?  Do you know?

20        A    I was asked by my supervisor to serve on the

21   panel.  I believe it was a second -- second round -- I

22   believe.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 51

1          Q    And your supervisor at that time was?

2          A    Kathleen Tesi.

3          Q    Kathleen Tesi.  Okay.  So, twice serving as a

4     member of a structured interview panel.

5          A    To the best of my knowledge.

6          Q    Okay.  Good.  Now, the other one, not

7     the -- the more current one, summary of 2007, but the

8     prior one --

9          A    Uh-huh.

10         Q    How did you come to serve on that panel?

11         A    I was asked to serve by Lorinda Potucek.

12         Q    And how did Ms. Potucek ask you?  Was it face

13    to face?

14         A    I don't recall.

15         Q    E-mail?

16         A    I don't recall.

17         Q    But she specifically approached you and asked

18    you through some media, either e-mail, face to face, or

19    by phone, to serve on a structured interview panel.

20         A    Yes.

21         Q    Okay.  Earlier, you had indicated that you've

22    been involved in teaching the structured interview

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 52

1    panel process classes at FDIC, correct?

2         A    Correct.

3         Q    How long have you been teaching the structured

4    interview panel process classes at FDIC?

5         A    I no longer teach them.

6         Q    What was the time-frame that you did do?

7         A    I really don't recall.  It was on or around

8    the Conanan consent decree time-frame.  So, there were

9    the time-frames that were built in there, when they

10   began the structured interview process.

11        That's when we developed -- when I began to

12   teach that training.  I probably taught it for about a

13   year-and-a-half.

14        Q    Okay.  And it would have been in the initial

15   stages of the structured interview process being put in

16   place and implemented by FDIC, correct?

17        A    Correct.

18        Q    Okay.  At the time that Lorinda Potucek

19   approached you to serve on a structured interview panel

20   for a position, did you receive any training at that

21   time to serve on that structured interview panel?

22        A    What kind of training?

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 53

1       Q    Any training?

2       A    I didn't receive any training.  I am the

3  trainer.

4       Q    Right.  And were you teaching the

5  course -- were you training the course at the time that

6  you served on this structured interview panel?

7       A    If I wasn't, I had just stopped teaching it.

8       Q    It would have been close in time.

9       A    It would have been close, yes.

10      Q    Perhaps even overlapping, possibly.  Okay.

11           Other than Lorinda Potucek asking you to serve

12  on the structured interview panel, did you have any

13  other conversations with Lorinda Potucek concerning

14  that structured interview panel?

15      A    No.

16      Q    Did you have any communications with her for

17  that structured interview panel other than that

18  initial --

19      A    I recall that she was going to have her

20  student intern deliver the interview questions to me.

21      Q    And why -- what do you base that recollection

22  on, Ms. Boosinger?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 54

1    A    Because that was the only contact that I

2    recall having with her.

3    **Q    And she told you she was going to have the**

4    **student intern --**

5    A    -- deliver the questions to me.

6    **Q    Do you remember the name of the student**

7    **intern?**

8    A    I want to say -- I'm not sure -- Suzanne

9    Taylor.

10   **Q    Okay.  So, other than Ms. Potucek asking you**

11   **to serve on the structured interview panel and**

12   **indicating to you that her student intern would get the**

13   **questions to you, you had no other conversations with**

14   **Ms. Potucek about the structured interview panel?**

15   A    That's correct.

16   **Q    Anything about the -- any conversations,**

17   **discussions, or contact about the position that was**

18   **being hired for?**

19   A    No.

20   **Q    Any discussion with Lorinda Potucek about any**

21   **applicants for that position?**

22   A    No.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 55

1       Q    And you did serve on a structured interview

2   panel for the selection of a -- to fill a position

3   working for Lorinda Potucek in the H.R. operations

4   section?

5       A    Yes, I did.

6       Q    And who else served on that panel?

7       A    Jo Rita Campbell.  She hasn't been with us for

8   a while.

9       Q    And I'm looking for your recollection,

10  so -- but the best of your recollection, it may have

11  been Jo Rita Campbell?

12      A    The best of my recollection.

13      Q    Okay.  Do you know who prepared the questions

14  for the structured interview panel?

15      A    I don't.

16      Q    All you know is they were provided to you at

17  some point, correct?

18      A    Yes.

19      Q    And the structured interview panel conducted

20  how many interviews?  Do you recall?

21      A    I don't.

22      Q    Do you recall interviewing Dorothy

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 56

1    Chappell-Johnson?

2        A    I do.

3        Q    Do you recall interviewing Roger Little?

4        A    I do.

5        Q    Do you recall interviewing anyone else?

6        A    Yes.

7        Q    Who?

8        A    There was a woman whose name is Paula, I

9    believe.  Might have been Foreman.  I believe Michelle

10   Petty.  Those are all I can recall.

11       Q    Okay.  During the course of interviews by you

12   and Ms. Campbell, if we can assume that it is Jo Rita

13   Campbell, based on your recollection, did you and Ms.

14   Campbell engage in any discussions or conversation

15   about each applicant or each interviewee before the

16   interview?

