**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

■4444444444444444444444447
                        5
DOROTHY CHAPPELL-JOHNSON, 5
                        5
        Plaintiff,      5
                        5
v.                      5 Civil Action No.
                        5 06-1074 (RCL)
                        5
SHEILA C. BAIR,         5
Chairman,               5
Federal Deposit         5
Insurance Corporation,  5
                        5
        Defendant.      5
                        5
■4444444444444444444444448

                    Arlington, VA

                    Friday, April 20, 2007

DEPOSITION OF:

        DOROTHY CHAPPELL-JOHNSON

called for examination by counsel for the
Defendant, pursuant to notice of deposition,
in Room E-7003, 3501 N. Fairfax Drive,
Arlington, VA 22226, when were present on
behalf of the respective parties:

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

2

APPEARANCES:

    On Behalf of the Defendant:

     WILLIAM S. JONES, ESQ.
     PATRICIA DAVISON-LEWIS, ESQ.
     Federal Deposit Insurance Corporation
     3501 Fairfax Drive, Room E-6006
     Arlington, VA 22226
     (703)562-2362
     (703)562-2482 fax

    On Behalf of the Complainant:

     JAMES E. SIMPSON, ESQ.
     Swick & Shapiro, P.C.
     1225 Eye Street, N.W.
     Suite 1290
     Washington, D.C. 20005
     (202)842-0300
     (202)842-1418 fax
     Jesimpson@swickandshapiro.com

Reporter: Nathan Morton

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

3

I-N-D-E-X

WITNESS                    DIRECT CROSS REDIRECT

Dorothy
Chappell-Johnson         4      138       144


EXHIBIT
NO.        DESCRIPTION                      MARKED

1     Comp Form for FDIC Vacancy            47
      Announcement 2004-HQ-2637
      for Human Resources Specialist

2     Complaints for Employment            57
      Discrimination and Retaliation
      filed June 12, 2006

3     Plaintiff's Initial Disclosures      63

4     Plaintiff's Answers to Defendant's   67
      First Set of Interrogations

5     Affidavit of Dorothy Chappell-       82
      Johnson, August 5, 2005

6     Affidavit of Dorothy Chappell-       88
      Johnson, August 11, 2005

7     FDIC Vacancy Announcement           107
      2004-HQ-2637 for Human
      Resources Specialist

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

4

1          P-R-O-C-E-E-D-I-N-G-S

2                                              10:02 a.m.

3     WHEREUPON,

4                    DOROTHY CHAPPELL-JOHNSON

5     WAS CALLED FOR EXAMINATION BY COUNSEL FOR

6     FEDERAL DEPOSIT INSURANCE CORPORATION AND,

7     HAVING FIRST BEEN DULY SWORN, HAS EXAMINED

8     AND TESTIFIED AS FOLLOWS:

9     DIRECT EXAMINATION

10                   BY MR. JONES:

11          Q    All right.  Ms. Chappell-Johnson,

12    as I indicated, my name is Bill Jones, and I

13    represent the FDIC in this case.  This is my

14    colleague, Pat Davison-Lewis, who's also an

15    attorney on the case.  And this is the case

16    concerning the position that you applied

17    for, for which Roger Little was selected.

18                   Now, have you ever had your

19    deposition taken before, before a court

20    reporter like this?

21          A    Not that I'm aware of.

22          Q    Okay.  Well, let me just talk

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

5

1    about the process a little bit.  Mr. Morton

2    has got a name tag that doesn't match his

3    name, will be taking down the questions and

4    your answers.  So your answers really need

5    to be verbal so that he can write them down;

6    he can't take down no shakes of the head or

7    nods or anything like that.

8             If any of my questions are

9    unclear or you don't understand them, you

10   know, please interrupt me and let me know

11   that.  You know, I'll try to do better and

12   make them clear.  And if later during the

13   deposition you think of something to add to

14   a previous answer to a question, or, you

15   know, you realize that there was something

16   wrong with the answer, or additional

17   information would be appropriate, please

18   feel free to interrupt at that point and,

19   you know, clarify your answer, add to your

20   answer, anything like that.  Is that okay?

21        A    Okay.

22        Q    All right.  And if you need a

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

6

1    break, just let us know, and, you know,

2    we'll take a break whenever you need it.

3          A    Okay.

4          Q    Are you taking any kind of

5    medications this morning at all?

6          A    No, I didn't take them.

7          Q    Okay.  Do you normally take some

8    sort of medication?

9          A    Yes.

10         Q    And what is that?

11         A    High blood pressure medication.

12         Q    High blood pressure; okay.  So

13   you're not taking anything today that would

14   interfere with your ability to answer

15   questions?

16         A    No.

17         Q    Okay.  And the fact that you're

18   not taking your high blood pressure

19   medicine, that's not going to interfere with

20   you answering questions either; is it?

21         A    No.

22         Q    Okay, good.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

7

1          What I'd like to do is -- because

2     we've never spoken before -- is get an idea

3     of your educational background to begin

4     with.  So if you could tell me, you know,

5     where you live, where you went to school, I

6     guess starting in high school.

7          A     In high school, I'm from

8     Smithfield, North Carolina.  I attended

9     Johnston Central High School in Smithfield,

10    North Carolina.

11         Q     Okay.  And when did you graduate

12    from there?

13         A     1964.

14         Q     Okay.  And did you go to college

15    after that?

16         A     Yes.

17         Q     Okay.  Where did you go?

18         A     North Carolina Central

19    University.

20         Q     And where is that located?

21         A     Durham, North Carolina.

22         Q     Okay.  Did you get a degree from

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

8

1    there?

2         A    No, I did not.

3         Q    Okay.  And what years did you

4    attend that institution?

5         A    1964 through 1968.

6         Q    Okay.  Any other institutions of

7    higher learning after that?

8         A    Johnson Central Tech.

9         Q    Okay.

10        A    That's a two-year school I

11   attended at the time -- one year.  At the

12   time it was a one-year school, but it has

13   become a two-year school.

14        Q    Okay.  And what did you study

15   there?

16        A    Business.  Business

17   administration.

18        Q    And when you were at North

19   Carolina Central State, what were your

20   fields of study?

21        A    Sociology and psychology.

22        Q    Okay.  And from the Technical

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

9

1    Institute, did you get any kind of degree or

2    certificate?

3          A    Certificate.

4          Q    Okay.  And was it a certificate

5    in business?

6          A    General business administration.

7          Q    All right.  And what year was

8    that; do you recall?

9          A    I can't recall that at this time;

10    no, sir.

11          Q    Okay.  It's hard to recall dates,

12    but let me ask you this:  After you had gone

13    to North Carolina Central State, did you

14    immediately go to the Johnson Institute?  Or

15    did you take some time?

16          A    No.

17          Q    What did you do in between the

18    two?

19          A    I worked and everything.

20          Q    Okay.  And what did you do?

21          A    I worked as a Medicare clerk, and

22    I did substitute teaching.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

10

```
1              Q     Okay.  And the Medicare, was that

2       a state government job?

3              A     No, private.

4              Q     Private; okay.  Now, and were you

5       working while you were going to the Johnson

6       Technical Institute as well?

7              A     No.

8              Q     Okay.  What did you do after you

9       got your certificate from -- in business --

10      general business from Johnson?

11             A     That's when I proceeded to work

12      as a Medicare clerk.

13             Q     Okay.  All right.  And how long

14      did you do that for?

15             A     Four and a half years.

16             Q     All right.  Why did you leave

17      that job?  Or where did you go to after that

18      job?

19             A     I came to Washington, D.C.

20             Q     All right.  And you got a job

21      here?

22             A     Yes.
```

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

11

1          Q          And what was that?

2          A          Accounting technician.

3          Q          With an agency?

4          A          Private industry.

5          Q          Private industry; okay.  Can you

6    give me an idea of how long you worked, and

7    what was that corporation?

8          A          East of the River Health

9    Association.

10         Q          I'm sorry, can you say that

11   again?

12         A          East of the River Health

13   Association.

14         Q          East of the River Health

15   Association; okay.

16         A          The first job was with -- may

17   have been -- well, East of the River Health

18   Association.

19         Q          Okay.  When you first came to

20   town here in Washington?

21         A          I believe so.

22         Q          Okay.  And how long did you do

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

12

1    that for?

2         A    I'm not certain of the years at

3    this time.  I'd have to --

4         Q    All right.  What did you do after

5    you worked for them?

6         A    I worked with another doctor -- I

7    came into the Government.

8         Q    Okay.  An agency here in

9    Washington?

10        A    Yes.  And I need to back up.

11        Q    Okay.

12        A    My first job was with Doctor's

13   Hospital.

14        Q    Okay.  When you first came to

15   town before you worked for the East of the

16   River Health Association?

17        A    Yes.

18        Q    And how long was -- what did you

19   do there?

20        A    As best I can recall, it was a

21   computer technician.

22        Q    Okay.  So now we're up to the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

13

1    East of the River Health Association.  And

2    how long did you work for that Health

3    Association organization?

4          A    I'm not certain, but around three

5    or four years.

6          Q    All right.  What was your next

7    job after that?

8          A    Then I came to the Government.

9          Q    Okay.  And what --

10         A    For the Government.

11         Q    Okay.  And I think we'd gotten to

12   asking what agency was that, that you --

13         A    The General Accounting Office.

14         Q    Okay.  Or the GAO?

15         A    GAO.

16         Q    Okay.  And what did you do for

17   them when you first started?

18         A    I started out in payroll as a

19   payroll technician.

20         Q    All right.  Do you remember your

21   grade level at that point?

22         A    I'm not certain.  I would have to

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

14

```
1     check back.  I'm not certain; I believe a

2     three or four.

3          Q    Okay.  And as far as a time frame

4     goes, are we -- would that have been late

5     `70s, early `80s; somewhere around then?

6          A    That's correct; late `70s.

7          Q    Okay.  So you're working for the

8     GAO as a payroll --

9          A    `80s.

10         Q    In the `80s; okay.  And how long

11    did you stay at the GAO?

12         A    Ten years.

13         Q    Ten years; okay.  And did you get

14    promotions while you were at the GAO?

15         A    Yes.

16         Q    Okay.  So you started off as a

17    payroll clerk, grade three or four, to the

18    best of your recollection.  And what was

19    your next promotion after that?

20         A    Five.

21         Q    Still a payroll clerk?

22         A    Still payroll at payroll
```

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

15

1    technician.

2         Q    Okay.

3         A    I moved from payroll clerk to

4    payroll technician.

5         Q    Okay.  And do you remember how

6    many years you stayed as a clerk before you

7    got the promotion to a technician job?

8         A    Not exactly.

9         Q    And what job did you have next

10   after being a payroll technician?

11        A    Payroll team leader.

12        Q    Team leader; okay.  Does that

13   mean you supervised people?

14        A    Yes.

15        Q    Okay.  And how many people did

16   you supervise at that point?

17        A    The time had lapsed; it's

18   uncertain at this time.

19        Q    Okay.  And what was your grade

20   level as a team leader?

21        A    It's grade six.

22        Q    Six; okay.  So you're steadily

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

16

1    progressing.  Did you have another promotion

2    while you were at the GAO after that?

3         A    Yes.

4         Q    Okay.  And what was that?

5         A    Grade seven.

6         Q    Seven.  Same team leader

7    position?  Not a change in title?

8         A    Same team leader position.

9         Q    Okay.  Are we getting towards the

10    end of the `80s at this point; mid `80s?

11         A    Yes.

12         Q    Okay.  So you're a grade seven

13    team leader at this point, and did you get

14    another promotion at the GAO after that?

15         A    Well, I left -- no.

16         Q    Okay.  And where did you go after

17    you -- and so you left the GAO, you were a

18    grade seven team leader; where did you go

19    then?

20         A    To the FDIC.

21         Q    To the FDIC; okay.  And what year

22    was that, that you first started with FDIC?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

17

1          A      1990.

2          Q      1990; okay.  And just to be

3    clear, it was the -- you have always been in

4    the FDIC, not the RTC?

5          A      Yes.

6          Q      Okay.  Always the FDIC?

7          A      Yes.

8          Q      And when you came to the FDIC,

9    what was your first position at the FDIC?

10         A      Payroll supervisor.

11         Q      Okay.  And was that a -- and what

12   grade level was that?

13         A      That was a seven.

14         Q      A seven; okay.  And so that's in

15   1990.  And you got promoted after that?

16         A      Yes.

17         Q      What did you get promoted to?

18         A      Nine.

19         Q      A nine.  Same title?

20         A      Yes.

21         Q      Payroll supervisor?

22         A      Yes.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

18

1          Q     Do you remember how long you had

2     been here until you got promoted from the

3     seven to the nine?  Here, I mean the FDIC?

4          A     I don't recall the exact year.

5          Q     Okay.  So you're a grade nine

6     supervisor -- payroll supervisor -- payroll

7     supervisor at this point?

8          A     Yes.

9          Q     And did you get promoted further?

10          A     Yes.

11          Q     And what did you get promoted to?

12          A     Grade 11.

13          Q     And 11; okay.  And same title?

14          A     I think was -- same title,

15     titling chief of payroll.

16          Q     Okay.  And how many people did

17     you supervise at that point?

18          A     I'm not certain of the number.

19     It was quite a few, but I'm not certain of

20     the number.

21          Q     Okay.  Do you remember some of

22     the names of the people who you did

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
19

1    supervise at that point when you were -- and

2    you were an 11 at this point?

3          A     Yes.

4          Q     Okay.  Do you remember names of

5    some of the individuals who you did

6    supervise at that point?

7          A     Yes.

8          Q     Who do you remember?

9          A     Roger Little.

10         Q     What was his position at the

11   time?

12         A     Just payroll technician, I

13   believe.

14         Q     Okay.  Would that have been like

15   a grade seven?

