**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - - - x

                                  :

DOROTHY CHAPPELL-JOHNSON,         :

                                  :

          Plaintiff,              :

                                  :

     v.                           : Civil Action No.

                                  : 06-1074 (RCL)

MARTIN J. GRUENBERG,              :

                                  :

          Defendant.              :

                                  :

- - - - - - - - - - - - - - - - - x


                         Washington, D.C.


                         Thursday, November 15, 2007


Deposition of

          LORINDA SUSAN POTUCEK

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Mary Ann

Kohler, Notary Public in and for the District of

Columbia, in the law offices of Swick & Shapiro, P.C.,

1225 Eye Street, N.W., Suite 1290, commencing at 10:46

a.m.

          Diversified Reporting Services, Inc.

               (202) 467-9200

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
                                                                        Page 2

         APPEARANCES:


              On Behalf of the Plaintiff:

                   JAMES SIMPSON, ESQ.

                   Swick & Shapiro, P.C.

                   1225 Eye Street, N.W.

                   Suite 1290

                   Washington, D.C.  20005

                   (202) 842-0300



              On Behalf of the Defendant:


                   WILLIAM JONES, ESQ.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 3

C O N T E N T S

EXAMINATION BY:                                                          PAGE

        Counsel for Plaintiff                                             4

DEPOSITION EXHIBITS:

1 - Organization chart                                                   43

2 - Selections of Lorinda Susan Potucek                                  51

3 - Job vacancy announcement                                             96

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 4

1                    P R O C E E D I N G S

2    Whereupon,

3                    LORINDA SUSAN POTUCEK

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6                         EXAMINATION

7         BY MR. SIMPSON:

8         Q    **Good morning, ma'am.**

9         A    Good morning.

10        Q    **Could you state your full name for the record,**

11   **and spell, please?**

12        A    Yes.  Lorinda Susan Potucek, L-o-r-i-n-d, as

13   in David, a, Susan, S-u-s-a-n, Potucek, P, as in Paul,

14   o-t, as in Tom, u-c-e-k.

15        Q    **Thank you.  And if you could please state your**

16   **address.**

17        A    Business or home?

18        Q    **Home.**

19        A    21115 Virginia Pine Terrace, Germantown,

20   Maryland, 20876.

21        Q    **What is the highest educational degree that**

22   **you have attained?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 5

1          A    Post-Master's degree.

2          Q    A post-Master's?

3          A    That's correct.  Work towards my doctorate.

4          Q    Now, when you say post-Master's, working

5    toward your doctorate?

6          A    Correct.  So, the highest attained was a

7    Master of Science degree from Vanderbilt University at

8    the Oxford and Cambridge University campuses in

9    England.

10         Q    And when -- what was the Master's of Science

11   degree in?

12         A    It was in counseling psychology and career

13   development.

14         Q    Counseling psychology and career management?

15         A    Career management, correct.

16         Q    And what was the time period that you were

17   earning that degree?

18         A    1974 to 1976.

19         Q    And it was full-time?

20         A    No.

21         Q    Okay.  And what were you doing while you were

22   also pursuing a Master's degree?

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 6

1          A      I was working for the Department of Defense in

2    Berlin, Germany, as a recreation center director.

3          **Q      Now, you had indicated that it was at**

4    **Vanderbilt University, the Oxford --**

5          A      At their Oxford and Cambridge University

6    campuses in England.

7                 I did not go to the Vanderbilt University

8    campus in Tennessee.

9          **Q      Did you actually attend classes in -- in**

10   **England?**

11         A      Correct.

12         **Q      While you were working in Berlin, Germany.**

13         A      Correct.

14         **Q      Working for -- you were working full-time for**

15   **DOD?**

16         A      Correct.

17         **Q      So, the classes were weekend classes?**

18         A      Sometimes.  And sometimes they were

19   in -- during the week.  Then I would take vacation time

20   to attend the class.

21         **Q      And prior to earning your Master's degree in**

22   **1976, what was your next lower level education, your**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 7

1    under-grad -- do you have -- strike that.  Do you have

2    any other Master's degree?

3        A    I have a Master's degree that I just earned

4    from Georgetown University in June of this year, in

5    their executive leadership coaching certificate

6    program, and it's considered a graduate certificate, a

7    graduate school certificate, because we had to compete,

8    and only 24 people were selected, and it was an

9    eight-month program, and I -- again, I graduated in

10   June of 2007.

11       Q    And that's a program that's sponsored by

12   the -- the Federal Government?

13       A    No.  It's Georgetown University.  It's not a

14   Federal Government program.

15       Q    And again, it was a certificate in executive

16   leadership?

17       A    Coaching.

18       Q    Coaching.

19       A    In order to be eligible to even apply, you had

20   to have at least a law degree or a Master's degree.

21       Q    And this was not -- was this a full-time

22   program?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                Page 8

1    A    No.  It was on my own time, but it was eight

2    months, and I went to class three days per month at the

3    Georgetown University campus, and the work that I had

4    to do for the course was done on my own time.  The

5    papers that I wrote had to be done on my own time.

6        **Q    Okay.  And any other Master's or Master's**

7    **equivalent?**

8    A    No.

9        **Q    Undergraduate degree?**

10    A    A Bachelor of Arts degree from Marylhurst

11    University -- Marylhurst, M-a-r-y-l-h-u-r-s-t.

12        **Q    Is that all one word, Marylhurst?**

13    A    Correct.  University.  In Portland, Oregon.

14        **Q    And that was a Bachelor of Arts?**

15    A    Correct.

16        **Q    In what discipline?**

17    A    Secondary education, English, and Spanish,

18    with a minor in French.

19        **Q    And when did you receive the Bachelor of Arts**

20    **degree from Marylhurst University?**

21    A    1970.

22        **Q    And did you attend Marylhurst University**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 9

1    full-time?

2        A    Yes.  Except for my junior year.  I spent my

3    junior year at the University of Valencia in Spain.

4        **Q    That was still part of the -- the --**

5        A    That was not part of Marylhurst.

6        **Q    That was additional education?**

7        A    Correct.

8        **Q    So, when you received your degree, your**

9    **Bachelor of Arts degree, in 1970, you had actually been**

10   **attending full-time education for five years?**

11       A    My junior year, I spent at the University of

12   Valencia in Spain.

13            So, I attended Marylhurst my freshman, my

14   sophomore, and my senior year.  My junior year, I went

15   with a different university to spend my junior year

16   abroad.

17       **Q    And the credits that you earned while studying**

18   **abroad transferred to Marylhurst and were accepted**

19   **towards the degree.**

20       A    Correct.  Correct.

21       **Q    Okay.  Have you ever given a deposition**

22   **before?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 10

1        A    Yes.

2        Q    **When?**

3        A    I can't remember.

4        Q    **Within the last five years?**

5        A    No.

6        Q    **Within the last 10 years?**

7        A    I can't remember.

8        Q    **Do you recall what the matter involved that**

9   **you gave a deposition for?**

10            **Was it a family law matter?**

11       A    I know I gave a deposition when I got my

12   divorce, but that was probably 21 years ago, and

13   I -- and I know that I've given depositions as -- as a

14   director of human resources in other agencies, but I

15   can't remember the year and the month.

16       Q    **Do you remember approximately how many**

17   **depositions that you would have given in relation to a**

18   **position you had with the Federal Government,**

19   **approximately how many?**

20       A    Approximately five.

21       Q    **Were they discrimination and/or -- strike**

22   **that.  Were they related to Title VII claims?**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 11

1           A     I can't -- I can't remember.  I remember that,

2     as the director of human resources, that they had to do

3     with how we filled jobs and the contracts that we had

4     with unions, with AFGE or NTEU.

5           I remember that it was our merit promotion

6     plan, if we -- how we -- how we followed the merit

7     promotion plan.  It was -- it was in my capacity as the

8     director of H.R., supervising a staff who -- whose job

9     it was to fulfill duties.

10          **Q     Let me ask you this.  Do you understand that**

11    **you are here today giving this deposition because you**

12    **are a named individual in an EEO formal complaint of**

13    **discrimination and/or retaliation filed by Ms.**

14    **Chappell-Johnson?**

15          A     I do.

16          **Q     Have you ever been a named alleged**

17    **discriminating or retaliating official in any other**

18    **formal EEO complaint filed by an employee of any**

19    **Federal agency?**

20          A     No.

21          **Q     So, none of the depositions, the approximate**

22    **five that you were just speaking about, would have**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 12

1    involved you giving deposition testimony because you

2    had been a named discriminating or retaliating

3    official.

4        A    No.

5        Q    Okay.  This is your first that brings us here

6    today.

7        A    Correct.

8        Q    Okay.  And just so I understand, prior to the

9    incident that brings us here today, you have not been

10   named as an alleged discriminating or retaliating

11   official in -- in -- in your time at FDIC.

12       A    Other than this complaint, not to the best of

13   my knowledge.

14       Q    Okay.  There have not been any EEO complaints

15   filed against you since this particular one was filed

16   in 2004.

17       A    No.

18       Q    And again, you were not a named alleged

19   discriminating or retaliating official in your capacity

20   in any other Federal agencies prior to coming to FDIC.

21       A    Not to the best of my knowledge.

22       Q    All right.  Okay.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)
Page 13

1          Do you have any other undergraduate degree

2     other than the Bachelor of Arts degree from Marylhurst

3     University?

4     A     No, but I do have a equivalent, a University

5     of Maryland certificate that required 21 to 28 hours,

6     in women's studies, that I -- I did on my own time,

7     that I also include in my resume.

8          Q     And when did you achieve that certificate?

9     A     I achieved that in 19 -- I believe it was

10    nineteen seventy -- it was over a period of time, so it

11    was from 1976 through 1981.

12         Q     And you actually received the certificate in

13    1981.

14    A     Correct.  Correct.

15         Q     Okay.  During the course of this

16    deposition -- and forgive me -- it's Potucek?

17    A     Correct.

18         Q     Ms. Potucek, I'm going to ask questions, and

19    when you answer a question, I'm going to assume that

20    you understood the question and that the response that

21    you are providing directly addresses that question that

22    I just asked.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 14

1            Do you understand that?

2       A    Uh-huh.

3       Q    Okay.  If I -- if I ask a question --

4       A    Yes.

5       Q    And when I ask a question that you don't

6   understand, please ask me to repeat it or restate it.

7   So, I want to make sure you understand whatever

8   questions I do ask, and just like a few seconds ago

9   with the wonderful illustration, when I ask you a

10  question, that you would answer either a one-word yes

11  or no, I would ask that you articulate that one-word

12  answer, as opposed to nodding your head or perhaps

13  mumbling some uh-huh or uh-uh, for the court reporter

14  to make sure that she can get a specific to that

15  question from you.

16           I'm going to be asking you many additional

17  questions, some of which, after I start asking the

18  question, you may think you know where the question is

19  going to end, and you may want to go ahead and try to

20  answer the question.

21           I will ask if you could let me finish the

22  question before you start to answer the question, so

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 15

1    that we make sure you're answering my complete question

2    and not part of my question.  Is that agreeable?

3         A    Yes.

4         Q    And likewise, when you start to answer a

5    question, I will do my best to let you finish before I

6    ask another question.

7         A    Okay.

8         Q    All right.  Now, at any time, if you desire to

9    take a break -- and you can take a break for whatever

10   reason, but if you desire to take a break, we will take

11   a break.  The only thing I ask is that if I have a

12   question that I have asked you, that we get the answer

13   to that question before we break.

14        A    Okay.

15        Q    All right.  Ms. Potucek, in preparation for

16   this deposition, did you review any documents?

17        A    I reviewed my affidavit.

18        Q    That's the affidavit that was in the report of

19   investigation, correct?

20        A    Correct.

21        Q    Now, when you say your affidavit, did that

22   include your supplemental affidavit?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 16

1       A    No.

2       Q    Just the one document, several pages --

3       A    Correct.

4       Q    -- your affidavit.

5            Okay.  Any other documents you reviewed?

6       A    No.

7       Q    Other than speaking with members of the legal

8    department, general counsel of the Federal Deposit

9    Insurance Corporation, did you speak with anyone prior

10   to this deposition?

11      A    Yes.

12      Q    Who did you speak with?

13      A    My physicians.

14      Q    And who were those physicians?

15      A    I have cancer, and I spoke to my chemotherapy

16   doctor at Johns Hopkins, Dr. Carolyn Hendricks, and I

17   spoke to my radiation doctor at Georgetown Medical

18   Center, Dr. Anna Sing.

19      Q    And if I might ask, why did you speak to your

20   treating health care providers?

21      A    Because I am on Arimadex and Tomoxifan, and

22   I'm on an antidepressant, a chemo drug every day for

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 17

1  five years, and I have extraordinary side effects from

2  this chemotherapy and radiation that I am undergoing,

3  and I am experiencing extreme fatigue and weakness and

4  memory loss because of the chemotherapy, and I wanted

5  to confer with them on my well-being and being able to

6  sit through a deposition for a period of time when I am

7  on this extraordinary medication.

8       Q    And what -- what advice did your treating

9  health care providers --

10      A    They told me that I could -- could participate

11  in the deposition, and if I can't remember, to say that

12  I can't remember, that this is not unusual for people

13  who go through chemotherapy, and if I need to take a

14  break, to articulate to people that I need to get up

15  and take a break.

16      Q    And I certainly have every intention of

17  supporting those requirements that you may have.

18          Now, other than the possibility of memory

19  loss -- strike that.

