**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

IN THE UNITED STATES DISTRICT COURT FOR THE

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x
                                      :
DOROTHY CHAPPELL-JOHNSON,             :
                                      :
          Plaintiff,                  :
                                      :
     V                                : Civil Action No.
                                      : 06-1074 (RCL)
                                      :
MARTIN J. GRUENBERG,                  :
                                      :
          Defendant.                  :
                                      :
                                      :
- - - - - - - - - - - - - - - x


                    Arlington, Virginia

                Thursday, November 29, 2007



Deposition of


               LORINDA POTUCEK


a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Kenyan

C. Hopchas, a Notary Public in and for the District of

Columbia, in the offices of the Federal Deposit

Insurance Corporation, 3501 Fairfax Drive, Arlington,

Virginia, commencing at 10:20 a.m.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 2

APPEARANCES:


On Behalf of the Plaintiff:


JAMES E. SIMPSON, ESQ.

Swick & Shapiro, P.C.

1225 Eye Street, N.W., Suite 1290

Washington, D.C.  20005

(202) 842-0300



On Behalf of the Defendant:


WILLIAM S. JONES, ESQ.

Legal Division

Corporate Operations Branch

Federal Deposit Insurance Corporation

3501 Fairfax Drive, Room E-6006

Arlington, VA  22226

(703) 562-2362

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 3

| | | |
|---|---|---|
| 3 | Vacancy Announcement | 4 |
| 4 | Position Description for HR Specialist | 39 |
| | CG-0201-7 FPL 11  8/04 | |
| 5 | Position Description for HR Specialist | 59 |
| | CG-0201-11  12/02 | |
| 6 | OF 612 Employment Application of Little | 93 |
| 7 | Employment Application of Chappell-Johnson | 110 |
| 8 | Merit Promotion Roster | 114 |
| 9 | 10/18/04 E-mail From Taylor to Boosinger | 135 |
| | with interview questions | |
| 10 | Candidate Selection Recommendation | 140 |
| 11 | Affidavit of Lorinda S. Potucek | 153 |

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
                                                              Page 4

1                   P R O C E E D I N G S

2    Whereupon,

3                       LORINDA POTUCEK

4    was called as a witness, and having been first duly

5    sworn, was examined and testified as follows:

6                      DIRECT EXAMINATION

7              MR. SIMPSON:  Good morning.

8              THE WITNESS:  Good morning.

9              BY MR. SIMPSON:

10        Q    And again, for the court reporter's sake,

11   it's Potucek, correct?

12        A    That's correct.

13             MR. SIMPSON:  Yes.  Okay.

14                  (Potucek Deposition Exhibit 3 was

15                   marked for identification.)

16             BY MR. SIMPSON:

17        Q    The court reporter is handing you what's been

18   marked as Exhibit 3 for this continuation of a

19   deposition that we had started earlier with you, Ms.

20   Potucek, and when we adjourned, that particular -- the

21   first part of the deposition, we in fact were talking

22   about Exhibit 3.  Do you recall that?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 5

1        A    Yes I do.

2        Q    Okay.  And Exhibit 3 is a vacancy

3    announcement for the position in question in this

4    particular case, is it not?

5        A    Yes it is.

6        Q    Okay.  And looking at page 2, near the end of

7    the first part of this deposition, I had asked you in

8    the portion of the Summary of Duties if there were any

9    duties that a CG-7 would not generally be required to

10   perform.  Do you remember that question?

11       A    Yes.

12       Q    Calling particular attention to about three-

13   fourths of the way down the paragraph, the line at the

14   end of which starts "At the" and continues on the next

15   line "full performance level."

16       A    Are you under Summary of Duties?

17       Q    Yes, ma'am.

18       A    Okay.  At the -- okay.

19       Q    And we had agreed the full performance level

20   in this particular case is a CG-11, correct?

21       A    Correct.

22       Q    Okay.  And in fact, when a selection decision

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 6

1    was made, no one was hired at the CG-11 were they?

2        A    No.

3        Q    Do you recall was there a hiring at the CG-9

4    level?

5        A    No.

6        Q    Okay.  So, in fact, the very beginning of the

7    Summary of Duties at the entry level, because this

8    position was announced at the CG-7, 9, 11 level,

9    correct?

10       A    Correct.

11       Q    It would start off at the entry level for the

12   duties, correct?

13       A    Correct.

14       Q    Okay.  Now also in the Summary of Duties,

15   further up from the sentence that we were just looking

16   at at the full performance level, there's reference to

17   the Corporate Human Resource Information System

18   (CHRIS).

19       A    Yes.

20       Q    And what is CHRIS?

21       A    It is the TNA system or the system that ties

22   into TNA that gives the employee's Social Security

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 7

1    number, their salary, their series, their grade.

2         Q    Okay.  Now is CHRIS -- CHRIS is an FDIC

3    automated personnel system, is it not?

4         A    That's correct.

5         Q    Also a payroll system?

6         A    Right.

7         Q    And CHRIS interfaces with the National

8    Finance Center --

9         A    Yes.

10        Q    -- database system, does it not?

11        A    Yes.

12        Q    Do you know, are there any functions that are

13   performed by CHRIS that do not tie into a system within

14   the National Finance Center?

15        A    I don't know that.

16        Q    But there are specific subsystems within the

17   CHRIS that do interface with the National Finance

18   Center system, correct?

19        A    I think you're correct.

20        Q    In other words, data is entered into CHRIS.

21        A    Right.

22        Q    And it's uploaded to the National Finance

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 8

1    Center.  Is that your understanding?

2        A    That's my understanding.

3        Q    Okay.  And I don't recall whether I'd asked

4    you before, but the Entry Processing Inquiry and

5    Corrections System, E-P-I-C, EPIC, that also is a

6    National Finance Center system, isn't it?

7        A    I'm not -- I cannot testify that it is or it

8    isn't.  I don't know that.

9        Q    All right.  Do you know whether the Federal

10   Deposit Insurance Corporation has any other human

11   resource information systems other than CHRIS?

12       A    Yes.  You asked me that last time.

13       Q    And your response was?

14       A    Automated Application System.

15       Q    What is an Automated Application System?

16       A    QuickHire.

17       Q    Okay.  Anything else?

18       A    There are probably others, but I don't know

19   at this point in time.  I cannot recall.

20       Q    Do you recall whether you had any

21   responsibilities for other FDIC automated systems in

22   your prior position?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 9

1      A    Yes.  There are many, but I don't recall --

2      **Q    Do you remember any of them?**

3      A    I would have to look at other documents to

4  jog my memory.

5      **Q    Okay.  But you independently cannot think of**

6  **any other systems other than the QuickHire and CHRIS**

7  **that were FDIC automated systems?**

8      A    I can recall if had something to jog my

9  memory.

10     **Q    But you cannot independently recall any right**

11 **now?**

12     A    No.

13     **Q    Okay.  All right.  Now QuickHire, the system**

14 **that you mentioned earlier as another data system, is**

15 **that considered a data system?**

16     A    Yes.

17     **Q    Okay.  Now looking at the summary of duties -**

18 **- and by the way, you did not have any involvement in**

19 **preparing this vacancy announcement at Exhibit 3, did**

20 **you?**

21     A    I went back after you inquired about the date

22 that I became the human resources officer.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 10

1          Q     Yes, ma'am.

2          A     And I have the exact date.

3          Q     And when did you become the --

4          A     I became the human resources officer on May

5     the 16th, 2004.  And at the same time, I was also

6     performing duties as the compliance officer.  So, it

7     could be that when I took over the HR position from

8     Shirley Purnell, that Shirley could have already

9     started working on this particular vacancy

10    announcement.  It could be that she was working on

11    this, but I cannot recall specifically that I worked on

12    it.

13         Q     Well, if my memory serves me correctly when

14    we last met for the first part of your deposition, I

15    believe your testimony was that because this position

16    would work under you, you fundamentally recused

17    yourself from involvement of the preparation and review

18    of the vacancy announcement.  Do you remember that?

19         A     Yes.  However, as the compliance officer, I

20    had to review all documents nationwide, and if this was

21    a standardized position description, and if this was a

22    standardized vacancy announcement, it could be that I

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 11

1   looked at other documents that were exactly like this,

2   because I did not know at the time that I was looking

3   at this as the compliance officer that I was going to

4   be applying for the HR officer and ultimately be

5   selected for that position.  That's why I can't say

6   absolutely that I never saw this document.

7       **Q    But that would be -- that would apply only if**

8   **there was work done on this before you became the HR**

9   **officer, correct?**

10      A    Only if this job -- a like job had been

11  filled.

12      **Q    Now we're talking about this vacancy**

13  **announcement for which the opening date, back on page 1**

14  **--**

15      A    Right.

16      **Q    -- was August 24th, 8/24.**

17      A    Uh-huh.

18      **Q    Which is roughly three months after you've**

19  **assumed the position of the HR officer for FDIC,**

20  **correct?**

21      A    Correct.

22      **Q    So, it is possible that you may have reviewed**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 12

1    it in your capacity as the compliance officer for the

2    Conanan consent decree function that you were

3    performing, correct?

4        A    Not -- not this one that was opened.  It

5    could have been a like document for another job in the

6    Corporation.

7        Q    And we're talking about this specific vacancy

8    announcement, Ms. Potucek --

9        A    Okay.

10       Q    -- not a like document.  Do you recall

11   reviewing this document as part -- at a time after you

12   became the HR officer for FDIC?

13       A    I cannot recall.

14       Q    Okay.  All right.  Back in the Summary of

15   Duties page 2, the third sentence that begins with

16   "Assists in testing and implementation of system

17   modifications and cahnges."  Do you know what that

18   means?

19       A    I believe it means --

20       Q    Do you know what it means, Ms. Potucek?

21       A    Without a reasonable doubt?

22       Q    Do you know what it means?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                          Page 13

1        A    I know what testing and implementation of

2    system modifications and cahnges means.

3        **Q    Okay.  In the context of this Summary of**

4    **Duties, what does it mean for a CG-7, 9 or 11 Human**

5    **Resources Specialist Information Systems and**

6    **Compensation, what does that duty entail?**

7        A    This duty would entail if the FDIC had

8    modifications for compensation and benefits or they

9    were negotiating with T. Rowe Price, or there were

10   other things in the bargaining unit that were being

11   implemented, or if there were other modifications that

12   came through from NFC or from OPF with retirement, that

13   this person would have to interface with Greg Talley's

14   shop and the IT area to implement this within our HR

15   operations.

16       **Q    Okay.  And what would a CG-7, 9 or 11 HR**

17   **Specialist Information Systems Compensation, what duty**

18   **would they perform or be required to perform in the**

19   **implementation of system modifications?**

20       A    They would be required to implement it in

21   operations.

22       **Q    Implement it how, ma'am?  That's my question.**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 14

1      A      To make sure that it was implemented in

2  operations.

3      **Q      Okay.  Let me ask this question.  FDIC is not**

4  **required or responsible for system changes to the**

5  **National Finance Center automated systems, are they?**

6      A      No.  But we modify --

7      **Q      Okay.**

8      A      When we have -- for example, because we have

9  CGs and because we have E's, and because we have

10  experts, we have to negotiate with NFC to put those

11  kinds of codes into the database, because NFC doesn't

12  have those kinds of codes in their database.  And when

13  agencies like the FDIC or OCC come up with different

14  kinds of letters before a grade, our person in

15  operations has to negotiate and work with NFC to see if

16  any other agency in the government already has used

17  those letters.

18          So when we came up with CG, or CGs here, we

19  have to make sure that another government agency out

20  there does not have CG in front of the number.  And

21  sometimes they do, and sometimes they don't.

22          So this person, because he or she is

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 15

1    implementing from an operations perspective, we have to

2    ensure that our folks, our managers, who are making

3    these recommendations, we can guide them so that we can

4    say when we implement the system modification that you

5    want and the union, you've negotiated with the union,

6    that we can do this with NFC.  Somebody has to be the

7    face to NFC, and it's this person in operations who

8    does that.

9        Q    **When you say "this person," you're not**

10   **talking specifically about the individual that would be**

11   **hired for this vacancy announcement, are you?**

12       A    Yes, in part.  They worked as a team with

13   Greg Talley's group, and we work together as a team.

14   So my person, this person would be the operations

15   representative.

16       Q    **The only individual in your office that would**

17   **do that?**

18       A    Yes, because this is the only person I have

19   that does the IT function in operations.

20       Q    Okay.  **Now, when this individual was hired --**

21   **strike that.  When this vacancy announcement was**

22   **prepared and announced, put out on the street, there**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                            Page 16

1    would have been only one position that worked for you

2    that would have the duties to assist in the

3    implementation of system modifications and changes?

4        A    Right.

5        Q    So there would be no other CG-7 or CG-9 or

6    CG-11 Human Resources Specialist Information Systems

7    and Compensation individual that would do this?

8        A    In operations, that's correct, in my shop.

9        Q    There's only one person?

10       A    Right.  Because we have -- we went through

11   three reduction in forces.

12       Q    Okay.

13       A    I had 28 people, and they chopped me down to

14   12.  I used to have more, but then this person became

15   the only person I had in my shop.

16       Q    And who performed these duties before this

17   announcement was made?

18       A    I don't know because I was not in the job.

19       Q    So when you came into the job, the job was

20   vacant?

21       A    I would assume so.

22       Q    But you don't know, do you?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 17

1       A       Shirley Purnell was in my job for five years,

2    and I'm not exactly sure what Shirley -- what was going

3    on and what reorganizations and realignments Shirley

4    was doing because I was sitting over in another office

5    as the compliance officer.

6       **Q       So when became the HR officer for FDIC, were**

7    **you briefed on your organization?**

8       A       Briefed how?

9       **Q       Yeah.  Were you told how many people you had**

10   **and what they did?**

11      A       I did it on my own.

12      **Q       What do you mean?**

13      A       I pulled organizational charts.  I pulled

14   everyone's OPF.  I always do that when I become a new

15   supervisor.

16      **Q       Okay.  And how many total subordinates did**

17   **you have when you assumed the position?**

18      A       I think I had at the time 28.

19      **Q       Okay.  And over what period of time were you**

20   **reduced down to 12?**

21      A       Monthly.

22      **Q       And how much per month?**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                Page 18

1      A    It depended on when people got jobs, when

2   people decided to retire, when people found jobs in

3   other agencies, when people were placed through the

4   reduction in force efforts within the FDIC.

5      **Q    Okay.  How many subordinates did you have --**

6   **if you started in May of '04 with 28, how many did you**

7   **have in June of '04?**

8      A    I have no -- I do not know.

9      **Q    How many did you have in July of '04?**

10     A    I don't know.

11     **Q    August of '04?**

12     A    I cannot recall.

13     **Q    Do you remember when it was by year that you**

14  **ultimately were reduced to 12 employees?**

15     A    The reduction in force letter that the

16  chairman signed, all those organizational charts and

17  realignments had to be effective on a certain date in

18  that letter, and I don't know what that --

19     **Q    Was it one year later?**

20     A    It could have been.  It might have been.

21     **Q    Okay.  But you don't recall how many**

22  **individual subordinate spaces that you lost between May**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 19

1    and August of 2004?

2        A    Well, I know that I lost -- I lost, what?

3    What's 12 from 28?  Sixteen?  I know that I was --

4        **Q    Over what period of time?**

5        A    Whatever the chairman's letter --

6        **Q    And you don't have a recollection of that**

7    **period of time?**

8        A    I don't have the chairman's letter in front

9    of me.

10       **Q    But you certainly weren't down to 12**

11   **subordinates in August of 2004 were you?**

12       A    No, probably not.

13       **Q    September of 2004?  You weren't down to 12,**

14   **were you?**

15       A    I don't -- I can't answer that, because I do

16   not know when everyone left or retired.

17       **Q    So between May when you became the HR officer**

18   **and August when this vacancy announcement -- who**

19   **performed the function of assisting in the**

20   **implementation of system modifications and changes?**

21       A    It was probably somebody in Greg Talley's

22   shop was helping me out until we could get the job --

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 20

1          Q      But do you know?

2          A      It was probably --

3          Q      Do you know?

4          A      -- Natalie Tyce could have been one.  Judy

5    somebody could have been another.

6          Q      I'm not asking what it could have been, Ms.

7    Potucek.  These questions are very specific.  Who was

8    it?

9          A      People in Greg Talley's shop.

10         Q      So that function was not being performed in

11   your office, was it?

12         A      It was until we got these jobs filled.

13         Q      No, no, no, no.  I just asked you, prior to

14   this being filled, was it being performed in your

15   office.

16         A      Yes.

17         Q      And you said, no, it was being performed in

18   Greg Talley's office.

19         A      Until we got the realignment done.

20         Q      What realignment?  The reorganization?

21         A      We had probably three, four, five

22   realignments in the Human Resource branch.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 21

1          Q      In what period of time?

2          A      Three years.

3          Q      What three-year period?

4          A      Probably 2003 to 2006.

5          Q      So this chairman letter that you were

6     referring to earlier --

7          A      There were several.  There were several.

8          Q      There were several of those letters.  So over

9     three years, the Human Resources branch went through

10    reorganization resulting in the reduction of spaces,

11    correct?

12         A      The entire corporation did, yes.

13         Q      Okay.  But HRB, the Human Resources Branch as

14    well --

15         A      Yes.  All of DOA did.

16         Q      Over a three-year period?

17         A      Correct.

18         Q      And you don't recall how many you lost over

19    what period of time?

20         A      Well, sixteen over three years.

21         Q      No, ma'am.  You got there in '04, and you

22    said you had 28.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 22

1        A     Right.

2        **Q     So if you said the reorganization was 2003 to**

3   **2006, it would have been over two years for you,**

4   **wouldn't it have been?**

5        A     Some of those people may have been already

6   slated to go to other -- the way that we did the

7   reduction in force, depending on your service

8   computation date, you were slotted in other

9   reorganizations, and so people were probably already

10  tasked to go to other organizations in 2003 but they

11  didn't actually leave until maybe the beginning of

12  2004.