17       A    No.

18       Q    After the interview, for each one of the

19   interviewees?

20       A    We had a discussion after each interview.

21       Q    And how long were these discussions

22   for -- after each of the interviews?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 57

1          A    I guess they could have been up to 15 minutes

2     or as little as 5.

3          Q    Do you have a recollection of how long you and

4     Ms. Campbell discussed the interview of Dorothy

5     Chappell-Johnson after the interview?

6          A    I do not.

7          Q    Roger Little, after his interview?

8          A    I do not.

9          Q    Do you have a recollection that either of

10     those two would have been as much as 15 minutes in

11     length?

12          A    No.  I recall 15 minutes being the amount of

13     time between interviews.  That's why I gave you that

14     time-frame.

15          Q    Okay.  And you took notes during the

16     structured interview panel, correct?

17          A    I did.

18          Q    Were you provided a structured interview -- a

19     structured interview question form for each question to

20     be asked during the interview?

21          A    Yes.

22          Q    Did it include benchmarks at the bottom of the

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 58

1    **page?**

2        A    Yes.

3        **Q    And the benchmarks represented what?**

4        A    The candidate's response would be -- the

5    benchmark was to be -- we were supposed to measure the

6    candidate's response against a benchmark.

7        **Q    Okay.  Did you review the applications or the**

8    **application of each interviewee prior to the interview?**

9        A    We had an opportunity to look at them briefly,

10   prior to the interview.

11       **Q    Okay.  Did you review the application of an**

12   **interviewee prior to that interview?**

13       A    Could you say that in a different way, please?

14       **Q    Yes.  For each of the interviews that you**

15   **conducted, where you participated, for this panel, did**

16   **you review the application of an interviewee prior to**

17   **interviewing that individual?**

18       A    Briefly.

19       **Q    You did.  And if you could tell me what you**

20   **mean by "briefly" reviewing the application.**

21       A    We were handed the packages right before each

22   interview.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                            Page 59

1                 We had a chance to look at them very briefly,

2      in that same 15-minute period.

3           Q    Who handed them to you?

4           A    I think Jo Rita had them.  I'm not sure.

5           Q    I'm sorry.  You think who?

6           A    Jo Rita.

7           Q    So you did not get a copy of any of the

8      candidates' applications prior to that 15-minute window

9      before the interview was to be conducted.

10          A    That's correct.

11          Q    Do you happen to know whether Jo Rita Campbell

12     had the applications prior to the convening of the

13     structured interview panel?

14          A    I don't.

15          Q    Did you ask her?

16          A    I did not.

17          Q    She didn't tell you.

18          A    No.

19          Q    Did you all discuss it in any way, how long

20     she would have had the applications prior to the panel

21     being convened?

22          A    No.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 60

1       Q    Okay.  What else would you have to review in

2    that 15-minute period before an interview, other than

3    the application?

4       A    Well, we would also have been -- with the

5    exception of the first interview, we also would have

6    been assessing the prior interview.

7       Q    Okay.  So, in that 15-minute period of time,

8    you would have had some kind of discussion with Ms.

9    Campbell about the interview that was just completed.

10      A    Yes.

11      Q    And then, in that same time period before the

12   next interview was conducted, an opportunity to review

13   at least the application for that interviewee?

14      A    Yes.

15      Q    Any other documents to be reviewed prior to an

16   interview being conducted?

17      A    I don't recall.

18      Q    Okay.  By the way, either before, during, or

19   after this structured interview panel, do you recall

20   the terms or the phrase "expertise in software

21   applications" being discussed with you?

22      A    I do not.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 61

1          Q    Do you know what -- what does the phrase

2    "expertise in software applications" mean to you?

3          A    It doesn't mean anything in particular to me,

4    other than if I were to assess a person's ability to

5    manage certain kinds of software, I would think the

6    person would have a high degree of ability to use it,

7    defining a particular software package.

8          Q    A software package.  If you could help me,

9    what's your understanding of a software package?

10         A    Like Microsoft Office has software packages

11   that are associated with it.

12         Q    Such as.

13         A    Excel, Access, Microsoft Word.

14         Q    Microsoft Word is a software package?

15         A    Well, that's how I understand it.

16         Q    Okay.  No.  Very good.  That's what I'm

17   looking for.

18              Any other software packages that you could

19   think of?

20         A    No.

21         Q    As you sit here today, do you have a

22   recollection of any discussions between you and Jo Rita

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page  62

1    Campbell about any of the candidates that were

2    interviewed during that process?