16         A     Lower -- it could have been --

17   I'm not saying that.

18         Q     It could have been lower; okay.

19   Who else?

20         A     Anita Banks.

21         Q     Okay.

22         A     Nellie Winder.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

20

1          Q      Who is that?

2          A      Nellie Winder.

3          Q      Okay.

4          A      Clotlie Adams, Rennie Knight, and

5     several others.

6          Q      Okay.  Now, of the people who you

7     supervised then, we know that Roger Little

8     is still with the FDIC; any of the other

9     ones still with the FDIC?

10         A      Some; Cindy Ballenger.

11         Q      Cindy Ballenger; okay.  Anyone

12    else?

13         A      Not that I can recall at this

14    time.

15         Q      Okay.  Now, when you got your

16    promotion to the grade 11, was that at the

17    time when they had temporary -- was that a

18    temporary promotion?

19         A      Yes.

20         Q      Okay.  How about the -- and the

21    previous supervisory position was a nine;

22    was that a temporary as well?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

21

1          A      No.

2          Q      That was permanent?

3          A      Yes.

4          Q      Okay.  And eventually the RTC

5     merged back into the FDIC at the end of

6     1995, at the beginning of 1996.  And a lot

7     of people lost their temporary promotions at

8     that point.  Did that happen to you?

9          A      Yes.

10         Q      Okay.  So does that mean you went

11    back to a grade nine?  You went back to your

12    highest permanent promotion?

13         A      Yes.

14         Q      So you were a nine at that point?

15    Were you still a supervisor starting in

16    1996?

17         A      Some; yes.  Between; yes.

18         Q      Okay.  But eventually you were

19    not a supervisor anymore?

20         A      Yes.

21         Q      And when did that happen?

22         A      Between 1996 and `97.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

22

1          Q      Okay.  During that transition

2     year?

3          A      Yes.

4          Q      Okay.  Before I get too ahead of

5     myself, when you were the grade 11 chief

6     personnel specialist supervisor -- it may

7     not be the exact title, but who was your

8     immediate supervisor?

9          A      Mary Anderson.

10         Q      Okay.

11         A      And Natalie Tyce.

12         Q      Was Natalie Tyce her supervisor?

13    Was she your second --

14         A      Natalie Tyce, first line; Mary

15    Anderson, second line.

16         Q      Okay; Natalie Tyce.  Is she still

17    here?

18         A      Yes.

19         Q      Okay.  So she's still here as

20    well.  And then after you lost your

21    temporary grade 11 supervisor position, who

22    was your supervisor at that point?  Did it

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

23

1    change?

2          A    Yes.

3          Q    And who was it?

4          A    Dave Harrington.

5          Q    Dave Harrington.  Is he still

6    here too?

7          A    No.

8          Q    No, he's not here.  Okay.  So

9    you're a nine, Dave Harrington is your

10    supervisor, and what were your job

11    responsibilities at that point?

12          A    Can I back up?

13          Q    Yes, certainly.

14          A    Mary Anderson was my supervisor

15    as we moved -- as we first went to a new

16    unit.  Mary Anderson was my supervisor for

17    quite a while.

18          Q    Okay.  And eventually Dave

19    Harrington became your supervisor.  Is that

20    because you changed sections, or did he

21    substitute for Mary Anderson?  How did that

22    come about that you got a new supervisor?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

24

1          A      They had an announcement and Dave

2     Harrington was selected.

3          Q      Okay.  And what kind of job

4     responsibilities were you doing when you

5     worked for Mr. Harrington?

6          A      Compensation pay and

7     compensation.

8          Q      Still in the personnel area?

9          A      Yes.

10          Q      Okay.  How long did you work for

11     Mr. Harrington about?  Or exactly, if you

12     can remember that.

13          A      I'm not certain of the exact

14     years; four.

15          Q      About four years?

16          A      Approximately four.

17          Q      Okay.  And what was your next

18     position?  I'm watching you think.

19          A      Okay.

20          Q      So four years is the best of your

21     recollection at this point?

22          A      At this point.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

25

1            Q      Okay.  And eventually you didn't

2      work for Mr. Harrington anymore?

3            A      That's correct.

4            Q      And who did you work for after

5      Mr. Harrington?

6            A      Shirley Purnell.

7            Q      Okay.  So you worked for Shirley

8      Purnell.  And this is when you were a grade

9      nine?

10           A      Yes.

11           Q      Okay.  Now, at some point, I

12     believe you were reduced in grade to a grade

13     eight?

14           A      That's correct.

15           Q      Okay.  And how did that come

16     about?

17           A      As the RIF, I was surplus

18     employee on the RIF list.

19           Q      Okay.

20           A      And I took a voluntary downgrade,

21     and I changed my mind and retracted it.  And

22     there was an eighth position left -- I took

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

26

1   a down -- voluntary downgrade to the eight.

2   I retracted that and went on the RIF list as

3   surplus and picked up a grade eight that was

4   available.

5           Q    So during the RIF process, you

6   ended up in a grade eight?

7           A    Yes.

8           Q    And it was the same pay?  So you

9   didn't have a reduction in pay?

10          A    No.  At that time, no.  No.

11          Q    You did not lose pay?

12          A    No.

13          Q    Okay.  And who did you work for

14  as a grade eight?  Was it still Ms. Purnell?

15          A    For a short while.

16          Q    Pardon me?

17          A    For a short period of time; yes.

18          Q    Okay.  And after that short

19  period of time?

20          A    We had so many bosses.  Let's

21  see, it was Ed Chimlowski.

22          Q    We'll have to help Mr. Morton

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

27

1    with that spelling later.

2             Did Mr. Chimlowski report to

3    Shirley Purnell, or was he -- or not?

4        A    He reported to Miguel Torrado.

5        Q    Miguel Torrado; okay.  And what

6    were your job responsibilities when you were

7    in the grade eight position?

8        A    They are reflected on my resume.

9    I can't recall all of them.

10       Q    Okay.  Do you remember what the

11   title was for that grade eight?

12       A    Benefit's assistant.

13       Q    Benefit's assistant; okay.  And

14   eventually -- now you're a grade nine?

15       A    Yes.

16       Q    And how did that come about that

17   you went from a grade eight to a grade nine?

18       A    I was put back as a grade nine.

19   I don't recall exactly how it happened.

20       Q    Okay.  Was it a competitive

21   promotion that you had to apply for?

22       A    No.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

28

1          Q     Okay.  How about going back to

2     the early `90s when you first come to the

3     FDIC when you got promoted to a -- I think

4     you said you came in as a seven?

5          A     That's correct.

6          Q     Okay.

7          A     Yes.

8          Q     And then you got promoted to a

9     nine.  Was that a competitive promotion?

10    Was that something you had to apply for, or

11    was it a career ladder?

12         A     It was neither.

13         Q     Neither?  Okay.  What was it?

14         A     I can't really recall that far

15    back, exactly what it was.  It was

16    advertised within the unit, but I don't

17    recall exactly how it was done.

18         Q     Okay.  But you weren't in a

19    seven, nine position where --

20         A     No.

21         Q     -- you know, you were

22    automatically up to a nine?  How about when

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

29

1   you were promoted to an 11?  Was that a

2   competitive position that you had to apply

3   for and be selected for?

4           A     No.

5           Q     Was that a career -- was it a

6   nine, 11 career ladder when you were in the

7   nine position?

8           A     Not to my knowledge at this time.

9           Q     Okay.  All right.  Well, now,

10  what do you remember about how the 11 came

11  about?  Was it the same sort of situation as

12  the nine?

13          A     No.  The 11 was as a result of a

14  desk audit.

15          Q     A desk audit; okay.  And was that

16  something you requested?

17          A     No.

18          Q     Do you know who requested the

19  desk audit?

20          A     I believe my supervisor, Mary

21  Anderson.

22          Q     Okay.  And now, what was Natalie

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

30

1    Tyce's relationship here?  Was she Mary

2    Anderson's supervisor?  Or was she a

3    subsequent supervisor of you?

4         A    She became my supervisor as a

5    result of a job announcement for a

6    supervisor position.

7         Q    Oh, that she applied -- that

8    Natalie Tyce applied for?

9         A    Yes.

10        Q    Okay.

11        A    And when that job was announced,

12   she applied and received the position and

13   worked under Mary Anderson and became my

14   supervisor.

15        Q    Okay.  And I'm not sure whether

16   we're up to the present now.  Who do you

17   work for now?

18        A    Greg Talley.

19        Q    Greg Talley.  And what

20   organization is that, that you work for Mr.

21   Talley?

22        A    DOA.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

31

1        Q        Yes.

2        A        Human Resources Benefit Center.

3        Q        The Benefit Center?

4        A        Yes.

5        Q        Okay.  And how many people are in

6    your unit that are supervised by Mr. Talley?

7        A        Repeat that question.

8        Q        How many people are in your unit

9    that are supervised by Mr. Greg Talley?

10        A        Two.

11        Q        Two?  Who is the other person?

12        A        Kathleen Tesi and Kathleen

13    Stewart.

14        Q        Okay.  So there's three of you

15    who report to Greg Talley?

16        A        And a summer intern.

17        Q        And a summer intern; okay.  Have

18    you ever worked for --

19        A        Excuse me.  There's a new unit

20    that's been added on.

21        Q        Okay.

22        A        Career Center.  And they report.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

32

1          Q      They report to Mr. Talley as

2    well?

3          A      Yes.

4          Q      Okay.  Now, have you ever worked

5    for Lorinda Potucek?

6          A      No.

7          Q      Okay.  Have you ever worked with

8    Lorinda Potucek on any projects or anything

9    like that?

10         A      No.

11         Q      Okay.  How about Susan Boosinger?

12   Did you ever work for her?

13         A      No.

14         Q      Or with her on any projects?

15         A      She's in my unit now, but

16   previously, no.

17         Q      She's in benefits?

18         A      Now; yes.

19         Q      So she reports to Mr. Talley as

20   well?

21         A      Kathy Tesi.

22         Q      She reports to Kathy Tesi; okay.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

33

1    And Kathy Tesi reports to Mr. Talley?

2         A    Greg Talley.

3         Q    Okay.  And you report to Kathy

4    Tesi too; is that right?

5         A    No.  I report to Greg Talley.

6         Q    Directly to Greg Talley; okay.

7    What's your position, now, that you occupy?

8         A    I am a human resource specialist,

9    assistant to the assistant director.

10        Q    Okay.  So you're like his special

11   assistant?

12        A    Yes.

13        Q    Okay.  And what kind of job

14   duties do you have in that -- in your

15   current position?

16        A    They are reflected in my last

17   resume.  They vary, the job positions, and

18   the functions vary; receiving incoming

19   visitors, working with some retirements,

20   various things.

21        Q    Okay.  And how long have you been

22   Mr. Talley's special assistant?  Or

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

34

1    assistant, I guess, is more accurate.

2          A     I would say January 2007.

3          Q     Oh, just --

4          A     Recently.

5          Q     Just at the beginning of the

6    year?

7          A     Yes.

8          Q     Okay.  And was that something

9    that you had to apply for and compete for?

10          A     No.  That was as a result of RIF.

11          Q     Okay.  It was a result of a RIF.

12    And could you explain that?  Did the person

13    who occupied that position lose their job or

14    something like that?

15          MR. SIMPSON:  Actually, I'm going

16    to object to the manner because we haven't

17    established that she knew whether there was

18    a job like that that existed before she took

19    it.  We haven't established that that has a

20    foundation.  So lack of foundation on that

21    question, but you can still answer, if you

22    know.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

35

1          BY MR. JONES:

2          Q     Well, let me ask this question:

3     How did you go from your previous job into

4     this job of special assistant for Mr.

5     Talley?

6          A     As a result of a RIF.

7          Q     Can you repeat that?

8          A     As a result of a RIF.

9          Q     Was it because your position was

10    designated as a surplus?

11         A     Yes.

12         Q     Okay.  So you either bumped or

13    retreated back into this position?

14         A     No.

15         Q     Well, how did you find out you

16    were going to be in this new position?

17         A     I was informed that this would be

18    my new position.

19         Q     Okay.  And the previous position

20    before January, what was that?

21         A     Human resource specialist.

22         Q     Okay.  And have I got this right

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

36

1    that when you were the human resource

2    specialist, you still reported directly to

3    Mr. Talley?

4            A    Kathleen Tesi.

5            Q    Kathleen Tesi; okay.  And was her

6    boss Mr. Talley?

7            A    Talley; yes.

8            Q    Okay.  Now, did you ever work

9    with Jo Rita Campbell?

10           A    No.

11           Q    And you did tell us that you did

12   work for Shirley Purnell at some point?

13           A    Yes.

14           Q    Can you tell me about how long

15   you worked for Ms. Purnell?

16           A    Very short period; I'm not

17   certain.  A couple of months.

18           Q    Excuse me.  Just a couple of

19   months; okay.  Now, I'm focusing in on

20   Lorinda Potucek, Susan Boosinger, and Jo

21   Rita Campbell.  Do you have any EEO

22   complaints against -- well, let me back up

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

37

1    for a minute.  You do have some other EEO

2    complaints that are pending at this point,

3    correct?

4         A    Yes.

5         Q    Okay.  Do any of them involve

6    either Ms. Potucek -- Lorinda Potucek, Susan

7    Boosinger, or Jo Rita Campbell?

8         A    No.

9         Q    Okay.  But you do have one that

10   involves Shirley Purnell?

11        A    Yes.

12        Q    Okay.  And that's another

13   non-selection case?

14        A    Yes.

15        Q    Okay.  Was she the selecting

16   official in that particular one?

17        A    Yes.

18        Q    Okay.  I'm really not familiar

19   with it.  If you just tell me who was the

20   selectee in that case, just so I have an

21   idea.

22        A    Patty Quattrone.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

38

1          Q      Pat Quattrone; okay.  Okay.

2    Let's focus in on the job position in this

3    case where Roger Little eventually got

4    selected.  So in September of 2004, you

5    applied for the human resources specialist

6    position in this case, correct?