20          In talking to your health care providers, did

21  they indicate whether the memory loss that you may

22  experience because of having undergone the

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 18

1    chemotherapy, to include the medication -- is that

2    long-term or short-term memory loss?

3        A    Every patient is different.

4        Q    In your case, were your advised about the

5    duration of memory loss that you may experience?

6        A    Only that every patient is different and they

7    cannot predict.

8        Q    So, in the discussion with your treating

9    health care professional, there was no specific

10   discussion about the duration of memory loss for you as

11   we sit here today.

12       A    Correct.

13       Q    And I think you had indicated that you were

14   undergoing -- had been undergoing chemotherapy and

15   medication for five years?

16       A    I finished the chemotherapy in April, and I

17   started the radiation.

18            I finished the radiation in June, and now I am

19   on the chemo pill every day for five years, starting

20   the first of September.

21       Q    Thank you.  Now, other than the potential side

22   effects of fatigue and -- and potential memory loss,

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 19

1    were there any other side effects of the medication

2    that you're currently taking, that your health care

3    professionals advised you about?

4         A    Yes.

5         Q    What else were those?

6         A    Fatigue, weakness, memory loss, depression,

7    bone and joint pain.

8         Q    Are you taking any other medication for the

9    depression?

10        A    Yes.

11        Q    What medication are you taking?

12        A    Lexapro.

13        Q    Lexapro?

14        A    Correct.

15        Q    And when did you start taking that?

16        A    The first of September.

17        Q    About the same time you started taking

18   the -- the -- the chemo medication pill.

19        A    Correct.

20        Q    Do you have any reason to believe, Ms.

21   Potucek, that the medication that you're currently

22   taking, other than what you have described as potential

EXHIBIT 19
**CHAPPELL-JOHNSON v. BAIR**
(No. 06-1074-RCL)                                              Page 20

1      side effects, will hinder you from answering questions

2      truthfully, to the best of your knowledge today?

3          A    No.

4          **Q    You're currently employed?**

5          A    Correct.

6          **Q    And who is your current employer?**

7          A    The Federal Deposit Insurance Corporation.

8          **Q    And what is your current position?**

9          A    I am the chair for the division of

10     administration for corporate university, and I am an

11     adjunct professor for the University of Maryland, where

12     I have been employed for 18 years, University of

13     Maryland, University College.

14         **Q    And you're an adjunct professor in what**

15     **discipline?**

16         A    Human resources, marketing, women's studies,

17     and business management.

18         **Q    Do you have a class that you teach every**

19     **semester?**

20         A    Correct.

21         **Q    And you've taught a class every semester for**

22     **the last 18 years?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 21

1       A    Correct.

2       **Q    And is that just the -- the -- the winter and**

3    **spring semesters, or does it include the summer**

4    **semester?**

5       A    Includes the summer.  Under the law, adjuncts

6    can only teach, in the State of Maryland, at least, if

7    you're an adjunct and you have another full-time job,

8    you can only teach 15 credits or five classes, five --

9       **Q    In any given academic year?**

10      A    Correct.  An academic year runs from summer,

11   fall, to spring.

12      **Q    It's a one-year period of time.**

13      A    Yes.  So, it's not a calendar year.  It

14   starts -- the academic year starts summer.

15      **Q    But it's 12 months any way you cut it,**

16   **correct?**

17      A    Correct.

18      **Q    Yes.  And each academic year for the last 18**

19   **years, have you taught a minimum of three classes?**

20      A    Five.

21      **Q    Okay.  So, there are some semesters at**

22   **University of Maryland, University College, where you**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 22

1    may teach more than one class a semester.

2         A    Correct.

3         Q    Okay.  What is your current grade as the

4    chair, division of administration for corporate

5    university?

6         A    CM-1.

7         Q    And how long have you been a CM-1?

8         A    I need to qualify that statement, because

9    I -- I've been a CM-1 at the FDIC for maybe five years,

10   but it's equivalent to a Grade 15 in the rest of

11   government, and I have been a Grade 15 in the rest of

12   government longer than five years.

13        Q    But the question is about your grade at the

14   FDIC as a CM-1.

15             "CM" stands for corporate management?

16        A    Correct.

17        Q    At a CM-1 -- you say you've been a CM-1 for

18   five years?

19        A    Correct.

20        Q    So, since sometime in 2002?

21        A    2002-2003.  I am not exactly certain when I

22   was promoted to the CM-1.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 23

1       Q    Okay.

2       A    But it was in that proximity.

3       Q    **How long have you been the chair for corporate**

4    **university division of administration?**

5       A    Two years.

6       Q    **And when were you -- when did you first start**

7    **as the chair for corporate university?**

8       A    January of 2006.

9       Q    **Okay.  So, slightly less than two years.**

10      A    Twenty-three months.

11      Q    **Was that a competitive position?**

12      A    Yes.  Yes.

13      Q    **So, it was announced, and you applied for it.**

14      A    Correct.

15      Q    **And were you interviewed for the position?**

16      A    Informally.

17      Q    **What do you mean by "informally"?**

18      A    It was not done by a formal interview panel.

19      Q    **So, you were not interviewed by a panel.  Who**

20    **were you interviewed by?**

21      A    My current supervisor, who made the selection,

22    Veejay Deshpande.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**                                    Page 24
**(No. 06-1074-RCL)**

1      Q    Okay.  So, actually, you were formally

2   interviewed by Mr. Deshpande, correct?

3      A    No, not formally.

4      Q    Okay.  How did the interview occur?

5      A    He knew me because of my other work at the

6   FDIC, and talked to me informally about the position.

7   There were no formal interview questions and benchmarks

8   that were documented on -- documented on an official

9   piece of paper.  I call that an informal interview.

10     Q    There were no formal questions or benchmarks

11  for questions that you were aware of, correct?

12     A    Correct.

13     Q    The interview -- was that face-to-face?

14     A    Yes.

15     Q    Did he take notes?

16     A    No.

17     Q    And did he have any other pieces of paper in

18  front of him?

19     A    No.

20     Q    So, you don't know whether he subsequently,

21  after talking with you, made any notes of the questions

22  and answers in the discussion period he had with you,

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 25

1    do you?

2         A    I do not know.

3         Q    So, the designation, "informal interview" is

4    your term.

5         A    Correct.

6         Q    And do you remember when you were informally

7    interviewed by Mr. Deshpande?

8         A    It was November or December of 2005.

9         Q    Okay.  Do you know if there were any other

10   candidates that applied for that position?

11        A    Yes.

12        Q    Do you know who they were?

13        A    No.

14        Q    Okay.  Do you know how many?

15        A    No.

16        Q    But Mr. Deshpande told you there were other

17   applicants?

18        A    Yes.

19        Q    But you personally didn't know anyone else

20   that had applied for that position, did you?

21        A    No.

22        Q    All right.  So, prior to becoming the chair,

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 26

1    division of administration for corporate university,

2    what was your position prior to that?

3         A    Human resources officer for headquarters.

4         Q    And when did you start that job?

5         A    It was sometime in 2003.

6         Q    Do you recall whether it would have been the

7    first half of '03 or the last half of '03 or the middle

8    of '03?

9         A    It was probably the last of -- in the fall of

10   2003.  I was in the position approximately two years

11   before I moved to corporate university.

12        Q    And your grade as the human resources officer

13   for FDIC headquarters?

14        A    CM-1.

15        Q    In fact, when you assumed that position as the

16   H.R. officer for FDIC, is that when you were promoted

17   to CM-1?

18        A    Correct.

19        Q    And was that a competitive process?

20        A    Yes.

21        Q    There was a vacancy announcement, and you

22   applied, based on the vacancy announcement.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 27

1          A     Yes.

2          **Q     Were you interviewed?**

3          A     Yes.

4          **Q     And who interviewed you?**

5                 **(Pause.)**

6          A     I can't remember.

7          **Q     Was it a panel, an interview panel?**

8          A     Yes, it was.

9          **Q     Okay.  By the way, Mr. Deshpande -- what is**

10   **his current title?**

11         A     He is the -- an executive dean for the college

12   of corporate operations and corporate university.

13         **Q     He's an executive dean for college operations**

14   **in the corporate university?**

15         A     He's the dean of the college of corporate

16   operations in corporate university.

17         **Q     Okay.  Do you know what his grade is?**

18         A     Executive.  He's an E, an EM.

19         **Q     Okay.  And Mr. Deshpande -- by the way, does**

20   **he have a Ph.D. or a --**

21         A     Yes, he does.

22         **Q     So, he's Dr. Deshpande?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                           Page 28

1        A    Correct.

2        Q    **Okay.  Is your title Doctor?**

3        A    No.

4        Q    **No.**

5             **When you applied for and were selected for the**

6    **human resources officer, approximately in the fall of**

7    **2003, who was your first-line supervisor when you**

8    **started?**

9        A    Shirley Pernell.

10       Q    **And what was her position title?**

11       A    It was associate -- associate director of -- I

12   can't remember the rest of the title.

13       Q    **And is she the one that hired you to become**

14   **the human resources officer?**

15       A    Yes.

16       Q    **She was the selecting official.**

17       A    Correct.  Or -- I don't know if she was the

18   recommending or the selecting, but it was -- she was my

19   immediate supervisor.  But on the document, I can't

20   recall whether she was the recommending or the

21   selecting.

22       Q    **Okay.  So, part of the interview prior to**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 29

1    getting this job would have included an interview

2    involving Shirley Pernell, correct?

3        A    Correct.

4        Q    Does that help refresh your memory as to

5    members of the interview panel, other than Shirley

6    Pernell?

7        A    No, because I had applied for many jobs and

8    was interviewed by many panels at the FDIC,

9    non-selected on -- and I cannot remember all the

10   panelists of all those interview panels.

11       Q    Okay.

12       A    It's a fog.

13       Q    Do you know whether Miguel Torrado was part of

14   the interview panel?

15       A    No, he was not.

16       Q    Was not.

17       A    No.

18       Q    Could he have been the selecting official?

19       A    He might have been.

20       Q    Okay.  Who was your second-line supervisor as

21   the H.R. officer?

22       A    Miguel Torrado.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 30

1      Q     And what was his position?

2      A     The director of human resources.

3      Q     Okay.  Now, between the period of you starting

4   as the H.R. officer for FDIC in -- sometime in the fall

5   of 2003 until you were selected to become the chair for

6   the division of administration for corporate

7   university, was Shirley Pernell your supervisor during

8   that entire period?

9      A     As the human resources officer, yes.

10     Q     Okay.  And was Miguel Torrado your second-line

11  supervisor that entire period?

12     A     Correct.

13     Q     Okay.  And prior to becoming the H.R. officer

14  for headquarters FDIC, what was your position?

15     A     The Conanan consent decree compliance officer.

16     Q     And when did you start that duty?

17     A     I believe it was the fall of 2001.

18     Q     So, approximately two years, you served as the

19  Conanan consent decree compliance officer.

20     A     Two-and-a-half years, I was the Conanan --

21     Q     Two-and-a-half years?

22     A     Actually, I was the Conanan consent decree

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 31

1    officer for three years, because the court order was

2    for three years.

3            So, it over -- I overlapped with the H.R.

4    officer and the Conanan consent decree.  For some

5    period of time, I was doing both jobs.

6       Q    I understand.  Yes, ma'am.  And in your

7    capacity as the Conanan consent decree compliance

8    officer, who was your first-line supervisor?

9       A    Miguel Torrado.  And I had -- well, Miguel

10   Torrado was officially my supervisor.

11      Q    Did you, in fact, have responsibilities to

12   report to the chairman of FDIC in that capacity?

13      A    My documents -- I did not report to her.

14      Q    Okay.

15      A    Or him.

16      Q    Who was your second-line supervisor as the

17   Conanan consent decree compliance officer?

18      A    Glen Bjorklund.

19      Q    And do you know what his position title was?

20      A    He's still in that position as the deputy to

21   the director for the division of administration.

22      Q    So, Mr. Bjorklund has been the deputy to the

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 32

1    director for the division of administration, to your

2    knowledge, at least since the fall of 2001.

3        A    Correct.

4        Q    Do you know whether there is current a Conanan

5    consent decree compliance officer?

6        A    There is not.

7        Q    And that responsibility that FDIC had to full

8    with a compliance officer ended in approximately 2003?

9        A    Probably January of 2005.

10       Q    And prior to serving as the Conanan consent

11   decree compliance -- oh, by the way, what was your

12   grade as the Conanan consent decree compliance officer?

13       A    CG-14.

14       Q    When you became the Conanan consent decree

15   compliance officer in approximately the fall of 2001,

16   was that a promotion for you?

17       A    No, it was a change to lower grade at my

18   request.

19       Q    So, prior to becoming the Conanan consent

20   decree compliance officer, what was your position?

21       A    The director of large bank operations for the

22   nation, at the Office of the Comptroller of the

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 33

1    Currency.

2                (Pause.)

3        Q    So, when you were -- strike that.

4             In becoming the Conanan consent decree

5    compliance officer, was that a competitive process?

6        A    Yes, it was.

7        Q    But you were not in FDIC at that time, were

8    you?

9        A    No.

10       Q    Do you recall who selected you for that

11   position?

12       A    Yes.

13       Q    Who?

14       A    Cindy Medlock.

15       Q    M-e-d-l-o-c-k?

16       A    Correct.

17       Q    Can you recall what her position was?

18       A    The director of human resources.

19       Q    And prior to becoming the Conanan consent

20   decree compliance officer, you worked for the Office of

21   the Comptroller of the Currency.

22       A    Correct.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 34

1          Q    And what was your grade?

2          A    A 15.

3          Q    Was it a GS-15

4          A    No.  It was in the band -- they have bands,

5     and I was in the band -- an NB something, but it was

6     equivalent to a 15.