13       **Q     Before you got there, they were already gone,**

14  **correct?   We're talking about -- you said you had 28 -**

15  **-**

16       A     Mm-hmm.

17       **Q     -- in May of 2004.  We're not talking about**

18  **ones -- positions that may have been lost prior to your**

19  **arrival, correct?**

20       A     It was the whole -- it's the entire --

21       **Q     Now, Ms. Potucek, when you assumed the**

22  **position as the HR officer, your testimony was you had**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 23

1    **28 subordinates, correct?**

2        A    On paper.  On paper on the org chart is what

3    I said.  On the organizational chart.

4        **Q    And then at some time down the road, for**

5    **which you don't remember the time period, you were**

6    **reduced to 12?**

7        A    Correct.

8        **Q    And certainly in that interim period, Vacancy**

9    **Announcement 2004-HQ-2637, which is Exhibit 3 that**

10   **you're looking at, was posted and filled, correct?**

11       A    Correct.

12       **Q    And you don't know who was performing these**

13   **duties between May 16th, 2004 and the time this**

14   **position was filled, correct?  Is that your testimony?**

15       A    I don't know by name.

16       **Q    And were these functions, these duties being**

17   **performed by personnel under you?**

18       A    Partly.

19       **Q    Partly.  And who were they?**

20       A    The entire staff of 28 or how many people I

21   had.  Everybody was chipping in and doing what they

22   could.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 24

1        Q    Were they all Human Resources Specialists?

2        A    Yes.

3        Q    Were they all Human Resources Specialists

4    Information Systems and Compensation?

5        A    No, but they knew enough.

6        Q    How many other Human Resources Specialist and

7    Information Systems and Compensation slots did you have

8    in May of --

9        A    They all do information systems.

10       Q    How many HR Specialists --

11       A    Twenty-eight.

12       Q    No.  No.

13       A    Twenty-eight --

14       Q    Now I want you to listen to the question, Ms.

15   Potucek, and answer the question.

16            MR. JONES:  Maybe if you just slow it down a

17   little bit.

18            MR. SIMPSON:  My question was, how many Human

19   Resources Specialists Information Systems and

20   Compensation spaces did you have?

21            THE WITNESS:  I don't recall.

22            BY MR. SIMPSON:

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 25

1      Q      Assuming that all of the 28 positions on

2    paper were -- were they all Human Resources

3    Specialists?

4      A      No.

5      Q      What did you have other than Human Resources

6    Specialists?

7      A      We had Human Resources Assistants.

8      Q      Assistants.

9      A      We had student interns, and all of the Human

10   Resources Specialists were required to do some HR

11   Information Systems work.

12     Q      So if I were to look at the Summary of Duties

13   or a position description for any HR Specialist,

14   irrespective of a parenthetical specialty --

15     A      Right.

16     Q      -- I would see something about assists in

17   testing and implementation of system modifications and

18   changes?

19     A      And you would see that they have to make sure

20   that the payroll is correct.

21     Q      We're talking about this statement.

22     A      Yes.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                   Page 26

1      Q      Assists in testing and implementation of

2   systems.

3      A    You would probably see that.

4      Q      In other HR Specialist --

5      A    You cannot be an HR Specialist without doing

6   some information system work.

7      Q      So this Summary of Duties at Exhibit 3

8   containing the sentence "assists in testing in

9   implementation of system modifications and changes," is

10  not unique to this position, is it, Ms. Potucek?  It's

11  a duty that's required of other HR Specialists that

12  would have been in the operations section?

13     A    No.  This one is unique because this is the

14  person who interfaces with NFC.  The other HR

15  Specialists are not allowed to interface with NFC,

16  because NFC has a rule that only one person from the

17  agency can be earmarked to be the conduit between the

18  agency and NFC.  NFC does not want 28 people calling

19  them.  They only want one.  And this is the person

20  who's the interface between NFC and operations.

21     Q      Does that person ever take leave?  The person

22  who fills that position?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 27

1          A    Well, I would hope so.

2          **Q    I would expect they would.  Who interfaces**

3   **with NFC if they're the only one that can?**

4          A    I would call NFC and say this individual who

5   is your person will be out for two weeks or three days

6   for training, and the person who's going to be the

7   backup is so-and-so, and that's what I would do.

8          **Q    You would do that?**

9          A    I would do that or I would have Janet Forrest

10  do that.

11         **Q    And who is Janet Forrest?**

12         A    Janet Forrest was my Grade 14 lead.

13         **Q    Okay.  Hmm.  So it's your testimony that**

14  **within this vacancy announcement, the sentence "assists**

15  **in testing and implementation of system modifications**

16  **and changes," is unique to this position?**

17         A    That's correct.

18         **Q    It's not going to be in any other vacancy**

19  **announcement for an HR Specialist, or did not appear in**

20  **your time that you were the HR officer for FDIC?  Is**

21  **that your testimony?**

22         A    Well, I would have to, in order for me to

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 28

1    make -- affirm that, I would have to study all of the

2    position descriptions.

3        **Q    Well, you just said, your testimony was that**

4    **it appeared only this vacancy announcement.   Now which**

5    **is it?**

6        A    Well, in order for me to be absolutely -- I

7    know what this person did for me in regard to NFC.  For

8    me to say that this sentence does not -- is not in

9    another 150 -- there are 150 people in HR -- that's a

10   stretch for me say that this sentence doesn't appear in

11   another 150 position descriptions.

12       **Q    We're talking about 28.**

13       A    No.

14       **Q    We're talking about 28 employees for you, Ms.**

15   **Potucek.**

16       A    No.  Because we have a whole section under

17   Greg Talley of all IT people, and you're asking me to

18   say that this sentence did not --

19       **Q    No.  I'm talking about your people, Ms.**

20   **Potucek.  That was the question.  Other HR Specialists**

21   **that work for you, was my question, not 150 in FDIC.**

22       A    No.  A hundred and fifty in the HR branch.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 29

1       Q    I'm talking about in your section, Ms.

2   Potucek.  This sentence did not appear in any other

3   vacancy announcements in your section?

4       A    I can't attest to that.

5       Q    So you can't say 100 percent certainty that

6   it was unique that it only appeared in this one, can

7   you?  That cannot be your testimony, can it?

8       A    I know what this person --

9       Q    Would you answer the question?  You cannot

10  say that it only appeared in this vacancy announcement,

11  can you?

12      A    I'll say that it did.

13      Q    Okay.  With certainty?

14      A    With certainty.  I'll face up.

15      Q    Okay.  It did not appear in any other vacancy

16  announcement --

17      A    I'll say that --

18      Q    May I finish the question, please?  It does

19  not appear in any other vacancy announcements for any

20  other subordinates that worked for you when you were

21  the HR officer in the operations branch?

22      A    I'll say that.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 30

1            MR. SIMPSON:  Okay.  I want to see the other

2    vacancy announcements for any hire that was conducted

3    in the time period that she was the HR officer for

4    FDIC.  That's a reasonable request based on testimony

5    of this witness.  I want to see them all.

6            MR. JONES:  The vacancy announcements that

7    were posted --

8            MR. SIMPSON:  In her tenure as the HR

9    officer.

10           MR. JONES:  I think we have those.

11           MR. SIMPSON:  Okay.  Very good.  Thank you.

12           BY MR. SIMPSON:

13       Q    Now, Ms. Potucek, do you happen to know how

14   long of a period of time the Federal Deposit Insurance

15   Company (sic) had positions that were titled Human

16   Resources Specialist, parentheses (Information Systems

17   and Compensation), close parentheses?

18       A    No.

19       Q    Do you have any idea?

20       A    No.

21       Q    Do you know whether the positions that were

22   titled Human Resources Specialist (Information Systems

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 31

1    and Compensation) were positions that had been titled

2    something different before they became HR Specialist

3    Info Systems and Compensation?

4        A    No.

5        Q    Okay.  By the way, CHRIS, do you know when

6    CHRIS was implemented in FDIC?

7        A    No.

8        Q    No idea?

9        A    No.

10       Q    All you know is when you became the HR

11   officer in 2004, CHRIS existed?

12       A    It existed when I came on board at the FDIC,

13   and I came on board on November the 18th, and CHRIS was

14   in effect.

15       Q    November the 18th?

16       A    2001.

17       Q    2001.  So CHRIS had been fielded prior to

18   November of 2001?

19       A    Correct.

20       Q    Okay.  And do you know whether FDIC employees

21   developed and fielded and implemented CHRIS, or was it

22   done by a contractor?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 32

1          A    I don't know.

2          **Q    You don't know.  Do you know what system**

3    **changes were made in your tenure as the HR officer to**

4    **the CHRIS system?**

5          A    No.

6          **Q    You have no idea, do you?**

7          A    No.

8          **Q    You don't know who would have developed and**

9    **written any systems changes to CHRIS, would you?**

10         A    Oh, now that's a different question.

11         **Q    Okay.**

12         A    You said -- the first question was, I don't

13   know of any system changes, and that's correct.  I

14   don't.  But then your second question was, do I know

15   who?  And the answer is yes I do.

16         **Q    Who?**

17         A    DIT, our Division of Information Technology,

18   would interface with people in operations and would

19   certainly interface with Greg Talley and his entire

20   Information Technology staff and the Division of

21   Administration.

22         **Q    But no one that worked for you wrote any**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 33

1   changes to the system, did they?

2        A    Not to the best of my knowledge.

3        Q    Okay.  At best, they may have had some input

4   into how changes were written to the system, correct?

5        A    That's correct.

6        Q    But they didn't actually perform that

7   function?

8        A    No.

9        Q    Actually, changes to automated personnel

10  systems were done by individuals other than in your

11  shop, correct?

12       A    No.  It was also done by people in ops

13  because you cannot have a team -- our representative

14  from operations worked with DIT, who does not have a

15  good understanding of HR systems.  And the people in

16  Greg Talley's shop were using the input from the person

17  in operations.  They worked together as a team to

18  implement.

19       Q    But DIT and Greg Talley's shop would have

20  been the ones that actually wrote the systems changes,

21  wouldn't they?

22       A    That's not at all true.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 34

1          Q     Okay.  All right.

2          A     They could have been this person as well.

3          Q     Oh.  So this person could have been an

4     information technology person, to write changes to an

5     automated system?

6          A     To recommend and write changes if they were

7     that good at the full performance level, yes.

8          Q     To do IT work, information technology?

9          A     Absolutely.  Absolutely.

10         Q     And where is that required in this summary of

11    duties?

12         A     It's not required.

13         Q     Is it required in the position description?

14         A     Probably not.  I don't have a copy of the PD,

15    but probably not.

16         Q     So they'd be doing something outside of their

17    job, wouldn't they?

18         A     Not necessarily.

19         Q     Oh, okay.  If it's not in their position

20    description, it's not in their duties, is it?

21         A     That's not correct.

22         Q     Okay.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 35

1       A    That's not correct.

2       **Q    Okay.**

3       A    They can perform other duties in their

4  position description.

5       **Q    As assigned, right?  Other duties as**

6  **assigned?  Is that what it is?**

7       A    Well, it's not only other duties as assigned,

8  but if a person brings a special skill to the job, then

9  that skill can be utilized, it's not going to be used

10 to their detriment.  It's not going to be used if they

11 don't want to do it or can't do it.  But if they want

12 to do it and they want to offer something that they've

13 learned in a prior position or have a skill or

14 particular educational degree in something, it would be

15 foolish for me not to utilize that.

16      **Q    Actually, and wouldn't it be true, Ms.**

17 **Potucek, that if you had someone apply for an HR**

18 **Specialist position, Information System and**

19 **Compensation at the CG-7, 9 and 11 level --**

20      A    Mm-hmm.

21      **Q    An applicant who had performed those duties**

22 **at the CG-11 level, that person -- would you think that**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                             Page 36

1    **person would be pretty qualified for this position?**

2         A    No, not necessarily.

3         **Q    If that person had performed the same duties**

4    **at the CG-11 level?**

5         A    Not necessarily.

6         **Q    Why would that person who had performed the**

7    **same duties as this position not be qualified for this**

8    **position?**

9         A    Because I take recency into account.  And

10   information technology is the fastest changing career

11   field in America.  And if the person does not have

12   recent experience in the most -- the fastest changing

13   career field, then I would -- I don't appreciate your

14   laughing at me.

15        **Q    Human Resources Specialist, that's a changing**

16   **--**

17             MR. JONES:  I don't appreciate that either.

18             MR. SIMPSON:  That's a changing field?

19             THE WITNESS:  You know, if I'm trying to be

20   serious and I'm trying to be truthful and forthright in

21   my comments --

22             MR. SIMPSON:  You're not answering my

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page  37

1    questions, though.

2              THE WITNESS:  But you're laughing at me and I

3    don't think that what I have to say happens to be

4    funny.  And it's not a joke.

5              MR. SIMPSON:  Ma'am -- well, ma'am, you know

6    what?  I can react any way I so desire.  You keep

7    answering the questions, okay?

8              MR. JONES:  Objection.

9              MR. SIMPSON:  All right.

10              MR. JONES:  Argumentative.

11              BY MR. SIMPSON:

12        **Q     So Human Resources Specialist Information**

13    **Systems and Compensation is an ever-changing specialty?**

14        A    That's correct.

15        **Q     Okay.  Based on what?**

16        A    Based on the research.

17        **Q     Based on what research?**

18        A    I teach for the University of Maryland and I

19    use research about the fastest changing career fields

20    in America, and information technology is at the top of

21    the list.

22        **Q     Okay.  And where is information technology**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 38

1    requirements contained in this vacancy announcement,

2    Ms. Potucek?

3         A    I --

4         Q    Information technology now, that's the

5    question.

6         A    Yes.

7         Q    Where are the words information technology in

8    the Summary of Duties, please?

9              MR. JONES:  Objection.  Do you want her to

10   answer the first question or the second question?

11             MR. SIMPSON:  You can answer where is the

12   term "information technology" contained in this Summary

13   of Duties.  And you take the time to review it, please.

14             THE WITNESS:  Well, first of all, CHRIS is

15   information technology system.

16             BY MR. SIMPSON:

17        Q    But information technology in that acronym

18   CHRIS, is it, Ms. Potucek?  I want you to find the term

19   "information technology" in the Summary of Duties,

20   please.

21        A    Well, it's not in the Summary of Duties.

22        Q    Thank you.  In fact, information technology

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                           Page 39

1    **functions are performed by DIT in FDIC, aren't they?**

2         A    No.

3         **Q    They are, aren't they?**

4         A    No they're not.

5         **Q    I didn't say the only.  I said that's where**

6    **they're performed, though.  And they're also performed**

7    **by -- they were performed by Mr. Talley's office as**

8    **well, correct?**

9         A    They're performed throughout the corporation.

10        **Q    Okay.  All right.**

11             MR. SIMPSON:  Let's mark as number 4.

12                          (Potucek Deposition Exhibit 4 was

13                           marked for identification.)

14             MR. SIMPSON:  The court reporter has handed

15   you what's been marked as Exhibit Number 4.  It's a

16   position description.  If you take a minute to review

17   that, have you seen this document before, please?

18             (The witness examined the document.)

19             THE WITNESS:  I can't recall.

20             BY MR. SIMPSON:

21        **Q    All right.  Well, let's turn to page 1, shall**

22   **we?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 40

1        A    Mm-hmm.

2        **Q    Turn to page 1, please.**

3             MR. JONES:  The top page?

4             MR. SIMPSON:  That's page 1.

5             BY MR. SIMPSON:

6        **Q    And if you look at line number 12.**

7        A    Yes.

8        **Q    Do you recognize that signature?**

9        A    Yes.

10       **Q    Would it be fair to say that you've seen this**

11  **before, Ms. Potucek?**

12       A    I probably signed it but didn't read it.  I'm

13  not certain.

14       **Q    Okay.**

15       A    I mean --

16       **Q    But we can at least say that you've seen the**

17  **first page, because you signed it, correct?**

18       A    I would see between nine and twelve thousand

19  documents a year.  And so I did not read everything.

20            MR. SIMPSON:  Counselor, I'm going to ask

21  that you advise your witness that she should answer the

22  question that is asked in the future.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 41

1          MR. JONES:  Well, maybe if you'd slow down a

2     little bit -- you're being very articulate and I can

3     understand your questions.  And maybe if you could slow

4     it down a little bit so she can concentrate on what the

5     gist of your question is --

6          MR. SIMPSON:  I think the majority of my

7     questions are pretty specific, and they should be

8     answered with a degree of specificity and not some

9     general comment.  So, having said that, thank you,

10    counselor.  I appreciate that.

11         BY MR. SIMPSON:

12    **Q    So it is fair to say, Ms. Potucek, that you**

13    **at least saw page 1 of what's been marked as Exhibit 4?**

14    A    Yes.

15    **Q    Okay.  And in fact, the position description**

16    **that we're looking at was dated -- your signature is**

17    **dated the 24th of August, isn't it?  8/24/04.**

18    A    Right.  Correct.

19    **Q    While you were the HR officer, correct?**

20    A    Right.  The same day that it was posted.

21    **Q    Okay.  Now tell me, would you have been**

22    **reviewing this position description in your capacity as**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 42

1    the HR officer for FDIC?

2        A    Yes.

3        Q    Yes.  Because isn't it true, Ms. Potucek,

4    that when you reviewed some 16,000 position

5    descriptions in your capacity as the compliance officer

6    for the Conanan consent decree, you wouldn't sign down

7    in block 12, would you?

8        A    No.

9        Q    Would you sign anywhere on that page?

10       A    Yes.

11       Q    Where would you sign?

12       A    Sometimes I would sign at the bottom.

13       Q    Sometimes?  When you wouldn't sign at the

14   bottom, where else would you sign?

15       A    I would use a sticky, a sticky piece of

16   paper, and I would write a note and send it back for

17   corrections.

18       Q    At those times, you wouldn't sign on the

19   form, would you?

20       A    No.

21       Q    Okay.  Did you always sign position

22   descriptions after you reviewed them in your capacity

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 43

1    as the compliance officer?

2        A    Yes.

3        Q    Sign or initial?

4        A    Either/or.

5        Q    It could have been either?

6        A    Correct.

7        Q    But if I were to look at some 16,000 position

8    descriptions in the period that you were the compliance

9    officer, I should reasonably expect to see either an

10   initial, your initials or your signature, correct?

11       A    If they were done during my tenure.

12       Q    That's what I said.  Yes, ma'am.

13       A    Yes.

14       Q    Okay.  But clearly, you signing in block 12

15   was in your capacity as the HR officer, not as the

16   compliance officer?

17       A    Correct.

18       Q    Because that position worked for you, didn't

19   it?

20       A    Yes.

21       Q    Okay.  Do you know who wrote this position

22   description, Ms. Potucek?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 44

1       A     No.

2       Q     In reviewing it, would there be any way for

3  you to tell who wrote this position description?

4       A     No.

5       Q     Did you write this position description?

6       A     No.

7       Q     Do you know whether, Ms. Potucek, whether the

8  class, title and position on page 1 up under Section 5,

9  the line 5(a) where it says HR Specialist Information

10  System and Compensation, you don't know whether that

11  position that is reflected in that line was a

12  derivative of a former position title within the FDIC?

13      A     No.

14      Q     You don't know that?  Okay.  And you'd agree

15  that this particular position description is for a CG-

16  7, correct?  Look at line 5(a).  Keep going across.  It

17  reflects that it's a CG 0201 07 FPL, Full Performance

18  Level 11, correct?

19      A     Your question is?

20      Q     This is a position description for a CG-7,

21  isn't it?

22      A     I have to look to the second page.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 45

1          Q     Okay.  Go -- please, go right ahead.

2                (The witness examined the document.)

3                THE WITNESS:  Yes.

4                BY MR. SIMPSON:

5          Q     This is not for a CG-9, is it?

6          A     No.

7          Q     Not for a CG-11, is it?

8          A     No.

9          Q     Okay.  All righty.  By the way, Ms. Potucek,

10    if we could, go back to Exhibit 3 for just a quick

11    second.  Summary of Duties.