3        A    Do I have specific recollection?

4        Q    Yes, ma'am.

5        A    No.

6        Q    You have no recall of discussions between you

7    and Jo Rita Campbell at the conclusion of Dorothy

8    Chappell-Johnson's interview.

9        A    I have no specific recollection.

10       Q    How about Roger Little after his interview?

11       A    Nothing specific.

12       Q    And you took notes during the interview panel.

13       A    Yes, we did.

14       Q    During that process, did you assign any kind

15   of score to a particular interviewee?

16       A    The form provides an area for you to rate the

17   candidate.

18       Q    To write the candidate --

19       A    To rate.

20       Q    To rate.  Numerically?

21       A    No.

22       Q    How?  Rate them how?  What are the categories?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                   Page 63

1      A    I believe outstanding, satisfactory, not

2   satisfactory, or unsatisfactory.

3      **Q    Do you recall that you provided such an**

4   **evaluative rating after the interviews that you**

5   **conducted as part of that panel?**

6      A    We did.

7      **Q    Did you observe Jo Rita Campbell's rating of**

8   **an interviewee after the interview had been conducted?**

9      A    I can't tell you that I observed it after.  I

10   might have -- we might have done something at the end

11   where we got to look at what the totals were and

12   compare notes.

13      **Q    The totals.**

14      A    The total number of satisfactory,

15   unsatisfactory.  We had one for each question.

16      **Q    You had a sheet of paper for each question**

17   **that would be filled out for each candidate that you**

18   **interviewed and an opportunity to rate at the bottom**

19   **above the benchmarks?**

20      A    Right.  Below the benchmarks.

21      **Q    Below the benchmarks.  And you and Jo Rita**

22   **Campbell compared notes as to -- the notes that were**

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 64

1    taken on the form, as well as the overall rating for

2    that interviewee?

3        A    At some point after the interview or after all

4    of the interviews, we did that.

5        Q    For each individual --

6        A    For each candidate.

7        Q    Do you recall whether you changed any of your

8    ratings as a result of that conversation with Jo Rita

9    Campbell?

10       A    I do not.

11       Q    Do you recall whether she changed any of her

12   ratings as a result of that -- those conversations?

13       A    I do not.

14       Q    By the way, what did you do with the

15   structured interview sheets after you and Ms. Campbell

16   were done with the panel?

17       A    The structured interview sheets were

18   combined -- I believe they were -- along with the

19   application packages -- were given to Lorinda Potucek.

20       Q    Did you deliver them to Lorinda Potucek?

21       A    I don't know if they were in my hands or in Jo

22   Rita's hands, but we both walked into Lorinda's office.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 65

1      Q    Okay.  So, when those notes were delivered to

2    Ms. Potucek, was there any discussion?

3      A    Yes.

4      Q    And what was that discussion?

5      A    Lorinda asked us how we rated the candidates.

6      Q    Did you discuss each individual candidate with

7    Ms. Potucek?

8      A    I believe we discussed the top two candidates.

9      Q    Do you recall who the top two candidates were?

10     A    I know Roger Little was one.  I believe Paula

11   Foreman, if I am recalling her name correctly, was the

12   second one.  I don't recall.

13     Q    And do you recall why Roger Little was one of

14   the top two candidates, what that was based on?

15     A    Specifically, I do not remember.

16     Q    What about Paula Foreman?

17     A    I don't remember specifically.

18     Q    Do you remember anything generally about

19   either one of them?

20     A    I do remember that both candidates gave full

21   and responsive answers, were able to articulate their

22   experience.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 66

1    Q    So, did you and Jo Rita Campbell actually make

2    a recommendation to Lorinda Potucek at that time?

3    A    We gave her the ratings.  Lorinda made the

4    choice.

5    Q    Did you give her a recommended selectee?

6    A    No.

7    Q    Did there come a time when you found out who

8    the final selectee was?

9    A    Yes.

10    Q    Who was the final selectee?

11    A    Roger Little.

12    Q    And how did -- how did you find out about that

13    selection?

14    A    I don't recall.

15    Q    Do you recall when?

16    A    Sometime shortly after.

17    Q    But you don't remember from whom you learned

18    that?

19    A    No.

20    Q    The circumstances of how you learned it.

21    A    I don't.

22    Q    So, other than delivering the panel results,

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 67

1    you and Jo Rita Campbell, and having a conversation

2    with Ms. Potucek at that time, did you have any other

3    conversation with Lorinda Potucek about that selection,

4    after that final hand-off --

5        A    No.

6        Q    But it's your recollection that either you or

7    Jo Rita Campbell gave the structured interview panel

8    packets back to Lorinda Potucek.

9        A    Yes.

10       Q    Do you know what's supposed to happen to notes

11   from a structured interview panel?

12       A    Yes.

13       Q    What's supposed to happen to them?

14       A    They are to be retained by the selecting

15   official.

16       Q    Okay.  Would it surprise you to know that

17   those notes, those structured interview panel notes

18   have not been found to this day?