7          A      Correct.

8          Q      Okay.  And you submitted your

9    application, right?

10         A      Yes.

11         Q      And what happened next after you

12   submitted your application with respect to

13   this position?

14         A      There was a waiting period, and

15   eventually you are notified that you --

16   eventually I was notified that I was not

17   selected.

18         Q      Okay.  Was there anything in

19   between?  Were there interviews?  There were

20   interviews in between though, correct?

21         A      Yes.

22         Q      And how were you notified about

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

39

1    those?

2         A    I'm not certain.  By e-mail or

3    phone call.

4         Q    Okay.  So you were notified that

5    you had qualified for the roster?

6         A    Yes.

7         Q    And you went down for an

8    interview?

9         A    Yes.

10         Q    Right.  And do you remember who

11    the interviewers were?

12         A    Yes.

13         Q    Okay.  And who were they?

14         A    Jo Rita Campbell, Susan

15    Boosinger, and there was one -- it seems

16    like there was three.  I don't recall the

17    other person.

18         Q    Okay.  And when you went down to

19    your interview, what happened in your

20    interview?  You walked in and saw Mrs.

21    Boosinger and Jo Rita Campbell, and, you

22    know, what do you remember that happened

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

40

1    next?

2         A    They interviewed me, asked

3    questions.

4         Q    Okay.

5         A    I responded.

6         Q    Okay.  Did they take notes?

7         A    I assume they did.  I don't know.

8         Q    Okay.  Do you remember about how

9    long the interview took?

10        A    About 45 minutes.

11        Q    Okay.  Do you think you did well

12   on the interview?

13        A    Yes.

14        Q    Okay.  And you said that

15   eventually you found out that you weren't

16   selected, correct?

17        A    Yes.

18        Q    Okay.  How did you find out?

19        A    By e-mail.

20        Q    And who sent the e-mail to you?

21        A    It was from the human resources

22   division of operations.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

41

1          Q      Okay.  And do you remember when

2     you found out that you weren't selected?

3     About how long after the interview?

4          A      Approximately two and a half to

5     three months.

6          Q      Two and a half to three months?

7          A      Approximately.

8          Q      Okay.  I wanted to ask you about

9     that envelope there.  Does that envelope

10    have anything in it related to this case?

11         A      The envelope has nothing in it.

12         Q      Okay.

13         A      This is my fan for my hot

14    flashes.

15         Q      Okay.

16         A      Okay.

17         Q      Would you describe for me how

18    FDIC employees get paid from the time that

19    we put our time in the CHRIS T and A system?

20         A      Our payroll is paid through the

21    National Finance Center, NFC.  And from the

22    time you put your T and A into the system,

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

42

1  it goes to the National Finance Center, and

2  they generate our checks.

3      Q    Okay.  Any intervening steps?

4      A    Only if there's errors.

5      Q    Only if there's errors; okay.  Do

6  you mean errors made by the people putting

7  in -- the individual employees putting in

8  their time?

9      A    Yes.

10      Q    And -- okay.  So the NFC actually

11  generates our direct deposits?

12      A    Yes.

13      Q    Okay.  Other than employees

14  putting in, you know, wrong time entries,

15  are there other things that can go wrong

16  with the payment process?

17      A    Can you explain what you are

18  referring to?

19      Q    Well, I actually don't know what

20  I'm referring to.  I'm wondering whether

21  other things can go wrong, you know, that

22  you're aware of as a -- because you're the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

43

1    timekeeper for -- are you the timekeeper for

2    your unit now?

3         A    Presently; yes.

4         Q    Okay.  Can things go wrong with

5    the NFC process itself?

6         A    Rarely.  But it can, but rarely.

7         Q    Okay.

8         A    I haven't experienced any since

9    I've been timekeeper.

10        Q    Okay.  At one time I had an over

11   payment.  Could you tell me what the process

12   is for dealing with overpayments?

13        A    You had an overpayment?

14        Q    I did.

15        A    Well --

16        Q    So I know those could happen.

17        A    It depends on your timekeeper and

18   what happened with your -- what was put in

19   the system.  It really depends --

20        Q    Okay.

21        A    -- on what was put in the system

22   to generate that overpayment.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

44

1        Q    Well, the case I know about, it

2    was a change in pay for performance, and

3    they miscalculated.  So in those kind of

4    cases, you know, what does the personnel

5    department do about that?  Or let me just

6    ask, are you familiar with what the

7    personnel department would do about that?

8            MR. SIMPSON:  I'm going to object

9    to the question for lack of foundation, only

10    because it sounds like that's not a function

11    that a timekeeper would do, but that the

12    personnel individual -- an individual in

13    personnel would input.  And we haven't

14    established her knowledge of the difference

15    between what she would do as a timekeeper

16    with the system and the function of some

17    other personnel individual putting in pay

18    for performance data.

19            MR. JONES:  Right.

20            BY MR. JONES:

21        Q    Let me preface that question by

22    asking, when you were the chief of the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

45

1    payroll section, were these the kind of

2    issues that you dealt with?

3         A    Somewhat; yes.

4         Q    Okay.  And that was back in 1992

5    to `96?  Would that be the right time frame?

6         A    `90.  1990.

7         Q    1990 through `96?

8         A    Yes.

9         Q    Okay.  And that's when Mr. Roger

10   Little worked for you.  Did he work for you

11   that entire six-year period?

12        A    Yes.  No.  No.  No.

13        Q    No?

14        A    No.  No.

15        Q    When did he first start working

16   for you?

17        A    After the payroll personnel unit

18   merged together.

19        Q    Okay.  Do you remember when that

20   was?

21        A    Not specifically.

22        Q    Okay.  But he didn't work for you

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

46

1    after 1996?

2          A     That's correct.

3          Q     Did you still work with him after

4    1996?

5          A     No.

6          Q     So you were in different sections

7    at that point?

8          A     Yes.

9          Q     Okay.  Did you ever work with him

10   subsequent to the time he was your -- that

11   you supervised him before 1996?

12         A     Did I -- repeat --

13         Q     I understand your answer to be

14   that, you know, you didn't work with him

15   right after, you know, you were not a

16   supervisor.  But at any time after that, did

17   you work with Mr. Little?  From then until

18   the present?

19         A     No.

20         Q     Okay.  I'm going to have you look

21   at some documents.

22               MR. JONES:  We can mark this as

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

47

1    Exhibit 1.

2                          (Whereupon, the above-

3                          referred to document was

4                          marked as Exhibit 1 for

5                          identification.)

6                THE WITNESS:  I have a question.

7    When you said worked with Roger Little, what

8    are you referring to?

9                BY MR. JONES:

10        Q    Let's wait until he's able to get

11   it on the record.

12                Yes, I had asked you, did you

13   ever -- well, let me be more specific.  Did

14   you ever work in the same section as Roger

15   Little?

16        A    No.

17        Q    Did you ever work on any projects

18   with Roger Little after -- from 1996 onward?

19        A    Let's see; yes.

20        Q    Okay.  And what projects did you

21   work on with him?

22        A    Maximum overtime.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

48

1          Q      Excuse me?

2          A      Overtime.

3          Q      Okay.  Did you say maximum

4    overtime?

5          A      Yes.

6          Q      Okay.  Can you tell us what that

7    project was?

8          A      Computed overtime for employees.

9    Computed overtime for FDIC employees.

10         Q      Okay.  Isn't that something

11   that's done automatically by the automated

12   system?

13         A      How do you mean?

14         Q      Well, I thought when you put your

15   time into the CHRIS/NFC system, doesn't it

16   compute your overtime pay?

17         A      Yes.

18         Q      So what was this -- so this was a

19   project that was different from that?

20         A      Somewhat; yes.

21         Q      Okay.  What actually were you

22   doing?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

49

1        A      Computing overtime for the

2    agency, setting up the overtime rates for

3    the agency.

4        Q      Okay.  And these were overtime

5    rates that -- when you say, "setting them

6    up," what do you mean by that?

7        A      Computing out what an overtime

8    rate would be for different grade levels.

9        Q      Okay.  And is that like time and

10   a half for hours over 40 hours a week?

11       A      Somewhat.  Things of that nature;

12   yes.

13       Q      Okay.  And on this project did

14   you and Roger Little do the same --

15   basically do the same thing?

16       A      It's hard for me to recall.  It

17   may be -- the duties that I performed would

18   be on my resume.

19       Q      Okay.  Was this a special project

20   that people were assigned to from different

21   sections?

22       A      No.  I can't recall really.  I

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

50

1     can't recall all that.

2          Q     Okay.  Do you remember about when

3     you worked with Mr. Little on this project?

4          A     Approximately `98.  Something in

5     that nature; or `99.

6          Q     Okay.  If you would look at what

7     has been marked as Exhibit 1, do you

8     recognize this document?

9          A     Yes.

10          Q     Is this the vacancy announcement

11     that you applied for?

12          A     Yes.

13          Q     Okay.  I'm looking at the second

14     page under the summary of duties, and I'm

15     looking at the second sentence that says,

16     "Assist others regarding system processing

17     problems with the National Finance Center."

18     I'm stopping right there.  Is that something

19     that you had done in the past?

20          A     Yes.

21          Q     Could you tell me one of the

22     examples of, you know, when you had dealt

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

51

1    with system processing problems with NFC?

2        A    Yes.  Any time an employee had a

3    problem of not getting paid correctly, not

4    -- something not going through, anything not

5    going through the system, if they suspected

6    maybe not getting their promotion on time

7    within grades on time; anything of that

8    nature.

9        Q    Okay.  And would this have been

10   something that you did when you were the

11   chief of the payroll section?

12       A    Yes.

13       Q    Okay.  How about the second one,

14   "Entry processing inquiry and correction

15   system EPIC"?  Had you previously dealt with

16   -- have you ever dealt with system

17   processing problems with this EPIC system?

18       A    Yes.

19       Q    Okay.  And what's an example of

20   that?

21       A    Any errors that generated on the

22   error report, and any errors that's

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
52

1    generated on the report has to be corrected.

2    And that report, it goes, and it goes

3    through EPIC.  And it's an error report that

4    comes out.

5         Q    Okay.  Is that an FDIC system, or

6    is that a --

7         A    That's an NFC product of National

8    Finance System.

9         Q    Okay.  Now, the Corporate Human

10   Resource Information System, CHRIS, that's

11   relatively recent, correct?

12        A    That's correct.

13        Q    But you deal with that in your

14   time-keeping function; is that right?

15        A    That is correct.

16        Q    Okay.  Now, I'm skipping the next

17   two sentences, and I'm going down to the

18   part about, "Reconciles payroll/personnel

19   suspense report and provides advice,

20   guidance, and assistance to administrative

21   personnel in the resolution of complex

22   payroll/personnel processing problems, and

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

53

1    oversees manual salary related payments."

2              Could you tell me what kind of

3    payments they're talking about when they

4    talk about, "manual salary related"?  Is

5    this something that you -- let me back up

6    for a minute.  Is this something that you

7    also had experience with?

8         A    Yes.

9         Q    Okay.  And what are these,

10   "manual salary related payments" that

11   they're talking about here?

12        A    Okay.  That's reflected in my

13   resume, but it includes people that may not

14   have gotten paid on time, people may not

15   have gotten paid at all, and things of that

16   nature.  Then it becomes manual pay because

17   it didn't go through the system.

18        Q    Okay.  Would an example of that

19   be if you didn't do your time sheet on time?

20   You know, like you were on vacation or

21   something like that?

22        A    Yes, or -- yes.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

54

1          Q      Okay.  And any other thing that

2     you can think of that would cause a problem

3     where you'd have to have a manual salary

4     related payment?

5          A      If your check went to the wrong

6     bank, or something of that nature.  Or if

7     you didn't get it because it went to the

8     wrong bank or something.  Anything of that

9     nature.

10         Q      Okay.  And again, these are

11    things that you would have dealt with when

12    you were the chief of the payroll section?

13         A      That's correct; yes.

14         Q      Okay.  Now, I'm looking down at

15    the quality ranking factors section, and No.

16    2, "Ability to use personnel automated

17    system to process complex personnel

18    actions."  It talks about retroactive

19    personnel actions.  Is that something that

20    you did?

21         A      Yes.

22         Q      So were --

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

55

1          A     And something that I would

2      oversee to being done.

3          Q     Okay.  So if someone, for

4      example, was raised up to a different grade

5      level that was retroactive, would you be

6      able to calculate what the back pay was that

7      that person would be entitled to?

8          A     Yes.

9          Q     Okay.  It's something that you

10     would be able to do yourself as opposed to

11     just oversee?

12         A     Yes.

13         Q     Okay.  Now, how about

14     garnishments?  How did you process

15     garnishments?  Or how does the FDIC process

16     garnishments?

17         A     Through the system and manually.

18         Q     Okay.  What's a garnishment?

19         A     Anything that's ordered through

20     the court.

21         Q     Okay.

22         A     If you don't pay Internal

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

56

1   Revenue, it can become a garnishment.

2          Q     Right.  And you also dealt with

3   child support and alimony payments?

4          A     Yes.

5          Q     And again, that's where they're

6   taking it right out of your check?

7          A     Exactly.

8          Q     And sending it to somebody?

9          A     By the courts.

10         Q     Okay.  That's pursuant to a court

11  order as well.  Do we have a lot of these at

12  the FDIC?

13               MR. SIMPSON:  I'm going to object

14  to the extent that --

15               MR. JONES:  Yeah.  A lot is a

16  relative term.

17               BY MR. JONES:

18         Q     Let me preface this by asking,

19  again, these are things that you dealt with

20  back when you were the supervisor in `96?

21         A     Yes.

22         Q     Until `96?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

57

1          A      Until `96.

2          Q      Can you give me an idea of the

3     volume of alimony payment cases there were

4     back then?

5          A      Not specifically.  It was heavy,

6     but not specifically.

7          Q      When you say --

8          A      Heavy.

9          Q      It was heavy; okay.  How about

10    child support, the volume of child support?