7          Q    MB?

8          A    MB.  I can't remember the number.  They have

9     seven bands, and I may have been a band six, five.  I

10    can't remember.

11         Q    Do you recall what "MB" stands for?

12         A    No.

13         Q    Okay.  But you were equivalent to a GS or a

14    CG-15?

15         A    Correct.

16         Q    Which one?

17         A    Both.

18         Q    Okay.  The FDIC does not grade its employee

19    out of GS, do they?

20         A    That's correct.

21         Q    They're graded at CG.

22         A    Correct.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                           Page 35

1      Q    Do you know if the pay structure for the CG

2    positions in the FDIC is equivalent to the GS pay in

3    the rest of Federal service?

4      A    It's equivalent, but not the same.

5      Q    It's different.

6      A    Different.

7      Q    Prior to becoming the Conanan consent decree

8    compliance officer for the Federal Deposit Insurance

9    Corporation in approximately the fall of 2001, had you

10   worked for the FDIC prior to that position?

11     A    No.

12     Q    Do you recall when you became the director for

13   the large bank operations, Office of the Comptroller of

14   the Currency, when you became the director for large

15   bank operations?

16     A    In the fall of 1999.

17     Q    And where were you prior to becoming the

18   director of large bank operations at the Office of the

19   Comptroller?

20     A    I was the -- a GS-14, chief of succession

21   management and planning at the Census Bureau in

22   Suitland, Maryland.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 36

1        Q    How much Federal service do you have?

2        A    Thirty-two.

3             (Pause.)

4        Q    So, that would put your basic pay entry date

5   of Federal service around 1975?

6        A    Actually, 1974, because I worked for a U.S.

7   senator on Capitol Hill, and my computation date shows

8   1974, but not all that time counted.  So, technically,

9   it would go back to '75, but on my records, it shows

10  1974.

11       Q    It would have been adjusted for the period of

12  time that does not --

13       A    Correct.

14       Q    -- is not credited to Federal service.

15       A    Correct.

16       Q    Thank you.  Now, in your current capacity as

17  the chair of the division of administration for

18  corporate university, is that a supervisory position?

19       A    No.

20       Q    Do you understand what the term "direct

21  report" means?

22       A    Yes.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 37

1          Q    So, you have no direct reports in your current

2    position.

3          A    Correct.

4          Q    So, you have no subordinates that work for

5    you.

6          A    Correct.

7          Q    In your position as human resources officer

8    for headquarters FDIC, is that a supervisory position?

9          A    Yes.

10         Q    Do you recall how many direct reports you had?

11         A    Initially, I had 28, and after the reduction

12   in force, I had 12.

13         Q    And the reduction in force would have occurred

14   something during the period fall 2003 to roughly

15   January 2006?

16         A    We had three formal reduction in forces.

17         Q    In that period of time.

18         A    Correct.

19         Q    And the RIFs occurred concurrently with

20   reorganization?

21         A    In some cases.

22         Q    The three.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 38

1          A    Correct.

2          Q    In that period of time, did all three of them

3    occur concurrently with a reorganization or

4    restructuring of your office?

5          A    No.

6          Q    How many of the three RIFs occurred

7    concurrently with reorganization?

8          A    Two.

9          Q    Okay.  As the Conanan consent decree

10   compliance officer, were you a supervisor?

11         A    No.

12         Q    Did you have a staff that administratively

13   supported you?

14         A    No.

15         Q    What about as the director of large bank

16   operations?  Is that a supervisory position?

17         A    Yes.

18         Q    How many direct reports did you have?

19              (Pause.)

20         A    Approximately 16.

21         Q    And would that have been fairly constant

22   between the period fall of 1999 and January of 2005,

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 39

1    approximately 16 direct reports?

2        A    No.

3        Q    It varied.

4             MR. JONES:  Did you say 2005?

5             MR. SIMPSON:  I'm sorry.  Strike that.

6             BY MR. SIMPSON:

7        Q    Between the period fall of 1999 and fall of

8    2001.  Forgive me.

9             MR. SIMPSON:  Thank you, Bill.

10            BY MR. SIMPSON:

11       Q    That's 16 -- the number of direct reports at

12   16 was fairly constant?

13       A    No.

14       Q    What did -- what was the range of direct

15   reports in that roughly two-year period?

16       A    Initially, it was 10.  Then they gave me all

17   the regional offices, all the H.R. offices in all the

18   regions, in a reorganization, and they all reported to

19   me, nationwide, which -- at the halfway mark, and that

20   upped it to 16.

21       Q    Okay.  Now, in the position, director, large

22   bank operations, your duties were principally

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 40

1    H.R.-related?

2         A    Yes.

3         Q    Were they completely H.R.-related?

4         A    Yes.

5         Q    Did you have any administrative duties as the

6    director of large bank operations?

7         A    Clarify "administrative duties."

8         Q    For the Office of the Comptroller of Currency.

9         A    What do you define as "administrative"?

10        Q    Non-human resources-related.

11        A    No.  No.

12        Q    They were all human resources-related.

13        A    Correct.

14        Q    Of your 32 years in Federal service,

15   approximately how much of that -- those 32

16   years -- have been in the H.R. field?

17        A    Twenty-seven years.

18        Q    And forgive me -- I did not make note of the

19   position that you worked in Berlin, Germany, for

20   Department of Defense during the period '74 to '76.

21   What was the name of that position?

22        A    Director of recreation services.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 41

1          Q    And that was human resources-related?

2          A    No.

3          Q    And in your capacity as the chair for the

4     division of administration for corporate university,

5     that's human resources-related?

6          A    Correct.

7          Q    So, you're the -- are you the H.R. officer for

8     the corporate university?

9          A    No.

10         Q    Who is the H.R. officer for corporate

11    university?

12         A    There is no H.R. officer.

13         Q    Other than you, are there any other management

14    officials with corporate university responsible for

15    human resources?

16         A    No one is responsible for human resources in

17    corporate university.

18         Q    Okay.  Except you.

19         A    No.

20         Q    Okay.  So, you have no H.R. responsibilities

21    as the chair for the division of administration.

22         A    On occasion.  Only when asked.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 42

1      Q     And who would ask you?

2      A     The chief learning officer.

3      Q     Who is that?

4      A     Tom Twerlliger.

5      Q     And what would that involve?

6      A     Asking me to write a position description.

7      Q     Anything else?

8      A     Asking me for counsel on how to post a job.

9      Q     Jobs that are posted by corporate

10     university -- are they actually posted out of the

11     Federal Deposit Insurance Corporation?

12     A     No, they're posted over in the human resources

13     branch, by the human resources officer, the job that I

14     vacated.

15     Q     You vacated in January of 2006 the position

16     you'd served in since the fall of 2003.

17     A     Correct.  They had responsibility to post all

18     the jobs at the headquarters for the FDIC in all the

19     divisions.

20     Q     When you were the human resources officer for

21     FDIC, were you responsible, through subordinates, to

22     maintain official personnel files for FDIC employees?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 43

1         A    Yes.

2         Q    In your current position as the chair of the

3    division of administration for the corporate

4    university, do you maintain official personnel files

5    for corporate university employees?

6         A    No.

7         Q    Those are maintained by --

8         A    -- human resources branch.

9         Q    So, fundamentally, the human resources

10   responsibilities are fulfilled by the human resources

11   branch of FDIC.

12        A    Correct.

13        Q    So, the human resources officer for corporate

14   university is whoever is sitting in the FDIC H.R.

15   office, correct?

16        A    There is no human resources officer in

17   corporate university.

18        Q    All of those functions are performed by the

19   human resources branch, correct?

20        A    Correct.

21                        (Exhibit No. 1 was marked for

22                         identification.)

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                  Page 44

1          Q     Thank you.  The court reporter has handed to

2     you what's been marked as Exhibit 1.  Could you

3     identify this document, please?

4              First of all, have you seen this document

5     before?

6          A     No.

7          Q     Okay.  It appears to be an organizational

8     chart, correct?

9          A     Yes.

10         Q     A chart that reflects you, Lorinda S. Potucek,

11    on the far left-hand side, as the human resources

12    officer, operations, correct?

13         A     Correct.

14         Q     And Jo Rita Campbell worked for you, as

15    reflected on this particular chart?

16         A     Yes.

17         Q     Was she a direct report?

18         A     Yes.

19         Q     Okay.  And you also -- just to the right of

20    the halfway point, at the bottom, Susan E.

21    Boosinger -- she didn't work for you, did she?

22         A     No, she did not.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 45

1        Q    And right next to the block that has your

2   name, it reflects Gregory D. Tally.  You didn't work

3   for him, did you?

4        A    No.

5        Q    Now, at the top, the third line from the top

6   of this particular document, it says, "as of November

7   1, 2004."  Looking at this organizational chart, can

8   you speak to the accuracy of any other block

9   represented here, other than yours and Jo Rita

10  Campbell, who worked for -- worked for you at that

11  time?

12       A    The accuracy?

13       Q    Yes, ma'am.

14       A    My block, the date of birth is incorrect.

15  It's --

16       Q    Your date of birth.

17       A    Yes.  It's not correct.

18       Q    What should it be?

19       A    9/2/48.

20       Q    Okay.  Anything else?

21       A    That's all.

22       Q    As of November 1, 2004, underneath the human

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 46

1    resources benefits block, we note that Dorothy

2    Chappell-Johnson is listed within the human resources

3    benefits.

4            Is it accurate, to your knowledge, that she

5    worked in the human resources benefits office?

6    A    To the best of my knowledge, it's correct.

7    Q    Now, this organization chart shows you

8    reporting to the human resources services center,

9    correct?

10   A    Correct.

11   Q    Who is responsible for the human resources

12   service center?

13   A    Shirley Pernell.

14   Q    And it shows her reporting to the human

15   resources branch.

16   A    Correct.

17   Q    And who was the head of the human resources

18   branch?

19   A    Miguel Torrado.

20   Q    And he was your second-line supervisor the

21   entire period of time that you served as the human

22   resources officer, correct?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
                                                    Page 47

1        A    Yes.

2        Q    **Okay.  And who was the head of the division of**

3    **administration?**

4        A    Arleese Upton Key.

5        Q    **That would have been as of November 1, 2004?**

6        A    She -- she was there prior to that, but yes.

7        Q    **And she was there the entire time you were the**

8    **H.R. officer?**

9        A    Yes.  And she's still there.

10        Q    **All right.  Now, you didn't prepare this**

11    **chart, did you?**

12        A    No.

13        Q    **Okay.  And you'll notice that the block next**

14    **to yours, for Gregory B. Tally, former assistant**

15    **director for human resources information management and**

16    **payroll -- do you know what his current position is**

17    **today?**

18        A    Greg is now over the benefits area.

19        Q    **He would be in the block that says human**

20    **resources benefits?**

21        A    Correct.

22        Q    **Do you happen to know when he became the head**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 48

1    of human resources benefits?

2        A    Not exactly.

3        Q    It was after November 1, 2004?

4        A    Most probably.

5        Q    But as of November 1, 2004, as you look at

6    this chart, Gregory Tally was in a position of human

7    resources information management and payroll, correct?

8        A    Yes.

9        Q    All right.  By the way, as of November 1,

10   2004, do you know who the -- the head of human

11   resources benefits office was?

12       A    Ed Chmalowski.

13       Q    Do you recall the spelling?

14       A    All I know is it's C-h-m-alowski.

15       Q    All right.  And is it your understanding, as

16   you look at this chart, organizational chart, that

17   Dorothy Chappell-Johnson reported to Mr. Chmalowski?

18       A    I -- I believe that to be correct.

19       Q    Okay.  If you know, by the time you left to

20   become the chair for the division of administration for

21   corporate university in approximately January of 2006,

22   was this organizational chart still in effect?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 49

1          A    I believe so.

2          **Q    Ed Chmalowski may not have been the head of**

3    **human resources benefits at -- in January of 2006, for**

4    **instance.  It could have been someone else, correct?**

5          A    Correct.

6          **Q    To the best of your recollection, he was the**

7    **head of human resources benefits office in November of**

8    **2004.**

9          A    I believe so.

10         **Q    Okay.**

11              MR. JONES:  Holding up okay?

12              THE WITNESS:  Yes.

13              MR. SIMPSON:  That's a good question.

14              Please, do not hesitate to indicate when you

15    need to take a break.  We'll take as many breaks as you

16    need to take.

17              THE WITNESS:  Okay.

18              MR. SIMPSON:  Thank you.

19              Thank you, Bill.

20              BY MR. SIMPSON:

21         **Q    Since January of 2006, it being a**

22    **non-supervisory position as the chair of the division**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 50

1    of administration, you have not had a -- an opportunity

2    to make any selections in that position, have you?

3        A    No.

4        Q    And as the human resources officer for FDIC,

5    human resources officer, operations, for FDIC, you did

6    have the occasion to make selections, did you not?

7        A    Correct.

8        Q    Do you recall how many selections you made in

9    the time period -- approximately the fall of 2003 until

10   January of 2006?

11           (Pause.)

12       A    Approximately 10.

13       Q    By the way, as part of your understanding of

14   why you are here today, is it your understanding that

15   Ms. Chappell-Johnson has alleged discrimination and/or

16   reprisal/retaliation for a non-selection of a

17   particular position?

18       A    That's my understanding.

19       Q    Is it your understanding that that's a

20   position that you were the selecting official for?