12         A     Yes.

13         Q     Do you see anywhere in the Summary of Duties

14    the phrase "expertise in software applications?"

15         A     No.

16         Q     Does this vacancy announcement anywhere in

17    any of the pages at Exhibit 3 address expertise in

18    software applications?

19         A     No.

20         Q     Okay.  Exhibit 4.  Looking at the position

21    description, is there anywhere in this position

22    description a requirement for expertise in software

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 46

1    applications?

2              **(The witness examined the document.)**

3         THE WITNESS:  It's implied in the

4    introduction.

5         BY MR. SIMPSON:

6    **Q    Ms. Potucek, is there anywhere in the --**

7         MR. JONES:  I'm going to object, because your

8    question needs to be specific, whether you're referring

9    to the specific term, and sometimes you are and

10   sometimes you are not.

11        MR. SIMPSON:  That was my question.

12        MR. JONES:  I didn't hear that question.

13        MR. SIMPSON:  Where it can -- does this

14   position description contain the term --

15        MR. JONES:  You said "address."

16        THE WITNESS:  "Address."

17        MR. SIMPSON:  Does it contain the term -- the

18   term -- "expertise in software applications?"  Thank

19   you, counsel.

20        THE WITNESS:  No.

21        BY MR. SIMPSON:

22   **Q    It does not.  Does it contain any of the term**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 47

1    -- does it contain the terms "software applications?"

2        A    No.

3        Q    And likewise, Exhibit 3 -- and you can go

4    back and look -- it's not addressed anywhere in the

5    vacancy announcement at Exhibit 3 using the term or

6    parts of that term "expertise in software

7    applications," does it?

8        A    It's implied.

9        Q    It doesn't -- the terms are not in that

10   document, are they?

11       A    No.

12       Q    No.  Thank you.  Looking at the first page,

13   the signature underneath your signature, do you know

14   whose signature that is?

15       A    Rita Bial-Boxley.

16       Q    Rita Bial-Boxley?

17       A    Correct.

18       Q    And the title, Ms. Boxley's title is HR

19   Specialist Operations?

20       A    Yes.

21       Q    Do you know what particular HR Specialist she

22   was?  Was she an Information Systems and Compensation

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 48

1  HR Specialist?

2       A    No.

3       Q    **What was her specialty?**

4       A    Her specialty was information automated

5  application systems specialist and payroll and

6  staffing.

7       Q    **That was in parentheses after HR Specialist?**

8       A    She did -- I'm not sure that it was in

9  parentheses, but the HR Specialist paren, (recruitment,

10  staffing, automated application systems, payroll)

11  that's what she did.  And I had many of those, many of

12  those jobs.

13      Q    **Can you name one subordinate that worked for**

14  **you that was an HR Specialist Automated Systems**

15  **Applications in the title that they had?**

16      A    You mean -- no.

17      Q    **That worked for you?**

18      A    No.

19      Q    **There were none that had that designation,**

20  **did they?**

21      A    No.  They were all HR Specialists, because

22  OPM wanted us to standardize all the positions and make

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 49

1    them 201s and make them HR.  So the way that we took

2    care of the specialty was in the introduction in the

3    KSAs and in the interview process.

4         Q    Okay.  All right.  Looking again at page 1,

5    section 5(a) where it says Class, comma, Title of

6    Position?

7         A    Mm-hmm.

8         Q    Now this one specifically says HR Specialist

9    Info Systems and Compensation, correct?

10        A    Yes.

11        Q    Did every HR Specialist that worked for you

12   have a parenthetical specialization, if you will?  If I

13   can use that term.  Do you understand what I'm asking?

14        A    Mm-hmm.

15        Q    Was there a parenthetical specialization or

16   further designation for all of the Human Resources

17   Specialists worked for you when you were the HR

18   officer?

19        A    Sometimes.

20             MR. JONES:  You mean in the position title?

21             MR. SIMPSON:  In the position title.

22             THE WITNESS:  Yes, sometimes.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 50

1          BY MR. SIMPSON:

2          Q    So you had Human Resources Specialists that

3     did not have a parenthetical after their title of

4     position?

5          A    And then I had some who did.

6          Q    Okay.  Okay.  By the way, looking also at

7     page 1 to the left of Ms. Boxley's signature, do you

8     see what look like initials and a date?

9          A    Those are my initials, and that is August 23

10    '04, LSP, those are again my initials.

11         Q    And why are your initials here when your

12    signature is also here?

13         A    I can't recall.

14         Q    Okay.  So if I were to track what is here,

15    you would have seen this document on the 23rd of August

16    when you initialed it and then signed it the next day

17    on the 24th, correct?

18         A    Correct.

19         Q    Twice you would have seen it?

20         A    Correct.

21         Q    Do you recall why you did not sign it on the

22    23rd?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 51

1          A    No.

2          Q    Do you recall whether you sent it back for

3    any changes between the 23rd and 24th?

4          A    I don't recall.

5          Q    Okay.  Now if I turn to, in Exhibit 4, if I

6    turn to the fourth page of Exhibit 1.

7               MR. JONES:  Exhibit 4?

8               MR. SIMPSON:  I'm sorry.  Thank you.  At the

9    top of that page it looks like Roman numeral I,

10   Knowledge Required by the Position.

11              THE WITNESS:  Mm-hmm.

12              BY MR. SIMPSON:

13         Q    We're on the same page?

14         A    Yes.

15         Q    Okay.  This Section number I, Knowledge

16   Required by the Position, is this where the KSAs are

17   developed for a vacancy announcement, do you know?

18         A    In part.

19         Q    In part.  Well, let's take a look at Exhibit

20   3 and turn to the second page of Exhibit 3, the vacancy

21   announcement, down about three-fourths of the way down,

22   Quality Ranking Factors, parenthetical (Desirable

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                              Page 52

1    Knowledge, Skills and Abilities), correct?

2         A    Mm-hmm.

3         Q    And it's 1 through 4?

4         A    Right.

5         Q    And let's start at number 4.  Number 4 reads

6    about the same as the very last one, the last entry in

7    Section I of Exhibit 4, doesn't it?

8         A    Yes.

9         Q    And number 3 corresponds with the one above

10   that in Exhibit 4?

11        A    Yes.

12        Q    Okay.  Ability to meet and deal effectively

13   with persons at various levels within and outside the

14   organization of Exhibit 4, is that contained anywhere

15   here in the KSAs?

16        A    No.

17        Q    Okay.  The ability to research, analyze and

18   recommend/implement solutions to moderately difficult

19   but well-precedented and/or recurring issues and

20   problems as contained in Section I of Exhibit 4, is

21   that contained in the KSAs?

22        A    You mean on the vacancy announcement?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 53

1          Q    Yes, ma'am.

2          A    No.

3          Q    No.   Again, the next one up on Exhibit 4,

4     Knowledge of automated HR systems used by the

5     Corporation including NFC, CHRIS, EPIC and knowledge of

6     related policies and procedures pertaining to access,

7     use and administration of these systems, which is in

8     Exhibit 4, is that in the KSAs of Exhibit 3?

9          A    Part of it's in number 2.

10         Q    Number 2.   Okay.   Okay.   And then the very

11    top one in Section I of Exhibit 4, that tracks somewhat

12    with number 1 of the KSAs of Exhibit 3, correct?

13         A    Yes, 1 and 2 mirror 1 and 2 under number I.

14    They're rewritten, but they basically have the thrust

15    of --

16         Q    Okay.   So is there anything in the KSAs of

17    Exhibit 3, the vacancy announcement, that is not

18    derived from Section I of Exhibit 4?

19         A    No.

20         Q    But there are some things in Section I of

21    Exhibit 4 that are not necessarily contained in the

22    KSAs, correct?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 54

1       A    Correct.

2       **Q    Okay.  All right.  By the way, we've**

3   **established that Exhibit 4 is a position description**

4   **for a CG-7.  Do you recall whether you reviewed a**

5   **position description for a Human Resources Specialist**

6   **Information Systems and Compensation CG-9 as part of**

7   **this vacancy announcement process?**

8       A    We don't have it.

9       **Q    You don't have it?**

10      A    The way that it works, you take the basic

11  position description, which in this case is a 7.  If

12  you decide to fill the job at the 9, then you add an

13  amendment, an addendum to the 7 position description.

14  If you fill it at the 11, you write an addendum as an

15  11 and add it to the CG position description.

16      **Q    Okay.**

17      A    So, in my 32 years of being in HR, I do not

18  recall that we sit and we write a 9 and we write an 11

19  because we don't know at the time what grade we're

20  going to be filling the job.

21      **Q    Okay.  So you -- there's a vacancy**

22  **announcement for a CG-7/9/11 that is posted within FDIC**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 55

1    --

2         A    Right.

3         Q    **And it's your testimony, if I understand**

4    **correctly, that there would not have been a position**

5    **description developed for a CG-9?**

6         A    Just an addendum.

7         Q    **But there would have been an addendum before**

8    **the vacancy announcement, correct?**

9         A    Yes, because the staffing specialist has to

10   make sure that they're qualified before they're put on

11   the roster.

12        Q    **Okay.  And there would have been an addendum**

13   **for CG-11?**

14        A    Correct.

15        Q    **Okay.**

16        A    But I did not see that, and it's not attached

17   when I sign off.  All I saw was this.

18        Q    **Okay.  In Section 7 of Exhibit 4, the**

19   **position description -- no, no, no.  First page.  First**

20   **page, Section 7, do you see -- do you note that there**

21   **is a name written in Section 7, line 7, block 7?**

22        A    Yes.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 56

1          Q     What's the name?

2          A     Roger Little.

3          Q     Is that your handwriting?

4          A     No.

5          Q     Do you know who wrote that?

6          A     No.  But when we were going through and

7     trying to match up position descriptions to employees

8     during the RIF, we had to pull for the delegated

9     examining unit, for their audit, we had to match up a

10    PD for every person that was on board.

11          So you're probably going to find that all the

12    PDs have somebody's name on it because that's what we

13    had to do.  And we had to give a copy of this to the

14    employee when they were selected and we had to put a

15    copy in their OPF.

16          Q     All right.  Is it your testimony that this

17    name would have -- do you know who put the name in

18    there?

19          A     I would imagine that it was Rita Bial-Boxley

20    because she was the staffing specialist for this

21    particular position.

22          Q     And when would his name -- when would Ms.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 57

1     Boxley have put his name on it?

2          A    After the selection was made.

3          Q    **After the selection?**

4          A    Yes.

5          Q    **Okay.  So, with a vacancy announcement that**

6     **closed on September the 8th, 2004, and a selection for**

7     **this position vacancy announcement would have made at**

8     **some point after September of '04, certainly after**

9     **September of '04, his name --**

10         A    Of '08.

11         Q    **Of '04.**

12         A    September --

13         Q    **Of '04.**

14         A    Oh, excuse me.

15         Q    **September of '04.  His name -- it's your**

16    **testimony his name would have been put on there?  Roger**

17    **Little's name would have been entered by Ms. Boxley?**

18         A    Correct.

19         Q    **Okay.**

20              MR. JONES:  Do you want to take a break?  Do

21    you need a break?

22              THE WITNESS:  Not yet.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 58

1           MR. JONES:  Since you're switching -- okay.

2           BY MR. SIMPSON:

3      Q    As the HR officer, did you review position

4    descriptions for vacancy or for positions other than in

5    your office?  Strike that.  It was your earlier

6    testimony that until such time as you gave up the

7    duties as the compliance officer, you reviewed all

8    position descriptions, correct?

9      A    Yes.

10     Q    But you reviewed them in your capacity as

11   compliance officer, correct?

12     A    Yes.

13     Q    When you became the HR officer for FDIC on

14   May 16th, 2004, was one of your duties to review all

15   position descriptions for the FDIC?

16     A    Yes.

17     Q    Would you have signed those position

18   descriptions as the HR officer of FDIC?

19     A    Sometimes.

20     Q    Which ones would you have signed?

21     A    The ones that were not a conflict of

22   interest.  All CM-2s, all executives.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 59

1      Q    **What would have represented a conflict of**

2   **interest, Ms. Potucek?**

3      A    Someone in my -- perhaps, let's see.  Someone

4   who I felt I had to recuse myself from if I had

5   information about them in my, you know, like the

6   realignment.  And there might have been an incident

7   where I said I'm not comfortable, I want to recuse

8   myself.  And it happened a couple of times.

9      Q    **Okay.  But not very often?**

10     A    Not very often.

11     Q    **Okay.**

12          MR. SIMPSON:  Let's mark as number 5.

13                    (Potucek Deposition Exhibit 5 was

14                     marked for identification.)

15          MR. SIMPSON:  The court reporter has handed

16   you what's been marked as Exhibit 5.  It's a position

17   description, correct?

18          THE WITNESS:  Yes.

19          BY MR. SIMPSON:

20     Q    **And for the record, I would indicate that the**

21   **dates on this document are 2002, which would have been**

22   **before you became the HR officer in May of 2004,**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 60

1    correct?

2         A    Correct.

3         Q    Okay.  In December of 2002, were you the

4    Conanan consent decree compliance officer?

5         A    Yes.

6         Q    Can you show me anywhere on this document

7    that your initials or your signature appears as you

8    having reviewed it as the compliance officer?

9         A    No.

10        Q    Okay.  Was it your earlier testimony -- just

11   want to make sure I got it right -- that you reviewed

12   all position descriptions in your capacity as a

13   compliance officer?

14        A    Unless they were standardized.

15        Q    Unless they were standardized?

16        A    And if they're new position descriptions re-

17   created, realigned, new to the organization, new to the

18   unit, then I would look at them.

19        Q    Okay.

20        A    If -- and this was my former boss, Carolyn

21   Jordan Smith, and she was the acting assistant director

22   and --

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 61

1          Q      She was actually the acting associate

2      director, wasn't she, not the acting assistant

3      director?

4          A      Acting associate director.

5          Q      Associate director HR.

6          A      So, she was my boss, and --

7          Q      She was your boss when you were the

8      compliance officer?

9          A      Until she left.

10          Q      Right.  Okay.  So looking at this, would you

11      be able to tell whether it was a new position

12      description?

13          A      No.

14          Q      Okay.  Look at block 4(b) towards the top

15      right-hand.

16          A      Mm-hmm.

17          Q      Do you see where it says Previously --

18          A      I see.

19          Q      Payroll/Personnel?

20          A      Right.

21          Q      Does that tell you that this was a position

22      description developed based on a prior or a previous

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 62

1    position?

2        A    Right.

3        Q    That's what that would tell you, correct?

4        A    Mm-hmm.

5        Q    In your 32 years of HR, you would be able to

6    glean that from this information, correct?

7        A    They probably did a payroll change and a

8    series change that OPM dictated, because they changed

9    it from a 301 to a 201.

10       Q    Right.  Sure.

11       A    So this is actually just a series change.

12   It's probably not a new PD.

13       Q    So I could reasonably -- you, as an HR expert

14   of 32 years, looking at this would say that this is at

15   least a change in career series, whether there are any

16   other changes to the duties, the position description

17   of the Payroll/Personnel Systems Specialist CG-0301-09

18   in developing this position description at Exhibit 5?

19   At least it's a change in career, correct?  Career

20   series, correct?

21       A    Yes.

22       Q    Okay.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 63

1        A    And a change in grade.

2        Q    A change in grade.  But you would not know

3    for sure whether there were any changes in duties

4    between the previous --

5        A    No.

6        Q    Okay.  Now if someone, Ms. Potucek, if

7    someone served in a position as a Payroll/Personnel

8    Systems Specialist CG-0301-09, had previously served in

9    that position, as an HR expert, would they reasonably

10   be able to perform the functions of the HR Specialist

11   Information Systems and Compensation CG-0201-11

12   position?

13       A    I'm not certain they could.

14       Q    Okay.  Is it a likelihood that they could?

15       A    I'm not certain they could.

16       Q    Is it a likelihood?

17       A    No.

18       Q    Okay.  All right.  But certainly the duties

19   that were performed by the Payroll/Personnel Systems

20   Specialist that would be subsumed into this position

21   description would have been duties they performed at

22   the CG-9 level, correct?

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 64

1        A    Yes.

2        Q    Okay.  And in fact, if this was nothing more

3    than changing from a CG-0309 Payroll/Personnel Systems

4    Specialist to a CG-0201-11 Human Resources Specialist

5    Information Systems and Compensation, in other words,

6    if that was the only changes to this PD, the person at

7    the Payroll/Personnel level in the previous position

8    would have been performing or have been expected to

9    perform in that position the same duties as this

10   position, correct?

11       A    Right.

12       Q    Right.  But again, this one does not reflect

13   your signature or your initials?

14       A    No.

15       Q    Likely not one of the 16,000 that you

16   reviewed?

17       A    Sixteen thousand documents but not position

18   descriptions.

19       Q    Okay.  But if this was a new position

20   description, you should have reviewed it, correct?

21       A    Correct.

22       Q    Okay.  All righty.  And, again, back to

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 65

1    Exhibit 4, the position description for the CG-7 that

2    Roger Little was hired for, because his name is entered

3    in block 7, you don't know -- this is a new position

4    description, isn't it?

5         A    I'm not certain it is.

6         Q    Okay.  Well, there's no -- in Section 4 where

7    it says reason for submission, if this position

8    replaces another one, you know, identify such position,

9    there's nothing entered in block 4, is there?

10        A    Yes, but we make mistakes.

11        Q    But there's nothing in block 4, is there?

12        A    But I can't say that this is brand new

13   because I often found in reviews that they were remiss

14   in not making all the annotations.

15        Q    "They" who?

16        A    The HR Specialist.

17        Q    The people that work for you, for instance?

18        A    Yes.  And Shirley Purnell and even before

19   that.

20        Q    But we're talking about a document that was

21   prepared while you were the HR officer?

22        A    Right.  Right.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 66

1      Q    So if there was a mistake made, it would have

2  been made under your watch, correct?

3      A    That's correct.

4      Q    Did that happen often?

5      A    Probably.

6      Q    Do you recall whether that happened in this

7  case?

8      A    I don't recall in this case, but I could tell

9  you, we make mistakes.

10     Q    We're all human.  Okay.  Now based on Exhibit

11 3, the vacancy announcement for which you were the

12 selecting -- were you the selecting official for the

13 position announced at Exhibit 3?

14     A    Yes.

15     Q    And where would I know, reviewing that

16 document, that you were the selecting official?

17     A    You wouldn't, I don't believe.  The only

18 place is the location unless you knew that this was

19 specific and the HR officer was Lorinda Potucek, you

20 wouldn't know that I'm the selecting official.

21     Q    But at least by title and position listed on

22 page 1 of the vacancy announcement --

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 67

1        A    Yes.

2        Q    -- that was you, because you were the HR

3    officer Operations Branch, correct?