19       A    Would it surprise me?

20       Q    Yes, ma'am.

21       A    It shouldn't happen.

22       Q    Would it surprise you?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 68

1        A    Yeah, I think it would.

2        Q    And that's something that you taught in the

3    training course that you did on the structured

4    interview panel process, correct, made it clear that

5    the selecting official is supposed to maintain copies

6    of the interview notes?

7        A    We discussed that during the training, yes.

8        Q    Also as part of the training -- strike that.

9             Do you know how structured interview questions

10    are supposed to be developed?

11        A    I used to.

12        Q    Okay.  What is your understanding, as you sit

13    here today, of what's supposed to be considered in

14    developing structured interview panel questions?

15        A    I believe it's a couple of different things.

16    I know that the vacancy announcement is one; the

17    position description is another.

18        Q    If you recall, aren't the structured interview

19    questions supposed to be geared towards the knowledge,

20    skills, and abilities?

21        A    Not necessarily.

22        Q    Okay.  Let's mark as number 3 --

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                       Page 69

1                              (Exhibit No. 3 was marked for

2                              identification.)

3           You don't happen to have a specific recall of

4    how long you reviewed Dorothy Chappell-Johnson's

5    application to her interview?

6       A    I do not.

7       Q    Or Roger Little's?

8       A    I do not.

9       Q    Or Paula Foreman?

10      A    I do not.

11      Q    Okay.  The court reporter has handed you

12   what's been marked as Exhibit 3.

13      A    Uh-huh.

14      Q    If you would, review that.

15      A    (Examining.)

16      Q    Have you had an opportunity to review that

17   document, Ms. Boosinger?  Do you recall seeing this

18   document before?

19      A    I do.

20      Q    This, in fact, is an e-mail from Suzanne

21   Taylor, and Suzanne Taylor was Ms. Potucek's student

22   intern?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 70

1          A    Yes, as I recall.

2          Q    And she's forwarding you by e-mail the

3    questions and the benchmarks for the structured

4    interview panel?

5          A    Yes.

6          Q    And her e-mail indicates at the top that she

7    provided you a hard copy of these questions, along with

8    the position description, correct?  That's what it

9    says.

10         A    Yes.

11         Q    Do you remember seeing a hard copy of the

12    interview questions?

13         A    I don't remember.

14         Q    It would have been prior to the interview

15    panel itself, correct?

16         A    I don't remember.

17         Q    Does this refresh your memory about whether

18    you reviewed the position description, which has been

19    marked as Exhibit 2?

20         A    No, it doesn't.

21         Q    Okay.  All right.

22              Now, I note that there is some handwriting,

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 71

1    handwritten remarks on this e-mail --

2        A    Uh-huh.

3        Q    -- at Exhibit 3.  Is that your handwriting?

4        A    It is.

5        Q    Do you recall when you did that?

6        A    Probably after I printed it out.

7        Q    Okay.  Soon after you printed it out?

8        A    Likely.

9        Q    And why did you make those annotations?

10       A    Because they relate to the structured

11   interview process.

12       Q    Do they relate to anything specific in terms

13   of the vacancy announcement?

14       A    No.  That was not -- that wasn't what I was

15   doing.  As a teacher of this course, we discussed

16   categories from which you could create and craft

17   questions and benchmarks, and -- and so, I looked

18   through these to see -- to look for a balance, and I

19   found it.

20       Q    Okay.  And the annotations from top to bottom,

21   the first one being decision-making --

22       A    Uh-huh.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 72

1        Q      -- the second being prioritizing --

2        A      Uh-huh.

3        Q      -- the third one, customer service, and on the

4    second page, organizational skills, correct?

5        A      Uh-huh.

6        Q      You didn't develop these questions.

7        A      I did not.

8        Q      Do you know who developed these questions?

9        A      I do not.

10       Q      Did you ever ask?

11       A      I did not.

12       Q      And no one told you.

13       A      No.

14       Q      And since you received these, no one's told

15   you who developed these.

16       A      I'm not certain.  I'm not certain -- it would

17   be guessing.

18       Q      What's your recollection of your determination

19   of who developed them?

20       A      I thought perhaps Lorinda developed them, but

21   I don't base that on anything other than an assumption,

22   because she was -- it was a position in her group.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 73

1          Q    Okay.  All right.

2               Now, in the structured interview panel

3     process, the questions that are indicated at Exhibit

4     3 -- the panel members are only supposed to ask the

5     questions that are here, correct?

6          A    That's correct.

7          Q    Not supposed to ask any additional questions

8     other than what is here, correct?

9          A    No.

10         Q    And during the panel, either you or Jo Rita

11    Campbell asked these specific questions of every

12    candidate, correct?

13         A    Yes, we did.

14         Q    Neither one of you strayed from the wording of

15    the questions, did you?

16         A    No.

17         Q    Do you recall whether any of the interviewees

18    asked questions of you and/or Ms. Campbell?

19         A    I don't.

20         Q    Is that something you would recall if they

21    did?

22         A    If it was something unusual or odd, I might

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 74

1    have recalled it, but I don't recall anything like

2    that.