11         A      A large volume.

12         Q      A large volume; okay.  And

13    garnishments?

14         A      Same.  There's all types of

15    garnishments.

16         Q      Okay.  And how about retroactive

17    personnel actions?

18         A      Quite a few.

19         Q      Quite a few; okay.

20                MR. JONES:  I'm going to ask the

21    court reporter to mark this as Exhibit 2.

22                          (Whereupon, the above-

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

58

1                              referred to document was

2                              marked as Exhibit 2 for

3                              identification.)

4              BY MR. JONES:

5          Q     And this is the complaint in your

6     lawsuit that we're talking about today.

7     Have you seen this before?

8          A     Yes.

9          Q     Okay.  Let me just make sure, in

10    paragraph 1 it talks about -- at the very

11    bottom, it talks about, "To remedy acts of

12    discrimination and promotion practices by

13    the FDIC based on your race, black."  Now,

14    that's not something that you're pursuing in

15    this case, correct?

16         A     Yes.

17         Q     Because Mr. Little had -- you're

18    not pursuing that in this case?

19         A     That's correct.

20         Q     Okay.  Because Mr. Little is

21    actually an African American male, correct?

22         A     That's correct.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

59

1        Q        Okay.  If you would turn over and

2    look at paragraph 3, the second sentence

3    says, "Ms. Chappell-Johnson is employed by

4    the Federal Deposit Insurance Corporation in

5    Arlington, Virginia," and that's correct,

6    right?

7        A        That's correct; yes.

8        Q        Okay.  And then it says, "The

9    acts of discrimination took place within the

10    District of Columbia."  Could you tell me

11    what acts of discrimination took place in

12    D.C.?

13        A        The acts of discrimination is

14    listed out in the report of investigation.

15    It's within that report of investigation.

16        Q        Okay.  Do you remember what they

17    are?

18        A        Yes.

19        Q        Okay.  And what are they?

20        A        Age and reprisal.

21        Q        Okay.  Now, did the interviews

22    take place here?  Did your interview take

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

60

1    place here in Virginia or in D.C.?

2         A     D.C.

3         Q     It took place in D.C.?

4         A     Yes.

5         Q     Okay.  And the job that you were

6    applying for, would that have been in D.C.?

7         A     Yes.

8         Q     The location had been in D.C.?

9    Okay.  And Ms. Potucek, do you know whether

10   Ms. Potucek was -- was her office in D.C. at

11   this time?

12        A     Yes.

13        Q     Okay.  Let's look at paragraph 7

14   on page 3.  And -- okay.  About halfway down

15   in paragraph 7, it says, "On November 3,

16   2004, she learned that she had not been

17   selected."  As far as you know, that's

18   right, correct?

19        A     Yes.

20        Q     Okay.  And again, the next

21   sentence says, "A white male was selected,"

22   and that's not correct, correct?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

61

1          A      Correct.

2          Q      Correct, that's not correct?

3          A      Correct, that's not correct.

4          Q      Now, the next one says, "Ms.

5    Shirley Purnell was the approving official."

6    And I wondered, how do you know that she was

7    the approving official?

8          A      I was informed when I questioned

9    as to the selection of the individual, who

10   made the final selection, and that's when I

11   was informed that Shirley Purnell was the

12   approving official.

13         Q      Okay.  And who informed you of

14   that?

15         A      Personnel.  Human Resources.

16         Q      Okay.  And when you say --

17         A      And Operations.  Operations is

18   part of Personnel.

19         Q      Okay.  And you asked the

20   question, and that was the response?

21         A      Yes.

22         Q      And who did you ask?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

62

1      A    I believe it was Jo Rita

2    Campbell.

3      Q    Jo Rita Campbell; okay.  And then

4    it goes on to say, "Ms. Purnell had been

5    involved in Ms. Chappell-Johnson's earlier

6    filed EEO complaints of discrimination and

7    retaliation."  Was there more than one

8    complaint against -- did you have more than

9    one complaint against Ms. Purnell?  Or was

10   there just the one nonselection?

11     A    Which question would you prefer

12   -- can you rephrase that and repeat it?

13     Q    Yeah.

14     A    And which question would you like

15   me to answer?

16     Q    You had - you have an EEO

17   complaint against Ms. Purnell --

18     A    Yes.

19     Q    -- in connection with a non-

20   selection where she was the selecting

21   official?

22     A    Yes.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

63

1          Q       Is that right?

2          A       That's correct.

3          Q       And besides this one, do you have

4     any other EEO complaints involving Ms.

5     Purnell?

6          A       Yes.

7          Q       Okay.  Could you tell me what the

8     other ones are?  Other than this complaint

9     that we're sitting and talking about today

10    where she was involved in the selection of

11    Roger Little, and the other complaint where

12    she was actually the selecting official --

13    and now I can't remember who you told me --

14    Patty Quattrone -- are there any other EEO

15    complaints that you have against Ms.

16    Purnell?

17         A       Just the two.

18         Q       Okay.

19               MR. JONES:  Let's have this

20    marked as Exhibit 3.

21                          (Whereupon, the above-

22                          referred to document was

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

64

1          marked as Exhibit 3 for

2               identification.)

3          BY MR. JONES:

4     Q    Now, I don't know whether you've

5     ever seen this before, but do you recognize

6     this?

7     A    Yes.

8     Q    So that's something you've seen

9     before?

10    A    Yes.

11    Q    Okay.  I just want to go down the

12    list of people that's on the first page

13    there.  Now, Lorinda Potucek, she was the

14    selecting official, correct?

15    A    Yes.

16    Q    And Jo Rita Campbell, she was one

17    of the interviewers?

18    A    Yes.

19    Q    Now, Greg Talley, up above, under

20    witnesses, it says, "In addition to the

21    plaintiff, the below-listed individuals are

22    likely to have discoverable information

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

65

1   relative to this matter."  What information

2   do you think Mr. Talley has about this

3   lawsuit?

4          A     I don't have the slightest idea.

5          Q     Okay.  At the time you applied

6   for this job, was he your supervisor?

7          A     No.

8          Q     Okay.  Let's go on to Ms.

9   Boosinger.  She was another interviewer,

10   correct?

11          A     Correct.  Yes.

12          Q     Okay.  And Shirley Purnell was

13   Ms. Potucek's boss?  She was her supervisor?

14          A     Yes.

15          Q     Roger Little, he's the selectee.

16   He was selected for the position, correct?

17          A     Yes.

18          Q     And Lois Cheney, let me ask you

19   the same question as to Mr. Talley:  What

20   information do you think she has concerning

21   your non-selection?

22          A     I can't say.  I really don't know

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

66

1    what information she had.

2        Q    Okay.  Let's look over on page 2

3    under the subsection C, the damages

4    computations.  The second sentence says, "In

5    addition, plaintiff's injuries also entail

6    mental and emotional pain and suffering, as

7    well as stress related physical pain and

8    suffering."

9            Now, when you didn't get this

10   job, what kind of mental and emotional pain

11   did you suffer?

12       A    Being hurt, upset, and wondering

13   why.

14       Q    Okay.

15       A    Stressed out, crying and upset.

16       Q    Okay.  And I understand you said,

17   "stressed out."  What kind of stress-related

18   physical pain and suffering did you

19   experience?

20       A    Then being upset and wondering

21   why I wasn't selected for a position that I

22   had previously held.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

67

1          Q     Okay.  And when you say a

2     position that you previously held, you're

3     talking about when you were the supervisor

4     or the supervisory chief?

5          A     Yes.

6          Q     Of the payroll section?

7          A     I got headaches, you know.

8          Q     Okay.

9          A     Headaches, and sometimes blood

10    pressure would go up from being worried

11    about it.

12         Q     Anything else?

13         A     There may be, but I can't think

14    of it at this time.

15         Q     Okay.

16               MR. JONES:  Let's mark this as

17    the next exhibit.

18                          (Whereupon, the above-

19                          referred to document was

20                          marked as Exhibit 4 for

21                          identification.)

22               BY MR. JONES:

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

68

1          Q      And let's look at the top of page

2     2 under the section that says, "answer."

3               Now, the second sentence says,

4     "In addition, plaintiff states that Shirley

5     Purnell was the selecting official for the

6     position vacancy for which plaintiff was not

7     selected."

8               Now, what is this based on, that

9     you're saying she was the selecting

10    official?  Is she the selecting official or

11    the approving official?

12         A      She was -- she approved the

13    selection.

14         Q      Okay.  So this really isn't

15    correct.  She's the approving official, and

16    Ms. Potucek is the selecting official?

17               MR. SIMPSON:  I'm going to object

18    to -- she hasn't stated that; you're putting

19    words.  But I'm going to object to the form

20    of the question and ask you to rephrase.

21               BY MR. JONES:

22         Q      Okay.  Do you agree that Ms.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

69

1   Purnell was the approving official?

2          A     Yes.

3          Q     Okay.  Do you agree that Ms.

4   Potucek was the selecting official?

5          A     I don't really know if she was or

6   not.  I assume that; I don't know.

7          Q     Okay.  And in the next sentence,

8   it says, "Ms. Purnell was aware of

9   plaintiff's prior protected activity."  Is

10  that based on the EEO complaint where she

11  was the selecting official for Patty

12  Quattrone?

13         A     Yes.

14         Q     And again --

15         A     I really -- well, I assume so.  I

16  don't know.

17         Q     Okay.  Well, is there any other

18  -- do you have any other information?  Do

19  you know why she would be aware of prior EEO

20  complaints that you have?

21         A     Yes.

22         Q     Okay.  And what information would

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

70

1    that be?  Why would you think she would be

2    aware of other EEO complaints?

3         A    It's listed within the report of

4    investigations.  Shirley Purnell was the

5    payroll personnel supervisor.  Any pay or

6    any cases that were presented by the legal

7    department for an act of pay or an act of

8    anything of that nature, she would be

9    involved in it.

10        Q    Okay.  But now, your other EEO

11   cases, did they result in any change to your

12   pay at all, at this point?

13        A    Yes.

14        Q    They did; okay.  I'm not aware of

15   that, so what EEO complaints did that -- so

16   you had a successful EEO complaint that

17   resulted in a change of your pay?

18        A    Oh, no.  No.  No.  No, I didn't

19   have -- I didn't quite understand the

20   question; no.

21        Q    Okay.  Let's look at the last

22   sentence of that paragraph where it says,

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

71

1    "Moreover, plaintiff had told the

2    recommending official, Lorinda Potucek,

3    about plaintiff's prior protected activity."

4    When did that happen that you told Lorinda

5    Potucek about --

6          A    Just general conversation.

7    During general conversation.

8          Q    Well --

9          A    I'm not certain exactly when.

10         Q    Okay.  So what do you remember

11    about that general conversation?  What was

12    the context of that conversation?

13         A    We were just talking about things

14    in general, of the agency, things in

15    general.

16         Q    Okay.  And what did you tell her?

17         A    I was wondering why I'm not

18    getting promoted.  So, you know,

19    opportunities of not getting promoted.

20         Q    So you were expressing concern

21    about not being promoted?

22         A    Yes.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

72

1          Q     Okay.  And what about prior

2     protected activity?  What did you tell her

3     about that?

4          A     Protected activity?  Where are

5     you, and what line are you?

6          Q     Still the last line of the first

7     paragraph under, "answer."

8               MR. SIMPSON:  You're still on

9     page 2, correct?

10              MR. JONES:  Yes.

11              MR. SIMPSON:  If I may, just --

12              MR. JONES:  Yes.  Thank you.

13              THE WITNESS:  We spoke of me not

14    being promoted, not getting positions that

15    were available; things of that nature.

16              BY MR. JONES:

17         Q     Okay.

18         A     And just general conversation

19    about ourselves and things like that; just

20    general conversation.

21         Q     Did she tell you about any EEO

22    complaints she had?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

73

1          A      No.

2          Q      Okay.  Let's go down to the

3    bottom of that page.  I just want to be

4    clear, under the answer, the second sentence

5    says, in the middle, "Plaintiff had

6    previously held the position that was being

7    advertised in vacancy announcement No. 2004-

8    HQ-2637."

9                  And when you say, "previously

10   held the position," you're talking about

11   when you were the supervisor of the payroll

12   section?

13         A      Yes.

14         Q      The next sentence says, "As such,

15   plaintiff served as a senior technical

16   advisor and was responsible for the entire

17   process of manual payments."

18                  Now, you've described, you know,

19   why manual payments would be necessary if

20   somebody didn't have their time sheet in on

21   time.  Was this an important part of the job

22   that you were applying for, processing

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

74

1    manual payments?

2         A     I was reading the resume, reading

3    the vacancy announcement --

4         Q     Yes.

5         A     -- that was so stated in the

6    vacancy announcement.

7         Q     Okay.  Can you show me where that

8    is in the vacancy announcement?  That's

9    Exhibit 1.

10        A     And it was within my resume --

11        Q     Okay.

12        A     -- as part of my experience under

13   knowledge, skills, and abilities.

14        Q     Okay.  Well, I guess my question

15   is, you know, why is that important in

16   connection with the vacancy that you applied

17   for?  And if it's in the vacancy

18   announcement, I'd like to --

19        A     The knowledge of rules,

20   regulations, related to human resource

21   processes and procedures.  Those were some

22   of the procedures and regulations --

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

75

1    procedures and factors that were part of the

2    unit.

3         Q    Okay.

4         A    And the garnishments, personnel

5    actions may appear as a part of all of that.

6         Q    Okay.  So these are all manual

7    payments?

8         A    They could be.

9         Q    Is it also something that could

10   be set up and automated as well?  Or is a

11   garnishment something you have to always --

12   you have to continually do as a manual

13   payment, or could you set it up?

14        A    No.  Systemwise, it can be done

15   in the system.

16        Q    Okay.  Is that the usual process

17   to have it set up?