21       A    Correct.

22       Q    So, the matter that brings you here today to

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                           Page 51

1    give a deposition was that you did not select Dorothy

2    Chappell-Johnson for a position.

3        A    Correct.

4                          (Exhibit No. 2 was marked for

5                          identification.)

6        Q    Okay.  Let's mark as No. 2 --

7             The court reporter has handed you what's been

8    marked as Exhibit 2, entitled "Selections of Lorinda S.

9    Potucek, human resources officer for operations, for

10   the two-year period, October 2, 2002, to October 2,

11   2004," correct?

12       A    Yes.

13       Q    I read that correctly at the top?  Thank you.

14            Now, if I may, you had indicated that you

15   became the H.R. officer in the fall of 2003, in earlier

16   testimony.

17            (Pause.)

18            Is that correct?

19       A    Is that what I said?

20       Q    That's what I wrote down.

21       A    Okay.  That's what I said, then.

22       Q    Okay.  You didn't become the H.R. officer for

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 52

1     FDIC in October of 2002, did you?

2               (Pause.)

3          A    I can't remember the date.

4          Q    Okay.

5          A    I cannot remember the month and the year

6     without looking at my official personnel file.

7          Q    I understand.

8               And questions that I ask you about -- the

9     questions that I ask you -- I am seeking information as

10    to what your recollection would be in the relevant

11    period of time involving the question that I may ask.

12    So, you understand that, correct?

13         A    Yes.

14         Q    Okay.  And based on your earlier testimony,

15    when you were the Conanan consent decree compliance

16    officer, starting in the fall of 2001, that was not a

17    supervisory position for you, so you wouldn't have made

18    any selections in that position, correct?

19         A    Correct.

20         Q    Okay.  So, would it be accurate to say that

21    the information that we're looking at in Exhibit 2

22    represents the hiring or selection decisions you would

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                         Page 53

1    have made between the fall of 2003 and October 2, 2004?

2    Would that be more accurate?

3         A    It might be.

4         Q    All right.  You didn't prepare this document.

5         A    No.

6         Q    Okay.  So, during the relevant period that we

7    are looking at, based on your testimony to this point,

8    between roughly the fall of '03 and October 2, 2004, do

9    you recall these particular selections that you made?

10        A    No.  Not -- not unless I see the name of the

11   person by these grades.

12        Q    And you would agree that, looking at this

13   document, that for each of the two numbered entries

14   here, there is a blank space --

15        A    Yes.

16        Q    -- on each line that reasonably would be the

17   name of the individual?

18        A    Could be, yes.

19        Q    Okay.  And these would have been two of the

20   approximate 10 selections that you testified earlier

21   that you would have made as the H.R. officer for FDIC.

22        A    Correct.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 54

1      Q      These two being up to the early October 2004

2      time-frame.

3      A      Correct.

4      Q      And you don't have a specific recall as to who

5      these individuals were.

6      A      No.

7      Q      And you were the selecting official for these

8      two positions, correct?

9      A      Without seeing the name, I cannot absolutely

10     validate.

11     Q      Now, of the 10 selections that you had

12     testified earlier that you made as the H.R. officer for

13     FDIC in the period of time that you were the H.R.

14     officer, did any of those 10 require the approval of

15     your supervisor before the selection became final?

16     A      Yes.

17     Q      In fact, all of them required the approval of

18     your supervisor, your first-line supervisor, before

19     they became official, correct?

20     A      Not all.

21     Q      All right.  Of the approximate 10, which ones

22     did not require the approval of your first-line

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 55

1     supervisor to become an effective selection?

2         A    The student interns.

3         Q    All right.  Do the student intern selections

4     that you made -- are they part of the 10 that you had

5     indicated earlier?

6         A    Yes.

7         Q    How many student intern positions did you fill

8     or select to fill while you were the H.R. officer?

9         A    Four.

10        Q    You basically had direct hire authority to

11    fill those positions without any higher approval by

12    Shirley Pernell.

13        A    Correct.

14        Q    So, that would leave --

15        A    -- approximately six.

16        Q    And those would have been permanent employees

17    within the human resources operations area, correct?

18        A    Correct.

19        Q    Okay.  For instance, you didn't make any

20    recommendations to hire an FDIC employee that was

21    not -- that did not report to you somehow, at least

22    indirectly, correct?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 56

1          A    Correct.

2          Q    Okay.  So, one of the six permanent employee

3     selections is the -- the selection to fill the position

4     that brings you here today, the one that was -- that

5     Dorothy Chappell-Johnson was not selected for.

6          A    Correct.

7          Q    And do you recall who was selected for the

8     position that Dorothy Chappell-Johnson was not selected

9     for?

10         A    Yes.

11         Q    Who was that?

12         A    Roger Little.

13         Q    Roger Little.  Okay.

14              Now, on Exhibit 2, there was a GS-9 personnel

15    management specialist and a GS-11 personnel management

16    specialist.

17              What office would those individuals have

18    worked for in your organization as the human resources

19    office operations?

20              Where would they have worked, those two

21    positions?

22         A    In operations.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 57

1        Q     Okay.  Well, I tell you, let's -- let's look

2    at -- at Exhibit 1 again.

3             Did you have sub-offices or branches or

4    sections --

5        A    No.

6        Q    You would have had somewhere between 12 and 28

7    direct reports all working under you, just like Jo Rita

8    Campbell.

9        A    Correct.

10       Q    And the fact that she was a human resources

11   specialist -- you'd agree, she was not a personnel

12   management specialist.

13       A    They're one and the same.

14       Q    They're one and the same.

15       A    Correct.

16       Q    So, looking at Exhibit 2 -- and I read GS-9

17   personnel management specialist -- is the exact same as

18   GS-9 human resources specialist?

19       A    Correct.

20       Q    Can you tell me, if you know, why positions

21   would be listed as personnel management specialist, as

22   opposed to human resources specialist, on Exhibit 2?

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                   Page 58

1        A      The Office of Personnel Management wants to

2    standardize the classification in the human resources

3    arena.  So, they are making an effort to change people

4    to be 201 human resources specialist, and some of the

5    old classification standards and position descriptions

6    and in the database still show as personnel management

7    specialist.

8        **Q      Is the personnel management specialist in a**

9    **different career field than a human resources**

10   **specialist?**

11       A      No.

12       **Q      They're both 201?**

13       A      Correct.

14       **Q      Just the position title is different.**

15       A      Correct.

16       **Q      And it's entirely possible that, up to October**

17   **2, 2004, the OPM standardized effort had not caught up**

18   **with these two personnel management specialists to have**

19   **been converted to human resources specialists?**

20       A      Correct.

21       **Q      Now, was your office responsible for the**

22   **conversion of personnel management specialist positions**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 59

1    at the FDIC to be renamed human resources specialist?

2        A    Yes.

3        Q    **That would have -- what would that have**

4    **required?**

5        A    That would have required going in and

6    reviewing all the position descriptions to validate

7    that they are, in fact, correct; notifying the employee

8    of the legislation and the official change; going into

9    the database and changing and converting from personnel

10   management specialist to human resources specialist.

11       Q    **Would it be safe to say that it was a paper**

12   **and database entry change?**

13       A    Yes.

14       Q    **It didn't affect employees' pay, did it?**

15       A    No.

16       Q    **Did it affect employees' duties?**

17       A    If the review of the position description

18   prior to doing the paper change -- it may have.

19       Q    **So, it was not just a paper title change from**

20   **a GS-9 personnel management specialist to a new P.D.**

21   **that said GS-9 human resources specialist where the**

22   **only changes, fundamentally, would have been the title**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 60

1    of the position.

2        A    Correct.

3        Q    **There may have been other changes within the**

4    **body of the position description, correct?**

5        A    And we had -- correct.  And we had an

6    obligation to tell employees about the change and why

7    the change was taking place.

8        Q    **And in fact, within the human resources**

9    **specialist position title, there are different kinds of**

10   **human resources specialists, are there not?**

11       A    Correct.

12       Q    **There are the human resources specialist,**

13   **information technology?**

14       A    Yes.

15       Q    **And human resources specialist, information**

16   **technology and compensation?**

17       A    Correct.

18       Q    **Any others that come to mind?**

19       A    Employee relations.

20       Q    **Would that be a parenthetical to the human**

21   **resources specialist, parenthetical, employee**

22   **relations?**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 61

1        A    Yes.

2        Q    **Okay.  Any others?**

3        A    Staffing, recruitment, compensation, benefits,

4    classification, training, training and development,

5    training and development and curriculum design.

6    They're all under the human resources umbrella of the

7    201.

8        Q    **And there may be combinations.   Information**

9    **systems and compensation, for instance.**

10       A    Correct.

11       Q    **Okay.**

12            **(Pause.)**

13            MR. SIMPSON:  Okay.

14            This might be a good time -- I'm at a good

15    break point, if you wanted to take a few minutes --

16            THE WITNESS:  Sure.

17            MR. SIMPSON:  -- at this point.

18            (A brief recess was taken.)

19            MR. SIMPSON:  Okay.  We're back on the record.

20            BY MR. SIMPSON:

21       Q    **Ms. Potucek, you have human resources program**

22    **experience with a number of Federal agencies in your 32**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 62

1   years of Federal service, correct?

2       A    Correct.

3       Q    And since approximately the fall of 2001, when

4   you came to work with FDIC, you had no prior experience

5   with human resources, personnel, policies, rules, and

6   regulations in FDIC prior to coming to them, correct?

7       A    Correct.

8       Q    Now, isn't it true that the Federal Deposit

9   Insurance Corporation has its unique set of personnel

10  and payroll rules, regulations, and policies?

11      A    Not anymore unique than OCC.

12      Q    But certainly unique as compared to the Office

13  of Personnel Management's Federal employee system as a

14  whole, correct?

15      A    As a whole?

16      Q    Yes, ma'am.

17      A    I cannot make that statement.

18      Q    But there are unique differences between the

19  personnel and payroll policies, procedures, and rules

20  within FDIC as compared to the Census Bureau.

21      A    Yes.

22      Q    And other Federal agencies that you worked for

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 63

1    other than the Office of Comptroller of the Currency,

2    correct?

3        A    Other than the Comptroller of the Currency,

4    correct.

5        Q    And you had -- you had approximately two

6    years' experience in the human resources area while you

7    were at the Office of the Comptroller of Currency,

8    correct?

9        A    Correct.

10       Q    But until the time in the fall of 1999 when

11   you went to work for the Office of the Comptroller of

12   the Currency, you had no prior experience with those

13   kinds of unique personnel and payroll policies, rules,

14   and regulations that existed at the OCC or the FDIC,

15   correct?

16       A    No.

17       Q    Okay.

18       A    No.  Excuse me.  Yes.

19       Q    And what organization prior to that?

20       A    Department of Army.

21       Q    The Department of Army does not follow Office

22   of Personnel Management for its civilian employees?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                      Page 64

1        A      There are demonstration projects going on

2    throughout the government, and you will have pockets

3    where some agencies are trying different flexibilities

4    in pay and compensation, and the Department of Army,

5    the Department of Air Force have pockets of

6    demonstration, and I was part of the demonstration

7    project with the Department of Army to implement these

8    flexibilities.

9        **Q      And did those pockets of differences at the**

10   **time run counter to the Office of Personnel Management**

11   **guidance?**

12       A      Only after they were approved.

13       **Q      And they were approved at the time that you**

14   **worked for these organizations?**

15       A      Correct.

16       **Q      But those demonstration projects that were**

17   **eventually implemented by the Departments of Air Force**

18   **and/or Army were still different than the personnel and**

19   **payroll policies, procedures, practices, and rules at**

20   **the Office of Comptroller of the Currency and/or the**

21   **FDIC, correct?  They were not the same as OCC and FDIC,**

22   **correct?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 65

1        A    They were very similar, yes.

2        **Q    Were they the same?**

3        A    In some situations, yes.

4        **Q    How many years of experience did you have**

5   **either with the Department of the Army or Department of**

6   **the Air Force in those unique personnel and/or payroll**

7   **policies, procedures, regulations, or practices?**

8        A    Approximately 10 years.

9        **Q    During what time period?**

10       A    With the Department of Air Force, from 1982 to

11   1989, and with the Department of Army, from 1994 to

12   1998.

13       **Q    And what specific organization within the**

14   **Department of the Army did you work between 1994 and**

15   **1998?**

16       A    I was at the headquarters, Department of Army,

17   in Heidelberg, Germany, and for the first part of that

18   time, I was the director of human resources training

19   and career development for Europe.

20       **Q    Was that in United States Army Europe or was**

21   **that personnel command in Heidelberg?**

22       A    It was USAREUR in Heidelberg for the

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 66

1    headquarters.

2        Q    Right.

3        A    And the latter part of my time at the

4    headquarters in Heidelberg, I was the H.R. marketing

5    director for Europe, and I was the specialist over all

6    the senior executives.

7        **Q    Now, in those capacities where you worked at**

8    **the headquarters for USAREUR, which is United States**

9    **Army Europe, U-S-A-R-E-U-R, did you report -- strike**

10   **that.**

11           **Did the commanding general of USAREUR have a**

12   **civilian personnel officer?**

13       A    Yes.

14       **Q    Did you report to the civilian personnel**

15   **officer, the CPO?**

16       A    He was the headquarters H.R. director.  Yes.

17       **Q    You reported to the CPO/headquarters H.R.**

18   **officer.**

19       A    He was not a CPO.  He was the -- he was the

20   headquarters director of human resources for Europe.

21   He was an executive.

22       **Q    Did he report directly to the commanding**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 67

1    general of USAREUR?