4        A    Correct.

5        Q    Okay.  So a current organizational chart

6    would have been able to tell me that that's who the

7    selecting official would have been, correct?

8        A    Yes.

9        Q    Okay.  Was there an interview panel convened

10   for --

11       A    Yes.

12       Q    And who was on that panel?

13       A    Joerita Campbell and Susan Boosinger.

14       Q    And who selected Joerita Campbell and Susan

15   Boosinger to serve on the interview panel?

16       A    I didn't select.  What you do is you put out

17   an interest to see who's available.  And Joerita was

18   available, and she wasn't the servicing HR Specialist.

19    I could not have Rita Bial-Boxley, because Rita was

20   the person who was the servicing specialist.  So

21   Joerita was available, and then I needed somebody from

22   outside of the organization.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 68

1          Q    Outside?  I'm sorry -- outside of?

2          A    Outside of operations.

3          Q    Yes, ma'am.

4          A    Outside of, you know, who under the Conanan

5     consent decree we ask managers to find somebody outside

6     their current organization to be on the interview

7     panel.

8          Q    You ask managers.

9          A    Yes.

10         Q    But you would have been the manager that

11    would have been asked to find somebody?

12         A    Yes.

13         Q    Okay.

14         A    And so Susan Boosinger was available, and so

15    Joerita and Susan were on the panel.

16         Q    And when you say you put out some kind of

17    announcement looking for volunteers --

18         A    Correct.

19         Q    How was that accomplished?

20         A    Normally I would talk about it at a staff

21    meeting.  I had staff meetings every Monday and

22    Wednesday, and I said I've gotten the roster.  Is

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 69

1   anyone available?  I'd like to get the interviews done

2   immediately.  Who's on leave, who has training?  You

3   know.  And so maybe Joerita at that time put up her

4   hand and said, fine, I'll do it.  And then I get on the

5   phone and I call other managers, and Susan was

6   available.

7        Q    Like whom?  What other managers?

8        A    Oh, I would call people over in ASB

9   Acquisitions, other managers.  I would call career

10  management.  I would call Paul Sherman in management

11  support.  I would just call around DOA and see who's

12  available, who had time.

13       Q    But you would have contacted managers, not

14  individuals, correct?

15       A    Correct.

16       Q    Okay.

17       A    Sometimes I -- well, actually, you know, I

18  probably did contact not just managers.  I probably

19  contacted employees specifically too.

20       Q    You called Susan Boosinger personally, didn't

21  you?

22       A    Yeah.  I probably -- I can't recall if I did

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 70

1    that, but if she said I did, then I probably did.

2         Q      **Could you have sent her an e-mail?**

3         A      I might have.

4         Q      **Okay.**

5         A      I might have.

6         Q      **Okay.**

7         A      She might have been acting, too, over at

8    career management and been the acting supervisor over

9    at career management at that time.

10        Q      **But you don't know?**

11        A      But I can't recall.

12        Q      **Okay.  Do you know whether Joerita Campbell**

13   **and Susan Boosinger had ever served on a structured**

14   **interview panel before?**

15        A      No.

16        Q      **You don't -- neither one of them told you**

17   **that they had?**

18        A      No.

19        Q      **Did you ask either one of them?**

20        A      No.  I can't recall.

21        Q      **Okay.  Were there any specific instructions**

22   **or comments that you made to either Joerita Campbell or**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 71

1    **Susan Boosinger before the structured interview panel?**

2        A    Other than meeting with them and giving them

3    the structured interview questions and benchmarks, I

4    don't even now -- I cannot recall who wrote the

5    structured interview questions and benchmarks.

6        **Q    Did you meet with both of them, either**

7    **together or individually?**

8        A    I must have.

9        **Q    You must have?**

10       A    I must -- I probably did.

11       **Q    But, again, you don't recall whether --**

12       A    I don't remember.

13       **Q    You don't recall whether they had served on a**

14   **structured interview panel before?**

15       A    No.

16       **Q    And your recollection is that you met with**

17   **them?**

18       A    Probably.

19       **Q    But is that your recollection?**

20       A    Yeah.  I would say that I probably had them

21   in my office.

22       **Q    Okay.**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                Page 72

1        A    It's not a requirement that people have

2    served on other interview panels.  It's not in our best

3    business practices.  It's not written or a directive.

4    People do it all the time.  It could be the first time,

5    it could be the twentieth time.  It's not a

6    prerequisite that they had served.

7        **Q    And I'm not suggesting in the question that**

8    **that happened.  It was a simple question.  Either you**

9    **knew that they had or had not.  And you did not know**

10   **whether they had served previously?**

11       A    There was no point in me asking.  There was

12   no purpose to ask.

13       **Q    Well, okay.  Was this the only structured**

14   **interview panel that you put together for a selection**

15   **in the HR Operations Branch?  How many others did you?**

16       A    Well, in my last time with you I think I

17   probably suggested that I filled four to five other

18   vacancies, so --

19       **Q    Other than student interns?**

20       A    Right.

21       **Q    Yes, ma'am.**

22       A    And so I would imagine that I had other

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 73

1    interview panels for those four or five other

2    positions.

3        Q    And did you --

4        A    And I also did it for student interns.  I'm

5    one of the few here who don't do panels for student

6    interns.

7        Q    **And was it your normal practice that you**

8    **would meet with the individuals that were serving on a**

9    **structured interview panel for a selection that you**

10   **were going to make?**

11       A    Sometimes.  And if I wasn't available, I

12   would have Janet Forrest do it since she was my Grade

13   14 lead.

14       Q    Okay.  **And it was your standard practice to**

15   **meet them, with either you or your lead?**

16       A    Yes.

17       Q    **And how long would these meetings last?**

18       A    Anywhere from going through the interview

19   questions and the benchmarks to how many questions,

20   clarifications they might need, it could last anywhere

21   from maybe 15 minutes maybe up to 45 minutes to an

22   hour.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                              Page 74

1     Q    And it would only be the one meeting before

2   the interview panel actually convened?

3     A    Usually.

4     Q    Okay.

5     A    Sometimes maybe they would think of a

6   question or call me on the phone or send me an e-mail

7   for clarification.

8     Q    Okay.  Did you give any specific instructions

9   to the panel members, Joerita Campbell and Susan

10   Boosinger?

11     A    Other than what's in the best business

12   practices that we're all required to do under the

13   Conanan consent decree, no.

14     Q    Okay.

15     A    And in my capacity still as the compliance

16   officer, I had to be extremely careful to make sure

17   that we were adhering to all of the best business

18   practices that we had developed.

19     Q    Did you make a statement to either or both

20   Joerita Campbell Susan Boosinger, that you were looking

21   for someone that had expertise in software

22   applications?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 75

1          A    I don't recall.

2          Q    You don't recall?

3          A    No.

4          Q    Okay.  So after the meeting with Ms. Campbell

5    and Ms. Boosinger, you expected that they would set up

6    an interview schedule, meet with the applicants,

7    interview, and then come back to you with the results

8    of the interview panel, correct?

9          A    Correct.

10         Q    And did they do that?

11         A    Yes.

12         Q    And do you recall when that meeting occurred?

13         A    Not date and time, no.

14         Q    Okay.  But it was clearly your understanding

15    at the time that the interviews had been conducted and

16    the panel was done, ready to give you feedback or

17    information --

18         A    Yes.

19         Q    -- as a result of the panel interviews?

20         A    Yes.

21         Q    Were there scores developed by Ms. Campbell

22    and Ms. Boosinger during the interviews?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 76

1          A    Clarify "scores."

2          **Q    Were there scores entered on any documents**

3     **that you reviewed or that were given to you as a result**

4     **of the interview panel, any documents that had scores**

5     **on them?**

6          A    No.  They had rankings.

7          **Q    They had rankings.  What were the rankings?**

8          A    Well, they had a piece of paper when they

9     came into my office, and they had written the names of

10    the candidates from top to bottom on who they highly

11    recommended, and the second person they recommended,

12    all the way to the last person.  But it was not on an

13    official document.

14         **Q    And do you recall how many applicants were**

15    **considered by the interview panel?**

16         A    Well, some applicants were listed on 7, 9,

17    11, so I don't know, maybe six, seven.

18         **Q    And what do you base that comment on, Ms.**

19    **Potucek?**

20         A    How long it took them to interview.

21         **Q    Okay.  Do you have an independent**

22    **recollection that there were six or seven interviews**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 77

1    conducted?

2    A    No, but I could -- I know at least three.  I

3    can recall at least three.

4    **Q    Okay.  And do you recall what the top to**

5    **bottom recommendation rankings of the interview panel**

6    **were by name?**

7    A    Yes.

8    **Q    Who were they?**

9    A    Roger Little and Paula Foreman were the top

10   two, and Dorothy was the last.

11   **Q    The last?**

12   A    Correct.  The last person on the list.

13   **Q    So that would indicate there were only three**

14   **interviews?**

15   A    I don't know.  I cannot recall who was in

16   between by name.  I just recall -- and I was only

17   interested then in speaking to them about the top two

18   that they highly recommended, and that was Roger Little

19   and Paula Foreman.

20   **Q    And did they provide you with documentation**

21   **that indicated how they arrived, other than this list**

22   **of one, two, three --**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 78

1          A    Yes.

2          Q    -- documentation on how they arrived at that

3     --

4          A    Yes.

5          Q    -- ranking?  And what documentation was that?

6          A    They had taken -- they had written -- well,

7     we and Joerita, Rita Bial-Boxley, the HR Specialist,

8     had written structured interview questions and

9     benchmarks, and she had taken those out of this

10    position description and this vacancy announcement and

11    had written benchmarks.  And I'm sure that Eugene Bell

12    or Shirley Purnell had reviewed the benchmarks in the

13    interview questions.

14         Q    Why are you sure of that?

15         A    Because as the compliance officer, I could

16    not review that.  It was a conflict of interest.

17         Q    Okay.

18         A    And those interview questions and benchmarks

19    had to be reviewed either by Shirley or Eugene.  And

20    the documents that Joerita and Susan Boosinger had in

21    front of them were their notes from the structured

22    interview questions.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 79

1          Q       They would have written notes on the pieces

2      of paper that represented a question, a specific

3      question with a specific benchmark for each interview

4      they conducted, correct?

5          A       Well, the benchmark was already written on

6      the form.

7          Q       No, I'm saying they would have written

8      comments on the piece of paper --

9          A       Yes.

10         Q       -- that had the question and the benchmark?

11         A       Yes.

12         Q       Because the benchmark was at the bottom of

13     the interview sheet, wasn't it?

14         A       Yes.

15         Q       Okay.  And they had -- there were a set

16     number of questions for each interview, and so both Ms.

17     Boosinger and Ms. Campbell presented to you, if there

18     were five questions, let's say, and they conducted

19     three interviews, they would have presented five pieces

20     of paper each for each interview that they conducted.

21     You would have gotten all of those pieces of paper,

22     correct?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 80

1          A     Yes.

2          **Q     Okay.  And then you would have also gotten a**

3   **separate sheet of paper that indicated their rankings 1**

4   **through whatever, correct?**

5          A     No.

6          **Q     Okay.  I think you -- okay.  You had told me**

7   **that they gave you a recommendation.**

8          A     No.  They had it in front of them.  They

9   didn't give it to me.  That's not an official document.

10   They just had made notes before they had come in to

11   see me that they highly recommended Paula Foreman and

12   Roger Little, and they arrived to their conclusion

13   based on the responses to the interview questions and

14   the benchmarks from the panel, from the interview

15   panel.                        And their notes on that

16   other piece of paper, which was just a piece of paper,

17   was not an official document.

18          **Q     So they didn't give that to you?**

19          A     No, they did not.

20          **Q     Did you make any notes of that when they told**

21   **you?**

22          A     No.  It was just all mental.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 81

1      Q    Okay.  Did you take any notes during --

2      A    No, because they gave me the interview --

3  they gave me the interview documents stapled together

4  on each candidate.

5      Q    And what did they tell you specifically that

6  they based their recommendations on?

7      A    Specifically, they told me that Roger was the

8  most excellent in the interview.  Communication skills

9  were superb, very articulate, very clear, concise.  His

10 recency in experience as it relates to the current

11 position, and the in-depth way he responded to the

12 interview questions was superb.  And his experience

13 with all of the things that were outlined in the

14 interview questions, he responded at the highest level

15 regarding the benchmark.

16     Q    Did they tell you whether they had reviewed

17 his application?

18     A    I know that the applications are given to

19 them, but they did not tell me specifically whether

20 they had reviewed the applications.

21     Q    Did you ask them?

22     A    No.  I can't recall whether I did or not.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 82

1          Q      Okay.  All right.

2          A      It's not a requirement.

3          Q      **What's not a requirement?**

4          A      It's not a requirement that the interview

5    panelists review the applications.

6          Q      **Hmm.**

7          A      It's not a requirement.  You're not going to

8    find anywhere written that the interview panelist must

9    absolutely look at the application.  Because the way

10   it's designed here at the FDIC is that the automated

11   application system and the way the applications come to

12   the manager and to the interview panel, now everyone

13   starts on an equal footing.  Everyone is equal up to

14   that point.

15          And in the past, it was required that people

16   look at the applications, but now that we're automated

17   or now that these applications flow through the system

18   and they're given to the panelists, everyone starts on

19   basically an equal footing.

20          Q      **Did that exist at the time of this selection,**

21   **Ms. Potucek?**

22          A      I'm sure it did.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 83

1        Q    You're sure it did.  Do you know whether it

2    did?

3        A    I'm not absolutely certain.

4        Q    When was QuickHire implemented in FDIC, Ms.

5    Potucek?

6        A    I don't have the exact date.

7        Q    So you don't know whether QuickHire was in

8    fact a functioning system when this selection was made,

9    do you?

10       A    No.

11       Q    Okay.  Let me ask you this question. In this

12   particular instance, if I were to look at the

13   applications of two applicants for this position --

14       A    Mm-hmm.

15       Q    -- and I saw that their applications were not

16   exactly the same --

17       A    Mm-hmm.

18       Q    -- would I be able to deduce that QuickHire

19   was not implemented at that time?

20       A    No.

21       Q    When FDIC implemented QuickHire, was it not a

22   mandatory requirement that an applicant use QuickHire

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 84

1    online system to apply?

2         A    Yes.

3         Q    So if QuickHire had been implemented and

4    there were two applications for a vacancy that were not

5    in the QuickHire format, would they have been

6    considered if QuickHire was already implemented and

7    mandatory to apply?

8         A    No.

9         Q    They wouldn't have been considered, would

10   they?

11        A    No.

12        Q    Okay.  So if the applications in this

13   selection process were not in the QuickHire format,

14   would that tell me that QuickHire had been implemented?

15        A    No.

16        Q    That wouldn't tell me that?

17        A    No.

18        Q    It would tell me that QuickHire had not been

19   implemented, wouldn't it?

20        A    It wouldn't tell me anything conclusively.

21        Q    When FDIC implemented QuickHire it was

22   mandatory to apply using the QuickHire system, wasn't

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                                Page 85

1   it?

2       A    Correct.

3       Q    So if applications were not submitted for

4   this vacancy announcement under the QuickHire system,

5   QuickHire would not have been implemented at that time,

6   correct?

7       A    Correct.

8       Q    Okay.  So your testimony about equal footing

9   with QuickHire, if QuickHire was not even implemented

10  for this selection in question, that statement doesn't

11  apply, does it?

12      A    Yes it does.

13      Q    Well, if the applications were not submitted

14  in QuickHire, then they're not on equal footing, are

15  they?

16      A    Yes they are.

17      Q    Okay.  And why would they be on equal

18  footing?

19      A    Because before we had QuickHire, we had

20  panels, and they were put in a room, and they rated and

21  rank paper applications, and it was still not a

22  requirement that the panelists on the interview had to

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 86

1    sit and go through all of the applications.  All they

2    got were the interview questions, the benchmarks, and

3    now they were interviewing.

4         Q    Okay.

5         A    It was not a requirement that people had to

6    wade through those applications again.

7         Q    Did this interview panel, was this interview

8    panel given applications?

9         A    Yes.  But it was not required for them to

10   review them.

11        Q    And you don't know whether Ms. Boosinger and

12   Ms. Campbell reviewed the applications?

13        A    No.

14        Q    They never told you?

15        A    No.

16        Q    And you never asked them?

17        A    No.

18        Q    Okay.  So as far as you knew, their

19   recommendations were based solely on the responses to a

20   series of questions presented by the structured

21   interview panel, correct?

22        A    And that is in alignment with the FDIC

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 87

1    policy.

2          Q    Yes ma'am or no ma'am?

3          A    Yes.

4          Q    That was your understanding?

5          A    Yes.

6          Q    Okay.  And they didn't indicate to you

7    anything that they relied upon or reviewed the

8    applications themselves?

9          A    No.

10          Q    Okay.

11          A    They were not required to.

12          Q    Okay.

13               MR. JONES:  Can we take a quick break?

14               MR. SIMPSON:  Yes, I think we can.

15               (A brief recess was taken.)

16               MR. SIMPSON:  Okay.  We are back on.  I just

17    want to note for the record that I had previously asked

18    Mr. Jones, the Agency counsel, to instruct the witness

19    to answer the questions that were asked.  And I would

20    also note on the record that there have been a number

21    of what I would consider, what I would characterize as

22    gratuitous answers that don't reach to the questions

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 88

1    asked.  And I just want the record to reflect that if

2    that continues and I reach the maximum seven-hour limit

3    that as a result of that, I reserve the right and will

4    likely petition the court for additional time to finish

5    the deposition if we run into that.

6            MR. JONES:  I understand and I don't think

7    that will be required.

8            MR. SIMPSON:  Okay.  Thank you, sir.

9            BY MR. SIMPSON:

10       **Q    Ms. Potucek, with respect to this particular**

11   **selection, at any point between the time that you were**

12   **aware that there was a vacancy in your office of the**

13   **Operations Branch for this HR Specialist position until**

14   **the time a selection was made for that vacancy, did you**

15   **have any conversation with Greg Talley?**

16       A    Yes.

17       **Q    When did you have this conversation with Greg**

18   **Talley?**

19       A    I don't know the date and time.

20       **Q    Okay.  Was it before the vacancy announcement**

21   **was posted?**

22       A    I don't recall the date and time.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 89

1       Q     Well, you don't recall whether it occurred

2    before the vacancy announcement was posted?

3       A     No, I do not.

4       Q     Did it occur before you made a selection?

5    Strike that.  Did it occur before you made a

6    recommendation for a selection?

7       A     I don't recall a date and time.

8       Q     But you did have conversation with Greg

9    Talley about this vacancy announcement, this position?

10      A     I recall that it was when the EEO

11   investigator came to see me.

12      Q     Do you recall that you had a conversation

13   with Greg Talley when the EEO investigator came to see

14   you?

15      A     I recall that.

16      Q     Okay.  Was it when the EEO investigator came

17   to see you that you recalled having a prior

18   conversation with Mr. Talley?