3         **Q    The training that you conducted on the**

4    **structured interview panel process provided for the**

5    **ability of interviewee candidates to ask questions**

6    **during the panel, correct?**

7         A    They can ask questions, ask that you repeat

8    the question.  They can't ask you to reinterpret it,

9    for example.

10        **Q    But there's no prohibition from an interviewee**

11   **asking -- actually asking any question.  It doesn't**

12   **mean the panel has to answer it, correct?**

13        A    That's correct.

14        **Q    Okay.  But you have no recollection of any --**

15        A    No.

16        **Q    -- questions being asked by any of the**

17   **interviewee candidates.**

18        A    I do not.

19             (Pause.)

20        **Q    Okay.  If you look at the interview questions**

21   **at Exhibit 3, do any of them address oral or written**

22   **communication?**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 75

1        A    Would you repeat the first part of your

2    question?

3        Q    Yes.  Looking at Exhibit 3, the interview

4    questions themselves --

5        A    Uh-huh.

6        Q    -- do any of them address written or oral

7    communications?

8        A    No.

9        Q    Do any of the questions address software

10   applications or software in any way?

11       A    No.

12       Q    Do any of the questions address a particular

13   candidate's expertise in any particular area?

14       A    I don't see the word "expertise" used here.

15       Q    Okay.  All right.

16            By the way, Ms. Boosinger, did you do anything

17   to prepare for this deposition?

18       A    I made sure I read the interview questions.

19       Q    So, you reviewed what you're looking at as

20   Exhibit 3 -- you reviewed that prior to this deposition

21   today?

22       A    Today.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 76

1       Q    Yes, ma'am.

2       A    I'm sorry.  I thought you were talking about

3    the interview.  Oh, I'm sorry.

4       Q    This deposition.

5       A    This deposition.

6       Q    Yes, ma'am.

7       A    No, I did nothing to prepare.

8       Q    I'm sorry?

9       A    I did nothing to prepare.

10      Q    You didn't review any documents to prepare

11   prior to coming to this deposition today?

12      A    You mean have I ever seen these since that

13   interview?

14      Q    No, ma'am.

15      A    I reviewed nothing.

16      Q    You didn't look at your affidavit.

17      A    I looked at nothing.

18      Q    Other than perhaps speaking to either Mr.

19   Jones or Ms. Davison-Lewis -- did you have any

20   conversations with anyone prior to coming to this

21   deposition today?

22      A    No.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 77

1      Q    You didn't tell your boss where you were going

2    to be?

3      A    My boss is on travel, and my second-line

4    supervisor wasn't in when I got here.

5      Q    Okay.  In the last six months --

6      A    Excuse me.  I did send my boss an e-mail

7    yesterday telling her that she wouldn't be able to

8    reach me this morning.

9      Q    Okay.  Other than that e-mail, no other

10   contact with --

11     A    No.

12     Q    Okay.  Within the last six months, have you

13   had a conversation with Lorinda Potucek about Dorothy

14   Chappell-Johnson's EEO complaint or lawsuit?

15     A    No.

16     Q    Okay.  Let's mark as number 4 --

17                    (Exhibit No. 4 was marked for

18                     identification.)

19          The court reporter has handed you what's

20   marked as Exhibit 4, and it's entitled "Affidavit" at

21   the top, correct?

22     A    Yes.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                Page 78

1       Q    In fact, the first line says, "I, Susan E.

2    Boosinger" -- this is your affidavit, is it not?

3       A    Yes.

4       Q    Okay.  I'd ask that you take a look -- please

5    review that.

6       A    (Examining.)

7       Q    All right.  You've had an opportunity to

8    review that?

9       A    Correct.

10      Q    Actually, do we need to go off for a little

11   bit?

12      A    No, I'm good.

13      Q    Okay.  Okay.  Just let me know when you're

14   ready to resume, ma'am.

15      A    Okay.

16      Q    Now, what the court reporter handed you is

17   Exhibit 4.  It's five pages, the first three of which

18   represent your actual affidavit, correct?

19      A    Yes.

20      Q    If you look at page three, is that your

21   signature on page three?

22      A    It is.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 79

1          Q      The third page.

2          A      It is.  I just noticed that it said two pages,

3    and there's three pages.

4          Q      Well, the statement is two pages, correct?

5          A      Oh, I see.  Okay.

6          Q      And your signature is on the third page,

7    correct?

8          A      Yes.

9          Q      But in actuality, the statement proper is

10   three pages, is it not?  Yes.  And you did sign it on

11   August 2, 2005, correct?

12         A      Yes.

13         Q      And of course, above your signature on page

14   three, "I have read this statement, consisting of two

15   pages, and it is true, complete, and correct to the

16   best of my knowledge and belief," correct?