18        A    Now it is; the system.

19        Q    Okay.  But in the past, did you

20   have to do them manually in the past?

21        A    Manual or system.

22        Q    Manually?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

76

1          A          Manually or within the system.

2          Q          Okay.  If you look over on page 3

3     of -- let me just take a look here to make

4     sure we're on the same page.  Page 3 of

5     Exhibit 4, the answer under Interrogatory 3

6     says -- talks about you being a supervisor.

7     And then it says, "As such, plaintiff served

8     as a senior technical advisor and was

9     responsible for the entire process of manual

10    payments while the selectee only worked with

11    certain aspects of manual payments."

12               So there were talking -- when we

13    talk about the selectee, when you're

14    referring to the selectee, we're talking

15    about Roger Little, correct?

16         A          Correct.

17         Q          Okay.  And you say, "He only

18    worked with certain aspects of manual

19    payments."  And again, this is when you

20    supervised him back before 1996, correct?

21         A          Yes.

22         Q          Okay.  And what were the certain

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

77

1    aspects of manual payments that he worked

2    with?

3        A    He would work with retroactive

4    promotions.  Well, no, he didn't -- no, he

5    didn't work with manual payments for

6    retroactive promos.  Most of, if any, of his

7    manual payments would probably be like

8    within grades, people who didn't get within

9    grade promotions, that were within grade on

10    time, things of that -- sort of that nature.

11        Q    Okay.  But you didn't supervise

12    him after 1996, correct?

13        A    That's correct.

14        Q    Let's turn over to page No. 4,

15    under Interrogatory No. -- the answer under

16    Interrogatory No. 5.  It says, "In addition,

17    plaintiff had" -- this is about mid-way

18    down.

19            "In addition, plaintiff had

20    discussions with several employees,

21    including Brent Braceley, Priscilla

22    McCutcheon, Rosetta Jones, Mary Bass, and

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

78

1    Linda Collins about her non-selection, and

2    that defendant and Ms. Purnell continued to

3    discriminate and retaliated against her."

4              When you're talking about -- at

5    the end, "Ms. Purnell continued to

6    discriminate and retaliated against her,"

7    are you referring to this non-selection?  Or

8    are you referring to --

9          A    Yes.

10         Q    And --

11         A    And -- yes.

12         Q    Okay.  And what did you tell

13   these individuals?

14         A    We discussed numerous things.  I

15   can't just recall exactly what we discussed,

16   but we discussed numerous things.

17         Q    Okay.  Were these one-on-one

18   conversations?  Or were these in a group?

19         A    No, one-on-one.

20         Q    One-on-one; okay.  Let's look

21   over on page 5.  And that first paragraph

22   about mid-way down it talks about -- it

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

79

1     says, "Plaintiff may call Brent Braceley and

2     Priscilla McCutcheon, former FDIC employees,

3     for whom the agency has addresses and

4     telephone numbers, to testify concerning the

5     discussions that they and plaintiff had

6     after plaintiff was not selected for the

7     vacant position, as well as their knowledge

8     of plaintiff's incident with shingles."

9          Can you describe for me what is

10    the incident with shingles that that refers

11    to?

12      A     Well, that's really -- that's

13    when I had shingles.  It was after -- it's

14    within this case, but it's not -- we talked

15    about it.  We talked about reasons as to why

16    people get shingles and things of that

17    nature.

18      Q     You thought it might be related

19    to this case?

20      A     No, not this case.

21      Q     Okay.  And if you would turn to

22    page 8, down at the bottom under the answer

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

80

1    for Interrogatory No. 14.  Four lines up

2    from the bottom it says, "In addition,

3    plaintiff has information that other younger

4    FDIC employees, Debbie Gonsa and Catherine

5    Stephens, had approached management

6    officials and complained of not being

7    promoted.  As a result of their complaints,

8    higher graded positions were created for

9    them and they were promoted."

10              How do you know about that?

11        A    I know of Catherine Stephens

12   because we had a discussion and she told me.

13        Q    You and Catherine Stephens did?

14        A    Yes.

15        Q    Okay.  How about Debbie Gonsa?

16        A    I was informed about her

17   conversation with -- going to management.

18        Q    Okay.  And who informed you about

19   that?

20        A    Priscilla McCutcheon.

21        Q    Now, it says, "They approached

22   management officials and complained"; do you

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

81

1  know what management officials they

2  approached and complained to?

3      A      Their supervisors.  And Catherine

4  Stephens approached her supervisor and

5  Miguel Torrado.

6      Q      Okay.  And who were her

7  supervisors?

8      A      At that time I believe Ed

9  Chimlowski.

10      Q      But they didn't -- to your

11  knowledge, they didn't approach either

12  Lorinda Potucek or Shirley Purnell?

13      A      I don't know.

14      Q      Do you have any information or

15  any reason to believe that either Ms.

16  Potucek or Ms. Purnell had anything to do

17  with these promotions for Debbie Gonsa and

18  Catherine Stephens?

19      A      Repeat that again.

20      Q      Do you have any information --

21      A      No.

22      Q      Well, let me do the whole thing.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

82

1    Do you have any information or reason to

2    believe that either Ms. Potucek or Ms.

3    Purnell had anything to do with the

4    promotions of Debbie Gonsa and Catherine

5    Stephens?

6         A    I don't know.

7         Q    Okay.  I think we can put this

8    one away.

9              MR. JONES:  Let's mark this as --

10   are we up to No. 5?

11             THE COURT REPORTER:  Yes.

12                       (Whereupon, the above-

13                        referred to document was

14                        marked as Exhibit 5 for

15                        identification.)

16             MR. JONES:  Okay.

17             BY MR. JONES:

18        Q    Let me give you what's been

19   marked as Exhibit 5 --

20             MR. SIMPSON:  Forgive me, Bill,

21   but just for clarification, this is not her

22   complete affidavit, Exhibit F-1; is it?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

83

1            MR. JONES:  This is -- well, let

2    me ask her.

3            BY MR. JONES:

4        Q    Do you recognize this document?

5        A    Yes.

6        Q    Okay.  And what is it?

7        A    It says affidavit.

8        Q    Okay.  Is this an affidavit you

9    gave to the investigator, the EEO

10   investigator, in this -- involving this non-

11   selection?

12       A    Yes.

13       Q    If we look on page 1, down at the

14   bottom, in your answer it says, "I was

15   better qualified for the subject position

16   than the person selected, because I

17   previously served in the announced position

18   at the CG-11 level for about three to four

19   years.  Indeed, I was the selectee's

20   supervisor when I served in the position at

21   the grade 11 level.  I had performed all of

22   the functions that were required by way of

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

84

1    the vacancy announcement.  The selectee had

2    not."

3             Now, you don't have any reason to

4    know everything that Roger Little did after

5    1996; do you?

6        A    Repeat that.  I don't have any --

7        Q    Well, let me phrase it this way:

8    When you say that you performed all the

9    functions and the selectee had not, you're

10    talking about when you supervised Roger

11    Little?

12        A    I'm speaking of what -- referring

13    to the vacancy announcement as the way it

14    was advertised.

15        Q    Okay.  But when you supervised

16    Roger Little prior to 1996, you knew what he

17    was doing and what he wasn't doing?

18        A    Yes.

19        Q    After 1996, you didn't supervise

20    him anymore, and you only worked on one

21    project with him, so you don't really know

22    what he was doing after 1996?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

85

1          A       No, I guess not.

2          Q       Let's flip over to page 2.  Way

3    down at the bottom, the answer down at the

4    bottom says, "I had previously filed two

5    other formal EEO complaints, one in 1998,

6    and one in 2004."

7                  But I want to focus in on the

8    next sentence that says, "None of the

9    managers or persons involved in this

10   selection process were named as alleged

11   discriminating officials in my prior

12   matters."  Is that accurate?

13         A       No.

14         Q       And why is it not accurate?

15         A       In 2004, Shirley Purnell was also

16   one of the managers that was named in the

17   case.

18         Q       So Ms. Purnell was an alleged

19   discriminating official?

20         A       Yes.

21         Q       Okay.  I just wanted to make sure

22   that was the case.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

86

1          Now, the very last sentence is

2    talking about Lorinda Potucek, and you say,

3    "I believe she viewed my EEO activity as a

4    potential problem and saw me as a trouble

5    maker."  Now, why do you believe that?

6          A    Just during general conversation

7    when we were talking about prior cases that

8    I had, things of that nature, and that she

9    said, "You know people that do EEO cases are

10   trouble makers."

11         Q    Oh, so she said that --

12         A    She said they were trouble

13   makers.

14         Q    Okay.  So she said that to you?

15         A    Yes.

16         Q    Did you take that as a warning?

17         A    No, because I've always heard

18   that.

19         Q    Okay.  After she said that did

20   you wish you hadn't told her that you had

21   prior EEO cases?

22         A    No.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

87

1       Q      Okay.  And I want to be clear

2    that you don't remember when this general

3    conversation took place with Ms. Potucek?

4       A      It was -- not exactly, I don't

5    remember, but I was in the compensation

6    unit.  I worked in benefits and

7    compensation, I do know that.  But I don't

8    know the exact day or year.

9       Q      Okay.  Now, was she in the

10   compensation unit, too?

11      A      No.

12      Q      Do you remember where it took

13   place -- the conversation took place?

14      A      Somewhere on that floor at the

15   time.

16      Q      Okay.  She worked on the same

17   floor?

18      A      Yes.

19      Q      And that was here in Virginia

20   Square?

21      A      No.  In D.C.

22      Q      Oh, that was in D.C.?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

88

1       A       Yes.

2       Q       Okay.  And where in D.C. were --

3       A       It was Pennsylvania Avenue.

4       Q       Okay.  1700 Pennsylvania Avenue?

5       A       That's correct; 1700.

6       Q       Okay.  So it's when you worked in

7   the compensation unit.  Was she a supervisor

8   at that point?  Or was she --

9       A       No.

10      Q       No; okay.  All right.  Let's mark

11  this as, I believe No. 6.

12                      (Whereupon, the above-

13                       referred to document was

14                       marked as Exhibit 6 for

15                       identification.)

16              BY MR. JONES:

17      Q       Oh, you know what?  Before we're

18  done with No. 5, just to clear something up

19  -- can you look back at No. 5, your

20  affidavit?

21              Down at the bottom it says --

22  it's printed, it says page 1 of 18, and the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

89

1    18 is crossed out and there's a handwritten

2    2.  And then on the second page it says --

3    it's printed in page 2 of 18, and the 18 is

4    struck out, and a No. 2 is written in.  And

5    then on the third page, down at the bottom

6    it says page 8 of 18, but up at the

7    signature block it says, "I have read the

8    statement consisting of three pages, and it

9    is true, complete, and correct to the best

10   of my knowledge and belief."

11              Is this your complete affidavit

12   that you gave?  Or are there -- I can see

13   that the -- whoever prepared the typed copy

14   put that it was an 18-page affidavit.  But

15   it looks -- do you recognize the -- let me

16   ask you this -- let me break it down.

17              Where the 18 is struck through

18   and it says 2, is that your handwriting?

19   Did you write that?

20       A    I don't believe so.  I'm not --

21       Q    How about the initials?

22       A    I don't recall.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

90

1          Q      How about the initials

2     underneath?

3          A      Because this would have gone back

4     to the investigating officer.

5          Q      Right.

6          A      The initials; yes.  The initials

7     are mine.

8          Q      Okay.  Well, usually people

9     initial when they've made a change.  Do you

10    recall making these changes from the 18 to

11    the 2?

12               MR. SIMPSON:  I'm going to object

13    to the form of the question.  It's not been

14    established that the only time someone will

15    initial is if there is a change.  There are

16    times when individuals initial at the bottom

17    of a page of an affidavit to indicate

18    there's nothing further, not always

19    reflecting that there were changes.

20               BY MR. JONES:

21         Q      Okay.  I'll state that this is

22    the affidavit that I got out of the report

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

91

1    of investigation.  Do you remember there

2    being any additional pages to this

3    affidavit?

4         A     I haven't looked at it recently,

5    so I really can't tell you if there was more

6    pages.

7         Q     Okay.  Let's look at Exhibit 6,

8    which is another affidavit.  And just for

9    ease of distinguishing it, I'll call this

10   your rebuttal affidavit.

11             On page 1, under response, the

12   second sentence says, "I have a prior EEO

13   case against Ms. Purnell."  And I just want

14   to make sure that when you're talking about,

15   "I have a prior EEO case against Ms.

16   Purnell," that's the one you talked about

17   that Ms. Quattrone was selected and you

18   weren't.

19        A     Yes.

20        Q     Okay.  And if you look over on

21   page 2, at the very top, it says,

22   "Approximately two years ago I had a general

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

92

1    conversation with Ms. Potucek.  During this

2    conversation my involvement about prior EEO

3    activity was communicated to her.

4    Additionally, she was aware of my age

5    because the age bracket was in part of the

6    conversation as well."

7                What did you talk about regarding

8    age in that conversation?

9         A    Basically how old we were.  How

10    old both of us were.

11         Q    Are you about the same age?

12         A    Close; yes.

13         Q    Okay.  Was she expressing any

14    dissatisfaction with lack of a promotion to

15    you?

16         A    Yes.

17         Q    Did she say anything about her

18    prior EEO activity?

19         A    I don't recall -- know if she had

20    any prior EEO activity; no.

21         Q    Okay.  I mean, well, would you

22    characterize this as a casual conversation?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

93

1          A       Casual.

2          Q       Was this kind of a passing in the

3     hall kind of situation?

4          A       Casual.

5          Q       Casual?

6          A       Yes.

7          Q       Anything else you can remember

8     about this conversation?  You said it

9     occurred on the floor, it was a casual

10    conversation.

11         A       Just that we weren't being -- I

12    wasn't being selected for positions, she

13    couldn't get a promotion, and just things

14    generally about promotions, and then not

15    being selected for the various positions.