2        A    Yes.

3        Q    None of the functions that you performed fell

4    under the deputy chief of staff for personnel,

5    headquarters, USAREUR, did they?

6        A    Yes.

7        Q    Yes, they did?

8        A    Yes.

9        Q    So, your boss worked for the deputy chief of

10   staff of personnel?

11       A    Yes.  And he worked for the four-star.

12       Q    So, in other words, your boss reported to the

13   deputy chief of staff for personnel, headquarters,

14   USAREUR.

15       A    Correct.

16       Q    And you're familiar with the -- the acronym

17   CPO, civilian personnel officer, correct?

18       A    Yes.

19       Q    As it relates in the field of Department of

20   Defense anyway, correct?

21       A    Yes.

22       Q    Okay.  And by that time, in the '94-'98

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 68

1    time-frame, USAREUR did not have a CPO, civilian

2    personnel officer?

3        A    They had CPOs -- they had one civilian

4    personnel officer after the Cold War located in

5    Seconheim, Germany, and his name was Smiley Williams.

6        Q    And he reported to the commanding general,

7    USAREUR?

8        A    He reported to the headquarters director of

9    human resources that I reported to.

10       Q    Okay.  All right.

11            Okay.  Now, when you came to work for FDIC in

12   the fall of 2001, in your capacity as the Conanan

13   consent decree compliance officer, did there come

14   a -- starting in that period of time, did there come a

15   time that you came to know Dorothy Chappell-Johnson?

16       A    Define "know."

17       Q    When is the first time you met Dorothy

18   Chappell-Johnson after your arrival to FDIC in the fall

19   of 2001?

20       A    I cannot recall.

21       Q    There came a time after the fall of 2001 that

22   you met her?

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 69

1          A     I know -- I know who she is.  I don't know how

2     I met her.

3          Q     Did you ever work on projects with --

4          A     No.

5          Q     -- Ms. Chappell-Johnson?

6          A     No.

7          Q     Did you ever serve on any committees with --

8          A     No.

9          Q     -- Ms. Chappell-Johnson?

10               Did you review any paperwork in your capacity

11    as the Conanan consent decree compliance officer

12    relative to EEO complaints by Dorothy Chappell-Johnson?

13         A     No.

14         Q     In your capacity as the Conanan consent decree

15    compliance officer, did you ever review any individual

16    EEO complaints by any FDIC employee?

17         A     No.

18         Q     Did you ever review any lists in that capacity

19    as the Conanan consent decree compliance officer, any

20    lists of names of FDIC employees who had filed EEO

21    complaints?

22         A     No.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 70

1        Q      There were no files by name of individuals

2    that you had?

3        A      No.

4        Q      By the time you took over as the Conanan

5    consent decree compliance officer in the fall of 2001,

6    did you process any paperwork for FDIC to opt out of

7    the consent decree?

8        A      No, that was done before my arrival at the

9    FDIC.

10       Q      Okay.  What exactly did you do, then, as the

11   Conanan consent decree compliance officer between the

12   period fall of 2001 and the fall of 2003?

13       A      I reviewed all position descriptions, newly

14   classified position descriptions.  I reviewed all

15   vacancy announcements before they were posted.  I

16   reviewed all of the knowledges, skills, and abilities

17   through the job analysis that the staffing specialist

18   did.  I reviewed all of the structured interview

19   questions.  I reviewed all the benchmarks.  I ensured

20   that the panels met the criteria of the best business

21   practices that were set forth by legal division under

22   the court order.  I kept statistics, without names, of

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 71

1   all the data that had to be reported to the legal

2   division on an annual basis.

3           When the selection justification forms came

4   in, when a selection was made, I made sure that it met

5   the criteria through the best business practices that

6   were published to all the FDIC employees on a global

7   message.  I reviewed training opportunities and ensured

8   that they were competed so that all employees had fair

9   competition for training opportunities.  And I -- and I

10  reviewed and helped with the curriculum design on the

11  structured interview training courses that are still

12  being conducted for new managers who come into the

13  FDIC.

14      Q    **When you would review the selection**

15  **justification documents, would there have been any**

16  **redactions on that particular document that you would**

17  **review?**

18           **Would there be any information that would be**

19  **redacted from those selection decision documents?**

20      A    Be more specific.

21      Q    **Well, you're looking at a selection decision**

22  **document.  Someone has made a selection and they've put**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 72

1    a justification.  You had indicated you reviewed those

2    documents, correct?

3        A    Correct.

4        Q    Was there any information that was deleted or

5    redacted, blacked out, whited out, on those documents

6    that you reviewed?

7        A    No.

8        Q    Was there any information relative to the

9    race, gender, national origin of those individuals who

10   were selected on those documents?

11       A    No.

12       Q    Okay.  So, there was nothing added to the

13   document that reflected a selection decision when you

14   reviewed it.

15           MR. JONES:  Object to the form.

16           BY MR. SIMPSON:

17       Q    You can answer.

18       A    No.

19       Q    Okay.  All right.  Now, starting in the fall

20   of 2001, do you recall whether you had any individual

21   personal or professional conversations with Dorothy

22   Chappell-Johnson up to the present?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 73

1          A    Personal or professional?

2          Q    **Yes, ma'am.**

3          A    I am sure that, during that course of time, I

4    may have had a passing conversation with Dorothy, as

5    well as many other employees in the human resources

6    branch, at social functions, all-hands meetings, or

7    wherever H.R. came together -- together with a social

8    function.

9          Q    **Do you have a recollection of any specific**

10   **personal conversations that you have had with Dorothy**

11   **Chappell-Johnson?**

12         A    I do not recall a specific conversation.

13         Q    **Do you have a recollection of -- do you have a**

14   **recollection of any conversations with Dorothy**

15   **Chappell-Johnson between the fall of 2001 to the**

16   **present?**

17         A    No.

18         Q    **Would there have been a time when you would**

19   **have had a conversation with Dorothy Chappell-Johnson**

20   **prior to August of 2004 regarding Dorothy**

21   **Chappell-Johnson filing EEO formal complaints with the**

22   **FDIC?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 74

1        A    No.

2        Q    **Have you had any conversations with any FDIC**

3   **employees about EEO activity, prior EEO activity by**

4   **Dorothy Chappell-Johnson?**

5        A    No.

6        Q    **No conversations at all with anyone about**

7   **prior EEO activity by Dorothy Chappell-Johnson.**

8        A    I only recall Miguel Torrado mentioning that

9   he had to go to legal division to discuss an EEO

10  complaint.

11       Q    **An EEO complaint by Dorothy Chappell-Johnson?**

12       A    And someone asked him who it was regarding,

13  and he said Dorothy Chappell-Johnson, and that is all

14  that was said.

15       Q    **Do you recall when that occurred?**

16       A    No.

17       Q    **But that certainly would have occurred**

18  **sometime between the fall of 2001, when you became the**

19  **Conanan consent decree compliance officer, and you**

20  **worked directly for Miguel Torrado, up until the time**

21  **of January 2006, when you left to become the chair of**

22  **the division of administration for corporate**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                              Page 75

1    university, correct?

2        A    Correct.

3        Q    So, that would have been a little over a

4    four-year period of time, you recall Miguel Torrado

5    making mention of an EEO complaint filed by Dorothy

6    Chappell-Johnson, correct?

7        A    Correct.

8        Q    Do you recall whether that comment would have

9    been made while you were the Conanan consent decree

10   compliance officer?

11       A    I don't recall when he made the comment.  He

12   only made the comment when he asked somebody to be

13   acting for him while he was out of the office.

14       Q    Where were you physically located with respect

15   to Miguel Torrado when you were the Conanan consent

16   decree compliance officer?

17       A    I moved three times in two-and-a-half years.

18       Q    With respect to his office location, each of

19   those three times, where were you located with respect

20   to his office location?

21       A    Two times on the same floor, down the hall.

22       Q    Down the hall how far?  Hundreds of feet?

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 76

1          A     From here to the ladies' bathroom, or further.

2          Q     **Fifty to a hundred feet at a minimum?**

3          A     Correct.

4          Q     **Okay.**

5          A     And one time, maybe from here to the elevator,

6     the closest doors to the elevator.  I was moved a lot.

7          Q     **Three times during the period the fall of 2001**

8     **to January 2006, you were moved -- your office was**

9     **moved three times in that period of time?**

10         A     Only -- I was moved three times as the

11    compliance officer, and one more time as the H.R.

12    officer, so a total of four times.

13         Q     **Okay.  And how close were you relative to**

14    **Miguel Torrado's office when you were the H.R. officer?**

15         A     A different floor.

16         Q     **Okay.  So, starting in the fall of 2003, you**

17    **were on an entirely different floor from Miguel**

18    **Torrado.**

19         A     Correct.

20         Q     **You were on the same floor during the period**

21    **fall 2001 to roughly the fall of 2003 --**

22         A     Correct.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 77

1          Q     -- same floor.  And the nature of your

2     duties -- would you have, as a general practice, had to

3     go down to Miguel Torrado's office on a daily basis?

4          A     Rarely did I ever go into his office.

5          Q     What about going down to his office area?

6          A     Rarely.

7          Q     Okay.  Now, that's rarely as the compliance

8     officer?

9          A     And as the H.R. officer.

10         Q     Okay.  So, it was a very rare situation you

11    found yourself in at a time when Miguel Torrado was

12    making a comment to someone that he had to go to the

13    legal department because of an EEO complaint filed by

14    Dorothy Chappell-Johnson.

15              MR. JONES:  Object to the form.

16              You can answer.

17              THE WITNESS:  Repeat that?

18              BY MR. SIMPSON:

19         Q     That would have been a very rare incident,

20    indeed, for you to have been near Miguel Torrado's

21    office when he told someone he had to go to the legal

22    department and that person asked what about and it was

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 78

1    an EEO complaint filed by Dorothy Chappell-Johnson,

2    correct?

3        A    He did not make the comment in his office.

4        Q    **Where was he?**

5        A    He was in a conference room.

6        Q    **And where was that conference room located?**

7        A    On the second floor.  I mean, on the floor

8    below his office.

9        Q    **And at that time, on the floor below where**

10   **your office was.**

11       A    Correct.

12       Q    **And why would you have been in the same**

13   **conference room with him at that time?**

14       A    We were discussing things during a staff

15   meeting.

16       Q    **It was a regularly scheduled staff meeting?**

17       A    Correct.

18       Q    **How often were those staff meetings?**

19       A    Once a week.

20       Q    **And they were always in that conference room?**

21       A    Over 50 percent of the time.

22       Q    **Okay.  And did those weekly staff**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 79

1    meetings -- were they conducted on the same day of the

2    week?

3         A    Usually.

4         Q    Usually.   What day?

5         A    Tuesday.

6         Q    Were they usually conducted at the -- started

7    at the same time?

8         A    Yes.

9         Q    What time?

10        A    9:00 o'clock.

11        Q    Do you know how long they normally lasted?

12        A    Anywhere from one to three hours.

13        Q    And it was at the conclusion of one of these

14   weekly staff meetings where he made a comment to

15   someone that he had to go to the legal department,

16   again, on an issue that involved an EEO complaint filed

17   by Dorothy Chappell-Johnson.

18        A    It was after the staff meeting, as he was

19   leaving, going to the doorway, and he asked somebody to

20   be acting for him while he went to the legal division

21   to discuss a -- an EEO complaint, and someone said who,

22   and he said Dorothy Chappell-Johnson.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 80

1        Q    Do you remember who he made the comment to

2    that he was going?

3        A    No.

4        Q    Do you recall who asked the question, who?

5        A    No.

6        Q    But it wasn't you.

7        A    No.

8        Q    But you overheard that conversation.

9        A    I only overheard it because I happened to have

10   been talking to somebody in the conference room, and I

11   had not departed from the conference room yet.

12       Q    Okay.  So, other than this comment that you

13   overheard by Miguel Torrado, is it your testimony that

14   you had no other knowledge of --

15       A    No.

16            MR. JONES:  Let him finish.

17            BY MR. SIMPSON:

18       Q    -- no other knowledge of EEO complaints filed

19   by Dorothy Chappell-Johnson.

20       A    No.

21       Q    Your testimony is she never talked to you

22   about her filing EEO complaints.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 81

1          A    No.

2          Q    Okay.  In your capacity as the Conanan consent

3    decree compliance officer, would FDIC employees

4    seek -- or come to speak to you about EEO matters that

5    they had?

6          A    No.

7          Q    That did not happen anytime in the two-year

8    period that you were the compliance officer?

9          A    If they tried, I deferred them to ODEO.  That

10   was not my role.

11         Q    ODEO being?

12         A    The Office of Equal -- the Office of Diversity

13   and Equal Opportunity, ODEO, Office of Diversity and

14   Equal Opportunity.

15         Q    Okay.  By the way, when you were the H.R.

16   officer, were you responsible for payroll issues of

17   FDIC employees?

18         A    In part.

19         Q    What part?

20         A    We were responsible within operations for

21   inputting the data of new employees when we got them

22   on-board.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 82

1        Q    Okay.

2        A    We were responsible to do different -- to

3   process different payroll documents when employees came

4   in and changed their allotments, their allocations, or

5   alimony or child deductions.

6        Q    Court documents, correct?

7        A    And other documents that -- that an employee

8   would initiate --

9        Q    Okay.

10       A    -- outside the court.

11       Q    Okay.  We were responsible for changing when

12   we had increases in January to pay.

13       Q    Annual pay increase.

14       A    Annual pay.  Promotions.

15       Q    Okay.  But your involvement was inputting data

16   into the system.

17       A    And reviewing to make sure that it was

18   correct.