19      A     No.

20      Q     Okay.  You didn't have a conversation with

21   Mr. Talley until the EEO investigator came?

22      A     I'm not certain.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 90

1          Q      Okay.  All right.  Do you remember what you

2     discussed with Mr. Talley?

3          A      Yes.

4          Q      What was discussed?

5          A      The particulars of information systems and

6     the interface with operations.

7          Q      Could you be more specific, please?

8          A      No.

9          Q      That's all you recall?

10         A      Correct.

11         Q      And, forgive me, it had to do with --

12         A      Information systems and the work in his shop

13     and the interface with information systems in

14     operations.

15         Q      You don't have a recall of anything else that

16     you discussed?

17         A      No.

18         Q      Okay.  All right.  Do you recall how many

19     applicants there were for this vacancy?

20         A      No.

21         Q      Would there be any way that you could think

22     of that would jog your memory as to how many applicants

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 91

1    there were?

2        A    No.

3        Q    Do you recall how many interviews were

4    conducted by the structured interview panel?

5        A    No.

6        Q    Okay.  With respect to this selection process

7    for the vacancy announcement that is reflected at

8    Exhibit 3, does the term "expertise in systems

9    application" sound familiar to you?

10       A    Could you repeat the question?

11       Q    Yes, ma'am.  As it relates to the selection

12   process for this vacancy announcement, does the term

13   "expertise in systems application" sound familiar to

14   you?  I'm sorry.  "Expertise in software applications."

15    Is that a term that you recall as part of this

16   selection process?

17       A    Yes.

18       Q    In what respect do you recall that?

19       A    I recall that it's my way of encompassing

20   different databases and the software that we use here

21   at FDIC, it's my way of explaining or interpreting the

22   skill requirement.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 92

1          Q     The skill requirement for what?

2          A     For this job.

3          Q     for this job.   What software are you talking

4     about that's used here at FDIC?

5          A     Specifically, you want me to name the

6     software?

7          Q     Yes, ma'am.   Yes, ma'am.

8          A     The software that I recall is Word.

9          Q     Word.   That's a word processing?

10         A     That software.

11         Q     Software.   Okay.

12         A     We have other software that we use with T.

13    Rowe Price.

14         Q     Such as?

15         A     I don't know the specific name, but it's

16    software.

17         Q     Did you ever work with that software?

18         A     No.   I'm not an IT person.   I never have.

19         Q     In your 32 years of experience in the HR, is

20    there a separate career series, career program for IT

21    specialists?

22         A     Yes.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 93

1         Q    It's not in the HR career field, is it?

2         A    Yes.

3         Q    Yes it is or yes it's not?

4         A    Both.

5         Q    There's a specific career series for IT

6    Specialist, correct?

7         A    Correct.

8         Q    That is a different series than the series

9    for HR Specialist, correct?

10        A    Yes.

11        Q    Okay.  All right.  In your meeting with

12   Joerita Campbell and Susan Boosinger after they

13   conducted the structured interview panel, did they

14   indicate whether any of the applicants had asked any

15   questions during the interview?

16        A    No.

17        Q    Did you ask them if any questions had been

18   asked?

19        A    I can't recall.

20             MR. SIMPSON:  Let's mark as Exhibit 6.  I

21   believe it's 6, correct?  Okay.

22                       (Potucek Deposition Exhibit 6 was

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 94

1                              marked for identification.)

2              BY MR. SIMPSON:

3        Q    Ms. Potucek, the court reporter has handed

4    you what's been marked as Exhibit 6.  Do you recall

5    seeing this before?

6        A    Yes.

7        Q    And this in fact is an application --

8    actually, it's an optional application for federal

9    employment in OF 612, correct?

10       A    Yes.

11       Q    And it's submitted by Roger Alan Little, is

12   it not?

13       A    Yes.

14       Q    Is this Roger Alan Little's application for

15   the vacancy in question here?

16       A    Yes.

17       Q    Okay.  Have you seen this before?

18       A    Yes.

19       Q    When did you see this?

20       A    I saw it when I made the selection and when

21   the EEO investigator came.

22       Q    And did you -- strike that.  When did you

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                         Page 95

1    review this application as part of the selection

2    process?

3        A    After Joerita and Susan Boosinger made their

4    recommendation.

5        Q    Okay.  And do you recall how long you spent

6    reviewing this application?

7        A    No.

8        Q    Would it have been ten minutes?

9        A    I don't recall.

10       Q    Half an hour?

11       A    I'm not sure.

12       Q    Did you thoroughly review this application?

13       A    Yes.

14       Q    Okay.  Now, Ms. Potucek, is this application

15   in the QuickHire format?

16       A    It does not appear to be.

17       Q    Because in fact, the QuickHire is an

18   automated system that provides an applicant to answer

19   questions on the QuickHire system, correct?

20       A    Correct.

21       Q    In a predetermined format, and everybody uses

22   the same format, correct?

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 96

1          A    Correct.

2          Q    And that format is not an Optional Form 612,

3     is it?

4          A    No.

5          Q    Okay.  Now when QuickHire was implemented by

6     FDIC, it was mandatory that applicants for a vacancy, a

7     vacant position, had to apply using QuickHire, correct?

8          A    No.

9          Q    Okay.  An employee of the Federal Deposit

10    Insurance Corporation applying for a vacancy in the

11    FDIC had to use QuickHire, didn't they?

12         A    No.

13         Q    Okay.  What was the purpose for implementing

14    QuickHire, do you know?

15         A    Yes.

16         Q    What was the purpose?

17         A    So that all employees would be screened and

18    assessed in their applications the same way through the

19    automated application system.

20         Q    Would that mean then that if applicants for -

21    - if two applicants for the same vacancy announcement,

22    one submitted an OF 612 and the other one submitted a

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                              Page 97

1    171, that they would not be reviewed the same?

2         A    It could be.

3         Q    Okay.  All right.  Now looking at Mr.

4    Little's application -- and please take a look at it --

5    does this application address the knowledge, skills and

6    abilities that are listed on Exhibit 3, the vacancy

7    announcement?

8              (The witness examined the document.)

9              THE WITNESS:  Yes.

10             BY MR. SIMPSON:

11        Q    It does?  And where does it address

12   knowledge, skills and abilities, the KSAs from the

13   vacancy announcement?

14        A    Do you have the KSA worksheet?

15        Q    Ma'am, my question is, does Mr. Little's

16   application address the KSAs that are on --

17        A    Yes.

18        Q    -- the vacancy?  And where does his

19   application address the KSAs?

20        A    Well, it would take me some time.  I would

21   have to go through -- do you want me to write them out?

22        Q    No.  If you look at the application --

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 98

1          A    Right.

2          **Q      -- which is Exhibit 6 --**

3          A    Yes.

4          **Q      -- show me where in his application he**

5    **addresses the KSAs.**

6          A    Well, in paragraph 1, 2, and under Other Job

7    Related, all of those will relate to 1, 2, 3 and 4.

8          **Q      They will relate to.**

9          MR. JONES:  Why don't we have -- give her a

10   couple of minutes to look at the whole application?  I

11   think that might expedite things.

12         MR. SIMPSON:  Well, I tell you what.  Let's

13   do this.  Let's look at Exhibit 3.  Let's look at page

14   3 of 4 of Exhibit 3, which is the vacancy announcement.

15

16         MR. JONES:  Three of four?

17         MR. SIMPSON:  Page 3 of 4.  There's a section

18   that says How To Apply.  Do you see that?

19         THE WITNESS:  Yes.

20         MR. SIMPSON:  All application material must

21   be included with original submission.  Then the next

22   paragraph, "We recommend that you include with your

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 99

1    application, descriptions or examples of experience

2    which demonstrate your possession of the knowledge,

3    skills and abilities identified in the qualification

4    requirements and ranking factor sections of this

5    vacancy announcement."

6            THE WITNESS:  Yes.

7            BY MR. SIMPSON:

8       Q    Now is there a requirement that an individual

9    address each knowledge, skill and ability listed in

10   this vacancy announcement?

11      A    No.

12      Q    There's not a requirement they do that, is

13   there?

14      A    No.

15      Q    Okay.  If an applicant does not address the

16   knowledge, skills and abilities in a vacancy

17   announcement, is that individual's application still

18   processed?

19      A    Yes.

20      Q    Okay.  All righty.  And it's your testimony

21   that Mr. Little's application addresses the knowledge,

22   skills and abilities, correct?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 100

1        A    Yes.

2        Q    **Okay.  Is there anything other than paragraph**

3   **1 and 2 on page 1 that he addresses the KSAs?**

4        A    Well, 1, 2 and Other Qualifications.

5        Q    **Other Qualifications.  Okay.  Anywhere else?**

6        A    And then the Attachment A.

7        Q    **Okay.  Does Attachment A identify this**

8   **information that's at Attachment A as addressing the**

9   **KSAs?**

10       A    Repeat the question?

11       Q    **Is there anything on Attachment A that**

12  **indicates that this input is addressing the KSAs?**

13       A    The fact that it's stapled to the OF 612.

14       Q    **Okay.  But there's nothing on this page,**

15  **these two pages at Attachment A, that say knowledge,**

16  **skills and abilities, is there?**

17       A    No.

18       Q    **Okay.  And you say you reviewed this**

19  **application thoroughly?**

20       A    I didn't say -- I said thoroughly, but I

21  can't recall when I reviewed the application.

22       Q    **But you did testify that you thoroughly**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 101

1    reviewed this application, correct?  That was your

2    earlier testimony.

3        A    In 2004.

4        Q    You thoroughly reviewed?

5        A    Mm-hmm.

6        Q    Turning to page 2 --

7            MR. JONES:  Of the application?

8            MR. SIMPSON:  Of Exhibit 6 -- and we may have

9    gone through this before.  But under Other

10   Qualifications, job-related training, there's a section

11   that it appears Mr. Little has entered data where it

12   says NFC training on the following systems, correct?

13           THE WITNESS:  Yes.

14           BY MR. SIMPSON:

15       Q    And then there's a list of some dozen or so

16   acronyms, correct?

17       A    Yes.

18       Q    All of those acronyms are National Finance

19   Center systems, aren't they?

20       A    I would assume that that's correct.

21       Q    Do you know for a fact whether these are all

22   NFC, National Finance Center, systems?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 102

1        A    No.

2        Q    You don't know?  Do you know whether these

3    acronyms, 16 of them, of these 16, do you know whether

4    the Operations Branch of the Human Resources branch

5    dealt with all of these systems as part of your

6    operation?

7        A    No.

8        Q    You have no idea, do you?

9        A    No.

10       Q    Okay.  But this application reflects that the

11   NFC training that Mr. Little says he received is listed

12   right there, these 16 acronyms.

13       A    Yes.

14       Q    He doesn't indicate that these systems are

15   FDIC systems, does he?

16       A    No.

17       Q    Okay.  All right.  Looking at the first two

18   pages of his application, do you see where Mr. Little

19   indicates that he's had experience with CHRIS?  CHRIS

20   being the FDIC Human Resources personnel system,

21   correct?

22       A    Correct.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 103

1          Q    Now do you see anywhere in the first two

2     pages of his application that he talks about experience

3     with CHRIS?

4               (The witness examined the document.)

5               THE WITNESS:  Yes.

6               BY MR. SIMPSON:

7          Q    Where?

8          A    The second line under number 2, promotion pay

9     setting, calculating pay data for back pay cases,

10    reimbursable details, adjustments, annual pay

11    adjustments is all CHRIS.  Federal and state taxes is

12    all CHRIS.

13         Q    Does it say that?  Does it say CHRIS?

14         A    It doesn't have to.  That's implied.

15         Q    This can't be done manually?  You can't do

16    back pay calculations manually?

17         A    But you have to put it in CHRIS or they're

18    never going to get their money.

19         Q    That doesn't mean you have to do that.  You

20    can do the calculation.  Someone else can put it in,

21    can't they?  If you do it manually, someone else can

22    put it in, correct?  Ms. Potucek?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 104

1          A    Not necessarily.

2          **Q    But it doesn't mean just because you do the**

3    **manual pay calculations that you're the one that puts**

4    **it in the system, correct?**

5          A    No.

6          **Q    No, it doesn't?  Okay.**

7          A    No, it does not mean.  It means that if you

8    do the calculations and the adjustments, you have to be

9    the one to put it in CHRIS because sometimes the way

10   that the pay is set, it has to be at a certain

11   incremental setting through NFC.  You can't just put

12   any salary into CHRIS.

13         **Q    All right.  It doesn't say in that line that**

14   **he inputted the data, does it?  You're inferring that.**

15    **I'm sorry.  First question.  It doesn't say anywhere**

16   **that he inputted the data in NFC does it?**

17         A    He worked for me for five-and-a-half months.

18         **Q    Ms. Potucek, answer the question.  It doesn't**

19   **say that he inputted the data, does it?**

20              MR. JONES:  I just want to be clear.  You're

21   only requiring a yes or a no answer?

22              MR. SIMPSON:  Absolutely.  Yes, sir.  Thank

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 105

1    you.

2            BY MR. SIMPSON:

3        Q    The section you just read to me is what we're

4    talking about.  It does not say that he inputted the

5    data to CHRIS, does it?  I'm going to ask you to focus

6    --

7            MR. JONES:  Just --

8            THE WITNESS:  No.

9            BY MR. SIMPSON:

10       Q    It does not say that, does it?

11       A    No.

12       Q    Okay.  It's your inference when you answered

13   my question that it related to CHRIS, isn't it?

14       A    Yes.

15       Q    Okay.  All right.  Now I'm going to go back

16   to my earlier question.  Is there anywhere in the first

17   two pages that Mr. Little's application refers to CHRIS

18   specifically, C-H-R-I-S, CHRIS?

19       A    No.

20       Q    It doesn't.  Nothing in the first two pages,

21   correct?

22       A    Correct.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 106

1      Q      Is there anything in the last two pages, Ms.

2      Potucek, that addresses or that states any experience

3      using the word "CHRIS" in the last two pages?

4             (The witness examined the document.)

5             THE WITNESS:  Specifically spelled out?

6             MR. SIMPSON:  Yes, ma'am.

7             THE WITNESS:  No.

8             MR. SIMPSON:  Okay.

9             BY MR. SIMPSON:

10     Q      Now on page 3 of the application, which is

11     the first page of Attachment A, at the end of the first

12     paragraph on Attachment A, there is a set of acronyms

13     again, correct?

14     A      Yes.

15     Q      Now you can count them, but I just counted

16     them, and there are 18 acronyms in that section at the

17     end of paragraph 1 of page 3.

18            MR. JONES:  We'll stipulate to that.

19            MR. SIMPSON:  All right.  I go back to page

20     2, and we had just counted, or I had just counted and

21     share with you that there were 16 acronyms under job-

22     related training that Mr. Little had said he had

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 107

1    received specific NFC training.  And I would welcome

2    you to count them.  Sixteen?  Counsel?

3              MR. JONES:  I'm stipulating to that, too.

4              MR. SIMPSON:  Okay.

5              BY MR. SIMPSON:

6        Q    Now did you by any chance note that there was

7    a different number of acronyms between pages 2 and 3

8    when you thoroughly reviewed this application?

9        A    No.

10       Q    Okay.  Now looking at page 3 of the

11   application, the first page of Attachment A, page 3,

12   the 18 acronyms listed there, are any of these FDIC

13   automated systems?

14       A    I don't know.

15       Q    Okay.  Now in Mr. Little's application, can

16   you tell me what FDIC databases, database systems that

17   he is an expert in?

18       A    No.

19       Q    You can't tell me based on this application

20   what database systems of the FDIC he's an expert in?

21       A    No.

22       Q    Okay.  Do you recall whether your earlier

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 108

1    review of this as part of the selection process you

2    identified any FDIC database systems that he was an

3    expert in?

4        A    No.

5        Q    Okay.  Now looking at page 1 of the

6    application, page 1, number 2 at the bottom of the

7    page, the first several words of that where Mr. Little

8    has typed in "Serve as the Payroll Expert for WPSS."

9    Do you know WPSS stands for?

10       A    No.

11       Q    And do you know what a Payroll Expert is?

12       A    Yes.

13       Q    What is a Payroll Expert?

14       A    A Payroll Expert is someone who can go into

15   the system and calculate garnishments, back pay,

16   reimbursibles, settlement cases, back pay for

17   retirement purposes.  Anything that's very, very

18   complex, that's unusual, out of the norm would be

19   something that you would give a Payroll Expert.

20       Q    Okay.  And a CG-7 can serve as a Payroll

21   Expert?

22       A    Yes.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 109

1                   MR. SIMPSON:  Okay.  Now if I turn back to

2       Exhibit 5.  I'm sorry.

3                   MR. JONES:  That's the PD that's not involved

4       in this case.

5                   MR. SIMPSON:  Yes.  Exhibit 4.  If you could

6       find Exhibit 4, the position description for the CG-7

7       HR Specialist, Information Systems and Compensation,

8       can you find in this position description anywhere a

9       connection between the system WPSS and payroll

10      expertise?

11                  (The witness examined the document.)

12                  THE WITNESS:  No.

13                  BY MR. SIMPSON:

14          Q    It's not contained in there at all, is it?

15      In that position description?

16          A    No.

17          Q    So there is no requirement in the position

18      description for the CG-0201-07, Human Resources

19      Specialist, to be an expert, a payroll expert in WPSS,

20      correct?

21          A    I don't know that for a fact.

22          Q    It's not required in the PD is it?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 110

1          A     I don't know what WPSS means.

2          **Q     Because you don't see WPSS in the position**

3    **description at all.**

4          A     But that does not mean that it's not

5    required.

6          **Q     Oh.  How would it be --**

7          A     I just don't know what it means.

8          **Q     How would it be required?**

9          A     If I knew what it meant and I could see what

10   it does, then I could answer your question.

11         **Q     So if someone lists that they're a Payroll**

12   **Expert in WPSS, you have no way of assessing what that**

13   **means, do you?**

14         A     No.

15         **Q     Okay.**

16               MR. SIMPSON:  Let's mark as Exhibit 7.

17                         (Potucek Deposition Exhibit 7 was

18                          marked for identification.)

19               MR. SIMPSON:  The court reporter has handed

20   you what's been marked as Exhibit 7.  Then I would ask

21   you to take a look at that, please, and ask if you've

22   seen this before.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 111

1              (The witness examined the document.)

2              THE WITNESS:  No.

3              BY MR. SIMPSON:

4      **Q    Okay.  You've never seen this before?**

5      A    No.

6      **Q    Okay.  As part of the selection process, Ms.**

7  **Potucek, did you review the applications for all of the**

8  **applicants?**

9      A    No.

10     **Q    Why not?**

11     A    I only reviewed the top two contenders that

12  the interview panel gave me.

13     **Q    Okay.  And why did you not interview the**

14  **applications for all applicants that were interviewed?**

15     A    Because the FDIC best business practices are

16  that the interview panel makes recommendations to the

17  selecting official, and there were two.  There was

18  either Paula Foreman or Roger Little.  And they were

19  the only two that I reviewed.