17         A      That's correct.

18         Q      And you would agree with me, Ms. Boosinger,

19   that your recollection of what occurred in this matter

20   of the selection of Roger Little and the non-selection

21   of Dorothy Chappell-Johnson for that position -- that

22   your recollection was -- was clearer and more accurate

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 80

1    on August 2, 2005, than it is today, November 16, 2007,

2    correct?

3         A    Yes, I believe that would be correct.

4         Q    Okay.  Now, looking at page two, the first

5    full paragraph, starting from the top, the paragraph

6    starts off, "As stated," correct?  "As

7    stated" -- that's the first full paragraph, because the

8    top of the page is a continuation from the prior page,

9    correct?

10        A    Uh-huh.  Yes.

11        Q    So, the first full paragraph, "As stated."

12   The third sentence in that paragraph -- "Roger Little

13   was determined to be the best qualified for the

14   position, and we based this determination on the

15   candidates' responses to the interview questions,"

16   correct?

17        A    Correct.

18        Q    I read that correctly?

19             Now, that's a true statement, correct?

20        A    That's a true statement.

21        Q    So, it was based on the responses by each

22   candidate to the questions posed by the structured

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 81

1    interview panel.

2         A    That's correct.

3         Q    And that's all that was considered in making

4    the recommendation and determining that Roger Little

5    was best qualified?

6         A    That's correct.

7         Q    That's what it says, correct?

8         A    Uh-huh.

9         Q    Yes.  And then the last paragraph, if you

10   would just take the opportunity to reread that, and

11   tell me if there is anything in that paragraph that you

12   would change today.

13        A    If I had an opportunity to add something to

14   that, I might add that -- that -- that Mr. Little's

15   oral communication skills enabled him to articulate his

16   responses.

17        Q    I would have read that to be already contained

18   therein, as I read that -- read that paragraph, the

19   full paragraph.

20        A    Okay.

21        Q    You'd agree that that statement is already in

22   there, correct?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 82

1          A    Okay.

2          Q    **Yes, ma'am.  You'd agree?**

3          A    Okay.

4          Q    **Okay.  Now, the fifth line in that paragraph**

5    **that starts with "assigned a score" --**

6          A    Uh-huh.

7          Q    **-- fifth line -- now, I had asked you**

8    **earlier -- and your testimony had been the score is**

9    **either outstanding or --**

10         A    Right.

11         Q    **-- good or not so good -- that's what you**

12   **meant there by "score" --**

13         A    Uh-huh.

14         Q    **-- as opposed to a numerical score?**

15         A    I mentioned that you took -- that we take the

16   questions and the responses to each of the questions

17   and you record how many fell into each category.

18         Q    **Right.**

19         A    So, there is math involved in determining how

20   many outstanding responses you have, how many -- how

21   many unsatisfactory responses you have, and how many

22   satisfactory responses you have.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 83

1    Q    So, there are really two kind of scoring

2    mechanisms that you and Ms. Campbell utilized, both

3    the -- the -- the word designations, such as

4    outstanding or not -- or unacceptable, not

5    satisfactory, and some numerical score that you

6    developed?

7    A    We didn't develop it; we simply counted the

8    number.

9    Q    And did you include that number, those

10   numbers, on the interview panel sheet?

11   A    We gave all that information to Lorinda.

12   Q    Did you include a numerical number on

13   individual panel sheets for each candidate?

14   A    The numerical number is evident, because

15   there's only one on each sheet.

16   Q    There's only one numerical --

17   A    There's only -- there's only one possible

18   answer, either excellent, or outstanding, rather,

19   satisfactory, or unsatisfactory, because I check a box.

20   That box is checked, and that's what I counted.

21   Q    Okay.  And so, for Roger Little's

22   interview -- structured interview panel sheets, would

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 84

1    there have been a number entered --

2          A    No.

3          Q    So, neither you nor Ms. Campbell, on those

4    sheets, affixed a numerical rating, correct?

5          A    It's correct.  There is no place on that form

6    to affix a numerical rating.

7          Q    You could write anything you want to on the

8    form, you'd agree, correct?

9          A    No.

10         Q    You couldn't?

11         A    No.

12         Q    You couldn't write a number down there, on the

13   last page?

14         A    I would not.  I would not.

15         Q    Not "would not."  You could, couldn't you?

16   Nothing to stop a panelist from writing any kind of

17   notes he or she wants, correct?

18         A    Well, we actually tell people not to do that.

19         Q    But that doesn't mean someone can't, correct?

20         A    I would not do it.

21         Q    Okay.  And therefore, you did not affix a

22   number, a numerical rating, for any of the candidates

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 85

1    involved in the selection process, correct?

2        A    That's correct.

3        Q    Okay.  So, score just means whether they were

4    outstanding, satisfactory, or unsatisfactory, correct?

5        A    It means whether they were the most

6    outstanding --

7        Q    The most outstanding based on what?

8        A    Based on the number of outstanding,

9    satisfactory, and unsatisfactory responses.

10        Q    But you didn't indicate how many outstanding

11    or how many satisfactory, how many unsatisfactory were

12    cumulative for any one candidate, did you?