16         Q       Okay.  Let's look down a little

17    bit further on page 2.  And in the first

18    paragraph under response, down towards the

19    bottom of that paragraph it says, "Since I

20    had previously trained the person that held

21    this position prior to the selectee, this

22    was one of our greatest concerns."  And then

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

94

1    it goes on.

2              Who are you referring to when you

3    talk about the person that held this

4    position prior to the selectee?

5         A    Donna Sarrano.

6         Q    Donna Sarrano?

7         A    Yes.

8         Q    Okay.  And how come she was no

9    longer in this position and they were

10   filling this vacant position?

11        A    She was retiring.

12        Q    Okay.  And when did you train her

13   for the position?

14        A    After I was selected to go to the

15   compensation unit.

16        Q    Okay.  And at that point she was

17   already in the position?

18        A    I'm not certain, but I know I

19   trained her.

20        Q    Okay.  Do you know whether there

21   had been a previous posting for this

22   position?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

95

1         A      No, not to my knowledge.

2         Q      Okay.  But it's not something --

3    even if there had been, it's not something

4    that you had applied for previously?

5         A      If there was a promotion,

6    potentially, I would have.

7         Q      If you knew about it, you would

8    have?

9         A      Yes.

10        Q      Okay.  But to your knowledge, you

11   hadn't -- this was the first time you

12   applied for this position?

13        A      Yes.

14        Q      Okay.  The same sentence there,

15   it says, "This was one of our greatest

16   concerns."  When you say, "our greatest

17   concerns," who are you referring to?  I'm

18   assuming you are referring to yourself, but

19   who else are you referring to?

20        A      And the supervisors.

21        Q      The supervisors; okay.  What

22   supervisors are you referring to when you

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

96

1    are talking about, "our greatest concerns"?

2         A    Mary Anderson, Natalie Tyce, and

3    the head of personnel.

4         Q    Okay.  Well, let me make sure I

5    understand this.  And let me step back a

6    little bit to put this in context.  It says,

7    "As I previously stated, I was, and

8    continued to remain the expert person to

9    process complex retroactive actions,

10   especially garnishments, child support, and

11   alimony payments cases.  The selectee had no

12   prior system knowledge of these functions."

13        And again, that's based -- "The

14   selectee had no prior system knowledge of

15   these functions," your statement is based on

16   when he worked for you, correct?

17        A    That's correct.

18        Q    Okay.  "Since I had previous" --

19   I'm reading on.  "Since I had previously

20   trained the person who held this position

21   prior to the selectee, this was one of our

22   greatest concerns that the selected

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

97

1    individual did not know how to perform this

2    function."

3            When you say, "this was one of

4    our greatest concerns," are you talking

5    about concern at the time he was selected?

6        A    Yes.

7        Q    Okay.  So, now, Mary Anderson

8    didn't have any concerns by this time?

9        A    No.

10       Q    Okay.  Is it a typo?  Should it

11   be, "My concerns"?

12       A    No.  No.

13       Q    Okay.  Who --

14       A    No.  Back up.  It should be Donna

15   Sarrano and I.  It was one of her greatest

16   concerns that he was taking her position.

17       Q    Okay.

18       A    But he did not know how to do

19   these functions.

20       Q    Okay.  Now, did you have -- you

21   had a conversation with Donna Sarrano about

22   this?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

98

1          A      Oh, yes.

2          Q      Was this before she left the

3     agency?

4          A      Yes.

5          Q      Okay.  And she expressed concern

6     that he was selected?

7          A      Yes.

8          Q      Okay.  Did she express anything

9     else during this conversation?

10         A      Well, she expressed the fact,

11    again, like the others, as to why I wasn't

12    being selected.

13         Q      And what did she say about that?

14         A      She believed this was reprisal

15    because of previous EEO activities.

16         Q      Okay.  Did she have any facts to

17    base that on, or was that just her

18    impression?

19         A      I don't know.  I didn't ask her.

20         Q      Okay.  If you would flip over to

21    page 3.  I think there's an extra page 1 on

22    there.  I left it the way I found it.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

99

1    On page 3, a little ways down,

2    there's a short, little paragraph that says,

3    "I questioned the interviewing panel, but

4    was informed that they made no

5    recommendations, that this was solely left

6    to management to make the decision."

7    Who was it that you questioned?

8    A    I questioned Jo Rita Campbell.

9    Q    Okay.  Anybody else on the

10   interviewing panel?  Did you talk to Susan

11   Boosinger?

12   A    Susan; no.  Susan wasn't present

13   at the time.

14   Q    Okay.  Do you remember when you

15   talked to Jo Rita?  How soon after the

16   selection was made?  Or, let me back up.

17   Let me ask a different question.  How soon

18   after the interview did you talk to Jo Rita?

19   A    Maybe a couple of weeks after the

20   interview.

21   Q    Okay.  Was it before you found

22   out who was selected?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

100

1          A     No, it was after I found out who

2     was selected.

3          Q     Okay.  And was she in your

4     section at the time?

5          A     No.

6          Q     And she's no longer with the

7     FDIC, correct?

8          A     Correct.

9          Q     Let's look over on page 4.  Well,

10    actually, this would be a good time to stop,

11    I think.  We're almost at two hours.  So

12    you're holding up very well.  That's all.  I

13    think we can go off the record if that's

14    agreeable?

15               MR. SIMPSON:  Off the record.

16               MR. JONES:  Okay.

17               (Whereupon, a lunch recess was

18    taken.)

19               MR. JONES:  Okay.  We can go back

20    on the record.

21    CONTINUED DIRECT EXAMINATION

22               BY MR. JONES:

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

101

1          Q         Now, before we broke for lunch we

2     were talking about your affidavit, which has

3     been marked as Exhibit 6, which I am

4     referring to as your rebuttal affidavit.

5     And we had just talked about page 3, about

6     you speaking to Jo Rita Campbell after the

7     interview and after you had found out who

8     had been selected.

9                    If you flip over to page 4, in

10    the middle of the page under "Response," it

11    says in the second sentence -- well, let me

12    read the first -- let me start at the first

13    sentence.

14                   "In response to this statement,

15    my resume makes mention all of the factors

16    that Ms. Potucek is focusing upon.  Since

17    she was relatively new to the section, and

18    Ms. Purnell did not know my capabilities,"

19    and then it goes on about talking about, "It

20    seems that no one read my resume."

21                   But I wanted to focus in on the

22    part that says, "Ms. Purnell did not know my

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

102

1    capabilities."  What do you base that

2    statement on, that Ms. Purnell did not know

3    your capabilities?  Is it supposed to be Ms.

4    Purnell -- is that right, the way it's

5    written?  Is it supposed to be Ms. Purnell?

6    It's not supposed to be Ms. Potucek?

7         A    Well, neither one really knew my

8    capabilities.  Ms. Potucek --

9         Q    Now, you worked for Ms. Purnell,

10   but not for very long?  Was that your

11   testimony?

12        A    Yeah.  Let me retract something

13   on that.

14        Q    Okay.

15        A    I worked under Ms. Purnell.  But

16   when we had the reorg. and I went -- I moved

17   from compensation to downstairs, because of

18   the RIF in progress, and I was a surplus

19   employee, they assigned me under Shirley

20   Purnell, but she -- I wasn't really doing

21   work for her.  I was continually doing the

22   compensation work at the time, but I was

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

103

1    assigned under her as a supervisor -- as her

2    being my supervisor because I had to report

3    to someone and they had dismembered the

4    unit.  And so they put me downstairs to

5    report to Shirley Purnell for a short period

6    of time.

7            Q    Okay.  And are we talking about

8    the period of time when you went from a

9    grade nine to a grade eight?

10           A    During some of that time.

11           Q    Okay.

12           A    No, I was still a grade nine

13   really, but it was kind of in the process.

14           Q    Okay.  And your old section was

15   being dissolved?

16           A    Yes.

17           Q    And what section was that?

18           A    Compensation.  Well, compensation

19   and benefits.

20           Q    Okay.  And so they sent you down

21   to work -- to report to --

22           A    Basically, to report to Shirley

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

104

1    Purnell.

2         Q    Okay.

3         A    And for her to find duties when

4    my work was low because my work supposedly

5    was being dissolved.

6         Q    Okay.  And when you say, "Short

7    period of time," what's your best

8    recollection of how long you actually worked

9    for her?

10        A    That was for the months that I

11   mentioned earlier; a couple of -- maybe --

12   not long, three or four months.

13        Q    Okay.  And after that time

14   period, where were you transferred to or who

15   did you work for?

16        A    I was transferred to the benefits

17   center here in Virginia.

18        Q    And who was your supervisor

19   there?

20        A    That's when I was under Ed

21   Chimlowski.

22        Q    Ed Chimlowski; okay.  Okay.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

105

1          A      Yes, that's kind of how it went.

2          Q      So is it fair to say Ms. Purnell

3    didn't know your capabilities because you

4    only worked for her a couple of months, or

5    three or four months?

6          A      Right.  Exactly.  Because she --

7    I didn't really work for her.  The work that

8    I was doing was continually compensation,

9    and she didn't have anything for me to do if

10   I asked her for something.

11         Q      Okay.  Who did you actually --

12   during this time period when you worked for

13   Ms. Purnell, who did you actually receive

14   assignments from?

15         A      I continued doing the work that I

16   was doing when I was in the compensation

17   unit.  I took that work with me and I

18   continued doing it until they assigned it to

19   someone else.

20         Q      Okay.  So you basically were

21   working on your own at that point?

22         A      Basically.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

106

1          Q      And when you would complete an

2      assignment or something like that, would you

3      report to anybody else?

4          A      When I would complete a -- no.

5          Q      No?  Who would you turn your

6      assignments in to?

7          A      Basically what I was doing was

8      things for legal division, and so I just had

9      to notify them on things that I was doing.

10         Q     Okay.  And who in the legal

11     division were you dealing with at that

12     point?

13         A     Saul Schwartz.

14         Q     Saul Schwartz; okay.

15         A     And other attorneys if they --

16         Q     Okay.  Do you remember any of the

17     other attorneys who you were dealing with at

18     the same time you were dealing with Saul?

19         A     I can't really think of their

20     names right now.

21         Q     Okay.

22                MR. JONES:  Let's mark this as

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

107

1    the next exhibit.  This is 7?

2                UNKNOWN SPEAKER:  Yes.

3                        (Whereupon, the above-

4                        referred to document was

5                        marked as Exhibit 7 for

6                        identification.)

7                BY MR. JONES:

8        Q    Can you identify this document?

9        A    Yes.

10       Q    And what is this?

11       A    This appears to be my resume.  My

12   resume.

13       Q    Is this what you submitted for

14   your application for the position we're

15   talking about in this case?

16       A    Yes.

17       Q    And by the way, I see that before

18   we give this to the court reporter to make

19   an exhibit, it's got your unredacted Social

20   Security number on it, so we'll take care of

21   that before it goes into the record.

22                So at the time you applied for

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
108

1    this, you have your first job that you

2    occupied at the time listed first; is that

3    correct, on the first -- I guess it would be

4    the second page?  I'm one page behind you.

5         A    This was my last job.

6         Q    Okay.  And so your supervisor is

7    Greg Talley.  And I guess that's just a

8    partial phone number there.  It's a 703

9    number, so it's here in Arlington, and the

10   address is Arlington.

11             Up four lines from his name, is

12   that supposed to be Human Resources Section?

13   It just has an "S."

14        A    Yes.

15        Q    Okay.  And I have to admit, I

16   don't understand a lot of this because I

17   don't know the details of personnel loss.  I

18   was hoping you'd be able to explain a few of

19   these things to me.

20             The first diamond -- or the first

21   bullet point talks about completing benefit

22   certifications applications.  What are

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

109

1    those?

2         A     Certifications such as going

3    through the official personnel folders.  And

4    there may be birth certificates, child

5    certificates, children of -- death

6    certificates.  Sending that information to

7    Blue Cross and Blue Shield on people that

8    have children which would like to continue

9    coverage after they have become of age to

10   come off their parent's insurance.  Things

11   of that nature.

12        Q     Okay.  So is that related to the

13   fourth bullet about this temporary

14   continuation of coverage packages?

15        A     In relationship; yes.

16        Q     Okay.  And then computing

17   military deposits?  That's -- what is that?

18        A     That's people that have been in

19   the military and had active duty service.

20   When they retire, the service can count

21   towards their retirement.  If they desire to

22   purchase the time back, then it's basically

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

110

1    doing things of that nature, computing their

2    pay and letting them know how much they will

3    have to pay back.

4        Q    Okay.  Did you ever do CSRS

5    redeposits or just military?

6        A    Yes.  Redeposits as well; yes.

7        Q    And that's sort of the same

8    thing; isn't it?

9        A    Almost.

10       Q    Except non-military?

11       A    Right.  Almost.

12       Q    Now, let's look over at the next

13   page, and this actually has two jobs listed,

14   it's got Dave Harrington as your supervisor.

15   And one is payroll/personnel systems

16   specialist from 9/29/96 through 1/03/97.  Do

17   you remember what -- was that a grade nine

18   position?

19       A    That was nine and eleven.

20       Q    Nine and eleven; okay.

21       A    Well, because they will call you

22   -- one title was chief of payroll personnel,

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

111

1    next thing it would be system specialist.

2    So it just kind of -- the title just kind of

3    bounced around.

4          Q    Okay.  And what about the

5    personnel management specialist job?  And

6    that says 1/3/97 to present, but I noticed

7    that up at the top it says 1/4/97 to 9/2003.

8    So should that be through 9/2003 actually?

9          A    Let's see --

10         Q    I -- maybe not.  Because I see on

11   page 1, in the middle of that box it says,

12   "Personnel management specialist," and that

13   was your job at the time you applied for

14   this?

15         A    Yes.

16         Q    Okay.  So it's just a different

17   supervisor?  Dave Harrington was your

18   supervisor?

19         A    Dave Harrington.

20         Q    But you were still a personnel

21   management specialist?