19       Q    Okay.  And it was information that was

20   inputted and sent to the National Finance Center,

21   wasn't it?

22       A    Yes.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 83

1          Q      When you were the H.R. officer, was your

2     office responsible for calculating payroll data as a

3     possible settlement for EEO complaints?

4          A      Yes.

5          Q      Was your -- in your capacity as the H.R.

6     officer, it was your office that was solely responsible

7     to do that, correct, within the FDIC structure.

8          A      No.

9          Q      Who else did that?

10         A      Sometimes, because of the nature of the

11    settlement, it did not come to our office.

12         Q      Who would do it?

13         A      Sometimes CM-2's or CM-1's at the supervisory

14    level would do that, so that no one else would know

15    anything about the settlement.

16         Q      CM-1's and CM-2's located where?

17         A      In the human resources branch.

18         Q      Okay.  If we could look at Exhibit 1, where

19    would that -- that would be underneath the blocks that

20    we show human resources branch that you indicated

21    Miguel Torrado was the head of that.

22         A      Yes.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 84

1          Q    Well, you'd agree with me that everything

2      below that is the human resources branch, correct?

3          A    Correct.

4          Q    Other than your office, what other offices

5      would do CM-1, CM-2 supervisory managerial

6      calculations?

7          A    Anyone that Miguel asked.

8          Q    Are you aware -- are you personally aware of

9      Miguel Torrado asking anyone other than your office to

10     do those calculations?

11         A    Yes.

12         Q    Who?

13         A    I know that he asked people in the H.R.

14     information management and payroll.

15         Q    Okay.  And how many are you aware that

16     he -- that Miguel Torrado asked the human resources

17     information management and payroll office to do?

18         A    I don't know how many.

19         Q    Were those only for CM-1's and CM-2's that you

20     were aware of?

21         A    No.  He asked CM-1's and CM-2's to do the

22     processing.  They were not about only CM-1's and

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 85

1    CM-2's.  He asked the managers in H.R. to process so

2    that the employees within HRB had no knowledge of the

3    settlement agreements throughout the corporation

4    because of the confidentiality.

5         Q    Okay.  Was there a policy when you were the

6    H.R. officer that, if there was a settlement

7    calculation to be prepared for a human resources branch

8    employee, that that -- those calculations would be done

9    by Shirley Pernell?

10        A    I do not know that.

11        Q    Do you know whether Shirley Pernell did

12   calculations on -- on benefits relative to the possible

13   settlement of EEO complaints for FDIC employees?

14        A    I do not know.

15        Q    Did you ever hear a conversation between

16   Shirley Pernell and Miguel Torrado concerning the

17   calculations for a human resources branch employee

18   relative to an EEO complaint?

19        A    No.

20        Q    And Shirley Pernell never made a comment to

21   you that she was doing a calculation for a human

22   resources branch employee?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 86

1      A     No.

2          Q     And she never told you that calculations for

3      HRB, human resources branch employees, would be done by

4      her?

5          A     No.

6          Q     But other than those incidents when Miguel

7      Torrado would ask a specific manager within his branch,

8      the human resources branch, to do a calculation, all

9      the other calculations would be done by your office,

10     correct?

11         A     Not necessarily.

12         Q     All right.  Other than those that Miguel

13     Torrado would have asked someone specifically or would

14     have been given to you for your personnel to do, who

15     else would have done them that you're aware of?

16         A     I don't know specifically by name, but I know

17     that people in the human resources information

18     management and payroll would help with that endeavor.

19         Q     Would help with it but not necessarily do it.

20         A     They would do it or help with it.

21         Q     Okay.  Other than those that Miguel Torrado

22     would have asked to be specifically done by a manager

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                           Page 87

1    in the human resources information management and

2    payroll office, correct?

3        A    Correct.

4        Q    So, in addition to him asking a specific

5    manager to do it in that office that is listed

6    currently as Gregory D. Tally, former assistant

7    director, in that -- in that organization, in addition

8    to Torrado asking some specific manager, there would be

9    other times that that office, that block that had Greg

10   Tally's name in it, they would do calculations.

11       A    On occasion.

12       Q    And do you know how it would be that they

13   would come about to do those?

14       A    If we, in operations, had excessive workloads

15   because of the reductions in force, excessive postings,

16   and we were inundated with time-lines set forth by

17   division directors, classification actions --

18       Q    I'm sorry.  But in those instances, who would

19   ask individuals of the human resources information

20   management and payroll office to do those calculations?

21   Would you be the one to ask?

22       A    No.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                      Page 88

1          Q     Who would -- who would ask?

2          A     I would go to my supervisor, Shirley Pernell,

3     and sit with her and show her my workload, and she

4     would solicit help from her counterparts within HRB.

5          Q     And they would be related to specific

6     calculations that needed to be done for a specific

7     employee at that time.

8          A     Correct.

9          Q     So, you were aware of the employee and the

10    calculation process that had to be done.  It's just you

11    were asking Shirley Pernell to have someone else do

12    that other than your office.

13         Q     I was not aware of the employee by name.  I'm

14    only aware of the workload.

15         A     You indicated you would go tell her of your

16    workload and ask her to get someone else to do the

17    calculation, correct?

18               Is that what you just said?

19         A     Yes.  But your question -- your statement was

20    that I would know the employee, and my response is I

21    don't know by employee name; I only know by workload.

22         Q     When you say "workload," what do you mean?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 89

1          A     I mean by volume.  I have 20 payroll

2    calculations to do.  Could you please find someone to

3    help people in ops to do the calculations?  I did not

4    give her a list by employee name.

5          **Q     Okay.  Payroll calculations.  And my questions**

6    **have been about -- related to possible settlement of**

7    **EEO cases, not just payroll calculations generally.**

8          A     I would not know employee name, even if it

9    were an EEO complaint settlement.

10         **Q     So, there would be no indication that you**

11   **would be aware -- there would be no information that**

12   **would make you aware that a particular payroll**

13   **calculation was related to a possible EEO settlement.**

14         A     Correct.

15         **Q     How would you -- how would your office get a**

16   **tasking to do a payroll calculation?**

17         A     An employee would come in and fill out

18   paperwork that indicated a change.

19         **Q     All right.  So, that's -- that's a specific**

20   **individual employee addressing a potential issue that**

21   **comes directly to your office.**

22         A     Or if someone is selected for a promotion.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 90

1       Q      Okay.

2       A      Someone is selected for a detail at a higher

3   grade.

4       Q      Right.

5       A      Someone is -- there is an adverse action and

6   it comes from employee and labor relations.

7       Q      An adverse action such as --

8       A      -- a change to lower grade or someone is

9   changed to lower grade because of a -- of a performance

10  action.

11      Q      A demotion.

12      A      A demotion.

13      Q      Okay.

14      A      During the RIF, people were assigned, applied,

15  and sometimes were selected for other jobs within the

16  corporation in a different series, in a different

17  grade.

18      Q      A different series would not necessarily

19  change their pay, though, would it?

20      A      Not necessarily.  But --

21      Q      Would there be any instances where a change in

22  a career series would affect an individual --

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 91

1       A    Yes.  When people move out of the headquarters

2   to other regions where the locality pay is different.

3       **Q    But that's not due to a change of series;**

4   **that's due to a change in position location.**

5       A    That's correct.

6       **Q    Okay.  When there was to be a payroll**

7   **calculation for the possibility of settlement, how**

8   **would your office get the tasking to do that?**

9       A    It would either go to Shirley Pernell or

10  Miguel Torrado because of the nature of the

11  sensitivity.

12      **Q    And either Miguel Torrado or Shirley Pernell**

13  **would bring that to you to have your section do that,**

14  **normally, correct?**

15      A    No.

16      **Q    All right.  The staff that you were**

17  **responsible for when you were the H.R. officer -- your**

18  **staff did payroll -- payroll calculations to develop**

19  **payroll figures for a possible -- for possible**

20  **settlement, in addition to other things, but for**

21  **possible settlement of EEO complaints, correct?**

22      A    Rarely.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 92

1      Q    In your two-year period as the H.R. officer,

2    do you recall how many your staff -- how many of those

3    payroll calculations your staff did related to the

4    possible settlement of EEO complaints?

5      A    Maybe two.

6      Q    Maybe two.  Those you would be aware of,

7    specifically, because your people were doing them,

8    correct?

9      A    But I never knew the name.

10     Q    That's fine.  But you were responsible to have

11   those calculations done by your subordinates and then

12   provided to whom?

13     A    To the employee and labor relations.

14     Q    Not to Shirley Pernell or Miguel Torrado.

15     A    It could go to Shirley Pernell or Miguel.  It

16   could go to labor relations.  It could go to the legal

17   division.

18     Q    But you know of only two that --

19     A    Approximately two.

20     Q    Okay.  Could have been a few more?

21     A    Probably not.

22     Q    Well, it's either going to be one or two.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 93

1        A    One or two.

2        Q    Okay.  Are you aware of calculations that

3    Shirley Pernell would have done herself --

4        A    No.

5        Q    -- relative to the possible settlement of an

6    EEO case?

7        A    No.

8        Q    But you are aware that Miguel Torrado would

9    ask other managers within the H.R. branch to do those

10   calculations, correct?

11       A    Yes.

12       Q    And you're aware that Shirley Pernell would

13   have asked other individuals within the human resources

14   center to do those types of calculations, correct?

15       A    And throughout HRB.

16       Q    Well, did the -- did the head of human

17   resources benefits on Exhibit 1, on the far right-hand

18   side, as you're looking at it -- did that individual

19   work for Shirley Pernell?

20       A    Greg Tally?

21       Q    No, ma'am.  Far right-hand side.

22       A    Uh-huh.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 94

1          Q      Human resources benefits.  The head of

2      that -- that function --

3          A      Uh-huh.

4          Q      -- did not work for Shirley Pernell, did --

5          A      No.

6          Q      So, Shirley Pernell would not assign

7      responsibilities for the human resources benefits

8      branch or section to do, would she?

9          A      She would not assign, but they would confer.

10          Q      Okay.  And in fact, as I look at the

11      organizational chart, Shirley Pernell was responsible

12      for the left half underneath the human resources

13      branch, correct?  The left half of this page underneath

14      HRB?

15          A      No.

16          Q      She was not -- as the associate director for

17      the human resources service center, she was not

18      responsible for you and for Greg Tally --

19          A      No.

20          Q      -- underneath her?  She was not responsible

21      for them?

22          A      She was not responsible for the H.R.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 95

1    information management and payroll.

2        Q    But you'd agree with me that there is a --

3        A    That was not under her purview.

4        Q    In November 1, 2004, that was not under her?

5        A    Correct.

6        Q    Well, can you tell me, then, the block -- the

7    box that is next to you, that has Greg Tally -- what

8    position is that?

9        A    That is -- Eugene Bell was in that job, and he

10   was my peer, CM-1, and he was over policy, employment

11   policy.

12       Q    Okay.  And at the time of November 1, 2004,

13   Greg Tally was the head of policy?  Is that what that

14   block is?

15       A    He's never been a head of policy.

16       Q    Okay.  In November 2004, if you know, did Greg

17   Tally work for Shirley Pernell?

18       A    He's never worked for Shirley Pernell.  He is

19   her peer.  He is a CM-2 peer to Shirley Pernell.

20       Q    Okay.  Thank you.

21                              (Exhibit No. 3 was marked for

22                               identification.)

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 96

1            Let's mark as Exhibit 3 --

2            The court reporter has handed you what's been

3    marked as Exhibit 3.  Have you seen this document

4    before?

5            Please, take a look at the entire document.

6       A    (Examining.)

7       Q    Do you recognize this document, Ms. Potucek?

8       A    I believe I do.

9       Q    Okay.  It's a document of some four pages,

10   correct?

11      A    Correct.

12      Q    And it's vacancy announcement 2004-HQ-2637,

13   correct?

14      A    Correct.

15      Q    Opening date of 8/24/04, closing date 9/8/04,

16   correct?

17      A    Yes.

18      Q    And the position is human resources

19   specialist, information systems and compensation, and

20   it's being advertised at the CG-0201-7/9/11 level,

21   correct?

22      A    Yes.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                  Page 97

1          Q    Okay.  Now, did there come a time -- strike

2     that.  Do you happen to know where within the division

3     of administration, human resources branch, H.R. service

4     center operations section, that the person selected for

5     this position would work?

6          A    In the operations section.

7          Q    Directly for you?

8          A    Correct.

9          Q    This would have been a direct report to you?

10         A    Yes.

11         Q    At the CG-7 level, would have reported

12    directly to you.

13         A    Correct.

14         Q    Likewise at the 9 level or the 11 level, would

15    have reported directly to you.

16         A    Correct.

17         Q    Now, this particular vacancy

18    announcement -- what office within FDIC prepared this

19    vacancy announcement?

20         A    The operations section within HRB.

21         Q    In other words, your office.

22         A    Correct.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 98

1       Q    And do you recall specifically who would have

2    worked on this vacancy announcement?

3       A    No.

4       Q    Were you involved in the preparation of this

5    vacancy announcement?

6       A    No.

7       Q    Not involved at all.

8       A    No.

9       Q    You did not review any document indicating the

10   summary of duties?

11      A    As the compliance officer, I willed that to

12   Shirley Pernell or other people because of the conflict

13   of interest, because all documents have to be signed

14   off, and I cannot, as the compliance officer, sign off

15   on my own documents.

16      Q    So, any document for -- any vacancy

17   announcement for a vacant position in your -- in the

18   operations center, Shirley Pernell would have reviewed?