20     **Q    So your guidance to the interview, the**

21  **structured interview panel was only to give you their**

22  **top two recommendations?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 112

1        A    No.

2        **Q    Now, Ms. Potucek, from a procedural**

3    **standpoint, if an individual applies for a vacancy and**

4    **is interviewed by the structured interview panel,**

5    **should that applicant's packet not be reviewed by the**

6    **selection process?**

7        A    No.

8        **Q    Why?**

9        A    Because the best business practice is that we

10   developed under the Conanan consent decree and the way

11   the structured interview process works is that the

12   interview panel recommends to the selecting official

13   the top candidate or candidates who were tied for first

14   place, and that is the recommendation that the

15   selecting official goes with.

16       **Q    I want to see that in writing.**

17       A    Okay.

18       **Q    I want to see that document that --**

19            MR. JONES:  Maybe you should ask her whether

20   there is such a document.

21            MR. SIMPSON:  Okay.  Fair.

22            BY MR. SIMPSON:

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 113

1      Q    Is this best business practices something

2    that is a written document within --

3      A    Yes.  There's a directive on the website.

4           MR. SIMPSON:  I would ask that we get that.

5           MR. JONES:  Okay.

6           MR. SIMPSON:  Notwithstanding that it may be

7    on the website, I want to make sure that I get -- and I

8    want to get the copy that was current at the time of

9    this selection, please.

10           BY MR. SIMPSON:

11      Q    So you never reviewed Dorothy Chappell-

12    Johnson's application during this selection process?

13      A    No.

14      Q    And the vacancy announcement at Exhibit 3

15    indicates that this position may be filled at the CG-7,

16    9 or 11 level, correct?

17      A    Yes.

18      Q    Was the interview panel required to consider

19    applicants for hiring at the 7 and/or the 9 and/or the

20    11 level?

21      A    No.

22      Q    They were not?  Why?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 114

1          A    That's the selecting official's decision.

2          Q    **And you remember receiving a merit promotion**

3    **roster?**

4          A    Yes.

5          Q    **And do you recall whether there were**

6    **applicants at the CG-7 level that were qualified at the**

7    **CG-7 level?**

8          A    Yes.

9          Q    **Were there applicants qualified at the CG-9**

10   **level?**

11         A    Yes.

12         Q    **Were there applicants qualified at the CG-11**

13   **level?**

14         A    Yes.

15         Q    **You do recall that?**

16         A    Yes.

17         Q    **Do you recall how many were qualified at the**

18   **CG-11 level?**

19         A    No.

20              MR. SIMPSON:  Let's mark as Exhibit 8.

21                     (Potucek Deposition Exhibit 8 was

22                      marked for identification.)

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 115

1          MR. SIMPSON:  The court reporter has handed

2    you what's been marked as Exhibit 7.  It's a Merit

3    Promotion Roster, correct?

4          THE WITNESS:  Yes.

5          BY MR. SIMPSON:

6    **Q    And it shows the issue date in the upper**

7    **right-hand portion of it, the issue date is September**

8    **20, 2004, correct?**

9    A    Yes.

10   **Q    And it lists by eligibility grade the**

11   **applicants and what their eligibility status is,**

12   **correct?**

13   A    Yes.

14   **Q    And is there anyone listed as eligible at the**

15   **GS-11 level?**

16   A    Yes.

17   **Q    Who?**

18   A    Dorothy Chappell-Johnson.

19   **Q    Is Dorothy Chappell-Johnson also eligible at**

20   **the 9 and 7 levels?**

21   A    Yes.

22   **Q    Is there any reason why you did not consider**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 116

1    **filling this position at the CG-11 level?**

2        A    Yes.

3        **Q    Why?**

4        A    Because I wanted to develop this individual

5    with the new organization and the new technology that

6    we were using, and the realignment.  And it was my

7    judgment that I wanted to put someone on a career

8    development plan and develop them at the 7.

9        **Q    You could have hired Dorothy Chappell-Johnson**

10   **at the 7 level, couldn't you have?  She was eligible,**

11   **wasn't she?**

12       A    Eligible, yes.

13       **Q    You could have hired her at the 7 level,**

14   **couldn't you have?**

15       A    Yes.

16       **Q    Or at the 9 level?**

17       A    Yes.

18       **Q    But you never considered her application, did**

19   **you?**

20       A    Yes.

21       **Q    When did you consider her application?**

22       A    Her application was forwarded to the

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 117

1    structured interview panel.

2        **Q    Did you ever consider her application, Ms.**

3    **Potucek?**

4        A    Yes, on the roster.

5        **Q    You reviewed her application?**

6        A    Oh, reviewed?  No.

7        **Q    And why did you not review her application?**

8        A    Because the structured interview panel gave

9    me Paula Foreman and Roger Little.  Dorothy was the

10   last person, of all the candidates that were

11   interviewed, she was the last one on the list.

12       **Q    And how do you know that?**

13       A    Because they told me.

14       **Q    You don't remember how many interviews were**

15   **conducted is your earlier testimony, wasn't it?**

16       A    But I saw and I recall who were the top two

17   contenders tied for first place and who was last.  I

18   don't remember who was in between.

19       **Q    By the way, the structured interview panel**

20   **gave you their documents from the panel process itself,**

21   **didn't they?**

22       A    Yes they did.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 118

1          Q      What did you do with those documents?

2          A      I put it in my credenza with other important

3    documents.

4          Q      Okay.  Did you ever turn those documents over

5    to the EEO investigator?

6          A      No.

7          Q      Were you ever asked to provide those

8    documents?

9          A      Yes.

10         Q      And why did you not provide them?

11         A      Because when I opened up the credenza, they

12   were gone, as with all the documents that were in the

13   credenza, not just those documents.

14         Q      And when were those documents removed?

15         A      I have no idea.

16         Q      Okay.  And you recall that you were -- you

17   had a meeting with an EEO investigator at some point in

18   time, and it was at this time that you discovered you

19   didn't have the documents?

20         A      No.  I discovered that there were 32 merit

21   promotion case files that were missing and other

22   official documents, and I turned it over to the OIG

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 119

1    here at the FDIC for a formal investigation.

2         **Q    And what was the result of that**

3    **investigation?**

4         A    They could not determine, even after looking

5    at tapes at the front entrance when we were located on

6    Pennsylvania Avenue, who had taken the documents, where

7    they were or what was shredded.  But we're still

8    missing all of those documents.

9         **Q    Do you remember when you reported it to the**

10   **OIG?**

11        A    No.

12        MR. SIMPSON:  I'd like to get a document as

13   to when that investigation was started to establish

14   when the documents became missing.

15        MR. JONES:  I'll see if I can get that.

16        MR. SIMPSON:  Okay.  I'm not looking for the

17   file itself.  I'm just looking for the date that it was

18   reported specifically.

19        BY MR. SIMPSON:

20        **Q    Because you don't remember when you noticed**

21   **that these files were missing, do you?**

22        A    I know that it was shortly after I became the

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 120

1    HR officer.

2         Q    Okay.  Shortly after.  You became the HR

3    officer in May of 2004.  The selection for this vacancy

4    occurred --

5         A    Yes.

6         Q    -- sometime in October of '04, correct?  Look

7    at Exhibit 8.

8              (The witness examined the document.)

9              THE WITNESS:  Yes.

10             BY MR. SIMPSON:

11        Q    There's not a date -- oh, is there a date of

12   your signature on the bottom of --

13        A    Yes, uh-huh.

14        Q    Okay.  And that's 10/27.

15        A    Yes.

16        Q    So certainly as of October 27th, the merit

17   promotion package, to include the structured interview

18   panel notes, were in your possession, correct?

19        A    Yes.

20        Q    So it was sometime after October 27th, 2004.

21    So between October 27, 2004 and the date that an EEO

22   investigator talked to you, you noted that these

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                              Page 121

1    documents were missing?

2        A    Yes.

3        Q    Okay.

4            MR. SIMPSON:  I'd like to be able to

5    establish that date if we could, please.

6            MR. JONES:  I would too.

7            MR. SIMPSON:  All right.

8            BY MR. SIMPSON:

9        Q    Do you have a specific recollection of how

10   many interview panel question sheets were given to you

11   by Ms. Boosinger and Ms. Campbell?

12       A    No.

13       Q    Okay.  Looking at Exhibit 8, does this jog

14   your memory as to which applicants were actually

15   interviewed by the panel?

16       A    Yes.

17       Q    All right.  Can you name for me who was

18   interviewed by the panel based on looking at number 8,

19   Exhibit 8?

20       A    I can recall under the requirements of the

21   Corporation that if you interview one, you interview

22   all.  That is mandated.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 122

1      Q     Unless someone decides they don't want to be

2   interviewed.  You don't have to interview someone that

3   says they don't have to?

4      A     It would be annotated opted not to be

5   interviewed.

6      Q     Okay.  So looking at this, based on that --

7   is that guidance in the best business practices --

8      A     Yes.

9      Q     Same document?

10     A     Yes.

11     Q     Okay.  That would indicate there were one,

12  two, three, four, five, six interviews conducted,

13  correct?

14     A     Yes.

15     Q     Okay.  The same six names appear both at the

16  CG-7 and the CG-9 level, correct?

17     A     Yes.

18     Q     Now was it the interview panel's

19  recommendation as to what grade to hire?

20     A     No.

21     Q     Okay.  Do you happen to know what grade in

22  October 2004, what grade Paula Foreman was?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 123

1          A    Not -- no.

2          Q    Did Paula Foreman work for you?

3          A    Yes.

4          Q    Okay.  Did Dorothy Chappell-Johnson work for

5     you?

6          A    No.

7          Q    Did Roger Little work for you?

8          A    Yes.

9          Q    Did Karen Pearmon work for you?

10         A    No.

11         Q    Did Michelle Petty work for you?

12         A    Yes.

13         Q    Can you remember what grade Michelle Petty

14    was in October of 2004?

15         A    No.

16         Q    Did Judith Rice work for you?

17         A    I'm not certain.

18         Q    Okay.  And your recollection was that the

19    interview panel told you that Karen Pearmon and Roger

20    Little were the top two recommendations from their

21    panel?

22         A    No.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 124

1          Q     All right.  Who were the top two?

2          A     Paula Foreman and Roger Little.

3          Q     Okay.  And your testimony was they told you

4     they were tied for first?

5          A     For different reasons.

6          Q     Ms. Boosinger and Ms. Campbell told you they

7     were tied for first.  Yes or no?

8          A     Yes.

9          Q     Okay.  And do you remember where Judith Rice

10    fell out in that one through six?

11         A     No.

12         Q     Where Michelle Petty fell out?

13         A     No.

14         Q     Karen Pearmon?

15         A     No.

16         Q     But it's your testimony that based on your

17    reviewing Exhibit 8, there were six interviews

18    conducted by the panel?

19         A     Yes.

20         Q     And that you would have at one time received

21    six different sets of structured interview questions, a

22    set from Ms. Boosinger for each six and a set from

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 125

1    Joerita Campbell for each six?

2        A    Yes.

3        Q    And that's part of the 32 merit promotion

4    packages that disappeared from your credenza at some

5    time?

6        A    No.

7        Q    Your earlier testimony was that there were 32

8    merit promotion packages that disappeared from your

9    credenza as well as other documents.

10       A    No.

11       Q    Okay.  How many merit promotion packages

12   disappeared from your credenza?

13       A    None.

14            MR. SIMPSON:  Let's go off the record for a

15   second.

16            (A brief recess was taken.)

17            BY MR. SIMPSON:

18       Q    Ms. Potucek, your earlier testimony was that

19   you put the structured interview panel notes from this

20   selection process in your credenza.  Did you put any

21   other structured interview panel notes from other

22   selections in your credenza?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 126

1        A    Yes.

2        **Q    How many others?**

3        A    The other four selections that I made.

4        **Q    Now the notes from the structured interview**

5    **panel, should they have been kept as part of a merit**

6    **promotion case file somewhere in your office other than**

7    **your credenza?**

8        A    No.

9        **Q    What does a merit promotion case file consist**

10   **of?**

11       A    It contains all the applications.  It

12   contains the vacancy announcement, a copy of the

13   position description, a copy of the KSA worksheet.

14       **Q    I'm sorry.  KSA worksheet?**

15       A    Worksheet.

16       **Q    What is a KSA worksheet?**

17       A    When they did paper paneling, they would have

18   to go through the paper application and transfer the

19   data to the KSA worksheet.

20       **Q    On a separate sheet of paper?**

21       A    Uh-huh.

22       **Q    Okay.**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page  127

1        A    And then they would have a rating, a point

2    rating to see who would be -- have enough points to be

3    referred.  Then when the selection is made, it would be

4    annotated in the merit promotion case file when the

5    selection was made and who was selected.

6        **Q    Okay.  Merit promotion case file, would that**

7    **include structured interview panel notes?**

8        A    No.  They're prohibited from being in there.

9        **Q    I think your earlier testimony was that there**

10   **were 32 merit promotion case files that were missing.**

11       A    Yes.

12       **Q    Of which the merit promotion case file for**

13   **this selection in question was one of those 32?**

14       A    I don't know that.

15       **Q    Do you know for a fact whether there was**

16   **still in the possession of FDIC a merit promotion case**

17   **file for this selection at all times?**

18       A    I don't know.

19       **Q    You don't know.  And you don't know whether**

20   **it was one of the 32?**

21       A    No.

22       **Q    Okay.  You do know that the structured**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 128

1      interview panel documents for this selection process

2      plus the other four for which you were the selecting

3      official did disappear from your credenza?

4          A    Correct.

5          Q    And that was noted contemporaneously with the

6      -- with someone noticing that the 32 promotion case

7      files?

8          A    No.

9          Q    When was -- when did you notice that the five

10     selections that you had testified to, the structured

11     interview panel notes, disappeared from your credenza?

12         A    I don't recall the date.

13         Q    Did you report that to the OIG?

14         A    Yes.

15         Q    Do you remember when you reported that to the

16     OIG?

17         A    No.

18         Q    When you reported the loss of those

19     structured interview panel documents from your

20     credenza, was that reported contemporaneously with the

21     loss of the 32 merit promotion case files?

22         A    No.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                      Page 129

1     Q    Those were reported different dates?

2     A    Yes.

3     Q    And did you -- were you the one that reported

4     to the OIG the loss of the 32 merit promotion case

5     files?

6     A    Yes.

7          MR. SIMPSON:  Make sure we've got both of

8     those dates, please.

9          BY MR. SIMPSON:

10    Q    And it's your testimony that you never

11    reviewed Dorothy Chappell-Johnson's application for

12    this vacancy in question?

13    A    Correct.

14    Q    Okay.  Did you review the application for

15    Karen Pearmon?

16    A    No.

17    Q    Did you review the application for Michelle

18    Petty?

19    A    No.

20    Q    Did you review Judith Rice's application?

21    A    No.

22    Q    Your testimony is you only reviewed two

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 130

1    applications?

2        A    Yes.

3        Q    For the other four selections that you were

4    involved as the HR officer, did you only review the

5    applications for the top two recommendations from the

6    interview panels?

7        A    I don't recall.

8        Q    But you followed the best business practices

9    guidelines, specifically followed them, didn't you?

10       A    Yes.

11       Q    Do you believe in giving applications for

12   positions in the FDIC, applicants being all applicants

13   for a position in the FDIC, a fair opportunity for

14   promotion?

15       A    Yes.

16       Q    What would be your definition of a fair

17   opportunity for promotion?

18       A    That they have reasonable time to apply for a

19   vacancy announcement and fill out a comprehensive

20   application.  Number two, that as it makes its way

21   through the system that the evaluation is applied

22   equitably to all applicants.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 131

1          Q      **What evaluation?**

2          A      The KSA application.

3          Q      **Done before an interview panel, correct?**

4          A      Correct.

5          Q      **That results in the merit promotion roster?**

6          A      Correct.

7          Q      **Okay.  Anything else?**

8          A      And that the people who are ultimately put on

9    the roster and referred for interview are all asked the

10   same questions against the same benchmarks.

11         Q      **Okay.**

12         A      By the same interview panelists.

13         Q      **Okay.  Are there any other factors from your**

14   **perspective that should go into providing an applicant**

15   **a fair opportunity for promotion?**

16         A      No.

17         Q      **Does your concept of a fair opportunity for**

18   **promotion mirror procedures that you have been exposed**

19   **to in your 32 years as a Human Resources person?**

20         A      Yes.

21         Q      **So, looking at Exhibit 8, someone who is**

22   **eligible for a position vacancy at the 7, 9 and 11**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 132

1    level who the selecting official or the recommending

2    official, did not even consider the application of, is

3    that a fair opportunity?

4        A    Repeat your question.

5        Q    For an individual applicant who appears

6    eligible at the 7, 9 and 11 level, that applicant not

7    even being considered by the recommending or selecting

8    official, is that a fair opportunity for promotion?

9        A    They were.  They're on the list.  They were

10   considered.

11       Q    They weren't considered by you.

12       A    They were.

13       Q    How were they considered by you?

14       A    They were referred to the structured

15   interview panel, who made their recommendation.

16       Q    They didn't make a recommendation at the 11

17   level, did they?

18       A    They didn't make any recommendations at any

19   level.

20       Q    But you could have made a selection at the

21   CG-11 level, couldn't you have?

22       A    Yes.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 133

1      Q    You didn't have to follow the structured

2    interview panel results, did you?

3      A    Yes.

4      Q    You had to?

5      A    Yes.

6      Q    You were required to?

7      A    Yes.

8      Q    So you could base your selection or your

9    recommendation only on what the structured interview

10   panel told you?

11     A    Yes.

12     Q    You couldn't consider anything else?

13     A    Probably not.

14     Q    No, ma'am.  Could you consider anything else?

15     A    No.

16     Q    No.  So when you made your decision, it was

17   only based on what the structured interview panel

18   recommended to you?

19     A    Yes.

20     Q    Then why did you review the applications of

21   the two, alleged top two recommendations from the

22   panel?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 134

1          A     Because the panel said that they were equal

2     for different reasons, and I needed to decide what I

3     wanted skill-wise in the job.

4          **Q     And they were different based on the**

5     **interview panel questions themselves, correct?**

6          A     Yes.

7          **Q     Did Ms. Boosinger or Ms. Campbell tell you**

8     **that they considered the applications of the**

9     **interviewees?**

10         A     No.

11         **Q     They didn't tell you that?**

12         A     No.

13         **Q     And you didn't ask?**

14         A     I don't recall.

15         **Q     Okay.  So you don't know whether they**

16    **considered the applications?**

17         A     They would not be able to consider the

18    applications because they only were asking interview

19    questions.  And they can't transfer information from

20    the application to the interview sheet.  They can only

21    document what comes out of the interviewee's mouth.