13        A    Where?

14        Q    In any way.

15        A    I'm talking about here.  You're talking about

16    in the interview process.

17        Q    Well, at any time, because you used the

18    word -- in that line, that fifth line, what do you mean

19    by "cumulative score was reached"?

20        A    That means that we looked at Roger Little's

21    and Dorothy's and all the other candidates and

22    we -- and we looked at them -- a number of questions,

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 86

1    and then when we were done, we saw how many questions

2    each candidate had responded to and what that

3    particular response -- whether it was outstanding,

4    satisfactory, or unsatisfactory, and at the end, for

5    all the questions, we agreed on the cumulative score on

6    the number of outstanding, satisfactory, and

7    unsatisfactory questions.

8         Q    Okay.

9         A    And we did not put them on the form.

10        Q    You didn't write -- neither you nor Ms.

11   Campbell wrote those numbers.

12        A    I don't know what Ms. Campbell did.  I don't

13   recall.

14        Q    All right.

15             Continuing down in that paragraph, looks like

16   line eight, "But I do recollect that Mr. Little was

17   very articulate, thorough, and polished in his

18   responses."  I read that correctly?

19        A    Uh-huh.

20        Q    Okay.  "He had outstanding oral communication

21   skills."  Have I read that correctly?

22        A    You did.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 87

1      Q    But you make no mention of any other

2    observations or outcomes about Mr. Little versus the

3    complainant, other than those two sentences, correct,

4    in your statement?

5      A    That's correct.

6      Q    Okay.  All right.

7           MR. SIMPSON:  Why don't we go off for just a

8    minute or two?

9           (A discussion was held off the record.)

10          MR. SIMPSON:  We're back on.

11          THE WITNESS:  Before we begin, having read

12    through this affidavit, I recognize that obviously I

13    did have some conversations with Mr. Troster, or

14    whatever his last name is, because I -- he did mention

15    to me about Dorothy's -- but that's the only

16    recollection that I would have --

17          MR. SIMPSON:  Thank you.  Thank you.

18          BY MR. SIMPSON:

19      Q    During the conduct of the structured interview

20    panel process, when Ms. Chappell-Johnson was

21    interviewed, either you or Ms. Campbell would ask her

22    questions.  Do you recall her answers to the questions?

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 88

1        A    I don't recall her answers.

2        **Q    Do you recall, during the course of the**

3    **interview, whether Dorothy Chappell-Johnson stated that**

4    **she had performed all of the duties of this position in**

5    **prior positions that she had worked?**

6        A    I don't recall her answers at all.

7        **Q    Do you recall reviewing the applications for**

8    **Dorothy Chappell-Johnson and Roger Little?**

9        A    Briefly.

10       **Q    Do you recall if there's anything that sticks**

11   **out in your mind about either one or both of those**

12   **applications?**

13       A    One thing sticks out in my mind, and it's that

14   there was a lot of narrative, supporting narrative, as

15   I recall, in Mr. Little's application.

16       **Q    Supporting narrative for what, ma'am?**

17       A    For what his job experience had been.

18       **Q    And do you recall what format of application**

19   **Ms. Chappell-Johnson presented in her application?**

20       A    I just remember that Roger's was extensive,

21   and Dorothy's application did not have the same volume

22   of information in terms of descriptions of the job.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 89

1      Q    But your recollection is Roger Little's

2   application included extensive description of his

3   duties and performance in prior jobs?

4      A    He included a lot of information, as I recall.

5      Q    Do you have any recollection of anything

6   specific?

7      A    No.

8      Q    Do you recall whether you reviewed the

9   position description during the interview panel

10   process?

11      A    I don't recall having done so.  I can't

12   imagine that I didn't.

13      Q    And vacancy announcement?

14      A    I'm sorry.  Vacancy announcement -- I probably

15   reviewed prior to the -- maybe during the interview.

16      Q    Okay.

17      A    Again, that's not a specific recollection.

18      Q    And if you recall, at Exhibit 3, the e-mail

19   from Ms. Taylor indicated that she dropped off a hard

20   copy of the interview questions and the position

21   description, didn't she?

22      A    She said that in her e-mail.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 90

1      Q    Do you recall whether you saw more than one

2   position description --

3      A    No.

4      Q    -- for this process?

5      A    I don't recall.

6      Q    And you'd agree, looking at Exhibit 1 -- and

7   let's look at Exhibit 1, which is the vacancy

8   announcement -- the position is being advertised at the

9   7, 9, or 11 level, correct?

10     A    That's what it says.

11     Q    Do you recall at what grade level Mr. Little

12  was selected for the position?

13     A    I don't recall.  I believe -- I believe it was

14  to be an 11, but I'm not certain.

15     Q    When you and Jo Rita Campbell met with Lorinda

16  Potucek at the completion of the interview panel --

17     A    Uh-huh.

18     Q    -- did you make a -- you made a recommendation

19  of Mr. Little, correct?