22         A    Right.  When I -- QOkay.  And what

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

112

1    grade level was that?  That's the job

2    starting in `97.

3         A    Right.  It was grade nine.

4         Q    Grade nine; okay.  The first

5    bullet says, "Computed and processed pay for

6    6,000 employees."  What 6,000 employees are

7    we talking about here?  Is that everybody in

8    D.C.?

9         A    It's kind of hard to remember,

10   but at that time it was including overtime

11   rates for employee -- it was an overtime

12   project that I had to compute the overtime

13   for about 6,000 employees.

14              And I forgot exactly what was

15   going on, but I had to go back and do all

16   the overtime for those employees.

17        Q    Okay.  So is this related to the

18   fourth bullet where it says, "I have

19   processed over 1,500 FLSA cases within the

20   last two years?"

21        A    Some of it, but no.  The FLA

22   cases were the cases that I worked on with

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

113

1    Saul Schwartz in the legal division, it was

2    a lot of cases that they had.

3        Q    Okay.  What about the very next

4    bullet about, "Resolved complex compensation

5    payroll/personnel problems such as dual lump

6    sum payment?"  What are you referring to

7    when you talk about, "Dual lump sum

8    payment?"

9        A    Dual lump sum payments are

10   payments when employees -- at the beginning,

11   some people retire at the end of the year,

12   but their leave carries over into the next

13   year, so -- and they have to be paid for

14   that.  So they get their regular lump sum

15   and then I have to go back and pay them at

16   the new rate.  We were getting a pay raise,

17   say in January, and you retire in December,

18   you would get -- your rate would be

19   different.  So you had to go back and pay

20   them for the old rate and the new rate.

21       Q    Oh, so you have to add them both

22   together to get their right amount?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

114

1        A       Well, they got separate checks.

2        Q       I see.  Okay.  Let me count down,

3    one, two, three, four, five, "Responded to

4    written requests to approve and deny waivers

5    of debt collection.  These waiver cases were

6    caused by erroneous overpayments of wages to

7    employees."

8                What are the waivers?  What did

9    you do with respect to waivers?

10       A       Okay.  If an employee was paid,

11   say paid in error and maybe paid too much

12   money for a promotion, someone computed the

13   promotion in, they put in the employee to be

14   paid at a grade 13 and he should have been

15   paid at a 12 or something, and that becomes

16   a salary overpayment, then the employee had

17   a chance to dispute this payment and say, we

18   would bill him for it because he was

19   overpaid, and he was basically like "I don't

20   believe I should pay this because you paid

21   me in error," and they would have to file a

22   waiver.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

115

1        Q       And would it be based on

2    hardship?

3        A       No.  Well, they could say it was

4    hardship -- it could be hardship for them to

5    have to pay it back.  But, no, it wasn't

6    based on hardship.  It was based on my

7    judgement of reviewing what really happened

8    and believing, you know, that the employees

9    should pay this back -- of not paying it

10   back, making the decision, and giving it to

11   my supervisor to make the final say so.  It

12   was based on whatever my approval was.

13       Q       Well, I wish I had known you

14   then.

15               Let's see, the very next bullet

16   says, "Wrote standard operating procedures

17   for lump sum payments and unemployment

18   compensation for separated employees."  I

19   guess I know what unemployment compensation

20   is, but what are the lump sum payments that

21   you're referring to here?

22       A       Writing guidelines for how we

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

116

1    should issue -- for how the agency or

2    personnel department should issue lumps sums

3    to employees, making some type of procedures

4    -- setting up procedures as to how we should

5    go about issuing lump some payments because

6    we didn't have any in place at that time.

7          Q    Okay.  And why would these lump

8    sum payments be given to employees?

9          A    Well, when you separate from the

10   agency you get paid for your annual leave --

11         Q    Yes.

12         A    -- so that was called a lump sum

13   payment.

14         Q    Okay.  So this is, again, this is

15   referring to what we talked -- what you

16   explained before about --

17         A    Partly.  Only these were

18   procedures for lump sum payments, as to how

19   to pay them.

20         Q    Okay.  And, let's see, one, two,

21   three down, it talks about, "Assisted with

22   gathering and writing information for the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

117

1    waiver circular."  Now, is the waiver

2    circular a -- is it a directive?

3         A    Yes.

4         Q    Does that still exist nowadays?

5         A    Yes.

6         Q    Okay.  And this is related to the

7    -- the bullet above it is about, "Waivers of

8    debt collection for overpayments?"

9         A    You said the bullet below it?

10        Q    No.  Above.  You know, the one we

11   talked about before about waivers of debt

12   collection?

13        A    Okay.  Yes.

14        Q    I just want to make sure I

15   understand we're talking about the same

16   thing.

17             And let's see, the second up from

18   the bottom, "Trained management and other

19   personnel specialists on using the appraisal

20   system."  Is that referring to performance

21   appraisal?

22        A    At that time; yes.  We had a

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

118

1    system called PERFORM.

2         Q     Okay.

3         A     And we went to offices, or we had

4    meetings set up for them to attend, and I

5    would do training sessions.

6         Q     Okay.  And is this something that

7    the supervisors had to do for their

8    employees?

9         A     Yes.

10         Q     Okay.  Let's flip over to the

11    next page, which, I think, starts your FDIC

12    employment.  Although, now, your testimony

13    was that originally you came in as a seven?

14         A     Yes.

15         Q     Okay.  So that's not shown on

16    here.  Now, when you came in as a seven, was

17    that a supervisory position initially?

18         A     Yes.

19         Q     It was; okay.  So this shows,

20    supervisor payroll personnel system

21    specialist for about two years, until April

22    of `92.  And then it shows -- and that shows

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

119

1    as a grade nine.  So is it accurate to say

2    that it started out as a grade seven and

3    then you got the promotion to a grade nine

4    sometime in between?

5         A    Yes, that's correct.

6         Q    Okay.  And then it shows chief

7    supervisor payroll personnel system

8    specialist starting in 4/92 through 9/28/96.

9    And that's the grade 11 position that you

10   had?

11        A    Yes.

12        Q    And this is the four-year --

13   approximate four-year period when you

14   supervised Roger Little, correct?

15        A    Yes.

16        Q    And the first bullet says,

17   "Supervised the office of eight payroll

18   assistants and one clerk typist."  So would

19   Roger Little -- was Roger Little one of the

20   eight payroll assistants?

21        A    I'm not certain at that time.  He

22   came under me -- I'm not certain of the year

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
120

1    because at first it was payroll assistants,

2    and then we later merged payroll and

3    personnel, and I picked up Roger Little

4    somewhere in there.

5        Q    When payroll and personnel merged

6    into -- into what?

7        A    Into payroll personnel.  It used

8    to be payroll by itself, and then personnel

9    operations and payroll operations.

10       Q    Okay.

11       A    Then it merged into one.

12       Q    Was he on the personnel side?

13       A    Yes.

14       Q    Okay.  So you didn't supervise

15   him for that entire period when you were the

16   chief/supervisor?

17       A    No.

18       Q    Let's see, one, two, three, four,

19   five, six, seven -- seven down, "Reviewed

20   and approved salary advances AD-343's,

21   354's, and other forms of pay."

22                When would -- this would be a

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

121

1    good thing for me to know -- when can people

2    get salary advances?

3          A    Okay.

4              MR. SIMPSON:  I'm going to

5    object, only to the point that this was --

6    if your question is during that time when

7    she --

8              MR. JONES:  Yes.  During that

9    period.

10              THE WITNESS:  Okay.

11              MR. SIMPSON:  As opposed to

12    currently, which --

13              THE WITNESS:  Okay.  If they

14    didn't get paid for some reason through the

15    system, they would get a salary raise, what

16    we call a PAV.

17              BY MR. JONES:

18          Q    Okay.  And you'd call that an

19    advance, even though it was something that

20    they had already earned?

21          A    Right.  But for some reason if

22    their checks got lost in the mail, or

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

122

1      stolen, or misplaced, or they say they never

2      received it; things like that.

3           Q      Okay.  And what is the AD-343

4      refer to?

5           A      That was a manual document

6      requesting pay through the NFC, or writing

7      up what happened and sending it down to the

8      NFC system.

9           Q      Okay.

10          A      A different number of pay

11     situations; it could be from promotions to

12     any particular pay situation.

13          Q      Okay.  So that's an NFC standard

14     form?

15          A      Yes.

16          Q      And how about the 354?  Is that

17     an AD-354; is that what that refers to?

18          A      Yes.

19          Q      That's another NFC form?

20          A      Yes.

21          Q      Okay.  One, two, three, four down

22     from that, "Made salary payments to

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

123

1    executive level staff, including the

2    withholding of benefits and taxes."  Was

3    that a different process than for non-

4    executive employees?

5         A    No, I don't believe so.  They

6    were just treated a little differently.

7         Q    Okay.  Do you remember how they

8    were treated differently?

9         A    We rushed things through.

10        Q    Good thinking.  Okay.  Let's see,

11   if you'll flip to the next page, the third

12   bullet down, "Developed SOPs for misplaced,

13   lost, or stolen bonds."  SOP is standard

14   operating procedure?

15        A    Yes.

16        Q    Okay.  And what kind of bonds are

17   we talking about here?

18        A    Savings bonds.

19        Q    Savings; okay.

20        A    Yes.

21        Q    So employees who misplaced their

22   savings bonds.  What was the standard

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

124

1    operating procedure?  This might be a good

2    thing for me to know, too.

3              MR. SIMPSON:  If it still exists.

4              THE WITNESS:  What were they?

5              BY MR. JONES:

6         Q    Yes.

7         A    Bonds that employees could

8    request through payroll deductions.  You

9    could have so much of your money come out of

10   your check until it generates your bond.

11        Q    Right.  I mean, I've got a -- let

12   me interrupt you.  I've got a whole bunch of

13   bonds that I got through the payroll

14   deduction down in my basement right now.

15   And if they got lost and it was back then

16   when you were the head of the section, what

17   would have been done?  What should I have

18   done when I came -- when I come to you and I

19   go, "My bonds are lost," then what happened

20   at that point?

21        A    If I can recall correctly, you

22   would have to give us a memo in writing,

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

125

1    stating that your bond was lost.

2        Q    Okay.

3        A    Including your social security

4    number, the series, the amount of the bond,

5    and the pay period that you -- that it was

6    misplaced or lost in.

7        Q    And you could get them reissued?

8        A    Yes.

9        Q    I hope they still have that.

10       A    But the other one -- you could

11   not cash both at one time.  You know, if it

12   was lost then it had to be lost.

13       Q    Right.

14       A    Because once -- it would be

15   canceled out.

16       Q    Right.  I hope they still have it

17   in case I lose one.

18           One, two, three, four, five down

19   from that, it talks about the SINQ report.

20   And then under that it talks about the NFC

21   SINQ, I guess you pronounce it, report.

22   Could you tell me what is that SINQ report?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

126

1      A      It was based on an error report,

2   the errors that went through the system,

3   correcting the errors.

4      Q      Okay.  I'm going to count up from

5   the bottom, three, "Calculated and prepared

6   retirement computations, paren, cards, for

7   separating employees and explained

8   retirement benefits."

9           I guess I understand everything

10  except that "cards" part.  What is it?

11     A      There were actually cards, but

12  they were large cards, like a sheet of paper

13  and longer, in all of the retirement

14  information.  All of your information was on

15  that from the time you come into the

16  Government, dates of service and things of

17  that nature until they get ready to leave,

18  and all that information had -- once you

19  leave, it had to be calculated -- computed,

20  if a person wanted to know as in this day,

21  we do it in the system, if you wanted to

22  know you had to do it manually.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

127

1          Q      Okay.  So you could find out what

2     your retirement benefits were going to be?

3          A      Yes.

4          Q      Based on what was on your card?

5          A      Yes.

6          Q      Okay.  I'm going to skip the

7     education and certificates page because we

8     talked about that, and go to the quality

9     ranking factors, and go to the second page

10    of that.  And it talks about, the fifth line

11    down, you have something about CULPRIT

12    reports.  Could you tell me what the CULPRIT

13    report -- what are the CULPRIT reports?

14         A      CULPRIT report --

15         Q      Was this at the same time the --

16    I'll ask you a new question to try to narrow

17    it down.  Were these at the same time the

18    SINQ -- you were working with the SINQ

19    reports?

20         A      Yes.

21         Q      Okay.

22         A      The CULPRIT, I'm trying to think

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

128

1    about what that was now.  I can't recall at

2    this time.  It may come to me later.

3         Q    Okay.  But it was something that

4    you did at the same time you were dealing

5    with the SINQ reports?

6         A    Yes.

7         Q    Under three, at the very end of

8    the first paragraph -- we're on the same

9    page here, the last sentence talks about

10   providing assistance with federal agencies

11   such as Department of Labor, Office of

12   Personnel Management, USDA, Department of

13   Agriculture, and other federal agencies.

14             Now, USDA and Department of

15   Agriculture, those are the same thing,

16   right?

17        A    Basically, yes.

18        Q    Okay.  I'm just making sure that

19   you're not referring to something else.

20   I've always heard that the Department of

21   Agriculture and U.S. Department of

22   Agriculture referred to is basically the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

129

1    same thing.

2          A      Basically, yeah.

3          Q      We're talking about the same

4    thing?

5          A      Yes.

6          Q      Down at the bottom of the same

7    page -- I'm losing my voice -- we're talking

8    about the PERFORM appraisal system.  Is that

9    the one where they have five different

10   categories, where you could be rated one to

11   five?

12         A      I believe so; yes.

13         Q      Okay.  We've had so many, it's

14   hard for me to remember.

15         A      Yes.

16         Q      Let's flip the page to No. 4.

17   And the first sentence under No. 4 says,

18   "I've written correspondence requesting

19   waivers and debts for retirement problems to

20   the deputy to the chairman as well as

21   letters to the employees."