19      A    Or I would ask Eugene Bell in employment

20   policy, who also reported to Shirley Pernell, and he

21   was also a CM-1.

22      Q    At this time, in 2004, he was a CM-1?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 99

1        A    Correct.  Correct.

2        **Q    Do you recall exactly when Mr. Bell became a**

3   **CM-1?**

4        A    No.  I do know that he was a CM-1, I would

5   say -- the exact time that I was selected for the

6   CM-1 -- within a month, he was selected for a CM-1, and

7   we both reported to Shirley Pernell, and I always asked

8   Shirley or Eugene to review work in my office, so as

9   not to have a conflict of interest.

10       **Q    So, you were not involved in any way in the**

11  **development of this vacancy announcement.**

12       A    Correct.

13       **Q    Okay.  Now, looking at this vacancy**

14  **announcement, would there be any way that I would know**

15  **who the selecting official would be?**

16       A    The only clue that you would have is, under

17  location, operations section.

18       **Q    Okay.  I could reasonably assume that whoever**

19  **was the head of the operations section or someone that**

20  **worked for the head of operations section would be the**

21  **selecting official?**

22       A    Correct.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 100

1      Q    Okay.  I would not assume that, since this job

2   would be in the operations section, that there would be

3   a next higher level to the operations section that

4   would make the selection?

5      A    You could assume under the best business

6   practices that we require an approving official with

7   the selecting official's recommendation.

8      Q    Okay.  And I think your earlier testimony was,

9   in your capacity as the human resources officer, the

10  only direct selections that you made were four student

11  interns that did not require the approval of your

12  first-line supervisor, correct?

13     A    Correct.

14     Q    Other than those four, the other six -- would

15  it be a selection by you without the approval of your

16  boss?

17     A    No.

18     Q    It could only be a selection that was approved

19  by your first-line supervisor, correct?

20     A    Correct.

21     Q    So, in effect, you would be the recommending

22  official, and your first-line supervisor would be

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 101

1    **making the selection, correct?**

2            MR. JONES:  Object to form.

3            You can answer.

4            THE WITNESS:  Technically, under the best

5    business practices, I would be a selecting official,

6    and the second level would be an approving official,

7    but there -- an approving official could -- could

8    disagree with the selecting official's recommendation

9    and reconvene to discuss another selection.

10           BY MR. SIMPSON:

11    **Q    But in a case like that, the initial,**

12    **quote/unquote, "selection" would not, in fact, be a**

13    **selection, would it?**

14    A    Correct.

15    **Q    It would be -- they'd send it back, so it's**

16    **not a selection, correct?**

17    A    Correct.

18    **Q    And it would not effectively be a selection**

19    **unless signed off on by your first-line supervisor,**

20    **correct?**

21    A    That's correct.

22    **Q    So, it only becomes a selection after that**

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 102

1    person signs it.

2         A    That's correct.

3         Q    And then it's a selection.

4         A    That's correct.

5         Q    Okay.  All right.  Now, you say you had -- you

6    were not involved in the development, preparation of

7    this vacancy announcement, correct?

8         A    Correct.

9         Q    As you look at page two, the summary of

10   duties, had there come a time, prior to the development

11   of this particular vacancy announcement, that you would

12   have approved the summary of duties for a CG-7/9/11

13   human resources specialist, information systems and

14   compensation?

15        A    Yes.

16        Q    Okay.  And when would that have been?

17        A    I would have reviewed the position

18   description, where the information is derived, to

19   ensure that this is the kind of job that I need and the

20   kind of person I must have in operations to do the

21   work.

22        Q    So, prior to the development of a vacancy

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
(No. 06-1074-RCL)                                                    Page 103

1    announcement, the FDIC has to make sure that there is a

2    position description for the position being advertised,

3    correct?

4        A    Correct.

5        Q    So, prior to this document being prepared, you

6    would have reviewed a position description for a

7    CG-0201-7, correct?

8        A    Correct.

9        Q    Would you have reviewed a position description

10   for a CG-0201-9?

11       A    Correct.

12       Q    And likewise for CG-0201-11.

13       A    Correct.

14       Q    Prior to this vacancy announcement ever being

15   prepared.

16       A    That's correct.

17       Q    And then someone else -- someone in your

18   office would have prepared this vacancy announcement,

19   but it would have been reviewed by either Eugene Bell

20   or Shirley Pernell.

21       A    Correct.

22       Q    All right.  After it had been reviewed and

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 104

1    approved by Shirley Pernell, would you have reviewed

2    the vacancy announcement before it was actually posted?

3        A    No.

4        Q    But someone in your office would have posted

5    it, correct?

6        A    Correct.

7        Q    Okay.  In the summary of duties -- strike

8    that.  Do you recall, at some time after August 24,

9    2004, which is the opening date for this particular

10   vacancy announcement, as reflected on page

11   one -- correct?

12       A    Correct.

13       Q    Sometime after August 24, 2004, let's say

14   until December 31, 2004, do you recall reviewing the

15   summary of duties that are reflected on this vacancy

16   announcement?

17       A    Yes.

18       Q    When would you have done that?

19       A    When the recommending panelist who interviewed

20   the candidates -- and we were designing the interview

21   questions -- the business practices that the FDIC has

22   is that you look at the position description and you

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 105

1    look at the summary of duties in the vacancy

2    announcement and you design structured interview

3    questions and benchmarks that relate to the KSAs.

4         Q    All right.  You indicated that, prior to the

5    development of the structured interview questions, you

6    would review the position description and the summary

7    of duties in the vacancy announcement?

8         A    Correct.

9         Q    Would there be a review of the knowledge,

10   skills, and abilities contained in the vacancy

11   announcement?

12        A    Yes.

13        Q    Okay.  So, three particular items would have

14   been reviewed for the development of interview

15   questions, correct?

16        A    Yes.

17        Q    Okay.

18        A    But --

19        Q    And you were involved in that process, the

20   development of the interview questions?

21        A    Yes.

22        Q    Which required you to look at summary of

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 106

1    duties, the KSAs, that are also located on the same

2    page two of the vacancy announcement as the summary of

3    duties, correct?

4        A    Yes.

5        Q    And the position description.

6        A    The KSAs come out of the position description.

7        Q    Are the KSAs verbatim included in the position

8    description?

9        A    Sometimes they're verbatim; sometimes they are

10   not.

11       Q    Okay.  Well, we'll get to that.

12            All right.  Now, under the summary of duties,

13   would you be able to address what the requirement -- an

14   existing requirement would be for a particular

15   statement in the summary of duties?

16            MR. JONES:  Object to form.

17            BY MR. SIMPSON:

18       Q    You can answer.

19       A    Would you please repeat the question?

20       Q    All right.  For instance, the first sentence

21   in the summary of duties, "At the entry level, works

22   closely under the close supervision and guidance of

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 107

1    senior H.R. staff," and you would -- in your capacity

2    as the H.R. officer, you would know what the genesis of

3    that statement in the summary of duties was, correct,

4    how that came about.

5        A    Yes.

6        Q    Is there anything in the summary of duties

7    that you don't agree with as being required for this

8    position?

9        A    (Examining)  No.

10        Q    You would agree with everything that's in

11    there.

12        A    Yes.

13        Q    Now -- and you would agree that the summary of

14    duties addresses at least two performance levels,

15    correct, at the entry level and then at the full

16    performance level, which is also addressed in this

17    paragraph, correct?

18        A    Yes.

19        Q    So, the fact that this is being advertised at

20    the CG-7/9/11 level -- it could be filled at any of

21    those three, correct?

22        A    Correct.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 108

1    Q    If, for instance, someone was hired as a CG-9

2    based on this vacancy announcement, would that be

3    considered an entry-level hire?

4    A    No.

5    Q    The entry-level hire would have been at the

6    CG-7 level, correct?

7    A    Correct.

8    Q    Now, is there anything in this summary of

9    duties that addresses a mid-level CG-9 performance of

10   summary of duties?

11   A    No.

12   Q    It addresses entry level CG-7 and it addresses

13   full performance level CG-11, correct?

14   A    Correct.

15   Q    Okay.  All right.  But someone hired at the

16   CG-7 level would still be responsible to perform all of

17   the duties in the summary of duty?

18   A    No.

19   Q    What duties would a CG-7 not be required to

20   perform?

21   A    I would have to pull the qualifications

22   handbook for the 7, and I would go through that and

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 109

1   mirror the summary of duties to the qualifications

2   handbook for a 7.

3          Then I would take the summary of duties and

4   mirror that to the 9, and then I would take the summary

5   of duties and mirror that to the 11, and develop a

6   career development plan, if they're hired at the 7 or

7   at the 9, to show them what they have to do before they

8   can get promoted to the next grade.

9      **Q    Okay.  Looking at the summary of duties, you**

10  **would agree -- will you agree with me that the sentence**

11  **that starts more than halfway down, the sentence that**

12  **starts with "At the," continuing to the next line,**

13  **"full performance level" --**

14     A    Uh-huh.

15     **Q    -- which is a CG-11 level, correct, full**

16  **performance level?**

17     A    Uh-huh.

18     **Q    That a CG-7 would not be required to perform**

19  **the duties to include serving as a troubleshooter and**

20  **super-user of human resources, H.R., automated systems,**

21  **with responsibility for performing a variety of**

22  **professional and technical duties in connection with a**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 110

1    **full range of transactions relating to compensation.  A**

2    **CG-7 would not be responsible to perform duties at the**

3    **full performance level, would they?**

4         A    Not necessarily.

5         **Q    Not -- in fact, they would not be.**

6         A    They might be.

7         **Q    They might be required to perform duties at**

8    **the full performance level as a CG-7?**

9         A    Correct.

10        **Q    Under what circumstances would a CG-7 be**

11   **expected to perform at the CG-11 level?**

12        A    If -- if I have a staff of people on leave or

13   sick leave and I have vacancies to fill and I am -- I

14   don't have expertise -- and it could be that this

15   person, even though they're at a lower grade, might

16   have enough experience to be a troubleshooter, and I

17   might go to that person and ask them to do certain

18   payroll actions, because they have come along faster

19   than they can get promoted and be able to do those

20   tasks.

21        **Q    But that employee is not at the CG-11 full**

22   **performance level for this position, correct?**

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 111

1          A    May not be.  But they may be a GS -- CG-9 and

2    already have the technical know-how.

3          Q    We're not talking about a CG-9 now, Ms.

4    Potucek.  I said at the CG-7 level, the entry level,

5    which we've agreed, entry level is CG-7.

6          A    Correct.

7          Q    A CG-7 is not, at the entry level, going to be

8    required to perform duties at the CG-11 level.

9          A    Not necessarily.

10         Q    Have you ever required a CG-11 to perform

11   CG -- have you ever required a CG-11 to perform -- a

12   CG-7 to perform CG-11 duties?

13         A    Absolutely.

14         Q    Absolutely.  With respect to this position,

15   have you required a CG-7 entry level to perform CG-11

16   duties?

17         A    Probably.

18         Q    When that individual was still a CG-7?

19         A    Absolutely.

20         Q    And if that CG-7 were not able to perform at

21   the full performance CG-11 level, did you take adverse

22   action against them?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 112

1        A    No.

2        Q    Did you dock their performance appraisal in

3    any way?

4        A    Repeat the question?

5        Q    When that CG-7, entry level, did not perform

6    at the full performance level of a CG-11, did

7    you -- did you annotate their -- negatively annotate

8    their performance?

9            MR. JONES:  Objection, assumes a fact not in

10   evidence.

11           BY MR. SIMPSON:

12       Q    You can answer.  Have you ever done that?

13       A    When they're a CG-7?

14       Q    Yes, ma'am.

15       A    And they're not performing at the 11 level?

16       Q    You ask them to perform at the 11 level and

17   they don't.

18       A    I only ask them to do 11 work when I know they

19   can do it.

20       Q    Has that ever happened?

21       A    Yes.

22       Q    Has that ever happened with Roger Little?

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 113

1        A    Yes.

2        Q    After he came in as an entry level CG-7?

3        A    Yes.

4        Q    Less than completing a year at the CG-7 level

5    and less than a year at the CG-9 level, you required

6    him to perform duties at the CG-11 level?

7        A    On occasion, but less than 5 to 10 percent,

8    and under the law, the legislation, under a

9    classification, you can ask people to perform at the

10   next higher grade and do duties on an occasional basis

11   when it's not -- it's not over a long period of time

12   and it happens to be a situation where you need their

13   expertise and it's a learning opportunity and you have

14   a situation where I have no one else to go to.

15       Q    Let's make sure we understand here.  I just

16   want to make sure we're clear, okay?  You said there

17   is -- there are -- I think you said -- you testified

18   there's legislation that says that you can go to the

19   next higher grade, correct?

20       A    And ask people to perform at the next higher

21   grade --

22       Q    Right.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 114

1          A     -- on an occasional basis, because the

2     position description says "performs other duties as

3     assigned," but when it becomes -- when it becomes over

4     25 percent of the time and it becomes an ongoing,

5     reoccurring basis, then the manager should not be

6     asking the employee to perform at the next higher

7     grade.

8          Q     I understand.  I understand.

9                Now, in the scenario -- the questions that I

10    have just been asking you, Ms. Potucek, I sort of want

11    to make sure we understand here.  At the CG-7 level,

12    what's the next higher grade?

13         A     For what series?

14         Q     For this.

15         A     Nine.

16         Q     Nine.  Okay.  Looking at the summary of

17    duties, is a CG-9 at the full performance level?