22         **Q     But you considered the applications?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 135

1          A    For two people.

2          **Q    Right.  And did that factor in your decision?**

3          A    Yes.

4          **Q    So -- okay.  So you did consider something**

5    **other than what the panel recommended?**

6          A    Yes.

7          **Q    So you made your decision on more than just**

8    **what the panel recommended?**

9          A    Yes.

10         **Q    Okay.**

11         MR. SIMPSON:  Let's mark as number 9.

12                    (Potucek Deposition Exhibit 9 was

13                     marked for identification.)

14         MR. SIMPSON:  Now, the court reporter has

15    handed you what has been marked as Exhibit 9.  And for

16    the record, I will note that your name does not appear

17    at the top of this exhibit, does it?

18         THE WITNESS:  No.

19         BY MR. SIMPSON:

20         **Q    Now do you know who Suzanne Taylor --**

21         A    Yes.

22         **Q    Who is Suzanne Taylor?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 136

1          A    A student intern.

2          Q    And in -- on Monday, October 18th of 2004,

3     she was a student intern, correct?

4          A    Correct.

5          Q    And who did she work for?

6          A    Me.

7          Q    Okay.  Do you know why Suzanne D. Taylor e-

8     mailed interview questions to Susan Boosinger?

9          A    Yes.

10         Q    Why?

11         A    Because that was one of her duties.

12         Q    Did you tell her to do that?

13         A    I don't recall.

14         Q    Would she have done it without your

15    authority?

16         A    Yes.

17         Q    Did you talk to Suzanne Taylor about sending

18    information to the members of the structured interview

19    panel?

20         A    I don't recall.

21         Q    But looking at what has been marked as

22    Exhibit 9, is it your recollection that these were the

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 137

1    interview questions and the benchmarks that would have

2    appeared on separate sheets of paper for the interview

3    panel?

4        A    I don't recall.

5        Q    And you'd agree with me that because the

6    files magically disappeared from your credenza --

7            MR. JONES:  Object to the "magically."

8            MR. SIMPSON:  Understand.

9            BY MR. SIMPSON:

10       Q    That you have no way sitting here today of

11   comparing these interview questions with what actually

12   were asked by the interview panel, do you?

13       A    No.

14       Q    Okay.  And as a result of the OIG

15   investigation, it was never determined if there was

16   anybody specific that could be found liable for

17   removing those documents from your credenza, was there?

18       A    No.

19       Q    Okay.  Did you prepare these interview

20   questions?

21       A    I don't recall.

22       Q    Who would have prepared interview questions

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 138

1    for an interview panel?

2         A    Rita Bial Boxley, the HR Specialist for the

3    job, is supposed to create the interview questions and

4    benchmarks and then confer with the selecting official

5    as to their appropriateness.

6         Q    Okay.  Do you recall seeing these questions

7    before?

8         A    I probably did.

9         Q    Do you recall seeing these questions before?

10        A    No.

11        Q    Now, in reviewing these questions -- and I

12   would ask you please to review the questions -- are the

13   words "software applications" contained anywhere

14   herein?

15             (The witness examined the document.)

16             THE WITNESS:  No.

17             BY MR. SIMPSON:

18        Q    Is the word "expertise" contained anywhere

19   herein the questions?

20             (The witness examined the document.)

21             THE WITNESS:  You want "experience" or

22   "expertise?"

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 139

1           BY MR. SIMPSON:

2           Q    No, ma'am.  I want the words -- the word

3    "expertise" anywhere here.

4           A    No.

5           Q    Are the words "information systems" contained

6    anywhere herein?

7           A    No.

8           Q    Okay.  By the way, did you have any

9    conversation with Shirley Purnell about the selection

10   in this matter at any time from your arrival, your

11   assumption of duties as the HR officer in May 16th,

12   2004 until October 27th, 2004?

13          A    Yes.

14          Q    What conversation did you have with Ms.

15   Purnell?

16          A    I reported to Shirley, so when the panel made

17   their recommendations to me and I made a decision, I

18   would confer with my supervisor and go in and speak to

19   her about the decision and the particulars of why I was

20   recommending this person.

21          Q    Did you have a conversation with Shirley

22   Purnell about the selection in question?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 140

1        A    Yes.  That is the procedure.

2        **Q    And did you meet in her office?**

3        A    I don't recall.

4        **Q    How long was the meeting?**

5        A    I don't recall.

6        **Q    What did you talk about?**

7        A    The particulars of why I was selecting Roger.

8        **Q    What particulars?**

9        A    I don't recall.

10       **Q    You don't recall.  And you don't recall when**

11   **you had that conversation with her?**

12       A    No.

13            MR. SIMPSON:  Okay.  Let's mark as number 10.

14                 (Potucek Deposition Exhibit 10

15   was

16                      marked for identification.)

17            MR. SIMPSON:  The court reporter has handed

18   you what's been marked as Exhibit Number 10, the top of

19   which indicates Federal Deposit Insurance Corporation

20   Candidate Selection Recommendation, correct?

21            THE WITNESS:  Yes.

22            BY MR. SIMPSON:

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                           Page 141

1      Q    And at the bottom -- does your signature

2   appear at the bottom anywhere on this document?

3      A    Yes.

4      Q    And where does it appear?

5      A    The second from -- the second blank from the

6   bottom.

7      Q    Okay.  And it's dated 10/27/04, correct?

8      A    Yes.

9      Q    Now, do you know how it would be that there

10  would be a date typed into this document?

11     A    No.

12     Q    Did you type the date in?

13     A    I don't recall.

14     Q    Did you prepare this document?

15     A    Yes.

16          MR. JONES:  Jim, can I interrupt you for just

17  a minute?  One of your previous questions was about her

18  conversations with Shirley Purnell between the time she

19  started, and I think you said October 24th.

20          MR. SIMPSON:  No, I said 27th of 2004.

21          MR. JONES:  Okay.  I wanted to make sure.

22          MR. SIMPSON:  Yes.  Thank you.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 142

1                BY MR. SIMPSON:

2        Q    So just so I understand, you say you prepared

3    this document.

4        A    Yes.

5        Q    Did you type something into some sort of word

6    processing system that printed it?

7        A    Yes.

8        Q    It was a pre-formatted document on the screen

9    and you typed in the information?

10       A    Yes.

11       Q    And does this mean that you typed all of the

12   typed information in here?

13       A    Not necessarily.

14       Q    Okay.  What information in here would you not

15   have typed in?

16       A    The date or anything at the bottom.  The

17   dates.

18       Q    I'm not talking about something written in.

19       A    Okay.

20       Q    Ms. Potucek.  What would you not have typed

21   that appears typed on this page?

22       A    I might not have typed in the vacancy

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 143

1    announcement number if that was not readily available

2    to me, or the position title, series and grade if that

3    was not readily available to me.

4         **Q    How else would it have been typed into this**

5    **document?**

6         A    Well, I would have typed in the

7    justification, because that's the requirement of the

8    selecting official.  But I could have given it back to

9    Rita Bial Boxley and asked her to finish it.

10        **Q    Okay.  Now looking at the justification, does**

11   **the phrase "software applications" appear anywhere in**

12   **here?**

13        A    No.

14        **Q    Does the phrase "information systems" appear**

15   **anywhere in here?**

16        A    No.

17        **Q    Does the word "expertise" appear anywhere in**

18   **here?**

19        A    No.

20        **Q    Okay.  Do you know what automated system**

21   **creates Excel spreadsheets?**

22        A    No.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 144

1          Q      Have you ever worked with Excel?

2          A      No.

3          Q      Do you know whether it's part of the

4     Microsoft Office Network?

5          A      I'm sure it is.

6          Q      Do you know that it is?

7          A      Yes.

8          Q      You know that it is part of the Microsoft --

9          A      Yes.  Yes.

10         Q      -- Office.  You've never worked with it, do

11    you?

12         A      No.

13         Q      What is an MS Access database?

14         A      I don't know.

15         Q      You typed it in there, didn't you?

16         A      Correct.

17         Q      You don't know what an MS Access database is?

18         A      I did at the time, but I don't now.  I don't

19    remember.

20         Q      What is CERTS, C-E-R-T-S?

21         A      I don't recall.

22         Q      Is it a FDIC automated system?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 145

1          A    I don't remember.

2          **Q    EPIC.  Do you know what EPIC is or was?**

3          A    No.  I don't remember it.  I used to know all

4    of this, but I don't remember now.

5          **Q    Okay.  Do you still work for FDIC?**

6          A    Yes.

7          **Q    Are you still in the Human Resources --**

8          A    No.

9          **Q    -- business?**

10         A    No.

11         **Q    Aren't you the Human Resources officer for**

12   **the corporate college or corporate university?**

13         A    No.

14         **Q    You perform Human Resources functions for the**

15   **corporate --**

16         A    No.  No.

17         **Q    Okay.  All right.**

18         A    There's only one Human Resources officer.

19   Corporate University is a training facility.

20         **Q    Now when you write at the bottom of this**

21   **justification that "Roger's experience as a**

22   **Payroll/Personnel Assistant provides him with an**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 146

1    excellent background and wealth of experience for the

2    Human Resources Specialist (Information Systems &

3    Compensation) position," that was based upon your

4    review of his application, wasn't it?

5         A    No.

6         Q    What was that based on?

7         A    He worked for me for five-and-a-half months.

8         Q    As a Payroll/Personnel Assistant?

9         A    And doing a variety of things.

10        Q    Was that as a Payroll/Personnel Assistant

11   that he worked for you for five months?

12        A    I would have to go back and look at his

13   particular job series.

14             MR. SIMPSON:  Let's go back and look at

15   Exhibit 6.

16             THE WITNESS:  He was a Human Resources

17   Assistant.

18             BY MR. SIMPSON:

19        Q    Oh, so -- wait a minute.  His position was a

20   Human Resource Assistant?

21        A    Mm-hmm.

22        Q    And he held that position from October '01 to

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 147

1    the present?

2         A    Mm-hmm.

3         Q    And looking at his application, when did he

4    work as a Payroll/Personnel Assistant?

5         A    Well, a Human Resources Assistant also does

6    Payroll/Personnel Assistant work.

7         Q    That's not my question, Ms. Potucek, please.

8     When is the last time he performed duties as a Payroll

9    -- look at his application, please, number two.

10        A    Oh.  September of 2001.

11        Q    And you're referencing his experience as a

12   Payroll/Personnel Assistant --

13        A    Mm-hmm.

14        Q    -- that ended three years earlier, correct?

15        A    Yes.

16        Q    That's what you're citing, three-year-old

17   experience, correct?

18        A    No.

19        Q    As a Payroll/Personnel Assistant, Ms.

20   Potucek?

21        A    He was still doing that in this job.

22        Q    So a Human Resources Assistant is the same

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 148

1    thing as a Payroll/Personnel --

2        A    Not the same, but they do similar work and

3    some of the same work.

4        Q    Some of the same.

5        A    Yes.  Absolutely.

6        Q    Okay.  And you'd agree looking at Exhibit 6

7    that his first entry under his job as a

8    Payroll/Personnel Systems Assistant, and I quote,

9    "serve as the Payroll Expert for WPSS," your earlier

10   testimony was you didn't even know what that was, did

11   you?

12       A    I don't recall what WPSS stands for.

13       Q    So you don't know what experience he had in

14   WPSS?

15       A    I knew at the time, but I don't recall.

16       Q    Do you make any reference to that here in

17   your justification?

18       A    No.

19       Q    No.  No.  Okay.  Would previous experience as

20   a Payroll/Personnel Systems Specialist be important in

21   this job for -- this job in question, this position in

22   question?  Would experience as a Payroll/Personnel

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 149

1    **Systems Specialist be important for this job?**

2         A    Not particularly.

3         **Q    Then why did you cite it in the justification**

4    **at the end of the --**

5              MR. JONES:  Are you saying Payroll/Personnel

6    Systems --

7              THE WITNESS:  Personnel Systems.

8              MR. SIMPSON:  Yes.

9              MR. JONES:  -- Specialist?

10             THE WITNESS:  You said Specialist instead of

11   Assistant.

12             MR. SIMPSON:  Yes.

13             MR. JONES:  So which is it?

14             MR. SIMPSON:  No.  That was my question.

15             MR. JONES:  No, you were saying Systems,

16   would it be important for a Payroll/Personnel Systems -

17   -

18             MR. SIMPSON:  Specialist.

19             MR. JONES:  -- Specialist.

20             MR. SIMPSON:  Let me rephrase that.

21             BY MR. SIMPSON:

22        **Q    Do you know what a Payroll/Personnel Systems**

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 150

1    Specialist did in the FDIC?

2        A    There's so many different interpretations.

3    No.

4        Q    Okay.  Well, you know, let's go back and look

5    at -- let's go back and look at Exhibit 5.  And, again,

6    for the record, we note that this was created in 2002

7    before you became --

8        A    Right.

9        Q    But we also note that this position

10   description for Human Resources Specialist Information

11   Systems and Compensation CG-0201-11 is based at least

12   in part, if not mirroring, what had previously been a

13   Payroll/Personnel Systems Specialist CG-9, correct?  Is

14   that what you see on page 1, comparing Section 4(b)

15   with Section 5(a)?

16           MR. JONES:  Object to the form of the

17   question.

18           MR. SIMPSON:  You can answer.

19           MR. JONES:  Compound.

20           THE WITNESS:  I'm not certain.

21           BY MR. SIMPSON:

22       Q    All right.  Can you tell me what the

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 151

1    relationship in Exhibit 5 between item 4(b) and 5(a)

2    Class/Title of Position, is there any relationship

3    between those two?  In your Human Resources experience

4    now, particularly in FDIC.  Is there any relationship

5    between those two?

6         A    There should be.

7         Q    There should be.  And what relationship would

8    that be?

9         A    The systems piece of it.

10        Q    What systems piece of it?

11        A    It says information systems, and up here it

12   says personnel systems.  So there's some nexus between

13   the systems.

14        Q    But you don't know how much nexus there was

15   between the previous position, Payroll/Personnel

16   Systems Specialist CG-0301-09, and the Human Resources

17   Specialist Information Systems and Compensation CG-

18   0201-11, do you?

19        A    No.

20        Q    But there is a relationship between those

21   two, isn't it?

22        A    There must be.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 152

1      Q     Okay.  But you can't sit here today and tell

2    me that the position description for the Human

3    Resources Specialist Information Systems and

4    Compensation was derived from that prior position of

5    the Payroll/Personnel Systems Specialist CG-0301-9?

6        A     No.

7        Q     Okay.  All right.

8             MR. SIMPSON:  Let's mark as Exhibit 11.

9             BY MR. SIMPSON:

10       Q     By the way, in preparation for this

11   deposition, the continuation today, did you review any

12   documents?

13       A     I reviewed my affidavit.

14       Q     Any other documents?

15       A     I asked Mr. Jones for Roger Little's

16   application.

17       Q     Why did you ask Mr. Jones for Roger Little's

18   application?

19       A     Because I couldn't remember if he had

20   submitted an application or whatever you call this, the

21   OF 612, whatever that is.

22       Q     And that's not an application?

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 153

1          A    That is.  But, I mean, the bonafide OPM

2    application 171 that we know.

3          Q    **Okay.**

4          A    Instead of the supplemental.  I couldn't

5    remember what he had submitted.

6          Q    **Okay.**

7          A    And those are the only two documents that I

8    reviewed.

9          Q    **And why would it have mattered whether he**

10   **submitted a 171 or some other form of application?**

11         A    It doens't matter.

12         Q    **Then why did you want to know whether it was**

13   **a 171?**

14         A    I just wanted to refresh my memory.

15         Q    **Refresh your memory on whether it was a 171**

16   **or some other application?**

17         A    I just wanted to look at the application.  I

18   don't care whether it's a 171 or 612.  I just wanted to

19   look at the application.

20         Q    **And why did you just want to look at the**

21   **application?**

22         A    Because it's been three-and-a-half years.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 154

1        Q    Did you review the application before we

2    started your first deposition two weeks ago?

3        A    No.

4        Q    Do you recall what documents you reviewed in

5    preparation for the deposition two weeks ago?

6        A    Affidavit.

7        Q    The affidavit was the only thing you

8    reviewed?

9        A    Yes.

10       Q    Okay.

11                         (Potucek Deposition Exhibit 11

12   was

13                         marked for identification.)

14            MR. SIMPSON:  I'm handing you what's been

15   marked as Exhibit 11.  And it is a six-page document.

16   Correct?

17            (The witness examined the document.)

18            THE WITNESS:  Yes.

19            BY MR. SIMPSON:

20       Q    And it's your affidavit, correct?

21       A    Yes.

22       Q    Is this the document that you reviewed prior

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                      Page 155

1   to this -- continuing this deposition today?

2        A    Yes.

3        Q    Okay.  And the one you reviewed prior to the

4   initial start of the deposition two weeks ago, correct?

5        A    Yes.

6        Q    Okay.  Now on page 5, the fifth page -- and

7   these pages are not numbered, are they?

8        A    No.

9        Q    But on the fifth page, that's your signature?

10       A    Yes.

11       Q    And the date, August 8, 2005, correct?

12       A    Yes.

13       Q    Now, Ms. Potucek, would you agree with me

14   that your recollection of the events in this matter

15   were more fresh to you and more clear to you as of

16   August 8, 2005 than they are today, November 29th,

17   2007?

18       A    Not necessarily.

19       Q    Why would your recollection be better today

20   than it was August 8, 2005 about the selection process?

21       A    Because I've looked at more documents.

22       Q    You didn't review any documents in preparing

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 156

1    this affidavit?

2         A    Yes.

3         Q    **What documents did you review in preparing**

4    **for this affidavit?**

5         A    Probably the vacancy announcement and the

6    position description.

7         Q    **Turning to page 4, the page before your**

8    **signature.**

9         A    Mm-hmm.

10        Q    **There appears to be some handwritten**

11   **information on that page.  Is that your handwriting?**

12        A    No.

13        Q    **Do you know whose handwriting that is?**

14        A    The EEO investigator's, I think.

15        Q    **You think?  You're not sure?**

16        A    I'm not sure.

17        Q    **Do you know who Joyce Orr is or was?**

18        A    Yes.

19        Q    **Who is Joyce Orr?**

20        A    She was -- she was a Human Resources

21   Specialist who worked for me.

22        Q    **Did Joyce Orr apply for that vacancy?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 157

1          A     No.

2          Q     **Did the EEO investigator ever tell you why he**

3    **would have put information on this page?**

4          A     Yes.

5          Q     **Why?**

6          A     He asked me if I made any other selections

7    for positions, and I said yes.  And he said, who?  And

8    I told him I selected Paula Foreman and Joyce Orr for

9    the next -- I think it was the next week after I made

10   this selection with Roger, I selected Joyce and Paula

11   for Human Resources Specialist off the same roster for

12   a targeted Grade 12.

13         Q     **For a targeted grade -- when you say targeted**

14   **Grade 12, full performance level Grade 12?**

15         A     Correct.

16         Q     **Hiring at what grade?**

17         A     Seven.

18         Q     **You hired both of them as sevens?**

19         A     I hired Paula at the 7, and I think Joyce was

20   the 9, if I recall.  I'm not certain.