20     A    We showed her the results of our interview,

21  and we said these are the -- these are the top

22  performers, Roger Little appears to be the top

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 91

1    performer.

2        Q    Okay.  And did you make -- did you -- did you

3    make a recommendation as to what grade for her to hire

4    him at?

5        A    Absolutely not.

6        Q    Do you recall whether Ms. Campbell did?

7        A    I don't recall her saying anything like that.

8        Q    Okay.  Now, looking at Exhibit 1, page two,

9    Exhibit 1 being the vacancy announcement, if you'd turn

10   to page two, summary of duties, the opening of that

11   says at the entry level, correct?

12       A    Right.

13       Q    And what -- what do you understand the entry

14   level to be based on this summary of duties for this

15   vacancy announcement?

16       A    Generally the lowest level in the -- in the --

17       Q    Which would be the CG-7, as reflected at -- on

18   the first page, correct?

19       A    Right.

20       Q    And you would agree that the next paragraph

21   down, below the summary of duties, qualifications

22   required, it says, for the CG-7, candidates must have

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 92

1    one year specialized experience at the lower grade,

2    CG-5, correct?

3        A    That's what it says.

4        Q    And that, for the CG-9, the candidates must

5    have one year at the CG-7 level, correct?

6        A    Right.

7        Q    So, if someone is hired for this position at

8    CG level, they have to perform at the CG-7 level for

9    one year before they can be promoted to 9, correct?

10       A    That's my understanding.

11       Q    And then another year must pass, successful

12   completion at CG-9 level in order to become a CG-11,

13   correct?

14       A    That's my understanding.

15       Q    And then if you continue to look at the

16   summary of duties above that, about two-thirds of the

17   way through that paragraph -- it's line 10 -- the end

18   of line 10 starts off "at the," the last two words at

19   line 10, "at the," "at the full performance level,"

20   continuing on line 11, correct, "at the full

21   performance level"?

22       A    Uh-huh.

EXHIBIT 3
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                      Page 93

1      Q    And that would be the CG-11, correct?

2      A    That's what I would interpret that to mean.

3      Q    Based on this being advertised as FPL

4   CG-7/9/11, correct?

5      A    Correct.

6      Q    Okay.  Your understanding of the -- of the

7   human resources personnel system within FDIC -- someone

8   hired at the CG-7 level, at the entry level, would have

9   to work two years before they could be required to be

10  held to the full performance level, 11, correct?

11     A    I don't know if there could be exceptions to

12  that.  It doesn't appear from this that there are, but

13  I don't know.

14     Q    But that's your understanding of the way the

15  system works, correct?  You have to work one year as a

16  7, one year as a 9, before you can become 11 and be

17  expected to perform at the full performance level of

18  CG-11, correct?

19     A    I believe that's true.

20     Q    Okay.

21          MR. SIMPSON:  I don't have anything else at

22  this time.

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 94

1              MR. JONES:  Okay.  I've just got a couple.

2              EXAMINATION BY COUNSEL FOR THE DEFENDANT

3              BY MR. JONES:

4       **Q    Ms. Boosinger, in the structured interview**

5    **process that the FDIC uses, can the panel members ask**

6    **follow-up questions?**

7       A    Yes, they can.

8       **Q    Do you recall whether, during the interviews**

9    **that we've been speaking about this morning, either you**

10   **or Ms. Campbell asked follow-up questions?**

11      A     They're referred to as clarifying questions,

12   where you can clarify something that the candidate has

13   told you, and I don't recall that we asked any

14   clarifying questions.

15      **Q    Okay.  And I wanted to be clear on your**

16   **testimony about the first time you learned that Ms.**

17   **Chappell-Johnson had a EEO complaint.  Your affidavit,**

18   **the first -- if you look at the first paragraph of the**

19   **affidavit, which is Exhibit No. 4, it says that you are**

20   **giving this statement, and then I'll start quoting,**

21   **"make the following statement freely and voluntarily to**

22   **Charles Lester Williams, who has identified himself to**

**EXHIBIT 3**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 95

1    me as a contract EEO investigator for the following

2    Federal agency, FDIC, investigating a complaint of

3    discrimination filed by Chappell-Johnson."  Did I read

4    that correctly?

5        A    Yes.

6        Q    Before you met with Mr. Williams, did you know

7    anything about Ms. Chappell-Johnson's EEO complaint?

8        A    No.

9        Q    And that was the first time you learned that

10   she had an EEO complaint.

11       A    That's correct.

12            MR. JONES:  That's all I've got.

13            MR. SIMPSON:  I have nothing further.

14            MR. JONES:  We will read and sign.

15            (Whereupon, at 12:18 p.m., the deposition was

16   concluded.)

17                           *   *   *   *   *

18            I have read the foregoing pages, which are a

19   correct transcript of the answers given by me to the

20   questions therein recorded.

21       Deponent_____

22            Date_____