22                Who was the deputy to the

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

130

1    chairman that you would write these -- that

2    you wrote these letters to?

3          A     Jane Sartori was one of them, and

4    -- what's the other guy?  What's his name?

5    And there was another guy, a male, I can't

6    --

7          Q     Was it Dennis Geer?

8          A     Yes, Dennis Geer, yes.

9          Q     Okay.  And then the next sentence

10   says, "I've written correspondence

11   responding to congressional inquiries

12   relating to personnel and pay issues."  Do

13   you remember any congressional inquiries

14   specifically that you responded to?

15         A     We received them, you know,

16   periodically.  And there are some that I

17   can't recall who or what, you know, but

18   there were -- we had to write up -- say if

19   the congressional office called or sent a

20   letter wanting to know why you did such and

21   such a thing, or why the person was maybe

22   put on leave, or whatever, that they request

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

131

1    that, or wanted a response to, we had to go

2    out to that unit or that division and go to

3    their supervisor and find out why they did

4    what they did and then give a response back

5    to Congress.

6         Q    Okay.  Now, what you wrote, would

7    that go directly back to Congress, or would

8    that go through the Office of Legislative

9    Affairs or something like that within the

10   FDIC?

11        A    It would go to my supervisor, and

12   she would give it to whomever that needed

13   that response.  And then it would go on up

14   to wherever, I guess it needed to go.

15        Q    Okay.  And your supervisor at

16   that time would be, what, Ms. Anderson or

17   Ms. Tyce?

18        A    Right.  That's correct.

19        Q    Okay.  And the next paragraph, it

20   talks about, "I've written standard

21   operating procedures for the unemployment

22   program and the dual lump sum payments."

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

132

1    And then it says, "I've written an

2    unemployment manual that consists of over 30

3    pages."

4              Do you have copies of any of

5    those documents, the unemployment manual or

6    the standard operating procedures?

7         A    Yes.

8         Q    Okay.  So --

9         A    If they're still in place.  I

10   should have copies; yes.

11        Q    Okay.  Would that be something

12   you'd be able to provide to me upon proper

13   request?

14             MR. SIMPSON:  No.  I recognize

15   and appreciate, but is this something that

16   currently exists in the system?  I mean, is

17   it readily accessible to you through the

18   agency that would still exist?  Do you know

19   if they still exist?

20             MR. JONES:  Go ahead.  You can --

21   yeah.  I mean, do you know if they exist?

22             MR. SIMPSON:  I mean, I realize

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
133

1    --

2              MR. JONES:  Are these available?

3              THE WITNESS:  Procedures?

4              MR. SIMPSON:  The SOP's?

5              THE WITNESS:  The SOP's?  I

6    believe they do.  To my knowledge, they do.

7              BY MR. JONES:

8         Q    Okay.  And how about the

9    unemployment manual?  Is that something

10   that's been superseded?

11        A    The unemployment manual?

12   Probably, because I'm not in that function

13   anymore, and not doing those functions, so

14   I'm not certain.

15             MR. JONES:  Okay.

16             MR. SIMPSON:  I would say for the

17   record, Bill, clearly that if you were not

18   able to locate something through the agency,

19   we'd be more than happy to try to run

20   something down and respond to it.

21             BY MR. JONES:

22        Q    Well, let me ask you this:  Do

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

134

1    you have the versions that you worked on?

2         A    Yes.

3         Q    Okay.

4         A    I believe I do.

5         Q    Okay.

6         A    I think.

7         Q    That's what I'd be interested in.

8              MR. JONES:  So I'll just request

9    on the record that you get the copies what

10   you worked on with respect to the SOP's and

11   the unemployment manual.

12             MR. SIMPSON:  Okay.  And the

13   SOP's for the unemployment program --

14             MR. JONES:  Yes.

15             MR. SIMPSON:  -- and the dual

16   lump some payments specifically.

17             MR. JONES:  Yes.

18             BY MR. JONES:

19        Q    Is that one document?

20        A    The SOP's?

21        Q    Yeah.  The SOP's for the

22   unemployment program and the dual lump sum

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

135

1    payments?  Or is that two different?

2        A    Two.

3        Q    Two, okay.  In the next

4    paragraph, it talks about dealing with

5    outside agencies.  And one of them -- I

6    recognize them all except for the Frick

7    company now talks, UCE eXpress.  What is

8    that?

9        A    That is a contracted unemployment

10   company that does our unemployment for us

11   now.

12       Q    Okay.  So they handle

13   unemployment claims made by former FDIC?

14       A    They handle any requests that

15   come from the Department of Labor, or

16   anything in that nature, where the employee,

17   when they leave the agency and want to apply

18   for unemployment, and maybe they're not

19   eligible, or maybe they are eligible, they

20   would go with the employee to the Department

21   of Labor if there is a dispute, and they

22   handle -- and other information -- and other

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                              136

1    unemployment information that comes up at

2    that time.

3         Q    Okay.

4         A    Basically they handle for them.

5    We used to handle it.  We contracted it out

6    to them to handle it.

7         Q    Okay.  And I see this as, "I deal

8    with outside agencies such as OPM and Frick

9    company."  So this is something that you do

10   now?

11             MR. SIMPSON:  I'm going to object

12   in that this is clearly a document that

13   talked about things until September 8th of

14   2004.  I think the document will speak in

15   that, but you may ask her.

16             MR. JONES:  Point taken.

17             BY MR. JONES:

18        Q    Let me ask that a little bit more

19   clearly.  This says, "I deal with outside

20   agencies."  So at the time that you prepared

21   this for submission, that was something that

22   you were doing at that time, correct?

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

137

1          A     Yes.

2          Q     Okay.  And let's see, that brings

3     us to the performance plan and evaluation.

4     And if you'd look at the last page, I see

5     that Ms. Purnell prepared this.  And you

6     both dated it 10/23/03.  So my question is,

7     is this during the four-month period that

8     you worked for Ms. Purnell?

9          A     Yes.

10         Q     Okay.  Do you know if she got

11    input from anybody else, because it's an

12    annual appraisal?

13              MR. SIMPSON:  And I'm going to

14    object to the extent that she may not know

15    what Purnell did unless Purnell told her.

16              MR. JONES:  Right.

17              MR. SIMPSON:  But you may answer.

18              MR. JONES:  That's why I'm asking

19    whether do you know whether she had input

20    from anybody else.

21              THE WITNESS:  No, I truly don't.

22    I'm not certain.

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

138

1        BY MR. JONES:

2            Q    Okay.  And before you were put

3    under her supervision, who was your

4    supervisor immediately prior?

5            A    Dave Harrington.

6            Q    Dave Harrington; okay.

7                MR. JONES:  Let's take a quick

8    break, and I may be done.

9                MR. SIMPSON:  Okay.

10                (Whereupon, a brief recess was

11    taken.)

12                MR. JONES:  Okay.  Back on the

13    record.  We have nothing further.

14                MR. SIMPSON:  Okay.  I only have

15    a couple.

16    CROSS-EXAMINATION

17                BY MR. SIMPSON:

18            Q    Ms. Chappell-Johnson, earlier, in

19    the early part of the deposition, Mr. Jones

20    asked you if you had ever worked for the

21    RTC.  When you joined the federal service

22    with the FDIC in 1990, were you specifically

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

139

1    with the RTC -- I mean, specifically with

2    FDIC?

3         A    Yes.

4         Q    You've never worked for the RTC?

5         A    No.

6         Q    Okay.  Did you ever service any

7    RTC employees as part of your job?

8         A    Yes.

9         Q    Okay.  You had indicated in your

10    earlier testimony that you were notified of

11    the non-selection in this matter that's the

12    cause of this matter by e-mail from the HR

13    staff, and you had indicated that you

14    thought it might have been two and a half to

15    three months after the interview.  Could it

16    in fact been sooner than two and a half to

17    three months?

18         A    Yes.

19         Q    It could have been weeks after

20    the interview?

21         A    It could have been; yes.

22         Q    Okay.  But you don't remember

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

140

1    exactly what the timing between the

2    interview and the e-mail notice, correct?

3         A    No, I don't.

4         Q    Okay.  If you would look at

5    Exhibit No. 4, which is your answers to the

6    interrogatories.  On page 2, the sentence,

7    the third line, also the third sentence,

8    "Ms. Purnell was aware of plaintiff's prior

9    protected activity."

10         Do you understand -- what

11    knowledge do you have of Shirley Purnell's

12    being involved in calculating employee

13    payroll issues in terms of settlement

14    discussions of EEO cases?

15         A    Ask that again now?

16         Q    Yes.  What is your understanding

17    of the involvement that Shirley Purnell

18    would have in developing payroll figures

19    when there's an EEO settlement discussion

20    ongoing?

21         A    Because it's supposed to be kind

22    of a private matter, and she was the head of

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

141

1    personnel operations -- personnel payroll

2    operations.  All those types of documents

3    and requests went directly to her.

4          Q    So it was your understanding that

5    she was aware of a prior complaint of yours

6    and that there was some settlement

7    discussion ongoing?

8          A    Yes.

9          Q    Okay.  Now, also in that same

10   paragraph, the last sentence, it says that

11   you had told Ms. Potucek about your prior

12   protected activity?

13         A    Yes.

14         Q    And you had testified that it was

15   a casual conversation -- general casual

16   conversation in the work area.  Did Ms.

17   Potucek say anything about management

18   considering people who complain as trouble

19   makers?

20         A    Generally speaking, yes.  During

21   our conversation, as I would think back,

22   during our conversation, we talked about it

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

142

1    and she did say, "Oh, that's a kind of bad

2    thing to do because you'll never get any

3    place.  Management always look at people

4    that file EEO complaints as trouble makers,

5    and normally they don't get any place."

6         Q    Okay.

7         A    "They don't ever get any

8    promotions.  It's hard."

9         Q    Okay.  Continuing on that same

10   page, page 2 of the answers to

11   interrogatories, down in the answer to

12   interrogatory No. 2, on the last line of

13   that page where it talks about -- actually

14   the next to last line, the sentence that

15   starts as such, "Plaintiff served as a

16   senior technical advisor and was responsible

17   for the entire process of manual payments."

18   Was it your understanding that the job that

19   you had applied for that is at issue here

20   required expertise in processing manual

21   payments?

22        A    That was part of my

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

143

1    understanding; yes.

2          Q    Okay.  Would you turn then to

3    Exhibit 1?  You can keep your spot there,

4    but Exhibit 1, page 2, under the summary of

5    duties, a little more than half way down,

6    it's a sentence that starts with,

7    "Reconciles payroll/personnel suspense

8    report and provides advice, guidance, and

9    assistance to administrative personnel in

10    the resolution of complex payroll/personnel

11    processing problems, and oversees manual

12    salary related payments."

13          A    Yeah.

14          Q    And it was your understanding,

15    obviously, that the duties for this position

16    required knowledge of manual payments to

17    process?

18          A    Yes, very much so because a lot

19    of payroll is about manual payments -- at

20    doing this.

21          Q    Okay.  Now, you had testified

22    earlier that you had filed one prior EEO

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

144

1    complaint against Ms. Purnell, correct, in

2    2004?

3         A    Yes, that's correct.

4         Q    And as we had just discussed, you

5    had an understanding that Ms. Purnell had

6    been involved in the earlier -- the 1998

7    complaint that you had filed, correct?

8         A    Yes.

9         Q    In the form of work documentation

10   coming to her office relative to the

11   settlement process?

12        A    Yes.

13        Q    Okay.

14             MR. SIMPSON:  Okay.  I have

15   nothing further.

16             MR. JONES:  I just got a few.

17   REDIRECT EXAMINATION

18             BY MR. JONES:

19        Q    In your conversation with Ms.

20   Potucek about your prior protected activity,

21   you said that she said that -- you said that

22   she said that management looked at people

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

145

1  who filed EEO complaints as trouble-makers?

2          A    Yes.

3          Q    Did she express any --

4          A    That may not have been those

5  exact words, but the trouble-maker part came

6  into play.

7          Q    Okay.  Did she express agreement

8  with that?

9          A    With explanation I would say yes.

10  She wasn't a supervisor at that time.  And

11  like I said, it was general conversation.

12  And basically, you know, it was that you

13  shouldn't -- that was maybe not a good thing

14  to do because management reviews people as

15  trouble-makers and they don't get too far,

16  basically.

17          Q    Did she express agreement that

18  she thought at that time people who filed

19  EEO complaints were trouble-makers?

20          A    Basically from the way I

21  interrupted it, I would say yes.  But she

22  didn't say as a supervisor.  As I stated, at

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

146

1    that time she wasn't in management.  So

2    basically, yes.

3         Q    And why did you get that

4    impression that she agreed with the people

5    that filed EEO complaints were trouble-

6    makers?

7         A    That's what she -- I mean, that's

8    basically what she said.  She said, "That's,

9    you know, maybe wasn't a good thing to do

10   because that's management's view -- view

11   people" -- and so I guess that was her

12   thinking because she stated it.  It had to

13   be her thinking.  I would assume that would

14   have to be her thinking because she stated

15   it.

16        Q    Okay.  I understand the sentiment

17   about management would think that people who

18   filed EEO complaints were trouble-makers,

19   but as you said, she wasn't a manager at

20   that point, correct?

21        A    Right.  That's correct.

22        Q    Was she in affect telling you

**EXHIBIT 9**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

147

1    that she thought people like you who filed

2    EEO complaints were trouble-makers?

3         A    I truly don't know what her

4    thinking was, but from my experience in

5    speaking with her and talking at that time,

6    and it's hard to recall because it has been

7    some time, but in speaking with her, I

8    believe that's what she thought.  I believe

9    that's what she thought.

10        Q    Okay.

11             MR. JONES:  Nothing further.

12             MR. SIMPSON:  I have nothing

13    further.

14             MR. JONES:  Thank you.

15             (Whereupon, the foregoing matter

16    concluded at approximately 2:05 p.m.)

17

18

19

20

21

22