18         A     No.

19         Q     It's at the CG-11 level.

20         A     Right.

21         Q     So, the legislation that you quoted is you

22    could require an incumbent entry-level CG-7 to do CG-9

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 115

1    work.

2        A    If I thought they could do it.

3        Q    Correct.  The same legislation that you just

4    quoted, that says you could go to the next higher

5    grade, does not include going from 7 to 11, does it?

6        A    Not necessarily.

7        Q    Well, if you go from 7 -- an entry-level CG-7,

8    requiring them to do CG-11, are you in violation of the

9    legislation?  Because the legislation says one higher

10   grade, correct?

11       A    I don't know that it says one higher grade.

12       Q    You just quoted -- your testimony was the

13   legislation allowed to go to the next higher grade,

14   which, for a CG-7, would be CG-9, not 11, correct?

15       A    It depends on the nature of what I'm asking

16   the person to do.

17       Q    If you're asking a 7 to do 11 work, is that

18   authorized by the legislation that says you can go one

19   grade higher?

20       A    Probably.

21       Q    When it is, in fact, two grades higher,

22   correct?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 116

1        A     Probably.

2        Q     **Probably.  But you don't know, do you?**

3        A     I do know that you can ask people to do work

4    at the next higher grade or above that.

5        Q     **Well, but that's not what your earlier**

6    **testimony was.  Do you know exactly what the**

7    **legislation says, Ms. Potucek?**

8        A     No, I would have to pull out the

9    classification standards.

10       Q     **Can you quote that legislation for me?**

11       A     No.

12       Q     **Okay.  You don't know the specific**

13   **legislation.**

14       A     I can find it, but I don't know it today.

15       Q     **FDIC has a personnel and payroll automation**

16   **system, does it not?**

17       A     Yes.

18       Q     **Is that called CHRIS?**

19       A     Yes.

20       Q     **And that's the Corporate Human Resource**

21   **Information System, CHRIS, right?**

22       A     I don't know what it stands for.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 117

1          Q      Okay.  Well, if you look at the third line of

2     the summary of duties, toward the end of the third

3     line, carrying over to the beginning of the fourth

4     line, it says "the Corporate Human Resource Information

5     System (CHRIS)," correct?

6          A      Okay.

7          Q      That's the FDIC's automated system, correct?

8          A      Yes.

9          Q      It's both personnel and payroll-related,

10    correct?

11         A      Yes.

12         Q      And prior to that, starting at the end of the

13    second line, it talks about "the National Finance

14    Center (NFC) Entry Processing Inquiry Correction System

15    (EPIC)," correct?

16         A      Yes.

17         Q      EPIC is a National Finance Center system,

18    isn't it?

19         A      I don't know.

20         Q      Is it an FDIC system?

21         A      Obviously we use it.

22         Q      You use it.  Is the FDIC responsible to

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 118

1    maintain that system?  Do you know?

2        A    I don't know.

3        Q    When you were the H.R. officer for FDIC, that

4    two-year period, fall of -- fall of '03 to January of

5    '06, did you have responsibility for payroll function's

6    interface with the National Finance Center?

7        A    Yes.

8        Q    And you had subordinates that did that,

9    correct?

10       A    Yes.

11       Q    Did you ever coordinate with the National

12   Finance Center?

13       A    No.

14       Q    You had subordinates that did that.

15       A    Correct.

16       Q    You expected them to know the different

17   systems, both FDIC and National Finance Center,

18   correct?

19       A    Yes.

20       Q    But you don't know whether EPIC is a system

21   maintained by FDIC or not.

22       A    I do not know.

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 119

1        Q    Okay.  Do you know if there are any other

2   personnel-related information systems for which FDIC

3   has a responsibility to maintain?

4        A    Our automated application system, Quick Hire.

5        Q    Okay.  Quick Hire.  Any other systems?

6   Information system related to personnel, human

7   resources?

8        A    That's all I know of.

9        Q    Payroll?

10       A    That's all I know.

11       Q    Okay.  Now, as I'm reading the second sentence

12   of this summary of duties, it starts at the end of the

13   first line, where it says "Assists others regarding

14   system processing problems with NFC, EPIC, CHRIS, or

15   other data systems."  Do you know what the other data

16   systems are?

17       A    No.

18       Q    All right.  That's something that's contained

19   in this summary of duties for a CG-7/9/11 in career

20   series 0201, and as you sit here today, you don't know

21   what those other data systems are?

22       A    There are data systems for retirement.  There

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 120

1   are data systems for managers, when we do our

2   pay-for-performance.

3        **Q    Are those National Finance Center data**

4   **programs or FDIC?  Do you know?**

5        A    They have to -- I recollect that they are

6   both.

7        **Q    Both CHRIS and within some subsystem of NFC.**

8        A    Yes.  Where the data has to be correct,

9   because when we calculate out pay increases, merit

10  promotions, merit increases through the

11  pay-for-performance, we get those documents to the

12  chairman's office, and they are in Excel spreadsheet

13  format, and these are other data systems that we

14  maintain for purposes that managers use.

15       **Q    Other data systems that are maintained by FDIC**

16  **or inputted into the National Finance Center.**

17       A    Correct.

18       **Q    Correct.  They're inputted into National**

19  **Finance Center.**

20       A    Some of them are.

21       **Q    And are some of them inputted into CHRIS?**

22       A    Yes.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 121

1          Q    Any other data system, information system that

2    they're inputted into?

3          A    I don't recall.

4          Q    You don't recall.

5               Do you know -- do you know if there are other

6    data systems that they would have been inputted into?

7          A    In other areas, the human resources branch?

8          Q    Under your --

9          A    No, I don't recall.

10         Q    Okay.  So, it's either CHRIS or an FDIC system

11   or subsystem or Quick Hire.

12              Those are the only three that you're aware of.

13         A    Correct.

14         Q    And the Quick Hire is maintained by FDIC,

15   correct?

16         A    Yes.

17         Q    And CHRIS is maintained by FDIC?

18         A    Yes.

19         Q    And the NFC systems are obviously maintained

20   by NFC.

21         A    Right.

22         Q    Now, do you know what office in the FDIC is

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                   Page 122

1    responsible for the CHRIS system?

2        A    I think it's joint between the operations and

3    then the human resources information management and

4    payroll section.

5        Q    And is that a section underneath the human

6    resources branch?

7        A    Correct.

8        Q    Do you know where that would fall on this

9    organizational chart?  Does it fall under human

10   resources benefits?

11       A    No, it's -- it -- it was, during that time,

12   equal to human resources benefits and the human

13   resources service center.

14       Q    Okay.

15       A    All three of those individuals are CM-2's.

16       Q    They reported to the head of the human

17   resources branch, at that time Mr. Torrado.

18       A    Yes.  Yes.

19       Q    Were there -- other than those three, other

20   than the human resources center, which was headed by

21   Shirley Pernell, and the human resources information

22   management and payroll block that would have been Greg

EXHIBIT 19
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 123

1    Tally --

2       A    Correct.

3       Q    -- and the human resources benefits, which

4    would have been headed by Ed Chmalowski -- those are

5    the only three distinct sub-elements of the human

6    resources branch that you know that reported directly

7    to Miguel Torrado at that time?

8       A    Yes.

9       Q    Okay.

10           MR. JONES:  Jim, I need to take a five-minute

11   quick break.

12           MR. SIMPSON:  Okay.

13           (A brief recess was taken.)

14           MR. SIMPSON:  We're back on at 2:00 o'clock.

15           BY MR. SIMPSON:

16      Q    Ms. Potucek, do you know Natalie Tyce?

17      A    Yes.

18      Q    How do you know Natalie Tyce?

19      A    Through my work in the human resources branch.

20      Q    Did she ever work for you?

21      A    No.

22      Q    Okay.  Where did she work in the human

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 124

1    resources branch?  Do you know?  During the time-frame

2    that you were the H.R. officer.

3        A    She worked in the human resources information

4    management and payroll.

5        Q    So, she worked for -- excuse me.

6        A    She worked for Greg Tally.

7        Q    For Greg Tally.

8        A    And then, when Greg moved over to benefits,

9    she worked with Sylvia.

10       Q    Okay.  All right.  Do you know whether -- if

11   you know -- do you know whether Natalie Tyce ever

12   worked on calculations -- payroll calculations for

13   possible EEO settlement?

14       A    I'm sure she did.

15       Q    Do you know whether she did?

16       A    I don't know for a fact that she did.

17       Q    Okay.  Do you know Brent Bracely?

18       A    No.  Brent?

19       Q    Brent Bracely.

20       A    That name is familiar.  That name is familiar.

21       Q    Do you recall ever having any personal

22   conversations with Brent Bracely about either his

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 125

1    **personal life or your personal life?**

2         A    No.

3         **Q    Do you recall any conversations with Brent**

4    **Bracely about EEO complaints filed by Ms.**

5    **Chappell-Johnson?**

6         A    No.

7              I don't recall -- that name is familiar, but I

8    don't recall what he looks like and how I would know

9    him.

10        **Q    Do you recall if there ever came a time in the**

11   **operations center, during the time you were the**

12   **supervisor in the -- your capacity as the human**

13   **resources officer -- where one of your subordinates**

14   **made an announcement in the operations center that**

15   **Dorothy Chappell-Johnson had filed an EEO complaint?**

16        A    Made an announcement?

17        **Q    Made an announcement.**

18        A    No.

19        **Q    Were you ever told that one of your**

20   **subordinate employees had made such an announcement in**

21   **the operations center?**

22        A    No.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 126

1          Q    Okay.  Just one second.  Okay.

2               MR. SIMPSON:  For the record, counsel for the

3     parties have had some discussions about going ahead and

4     going into recess at this point for this deposition,

5     and reconvening this deposition at approximately 10:00

6     o'clock a.m. on Thursday, the 29th of November, and

7     that's a date and time that's agreeable to all the

8     parties present at this point in time.

9               I would ask, Bill, if you have anything for

10    the record at this point?

11              MR. JONES:  It's agreeable to the parties.

12    It's our understanding that the deposition will

13    reconvene in our offices in Arlington, and will be for

14    approximately an additional four hours, and Ms. Potucek

15    will be available on that date, starting at 10:00

16    o'clock in the morning.

17              MR. SIMPSON:  Okay.

18              The last thing I have is, during the course of

19    this deposition, the deponent, Ms. Potucek, received a

20    piece of paper and made some annotations, and this

21    time, I would just like to take a look at that

22    document, if I may.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 127

1            BY MR. SIMPSON:

2        Q    If I may, Ms. Potucek, I understand the

3    initial entries that you've written, and what you have

4    written here are dates and organizations, in essence,

5    that you worked, starting in 1998.  I wonder if you

6    could share with me the information -- and I'm going to

7    give it back to you -- that you've indicated in

8    November, fall '01 to '02, and tell me what that

9    information, down to the first line, represents,

10   starting with November, fall '01 to '02?

11       A    Right.  I put '01 to '02, compliance officer,

12   and then '03 -- I wanted to count the three years under

13   the court order that started in January of '02.

14       Q    Okay.  And does that -- do those dates reflect

15   when you became the H.R. officer, between '02 and '04?

16       A    No, the compliance officer.

17       Q    Just for the compliance --

18       A    Right.

19       Q    And you became the H.R. officer in the fall of

20   '03, correct?

21       A    Of '04.

22       Q    In the fall of '04.

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 128

1        A    Late '04, I became the H.R. officer, because I

2    was the H.R. officer late in '04, all of 2004, and all

3    of 2005.

4        **Q    Wait a minute.**

5            **You could not have come late '04 -- oh, I'm**

6    **sorry.  You were the compliance officer for all of '04**

7    **and --**

8        A    -- part --

9        **Q    -- of '05.**

10       A    No, I was the compliance officer from -- I

11   came on-board at the FDIC in the fall of 2001.

12       **Q    Correct.**

13       A    The court order became effective in January of

14   '02.

15           So, I was officially the compliance officer in

16   '02, '03, and '04, until January of '05 --

17       **Q    Correct.**

18       A    -- when the court order was over.

19       **Q    Correct.**

20       A    In the fall of '04, I was selected to be the

21   H.R. officer, so I was in a dual role as the compliance

22   officer and the H.R. officer for approximately six

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 129

1    months.

2         Q    Well, if you would agree, that would be either

3    September, October, November through December, correct?

4         A    It was sometime in that time-frame, yes.

5         Q    And you would agree with me that, looking back

6    at Exhibit No. 3, the vacancy announcement, that was

7    opened in August -- on August 24, 2004, correct?

8         A    Correct.

9         Q    Closed on September 8, 2004.

10        A    Correct.

11        Q    And you were involved in the development of

12   the position description for the CG-7, 9, or 11,

13   correct?

14        A    Yes.

15        Q    So, you would have had to have worked on the

16   position description prior to August 24, 2004, correct?

17        A    Correct.

18        Q    So, is it still your testimony that you became

19   the H.R. officer in the fall of '04 or the fall of '03?

20        A    Fall of '04.

21        Q    Okay.  That being either September, October,

22   or November, correct?

**EXHIBIT 19**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 130

1        A    Correct.

2        Q    Okay.  I have nothing further at this time.

3             MR. JONES:  I have nothing at this time.

4             If you're going to produce a separate

5    transcript for -- we will read and sign, whether

6    individually or together.

7             (Whereupon, at 2:10 p.m., the deposition of

8    LORINDA POTUCEK was concluded.)

9

10                               *    *    *    *    *

11

12            I have read the foregoing pages, which are a

13   correct transcript of the answers given by me to the

14   questions therein recorded.

15

16        Deponent_____

17

18        Date_____

19

20

21

22