21         Q     **Okay.**

22         A     I'm not certain what grade they came on, but

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 158

1    it was a targeted Grade 12.

2        Q    And you made these selections from the same

3    merit promotion?

4        A    Yes.

5        Q    Okay.  The same document that we've marked as

6    --

7        A    No.  No.  It was a different job vacancy.  It

8    was a different vacancy announcement, a completely

9    different job, because it was a Grade 12.  It was not

10   Information Systems.

11       Q    So it wasn't off the same promotion that you

12   had earlier said?

13       A    No.  It's not.  It's off --

14       Q    Okay.

15       A    It was a different roster.

16       Q    In fact, the notation here, did you select

17   Paula Foreman for a Personnel Management Specialist

18   position?

19       A    Yes.

20       Q    Okay.  And what position did you select Joyce

21   Orr?

22       A    The same one.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 159

1    Q    **Personnel Management Specialist?**

2    A    Yes.  Well, it's now Human Resources

3    Specialist.

4    Q    **But --**

5    A    I don't know why he wrote that.

6    Q    **Okay.  Now, in reviewing your affidavit prior**

7    **to either the initial or the continuation of your**

8    **deposition, in reviewing that, is there anything that**

9    **you would change?  Anything that's written here or**

10   **typed in here that you would change as you review it**

11   **today?**

12   A    Yes.  I would change my date of birth to

13   9/2/48, and under the first question, what was your

14   involvement in the selection at issue?  Under the

15   answer, I would say I served as the selecting official

16   and not the recommending official.

17   Q    **Why did you say on August 8th in your**

18   **affidavit that you were the recommending official?**

19   A    I don't recall.

20   Q    **Was there ever a selection that you made in**

21   **your tenure as the HR officer that did not require the**

22   **approval of your immediate supervisor?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 160

1          A    No.

2          Q    **They all required --**

3          A    Yes.

4          Q    **-- the approval?  And they actually didn't**

5    **become a selection until that approval was in writing**

6    **and signed, correct?**

7          A    That's correct.

8          Q    **Okay.  But those are the only changes that**

9    **you would make?**

10              **(The witness examined the document.)**

11              THE WITNESS:  Yes.  I would not make any

12    other changes.

13              BY MR. SIMPSON:

14         Q    **Okay.  All right.  If we could -- okay.**

15    **Towards -- at the bottom of page 1, the question,**

16    **"Please explain why the Complainant was not selected**

17    **for the position.  In doing so, please compare her**

18    **qualifications to that of the Selectee."**

19              **And underneath that is an answer.**

20         A    Yes.

21         Q    **As you review that answer today, does the**

22    **answer in your affidavit answer the question that was**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 161

1    asked?

2         A    Repeat the last part of the question.

3         **Q    Does the answer that's reflected at the**

4    **bottom of page 1 of your affidavit answer the question**

5    **that was asked right above?**

6              **(The witness examined the document.)**

7              THE WITNESS:  It doesn't answer entirely the

8    question.

9              BY MR. SIMPSON:

10        **Q    In fact, you don't make any reference in that**

11   **answer to the Complainant at all, do you?**

12        A    No.

13        **Q    You don't make any reference to Complainant's**

14   **qualifications at all?**

15        A    No.

16        **Q    You don't make any mention of the selectee's**

17   **qualifications at all, do you?**

18        A    Yes.

19        **Q    What?  What do you state as were the**

20   **selectee's qualifications?**

21        A    That whole paragraph is referring to the

22   selectee.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 162

1        Q    It doesn't say that, though, does it?

2        A    It infers.

3        Q    Infers.  But it doesn't say that, does it?

4        A    No.

5        Q    Okay.  Now, the fourth from the bottom line

6    where it says you were -- "that I was seeking someone

7    who had expertise in a multitude of software

8    applications who could interface with the IT

9    Departments in FDIC," what software applications were

10   you looking for that someone would have expertise in?

11       A    I don't recall at the time.

12       Q    You don't recall what you meant when you

13   wrote that in August or signed this information in this

14   affidavit?

15       A    I don't recall.  I knew at the time, but I

16   don't recall now.

17       Q    And, of course, we have reviewed Mr. Little's

18   application, and your earlier testimony was that there

19   wasn't any mention in there about expertise, correct?

20   With the exception of being an expert payroll in WPSS,

21   that you have no idea what that is, correct?

22       A    And he worked for me for five-and-a-half

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**                    Page 163
**(No. 06-1074-RCL)**

1    months.  So I knew his expertise.

2        Q    You knew his expertise?  Do you -- in what's

3    been marked as Exhibit 6, the justification for the

4    recommendation -- I mean Exhibit 10 -- justification

5    for the recommendation, Exhibit 10.  Does the word

6    "expertise" appear in your justification at all?

7        A    No.

8        Q    I'm sorry.  I had already answered (sic) that

9    and you had said no, didn't you?  Software applications

10   shows up nowhere in this justification, does it?

11       A    No.

12       Q    As you sit here today reviewing your

13   affidavit at Exhibit 11, you don't remember what you

14   meant by "multitude of software applications that could

15   interface with the IT Department in FDIC?"

16       A    No.

17       Q    Okay.  Now turning to page 2, "Why are these

18   skill sets necessary to the position at issue?"  And

19   your answer is "To resolve payroll and personnel

20   issues, the incumbent interfaces with the National

21   Finance Center, OPM, other government agencies, and

22   FDIC regional offices."  Period.  "The incumbent

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 164

1    supplies various reports to these customers."

2              What customers?

3    A    The customers who worked in the organizations

4    in line 2.

5    Q    So the National Finance Center is a customer

6    of the FDIC?

7    A    Absolutely.

8    Q    The FDIC is not a customer of the National

9    Finance Center, are they?

10   A    It's both ways.

11   Q    Oh, okay.  And OPM is a customer?

12   A    Yes.

13   Q    How is OPM a customer of the FDIC?

14   A    We do reimbursibles and we have OPM people

15   come over here on contract to help us with monster.com

16   and QuickHire.  And we work with them with strategic

17   planning, human capital.  Our employee and labor

18   relations people work with OPM and its reimbursibles.

19   So it's two-way.

20   Q    For this position, how is OPM a customer for

21   this position?

22   A    When we do reimbursibles, this person has to

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 165

1    know how to reimburse OPM for their services.

2         **Q      What services?**

3         A      When they came in to help us with the

4    reduction in force for over three years, we had to pay

5    them.

6         **Q      And that made them a customer?**

7         A      Yes.

8         **Q      Okay.**

9         A      And we were a customer.  It's a two-way.

10        **Q      Okay.  And what other government agencies?**

11        A      The other FIREAS.  The Federal Reserve Board,

12   the Office of the Comptroller of the Currency, OTS.

13        **Q      What reports are provided to those customers**

14   **that are prepared by the incumbent?**

15        A      During the course of the year when we get

16   ready to review our compensation and benefits and we

17   compare ourselves to other FIREAS, we give -- we

18   exchange reports with the other FIREAS to ensure that

19   we're competitive with their compensation and benefits.

20        **Q      And how are these reports generated?**

21        A      Someone would tell this person what data they

22   needed, and this person would have to write the report

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                Page 166

1  and put it into the system so the data that we

2  collected, that would be given to whoever is requesting

3  it, would be in the format and have the data that they

4  wanted to review.

5      Q    **Into what system, ma'am?**

6      A    I'm not certain.

7      Q    **You don't remember?**

8      A    No.

9      Q    **You were responsible for that function, and**

10  **as you sit here today, you don't remember --**

11     A    No.

12     Q    **-- what system was used to do that?**

13     A    No.

14     Q    **Was it a National Finance Center system?**

15     A    I'm sure it partly was.

16     Q    **So it would be inputting information, not**

17  **generating a report?  It would be inputting data, would**

18  **it not?**

19     A    But it's generating a report here.  NFC

20  doesn't generate the report for us.

21     Q    **But it's inputting data for which a computer**

22  **system generates the report, correct?**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 167

1        A    I'm not certain.

2        Q    Okay.  Continuing in that same paragraph, the

3    sentence that starts "Generating these kinds of reports

4    requires expertise in a variety of software

5    applications."  What software applications?

6        A    I'm not certain.

7        Q    You don't remember.  It could be NFC software

8    systems?

9        A    It could be.

10       Q    It could be.  CHRIS?

11       A    Could be.

12       Q    Could be.  Going down to the bottom of that -

13    - oh, wait a minute.  At about the middle.  "It needs

14    to be understood at the time that I was charged with

15    this selection I was relatively new to my Human

16    Resources Operation position."  Period.  "Greg Talley,

17    the former Assistant Director for Human Resources

18    Information Management and Payroll advised me that the

19    interface between my Operations unit and his

20    organization would be greatly enhanced by my placing in

21    the announced position an individual who had expertise

22    in software applications and quality review

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 168

1    enhancements."

2              **Have I read that correctly?**

3       A    Yes.

4       **Q    And what was meant by "expertise in software**

5    **applications?"**

6       A    I'm not certain at the time.

7       **Q    And you haven't been able to identify in Mr.**

8    **Little's application what expertise in software**

9    **applications he had, were you?**

10      A    No.

11      **Q    But you selected him, didn't you?**

12      A    Yes.

13      **Q    And I go to the last sentence, "Based on his**

14   **lead" -- his lead being Greg Talley -- "his lead and**

15   **guidance, considering he was an expert in the IT area,**

16   **I focused my requirements on software application**

17   **knowledge and expertise."**

18             **Is that what you made your selection decision**

19   **on?**

20      A    In part.

21      **Q    In part.  And what else did you rely on?**

22      A    The next -- the knowledge and expertise but

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 169

1   the excellent communication skills and the customer

2   service and how articulate the incumbent has to be over

3   e-mails, telephones.  And Roger, having worked for me

4   for five-and-a-half months, he was absolutely superb.

5        **Q    So you relied on the structured interview**

6   **panel results, your review of his application, and what**

7   **you knew of his abilities in working for you?**

8        A    Yes.

9        **Q    So you considered information that was not**

10  **contained in the vacancy announcement, didn't you?**

11       A    No.

12       **Q    If you considered his experience working for**

13  **you, you did, didn't you?**

14       A    He could not have been referred to me without

15  consider the information in the vacancy announcement.

16       **Q    And so everything in his application you can**

17  **attest to that he did, that observed him doing?**

18       A    No.

19       **Q    So I look at his application as a Human**

20  **Resource Assistant.  By the way, he worked for Janet**

21  **Vorce, correct?**

22       A    Vorce.

EXHIBIT 20
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 170

1        Q    If you look at Exhibit 6.

2        A    Yes.

3        Q    He worked for you directly, didn't he?

4        A    Yes.  She was a team lead, so he worked for

5    me directly.

6        Q    Who rated him?

7        A    I did.

8        Q    Why is his supervisor listed as Janet Vorce?

9        A    Because she's a team lead.

10       Q    She supervises him?

11       A    She gives him work but she doesn't supervise

12   him under the true definition of a supervisor.

13       Q    True definition.  Okay.  Going to that next

14   paragraph under the one we were just talking about

15   where the ending sentence is based on his lead

16   guidance.  The next paragraph that starts with "using

17   software applications, knowledge and expertise as my

18   focus."  What software applications knowledge are you

19   addressing here?

20       A    I'm not certain.

21       Q    Okay.  But based on that, you said you found

22   the selectee the best qualified.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 171

1       A    Yes.

2       Q    And indeed more qualified than Complainant.

3   How did you know that?  To make that statement, how did

4   you know that he was best qualified and more qualified

5   than the Complainant?

6       A    Recency in experience in his five-and-a-half

7   months of reporting directly to me.

8       Q    Recency of experience.  How would you have

9   known the Complainant's recency of experience?

10      A    She wasn't working in Operations.

11      Q    So it's based on the five-and-a-half months

12  that he worked for you.  That's what you're calling the

13  recency in experience?

14      A    Yes.

15      Q    Okay.  And when you go on to say that the

16  selectee outlines a multitude of database systems he is

17  an expert in, let's look at Attachment A to Mr.

18  Little's application, which I think is Exhibit 6.  And

19  let's look at Attachment A, the third and fourth pages

20  of his application.  Do we see the word "expert" at all

21  in this, these two pages, Ms. Potucek?

22      A    No.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                           Page 172

1      Q    We don't.  But you're making a statement that

2    the selectee outlines a multitude of database systems

3    he is an expert in?

4      A    Mm-hmm.

5      Q    He doesn't mention expert, being an expert in

6    anything in that attachment, does he?

7      A    No.

8      Q    Okay.  Then you go on to say, "although the

9    Complainant's application details a wealth of

10   experience, it did not lay out the software program

11   areas that she had a working knowledge of."

12         Now, I showed you what was marked as Exhibit

13   Number 7, which was Dorothy Chappell-Johnson's

14   application.  You said you never looked at it.

15         MR. JONES:  Objection.  Misstates her prior

16   testimony.

17         MR. SIMPSON:  I don't think it does, but

18   objection noted.

19         BY MR. SIMPSON:

20     Q    Did you not say that?

21     A    You asked me if I had ever seen her

22   application when the selection process was being -- as

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 173

1    it was progressing, and my answer was, no, I did not

2    review her application.

3         Q    **When have you reviewed her application?**

4         A    The only time I reviewed her application is

5    when the EEO investigator had it and gave it to me.

6    That was the first time.

7         Q    **Hmm.  When I asked you what you reviewed with**

8    **the EEO investigator, you didn't say applications.  You**

9    **said vacancy announcement and selection recommendation.**

10        A    That was for all -- for everyone.  But the

11   only application I reviewed for any one of those people

12   was Dorothy Chappell-Johnson's when he handed it to me.

13        Q    **Now looking at the question that starts at**

14   **the bottom of page 2, "Please address this argument by**

15   **the Complainant:  I was better qualified for the**

16   **subject position than the person selected because I**

17   **previously served in the announced position at the CG-**

18   **11 level for about three to four years.  Indeed, I was**

19   **the Selectee's supervisor when I served in the position**

20   **at the Grade 11 level.  I had performed all of the**

21   **functions that were required by way of the vacancy**

22   **announcement.  The Selectee had not."**

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 174

1          And it goes on to specify some specific

2    experience that the -- that Ms. Chappell-Johnson said

3    she had that Mr. Little did not.  Now, when you

4    reviewed her application, did you find this to be true?

5     What's contained in this question as to what Ms.

6    Chappell-Johnson is claiming, that she was better

7    qualified because she had served in that position?

8         A    I can't recall.

9              MR. SIMPSON:  Well, let's look at her

10   application, which is Exhibit 7.  Do you want to

11   refresh your memory?

12             (The witness examined the document.)

13             BY MR. SIMPSON:

14        Q    Is what she says true based on her

15   application?

16        A    I would say so.

17        Q    Okay.  And then in your answer, you go on to

18   state that the position focuses on various automated HR

19   systems and processes.  And other than the National

20   Finance Center systems and CHRIS, can you identify any

21   other automated HR system, and other than QuickHire,

22   which I think we agree wasn't even implemented at this

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 175

1    time, but other than CHRIS and FDIC automated systems,

2    can you identify any other HR automated systems that

3    were required in this position?

4        A    I can't -- I don't recall.

5        Q    There are none that you recall today?

6        A    I don't remember.

7        Q    Okay.  And that "will serve as a

8    troubleshooter and super user of HR automated systems."

9     And what were those HR automated systems?

10       A    I don't remember.

11       Q    Okay.  But someone that's worked with

12   National Finance Center for a number of years and

13   worked with CHRIS since it was implemented would have

14   experience in both of those HR automated systems,

15   wouldn't they?

16       A    I'm not certain.

17       Q    Okay.  So it's your testimony that the only

18   time you ever looked at Dorothy Chappell-Johnson's

19   application was with respect to providing an affidavit

20   to the EEO investigator?

21       A    Yes.

22       Q    Okay.  By the way, when a merit promotion

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 176

1    roster is prepared, the names that are contained on a

2    merit promotion roster, those are fully qualified

3    applicants, are they not?

4         A    Yes.

5         Q    Does the term "best qualified" mean anything

6    to you?

7         A    No.

8         Q    In your 32 years as an HR person, you've

9    never heard the term "best qualified?"

10        A    Yes.

11        Q    You have?  What does it mean to you?

12        A    It means in the whole person concept that

13   they're best qualified in knowledges, skills and

14   abilities.

15        Q    Isn't it true that under some Human Resources

16   personnel systems within the government that a best

17   qualified list is in fact a merit promotion list?  That

18   the only names that appear on that list are considered

19   best qualified by the HR component?

20        A    Yes.

21        Q    So it would be safe to say that in your 32

22   years of HR, the best qualified list would be a list of

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**                                     Page 177
**(No. 06-1074-RCL)**

1    applicants who are considered best qualified for a

2    particular position, correct?

3         A    Yes.

4         Q    Would that apply in the same way in the FDIC

5    in September of 2004 that a merit promotion roster

6    would consider the best qualified applicant for

7    consideration?

8         A    Yes.

9         Q    When you made the final selection in this

10   matter, what did you consider in making that final

11   selection?

12        A    I considered the structured interview panel

13   recommendations of Paula Foreman and Roger Little.  I

14   looked at their applications.  I looked at the

15   interview notes, the benchmarks.

16        Q    Again, that's the panel, from the panel?

17        A    The panel.  And then I considered the superb

18   work that Roger had demonstrated in five-and-a-half

19   months working for me.

20        Q    And you did not consider the applications of

21   any other individuals that appeared on the merit

22   promotion --

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 178

1        A    No.

2        Q    -- roster?

3        A    No.

4        Q    Despite the fact that some of those were

5    eligible, considered best qualified eligible by the

6    system for a CG-9 or 11?

7        A    But they're no longer best qualified once

8    they go through the structured interview process.

9        Q    So that would be -- but that would be true if

10   that's all you made your selection based on was the

11   recommendation of the panel, right?

12       A    I only looked at the two they recommended.

13       Q    The two that they -- the two names they gave

14   you were the best, quote -- what the panel members

15   thought were the best qualified, and you would agree

16   that different panelists could have come to a different

17   conclusion, couldn't they have?

18       A    Possibly.

19       Q    You'd agree they could, couldn't they?

20       A    Yes.

21       Q    Yes.  Okay.

22            MR. SIMPSON:  Let's take a few minutes.

**EXHIBIT 20**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 179

1           (A brief recess was taken.)

2           MR. SIMPSON:  I don't have any other

3    questions at this time.  Counselor?

4           MR. JONES:  I got nothing either.  We'll read

5    and sign.

6           MR. SIMPSON:  Okay.  We're off.

7           (Whereupon, at 1:55 p.m. the deposition of

8    LORINDA POTUCEK was concluded.)

9                           *  *  *  *  *

10

11           I have read the foregoing pages which reflect

12    a correct transcript of the answers given by me to the

13    questions therein recorded.

14

15           Deponent

16

17           Date