**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - x

                              :

DOROTHY CHAPPELL-JOHNSON,     :

                              :

          Plaintiff,          :

                              :

     v.                       : Civil Action No. 06-1074

                              :

MARTIN J. GRUENBERG,          :

                              :

          Defendant.          :

                              :

- - - - - - - - - - - - - - x


                    Washington, D.C.


                    Friday, November 16, 2007


Deposition of

              SHIRLEY Y. PURNELL

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Mary Ann

Kohler, Notary Public in and for the District of

Columbia, at the law offices of Swick & Shapiro, 1225

Eye Street, N.W., 12th Floor, commencing at 1:09 p.m.


              Diversified Reporting Services, Inc.

                    (202) 467-9200

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

APPEARANCES:


On Behalf of the Plaintiff:

JAMES SIMPSON, ESQ.

Swick & Shapiro LLP

1225 Eye Street, N.W.

Washington, D.C. 20005


On Behalf of the Defendant:


WILLIAM S. JONES, ESQ.

PATRICIA DAVISON-LEWIS, ESQ.

Corporate Operations Branch

Federal Deposit Insurance Corporation

3501 Fairfax Drive, Room E-6006

Arlington, VA 22226

(703)562-2362

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 3

C O N T E N T S

EXAMINATION BY:                                          PAGE


Counsel for Plaintiff                                      4




PURNELL DEPOSITION EXHIBITS:


1 - Organization chart                                    5


2 - Vacancy Announcement for 2004                        10


3 - Position Description                                  35


4 - Vacancy Announcement                                 46


5 - Merit Promotion Roster                               61


6 - Affidavit for Ms. Purnell, 8/25/05                   65

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 4

1                    P R O C E E D I N G S

2    Whereupon,

3                    SHIRLEY Y. PURNELL

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR PLAINTIFF

7              BY MR. SIMPSON:

8        **Q    Good afternoon.**

9        A    Good afternoon.

10       **Q    I wonder if you would please state your full**

11   **name and spell it for the record, please?**

12       A    My name is Shirley Y. Purnell, S-h-i-r-l-e-y

13   Y.   P-u-r-n-e-l-l.

14       **Q    And if you could please state your address for**

15   **the record?**

16       A    207 Hill Road, Landover, Maryland, 20785.

17       **Q    Okay.   Now, Ms. Purnell, do you recall giving**

18   **a deposition in this office back in May 2007?**

19       A    Yes.

20       **Q    Okay.   And for the record, I would note that**

21   **the transcript of that deposition -- I don't think we**

22   **need to provide Agency a copy because he has a copy,**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 5

1    but if you need a copy, I will --

2              MR. JONES:  I assume Mr. George has copy.

3              BY MR. SIMPSON:

4        Q    For purposes of discovery, that is a document

5    and as such, I don't think we are going to find

6    ourselves here for as long as we certainly were on that

7    occasion because a lot of  information that came out

8    during that deposition will be applicable to this in

9    terms of your background; your work assignment, et

10   cetera.

11       A    Okay.

12       Q    Having said that, I would like to have the

13   court reporter mark as Exhibit One.

14                        (Purnell Deposition Exhibit

15                        No. 1 was marked for

16                        identification.)

17            Now, Ms. Purnell, the court reporter has

18   handed to you what's been marked as Exhibit One and it

19   is titled, "Relationship of Affiants Chart Federal

20   Deposit Insurance Corporation As of November 1, 2004,"

21   and it is the form of an organizational chart, is that

22   the way that you would read that?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 6

1         A    Yes.

2         Q    Now, if you could for me indicate as of

3    November 1, 2004 whether you were employed by the FDIC

4    and where on this chart you would have fallen?

5         A    I was employed by the FDIC at that time and I

6    would have been the Assistant Director for the Human

7    Resource Service Center.

8         Q    And for our purposes, that falls right under

9    the Human Resources Branch?

10        A    That is correct.

11        Q    And you reported to who at the Human Resources

12   Branch?

13        A    Miguel Torado.

14        Q    Okay.  Now, under the Human Resources Services

15   Center where you were serving as the assistant

16   director, there are several blocks underneath that.

17   One of them goes to Lorinda S. Potucek, Human Resources

18   Officer Operations.

19             Ms. Potucek reported directly to you?

20        A    That is correct.

21        Q    And she was in fact the HR officer for the

22   Operations Center of the Human Resources Service

EXHIBIT 26
**CHAPPELL-JOHNSON v. BAIR**
(No. 06-1074-RCL)                                              Page 7

1    Center?

2         A    Yes.

3         Q    **There is another block that reflects a Gregory**

4    **D. Tally.  Did Mr. Tally work for you on November 1,**

5    **2004?**

6         A    To the best of my recollection, that section

7    was still under the Human Resources Service Center.

8         Q    **And that branch or office would have been**

9    **titled, what?**

10        A    That was the Human Resources Information

11   Management Payroll Section.

12        Q    **Okay.  Were there any other subdivisions**

13   **underneath the Human Resources Service Center that**

14   **reported to you that are not reflected on that chart?**

15        A    No.

16        Q    **Okay.  And was Gregory D. Tally, was he at**

17   **that time the Human Resources Information Management**

18   **and Payroll Chief?**

19        A    Yes, I believe he was.

20        Q    **Did there come a time when Eugene Bell filled**

21   **the position that shows as Gregory D. Tally?**

22        A    There has been a combination of branches and

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 8

1   Eugene Bell is now the head of the Human Resources

2   Service Center that encompasses that function but he

3   never held the position as the Assistant Director of

4   Human Resources Information Management Payroll.

5        **Q     Okay.  November 1, 2004 Mr. Bell reported to**

6   **you, didn't he, directly to you?**

7        A     Let's see, when this happened Mr. Bell was in

8   the HR organization and -- I apologize.  There was

9   another section.

10       **Q     Right.  And what section was that?**

11       A     That section was at that time called the -- I

12   think it was called the Staffing and Compensation.

13       **Q     All right.  And again, I think the**

14   **organization that we covered in your deposition in May**

15   **of 2007 addressed that as well, but I appreciate the**

16   **clarification here.**

17            **Okay.  When you were the assistant director**

18   **for the Human Resources Service Center, if there was a**

19   **position vacancy in the Operations Branch for which**

20   **Lorinda S. Potucek was the head as the HR officer, if**

21   **there was a vacant position for which there was going**

22   **to be a vacancy announcement, would Ms. Potucek have**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                Page 9

1   **been the individual in your organization to work the**

2   **development of a vacancy announcement for that vacant**

3   **position?**

4       A    As the selected official, she would have been

5   responsible for the approval, but the actual

6   development of the vacancy announcement would have been

7   done by a specialist, an HR specialist.

8       **Q    That would have worked for her?**

9       A    Worked for her, yes.

10      **Q    Okay.  Did there come a time when Ms. Potucek**

11  **would have asked you to serve as the reviewing or**

12  **verifying official for information in a vacancy**

13  **announcement for a position that she would be hiring?**

14      A    Right, that would be the case.  Typically,

15  Lorinda Potucek would have signed off on the vacancy

16  announcements as the human resource officer.  Since

17  this vacancy occurred in her organization, I would have

18  approved it.

19      **Q    And that would have been true for any vacant**

20  **position that worked under her?**

21      A    Right.  She would not have been the person who

22  could have done the final approval --

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 10

1        Q    Of the?

2        A    Vacancy announcement.

3        Q    Right.  And the reason that we have you here

4    today for this deposition involves a non-selection of

5    Dorothy Chappell-Johnson for a position that was in the

6    Human Resources Office Operations Branch, correct, as

7    you understand it?

8        A    That's correct.

9        Q    And for that position, you would have been

10   involved in the final approval of a vacancy

11   announcement?

12       A    That's correct.

13           MR. SIMPSON:  Why don't we mark as

14   Exhibit Two.

15                          (Purnell Deposition Exhibit

16                           No. 2 was marked for

17                           identification.)

18           MR. SIMPSON:  And for the record, Counsel has

19   a copy from an earlier deposition.

20           BY MR. SIMPSON:

21       Q    I'd ask that you take a look at Exhibit Number

22   Two and take what time you need to review it and then

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 11

1      let me know when you are done, please.

2                (Witness reviewed the document.)

3                THE WITNESS:  Okay.

4                BY MR. SIMPSON:

5           Q    All right.  What has been handed to you is

6      Exhibit Two, Vacancy Announcement Number 2004-HQ-2637,

7      correct?

8           A    That's correct.

9           Q    And it is for a Human Resources Specialist

10     (Info Systems & Compensation), correct?

11          A    That's correct.

12          Q    Advertised at the CG/07/09/11 levels, correct?

13          A    Correct.

14          Q    Okay.  Now, were you involved, Ms. Purnell, in

15     the review and approval of this vacancy announcement?

16          A    Yes, I'm sure I was.

17          Q    And that would include reviewing and approving

18     the Summary of Duties on page two?

19          A    Yes.

20          Q    And the Knowledge, Skills and Abilities also

21     on page two?

22          A    Yes.

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 12

1      Q     Now, when an individual applies for a position

2  based on a vacancy announcement, does the FDIC require

3  that applicant to submit an application that identifies

4  and addresses his or her experience and answers to each

5  individual knowledge, skill and ability on page two?

6      A     They should address them, yes.

7      Q     And should they identify, specifically, what

8  knowledge, skill and ability they are addressing in

9  their application packet?

10     A     I think in the case of the way that the system

11 was set up at this point, they were responding to

12 individual questions within the automated system that

13 gave them a range of options to select from in order to

14 describe your experience.

15     Q     Applicants for this position were not required

16 to submit a separate piece of paper addressing the

17 knowledge, skills and abilities?

18     A     It is all submitted electronically through an

19 automated system that would have a section that would

20 generally describe their duties that they performed in

21 various positions, but then they would be asked very,

22 very specific questions related to the knowledge,

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 13

1    skills and abilities identified in the vacancy

2    announcement.

3        Q    So if for instance if I were a supervisor in

4    FDIC and I was looking to fill a vacant position and I

5    received several applications, I would expect to see

6    the application format for each applicant to be roughly

7    the same?

8        A    Yes, and the system.

9        Q    All right.  Was there a requirement that

10   applicants only submit their applications through the

11   automated online system?

12       A    The expectation was the applicants would -- if

13   any applicant had a problem for any reason where they

14   could not fill out electronically, they would have to

15   contact the specialist that was handling the vacancy

16   and describe what the reason was, if they couldn't

17   complete the application electronically.

18       Q    But if an individual wanting to apply for that

19   vacant position did not follow those steps but rather

20   submitted an application be it a resume or a 171 or

21   whatever, that still would be accepted, wouldn't it?

22       A    The individual would have been contacted and

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 14

1    the questions could have been sent to them -- like a

2    hard copy of the questions and they could have just

3    checked the blocks that were appropriate.

4        **Q    Okay.  Now, looking at the first page of**

5    **Exhibit Number Two, is there information that would**

6    **tell me where this position would work, once filled?**

7        A    If you look under "location," it says

8    "Division of Administration, Human Resources Branch, HR

9    Service Center Operations Section."

10       **Q    And so that would mean that the vacancy once**

11   **filled would work in the operations section of the HR**

12   **Service Center, correct?**

13       A    That's correct.

14       **Q    Okay.  Now, looking at this is there any way I**

15   **would be able to tell, as a potential applicant for**

16   **this position, that I would be able to tell who the**

17   **selecting official would be?**

18       A    No.

19       **Q    And the fact that the location of this vacant**

20   **position indicates the operations section, that would**

21   **tell me that that individual would somehow work either**

22   **directly or indirectly for Lorinda Potucek, correct?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 15

1      A    If you had knowledge of the organization, you

2  would know that.

3      **Q    Yes.  Thank you.  In this particular vacancy,**

4  **do you know who the selecting official was?**

5      A    Lorinda Potucek.

6      **Q    Now, based on our review of Exhibit Number One**

7  **which we refer to as an organizational chart, it shows**

8  **Ms. Potucek working for you, did you grant to Ms.**

9  **Potucek the authority to make selections for vacant**

10 **positions?**

11     A    I don't know that there is any delegated

12 document, if you are talking about a delegated

13 document.  I didn't give a delegated document to her

14 that says that.  In your position description, it would

15 say that she makes selections.

16     **Q    And was it your practice that to your**

17 **subordinate managers you gave them at least verbally**

18 **selection authority?**

19     A    Yes.

20     **Q    When one of your immediate subordinate**

21 **managers would make a selection, was it a true**

22 **selection without your approval or your boss's**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                             Page 16

1    approval?

2        A    No.

3        Q    So in fact, one of your subordinate managers

4    submitting a document indicating a selection of theirs

5    for a particular vacant position, it was not a

6    selection until it was approved by either you or

7    someone that you worked for?

8        A    The final approval authority for any selection

9    in HR was the head of the branch which would have been

10   Miguel Torado, but the selection document would show

11   Lorinda Potucek as a selecting official.  It would

12   probably be aligned for my concurrence and then the

13   final approval would be that of the branch head, Miguel

14   Torado.

15       Q    But if Lorinda Potucek were to submit her

16   recommendation to fill a vacancy, you could deny that,

17   couldn't you?

18       A    Yes.

19       Q    And therefore, it could not be a selection,

20   correct?

21       A    If I denied it, it would not be a selection.

22       Q    So your disagreement or your denial of a

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page  17

1    **particular name to fill a position is a non-selection**

2    **for that position;  your signature approving something**

3    **signed by Ms. Potucek would indicate you were approving**

4    **the selection, correct?**

5        A    I would like the word, "I concurred" in the

6    selection.

7        **Q    But it is not a selection until you signed it,**

8    **correct?**

9        A    You or your supervisor?

10       A    Semantics.  The selection was done by Lorinda

11   Potucek.  For me to not concur, there would have to be

12   something very, very wrong in my opinion with the

13   selection in order not to concur in the selection.  I

14   trust the judgement of my manager, so I would have to

15   have some -- and I can't imagine what that would

16   be -- some reason to not concur in the selection.

17       **Q    But just as you could non-concur and deny a**

18   **selection and therefore it is not a selection until**

19   **your signature gets on that document approving there is**

20   **not a selection, correct?**

21           **Semantics or not, it is not a selection until**

22   **you or one of your superior say, correct?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                   Page 18

1      A    And it's non-selection until Miguel Torado

2   approves it, until the head of the branch approved it.

3   If you go that way, it wouldn't be a selection until he

4   approved it because he certainly would have had the

5   authority to overturn anything that I decided.

6      **Q    And there is a space on the appropriate FDIC**

7   **selection forms that indicates in this case Ms.**

8   **Potucek's signature, your signature and Miguel Torado,**

9   **correct?**

10     A    Yes, there is a place on there.

11     **Q    On the same document?**

12     A    Yes.

13     **Q    All three signatures required?**

14     A    All three signatures required.

15     **Q    Okay.  And how did it come, Ms. Purnell, that**

16  **you served as the verifying approving official for this**

17  **vacancy announcement that we have here as Exhibit Two?**

18     A    Typically the HR officer would be responsible

19  for approving the vacancy announcement but if the human

20  resource officer is actually involved in the selection

21  process, then someone other than the HR officer would

22  sign it.  I was the higher level supervisor to the HR

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 19

1   officer, so I signed it.

2        Q    Okay.  And you, assuming the responsibility in

3   this particular instance for this vacancy announcement

4   to be the verifying approving official, was that as a

5   result of Ms. Potucek coming to you and saying you have

6   to handle this one?

7        A    It was probably -- it was not the first time

8   that there had been an occasion that Lorinda would have

9   been the selecting official and would require that I

10  approve the vacancy announcement because she couldn't.

11  There have been occasions where she was absent for the

12  day and approvals were required for a vacancy and I

13  would approve it and it may not be a vacancy that was

14  in HR.

15       Q    And I can appreciate the fact that your

16  testimony to that question is what would normally

17  happen or what -- what did happen, did Ms. Potucek

18  approach you about you serving as the reviewing and

19  approving official on this vacancy announcement?

20       A    My recollection is that she gave me the

21  documents to review.

22       Q    So they came to her and then she brought them

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 20

1    to you?

2         A    It came to me electronically.

3         **Q    But from her?**

4         A    Yes.

5         **Q    Okay.  All right.  Was that via e-mail?**

6         A    Yes.

7         **Q    And you have a recollection of receiving that**

8    **e-mail?**

9         A    Yes.  Well, all of the vacancy announcements

10   are approved through the Quick-Hire system.  It came

11   electronically to me and I don't have any reason to

12   believe that this one was different.  I don't have an

13   absolute recall that it was done that way.

14        **Q    Would one of Ms. Potucek's subordinates be**

15   **able to send you a vacancy announcement directly via**

16   **e-mail electronically?**

17        A    Yes, they could but it would have something

18   there to indicate that Lorinda had approved it, like

19   her e-mail attached immediately above saying "approval"

20   and then the document being forwarded or something.

21        **Q    Well, but if she has forwarded you something**

22   **that she has already said she is approving, why does**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 21

1    she need you to approve it?

2        A    She is telling me that she has reviewed it and

3    as far as she is concerned, that it is okay.  She's

4    asking for a second-level review.

5        **Q    Okay in those cases, she is not exercising an**

6    **approval, she is sending it to you for your approval,**

7    **correct?**

8        A    Correct.

9        **Q    Got it, okay.  Do you recall anything in the**

10   **body of that e-mail where she electronically sent you**

11   **this draft vacancy announcement?  Did you or Ms.**

12   **Potucek have any conversation or discussions about this**

13   **vacancy announcement?**

14       A    I know we had discussions about the actual

15   vacancy itself and to fill another position.  I don't

16   recall a specific conversation about the vacancy

17   announcement.

18       **Q    All right, what conversation did you have**

19   **about the vacant position itself with Ms. Potucek?**

20       A    One of the things that I know that we talked

21   about is the priority of filling vacancies because we

22   had to get specific approval from Miguel Torado to fill

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 22

1  vacancies and they were I would say some competing

2  priorities in the organization, Eugene's staff, her

3  staff, we have a vacancy, which organizations are we

4  filling in.

5      **Q      Did this position exist as a vacant position**

6  **that had filled prior to this vacancy announcement or**

7  **was it a new position?**

8      A     This was a new position description and when I

9  say it is a new position description, it was a

10 combination of duties from a couple of PD's that

11 existed before.

12     **Q      But the position itself, did not exist prior**

13 **to the development of the position description?**

14     A     No.

15     **Q      So it was a new position?**

16     A     It was a new position.

17     **Q      And who approved the new position to be**

18 **advertised and filled, was it you?**

19     A     The approval to fill any position in that

20 branch came from Miguel Torado.

21     **Q      Were you involved in the development of the**

22 **position that there be a new position?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 23

1    A    I certainly was involved in discussing with my

2    superior and with Lorinda what I thought were the

3    duties that needed to be done in a position like that.

4        **Q    Did the identification of a need to create**

5    **this position and fill it start with Ms. Potucek?**

6    A    There were -- my recollection is that there

7    was a discussion with Lorinda and myself about what we

8    thought was a void in the office in terms of insuring

9    accuracy of personnel documents, personnel actions and

10   that kind of thing, kind of more in the line of quality

11   control, and I certainly remember having a discussion

12   with Miguel Torado about why there was the need to do

13   that.

14       **Q    Personnel actions, personnel documents getting**

15   **into the system correctly, being inputted correctly,**

16   **being verified and inputted correctly?**

17   A    Verified and inputted correctly and when the

18   actual paper documents were produced, also verification

19   that they were correct.

20       **Q    Okay.  And up to the point of the discussion**

21   **that there was a need for a position like this, you had**

22   **had discussions with Ms. Potucek that indicated that**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 24

1    **there was a void, there was a problem, there was need**

2    **for someone to do that?**

3         A    Yes.  One of the things that we talked about

4    as a number of correction actions that were being

5    produced like on a personnel action to promote an

6    individual, that maybe the original promotions actions

7    and two actions correct in that promotion action, so it

8    was that kind of thing that we discussed.

9         **Q    And you indicated correction documents, that**

10   **would have been after some identification of some kind**

11   **of mismatch or error in the personnel system or payroll**

12   **system?**

13        A    Right.  It could be that there was an input

14   error.  It could be that the individual who input the

15   action put something in it.  It could be that the

16   salary was incorrect.  It could be that they didn't

17   have the individual in the right retirement system.  It

18   could have been any number of things.

19        **Q    Now, as we discussed in your prior deposition**

20   **but for edification purposes today, the FDIC in this**

21   **timeframe 2004 had its own personnel and payroll system**

22   **referred to as CHRIS, correct?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                              Page 25

1        A     Yes, CHRIS did exist when that happened.

2        **Q     And the FDIC also inputted data and documents**

3   **into the National Finance Center Data Systems as well,**

4   **correct?**

5        A     The two systems interface.  CHRIS interfaced

6   with the National Finance System but it was possible to

7   enter data directly into NFC and bypass the CHRIS

8   System.

9        **Q     And would there be information and data**

10  **inputted into CHRIS that would not be inputted into the**

11  **National Finance Center System?**

12       A     I can't think of anything.

13       **Q     Okay, so if there was a need to create**

14  **correction documents for an error, that would have been**

15  **based on an error that was identified by the National**

16  **Finance Center Systems, correct?**

17       A     The error could be identified through a CHRIS

18  report as well.

19       **Q     Such as what?**

20       A     They had daily CHRIS reports that came out.

21  There were a number of things.  We got a mismatched

22  report that would show the difference between data

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 26

1    contained in CHRIS and data contained in the National

2    Finance Center.  I'm trying to think of some of the

3    other reports.

4        **Q    And CHRIS would generate an error report for a**

5    **difference in data between CHRIS and the National**

6    **Finance Center System?**

7        A    The National Finance Center would --

8        **Q    Create the error report, wouldn't it, if there**

9    **was a difference?**

10       A    Mm-hmm.  I'm trying to think if there were

11   anything separately coming out of CHRIS.  There would

12   be SINQ reports, Suspense --

13       **Q    Is that S-I-N-Q, the acronym SINQ?**

14       A    Mm-hmm.

15       **Q    And that was a report generated by the**

16   **National Finance Center?**

17       A    The National Finance Center -- showing an

18   action did not complete the interface and the

19   individual who input the action would typically go back

20   and try and figure out what was the problem and fix the

21   problem so that the action would go forward.

22       **Q    So that the action would accepted, processed**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 27

1    and a permanent record in the National Finance Center

2    System, correct?

3        A    Right, the National Finance System is the

4    official system of record.

5        Q    Okay.  And you can't think of any error

6    reports that would be generated by CHRIS that would not

7    otherwise be covered by some error report generated by

8    the National Finance Center?

9        A    I can't think of any but that doesn't mean it

10   doesn't exist.

11       Q    Okay.  And if there were any correction

12   documents that were required to be created and then

13   inputted, they would ultimately be to correct data in

14   the National Finance Center database, correct?

15       A    Yes.

16       Q    Now, in your discussions with Ms. Potucek

17   about what you have described as a void in quality

18   control, was there discussion about assigning the duty

19   to existing resources within the operation section?

20       A    At the time, when I said this position

21   description was a combination of duties from a couple

22   of different old position descriptions, prior to

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 28

1    filling this job, there was a specialist who did have

2    the quality control who had retired from the

3    organization.

4        **Q    So you had a vacancy of a position for which**

5    **that incumbent before he or she left did at least some**

6    **of the functions that you have identified needed to**

7    **picked up?**

8        A    Right.

9        **Q    Did you fill the position that that individual**

10   **incumbent who retired, did you fill that vacant**

11   **position?**

12       A    No.

13       **Q    Did you take that full-time equivalent**

14   **position and use that allocation or money to fill this**

15   **one?**

16       A    I would have to say, no, because what happened

17   is we had to go back in and request -- because when the

18   person left, we were going through a period of

19   downsizing.  That was one of the positions that was

20   considered to be a position that would not be filled,

21   so --

22       **Q    Within the Human Resources Service Center**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 29

1    which you were the assistant director, you had a rather

2    large complement of human resource specialist, did you

3    not?

4        A    Fairly large.

5        Q    And within the Human Resources Specialist

6    positions, there were some sub-specialties within the

7    HR specialist position, for instance, an Information

8    Systems and Compensation individual as is reflected on

9    this vacancy announcement, correct?

10       A    Would be a different duty than some of the

11   other ones that were described as Human Resources

12   Specialist with no parenthetical.

13       Q    Okay, or it would have the parenthetical

14   employee development, for instance?

15       A    Well, there were no employee development types

16   in the Human Resources Service Center.

17       Q    Can you think of any other parenthetical

18   specializations within the Human Resources Specialist

19   field?

20       A    Human Resources Specialist Benefits; Human

21   Resources Specialist Information Systems.

22       Q    And Information Systems being different than a

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                                Page 30

1  Human Resources Specialist Information Systems and

2  Compensation, correct?

3      A    Right.

4      Q    Did you have any Human Resources Information

5  Systems that worked for you in the Human Resources

6  Service Center?

7      A    Not at that time.

8      Q    Okay.  But Ms. Potucek certainly had more

9  Human Resources Specialists other than specifically

10  Information Systems and Compensation position, correct?

11      A    Yes.

12      Q    Now, if I look at page two of Exhibit Two

13  under the "Summary of Duties," it starts off at the

14  entry level, those four words, "At the entry level,"

15  and at the entry level, what does that mean in terms of

16  this vacancy announcement?

17      A    It's a grade seven.

18      Q    And it's true that if someone is hired at the

19  CG-7 level, they would have to work for a year at the

20  seven level before they are eligible for the career

21  ladder, non-competitive promotion, CG-9, correct?

22      A    It depends, if they entered the position at

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 31

1   the grade seven;, it depends on what they have been

2   doing.  They may have been in the seven position for

3   two years, so it could be that I could select them at

4   the grade seven today and next pay period promote the

5   to a nine.

6        **Q    Okay, but was that common or was that rare?**

7        A    It's common enough.

8        **Q    But otherwise all things being equal, hired at**

9   **the entry level CG-7, they would have to work for a**

10  **year before they could become a nine?**

11       MR. JONES:  Object to the form.  You can

12  answer.

13       THE WITNESS:  If they entered the

14  position -- say the individual selected was a grade six

15  at the point they were selected; they were a grade-six

16  and they moved into the seven position.  It was

17  expected that it would take them a year.

18       BY MR. SIMPSON:

19       **Q    Right.**

20       A    Okay.

21       **Q    And likewise, a year at the nine level before**

22  **they could be non-competitively promoted to the full**

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 32

1    performance level, CG-11, correct?

2        A    Correct.

3        Q    And in fact, if I look about two-thirds down

4    the summary of duties -- I think it is line 10.  The

5    very end of that line starts with the words, "At the."

6        A    Mm-hmm.

7        Q    Continuing to the 11th line, "At the full

8    performance level" and that being the CG-11, correct?

9        A    That is correct.

10       Q    That whoever gets hired for this position, if

11   they are hired at the seven level, would not be

12   expected to perform any less than one year at the full

13   performance level, correct?

14       A    I'm not sure I understanding what you are --

15       Q    If I'm hired at the seven level, I'm not

16   expected to work at the full performance CG-11 level

17   until a one-to-two-year period, correct?

18       A    That's right.  That's reasonable.

19       Q    That's normal, isn't it?  And that is what is

20   anticipated here in the wording here between the

21   Summary of Duties on page two and the Qualifications

22   Required, the next section underneath that?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 33

1          A    That is basically what is anticipated.

2          **Q    So an individual would not be hired at the**

3     **CG-7 level based on the full performance level**

4     **expectations of performance at CG-11, correct?**

5          A    If I understand you correctly, what you are

6     saying is that the expectation at the seven level would

7     be very different than the expectation of performance

8     at the 11 level?

9          **Q    Correct.**

10         A    That's correct.

11         **Q    And it would be normally expected that that**

12    **individual would not be required to perform at the full**

13    **performance level for that one-to-two-year period?**

14         A    That's correct.

15         **Q    Okay.  All right.  In filling this vacancy, do**

16    **you know whether there was a structured interview panel**

17    **convened?**

18         A    There was a structured interview panel

19    convened.

20         QQ   And how do you know that?

21         A    I read my own affidavit so I know that that

22    exists.

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 34

1      Q    Other than reading your affidavit, would you

2    have known that there was a structured interview panel

3    to fill this position?

4      A    Yes.

5      Q    Because it fundamentally a requirement of the

6    Conanan Consent Decree, wasn't it?

7      A    The Conanan Consent Decree requires structured

8    interviews, but it did not require a structured

9    interview panel?

10     QQ   Right and who made the decision to convene a

11   structured panel in this case, do you know?

12     A    It would have been Lorinda.

13     Q    Okay.  Were you involved in any way in the

14   structured interview process?

15     A    When you say involved in any way, I --

16     Q    In any way?

17     A    -- didn't pick the people who would be on the

18   panel.  I don't have any recollection that I had

19   anything to do with --

20     Q    Were you involved in any way in the

21   development of questions to be asked by the interview

22   panel?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 35

1        A    I am sure that I reviewed them because Lorinda

2    would typically review them if she were not the

3    selecting official because she was an HR officer.

4    Since she was the HR officer, I'm sure I reviewed them.

5        **Q    So you have no specific recollection at this**

6    **time?**

7        A    No.

8        **Q    Understand.  Let's mark as Exhibit Three --**

9                        **(Purnell Deposition Exhibit**

10                       **No. 3 was marked for**

11                       **identification.)**

12           **The court reporter has handed you what has**

13    **been marked as Exhibit Three and then in the upper-most**

14    **top middle, it says "Position Description," correct?**

15       A    Yes.

16       **Q    And also under Number Five (a), the second**

17    **block, it says, "HR SPEC (Info Sys & Comp)".**

18       A    That's correct.

19       **Q    And it's at the CG-7 level, correct?**

20       A    That is correct.

21       **Q    And take your time looking at it but do you**

22    **remember seeing this document before?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                   Page 36

1          A    I don't specifically remember.

2          **Q    Well, let me draw your attention to about**

3    **two-thirds of the way down on the far left-hand side.**

4    **You will see two signatures?**

5          A    Yes.

6          **Q    Do you recognize those signatures?**

7          A    Lorinda Potucek and Rita Baugh Boxely.

8          **Q    Okay and right next to Ms. Boxely's signature,**

9    **do you see anything else entered there?**

10         A    It looks like a date and it looks like

11   Lorinda's initials.

12         **Q    Those are not your initials, are they?**

13         A    They are definitely not my initials.

14         **Q    They are not your initials?**

15         A    They are not.

16         **Q    By they way, do you remember when Lorinda**

17   **Potucek assumed the position as the HR officer of the**

18   **operation section?**

19         A    It's difficult to remember.  It would have

20   been sometime between March of '03 and January of '04

21   and the reason that I say that is because it was during

22   the period of time that I was acting as the assistant

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 37

1  director for the HR Service Center that that selection

2  was made.

3      Q    Do you have any recollection, for instance,

4  that on or about August 24, 2004, which is when Ms.

5  Potucek signed this particular position description,

6  right, 8/24/04?

7      A    Well, it looks like 8/23 -- '04 is where I

8  have an initial here and then 8/24, so it looks like it

9  has got two sets of initials here.

10     Q    No.  One if a signature and one is initials,

11  you'd agree?

12     A    Yeah.  Well --

13     Q    Signed on 8/24, correct?

14     A    Yes.

15     Q    Do you recall whether Ms. Potucek had just

16  recently come onboard as the HR officer?

17     A    It was probably around -- somewhere in this

18  period of time.  All I can remember is that it was

19  sometime after March of -- I don't remember

20  specifically.  I know it was after March of '04 and I

21  changed my mind in terms of whether this is Lorinda's

22  signature. I think that is Sharon Pearson.

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 38

1          Q    Sharon Pearson?

2          A    Yeah, I believe that is Sharon Pearson.

3          Q    But it is definitely not yours?

4          A    It is definitely not mine.

5          Q    But it is possible that Ms. Potucek could have

6     been the HR officer for a short period of time as of

7     August 24, 2004?

8          A    She would have been the HR officer in August

9     of '04 for probably at least eight months or longer.

10         Q    Okay.  Now, in looking at what we've marked as

11    Exhibit Three, do you recall seeing this in the

12    timeframe say July, August of 2004?

13         A    Probably somewhere in that timeframe.

14         Q    Okay.  And you would agree that this is the

15    position description for Human Resources Specialist

16    Information Systems and Compensation at the CG-7 level?

17         A    Yes, that's what it says. Yes.

18         Q    And that would comport with the vacancy

19    announcement being indicated as the entry level CG-07,

20    correct?

21         A    That's correct.

22         Q    So in order for this vacancy announcement to

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 39

1    be developed, the position description would have had

2    to be developed first, correct?

3        A    Yes.

4        Q    For the CG-7?

5        A    Yes.

6        Q    Now, because the vacancy announcement is

7    indicating the vacancy can be filled at either the

8    seven, nine or 11 level, would there have been a

9    requirement to have developed position descriptions for

10   the CG-9 and the CG-11?

11       A    Typically, we allow specialists to develop a

12   position description at one grade level and they can

13   write a Statement of Difference for the next grade

14   level.  We don't typically allow them to write a

15   Statement of Difference for two whole grade levels.  In

16   other words, they had a description at the seven.  They

17   could have done a Statement of Difference for the nine

18   but there should have been like a full-blown position

19   description at the 11.

20       Q    Do you recall seeing a position description at

21   the CG-9 and/or the 11 level?

22       A    Not specifically.  I don't recall that, no.

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 40

1    Q    But certainly there must have been at least

2    another position description at the 11 level?

3    A    Yes.

4    Q    And possibly also could have been one at the

5    nine level?

6    A    That is correct.

7    Q    But at a minimum, there would have had to have

8    been three separate documents, PD at the seven; either

9    a PD or a Statement of Difference for the nine but

10   definitely PD for the 11?

11   A    Right.

12   Q    And you don't have any recollection of

13   reviewing those?

14   A    Not specifically, no.

15   Q    Now, the Human Resources Specialist

16   Information Systems and Compensation position title as

17   reflected at 5-A, the second block, do you know whether

18   the HR Specialist Information Systems and Compensation

19   position title had existed as a different position

20   title prior to the development of this position?

21   A    I'm not sure I understand.

22   Q    Okay.  If you know, other than a Human

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                                   Page 41

1   Resources Specialist, before Human Resources Specialist

2   Information Systems and Compensation position title,

3   was there another position title before that, that

4   would have done these functions?

5       A    As I mentioned earlier, this particular

6   position was the merging of like several different

7   positions that existed prior to this job existing.

8       Q    How much prior?  Immediately prior, several

9   years prior?

10      A    It was a Grade- 11 position that we abolished

11  as a result of the RIF.

12      Q    And what was that position titled?

13      A    Oh, it was probably titled Human Resource

14  Specialist Info System or Information Systems or

15  something very close to that.

16      Q    All right.  You are familiar with a duty

17  position within FDIC at one time of the Payroll

18  Personnel System Specialist?

19      A    Yes

20      Q    Was this a position that was based, at least

21  in some part, on that prior position title?

22      A    There was a position in the office -- when the

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**

Page 42

1    Office of Personnel Management redescribed what kinds

2    of duties would be in the 201 Series, the Human

3    Resource Series, the job that you are describing as a

4    Payroll Personnel job was moved from the 301 Series

5    into the 201, based on OPM changing the description for

6    what kind of work would be in the 201 Series.

7        So there was a job that existed that was a

8    Personnel Payroll Information something that got

9    converted into the Human Resource Specialist Info

10   Systems.

11       Q    Info Systems by itself or Info Systems and

12   Compensation?

13       A    I think it was -- I think it was just Info

14   Systems.  I don't know that it had "compensation" on

15   it.

16       Q    So if you are looking at what we have marked

17   as Exhibit Three, if I were to look at Section 4(b),

18   which is blank right now, if it said, Formerly

19   Payroll/Personnel System Specialist, I could make a

20   connection between that former position and what is at

21   5(a) HR?

22       A    No.

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                          Page 43

1          Q      **I can't make that connection?**

2          A      I don't think so.   What I have been trying to

3    describe is that there was a position that was a

4    payroll- personnel-type position and Information

5    Systems job.   When that job was abolished through the

6    RIF, we created this position that had a combination of

7    duties, so I don't think that it necessarily flows that

8    this position that we are looking at now is from that

9    personnel payroll job.

10         Q      **Not that it is a --**

11         A      I don't think that we would have ever put it

12   in (b) as the -- you were asking if it would be in this

13   (b) section; I don't think we would because I see the

14   jobs as very different, this 4(b).

15         Q      **Yes, ma'am.**

16         A      You asked me if would it be in 4(b).   I don't

17   think it would have because the job was different.

18   This was a combination of several positions.

19         Q      **All right, but if I saw a position description**

20   **that did list in 4(b) Payroll/Personnel Systems**

21   **Specialist and I also saw then in that block of 5(a) in**

22   **the middle, HR Specialist Info Systems and**

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                     Page 44

1    **Compensation, there would be some connection between**

2    **those two, would there not?**

3        A    I would say that they were some duties that

4    were similar between the Payroll Personnel -- there is

5    the same basic kind of work being done in the HR

6    environment, so there are some duties that would be

7    similar, but I don't want to say that it is the same

8    job because it is not.

9        **Q    Okay.  Significant number of duties, to your**

10   **recollection?**

11       A    A number of the duties would be the same.

12       **Q    Okay.  In fact during the May 2007 deposition,**

13   **do you recall whether we in fact in that deposition**

14   **went through or considered position descriptions for**

15   **which there was an entry in 4(b) for the**

16   **Payroll/Personnel System Specialist and it was an HR**

17   **Specialist Info Systems and Compensation?**

18       A    I don't specifically recall but if you say

19   that it was, that is very possible.  I don't

20   specifically recall it.

21       **Q    You have no general recollection that we went**

22   **through a comparison of --**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                         Page 45

1          A    Yes, I do remember us going through comparison

2      PD's

3          Q    Yes.  That included an entry in 4(b) for a

4      Payroll/Personnel System Specialist that also carried

5      and HR Specialist Information Systems and Compensation?

6          A    I don't specifically recall that.

7          Q    But you have a general recollection that we

8      did that?

9          A    I have a general recollection that we compared

10     duties of several PD's.

11         Q    Okay.  Now, did you approve this position

12     description at any time?

13         A    I don't recall approving the position

14     description, specifically.

15         Q    Okay, for the CG-9 level, the same HR

16     Specialist Info Systems and Compensation, do you have a

17     recollection of approving a CG-9?

18         A    No, I don't.

19         Q    A CG-11?

20         A    No.

21         Q    Okay.  Now, do you recall whether you had any

22     conversation with Linda Potucek about convening a

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 46

1    structured interview panel?

2        A    No, I don't recall having a conversation with

3    her.

4        Q    Okay.  Now, your recollection of this

5    particular vacancy announcement and selection process,

6    do you remember who it was that made the selection in

7    this particular case?

8        A    Lorinda made the selection.

9        Q    And how do you know that sitting here today?

10       A    I read m y affidavit and my affidavit told me

11   that Lorinda made the selection.

12       Q    Okay and do you recall what she made the

13   selection based upon?

14       A    I don't have anything in my head just standing

15   out that tells me the specifics.

16       Q    Okay.  Let's mark as Exhibit Four.

17                        (Purnell Deposition Exhibit

18                        No. 4 was marked for

19                        identification.)

20            The court reporter has handed you what has

21   been marked as Exhibit Four in this deposition, do you

22   recall seeing this document before?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 47

1          A    Yes.

2          Q    Okay.  By the way, in Section II, "Name of

3     Candidate Selected," there appears to have been a typed

4     entry that was scratched out and Roger Little was

5     written above that, do you know the name that was i

6     that block?

7          A    No.

8          Q    You didn't prepare this form, did you?

9          A    No, I did not.

10         Q    You didn't scratch that out and write Roger

11    Little?

12         A    No.

13         Q    That's not your handwriting, is it?

14         A    No.

15         Q    Okay.  And if you would look at the very

16    bottom of that page --

17         A    Yes.

18         Q    -- is that your signature at the bottom?

19         A    It is.

20         Q    Dated the 27th of October 2004?

21         A    That's correct.

22         Q    And right above that, whose signature is that?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                              Page 48

1          A    Lorinda Potucek's.

2          **Q    Now, to the left of Ms. Potucek's signature,**

3     **there appear to be some kind of an entry, do you know**

4     **what that entry is?**

5          A    Based on -- it looks like it could be Jo Rita

6     Campbell -- I'm not sure -- it was one of the

7     specialists in the office.

8          **Q    And why would there have been Jo Rita**

9     **Campbell's initials off to the left of her signature?**

10         A    Because the specialist working the case would

11    typically review the selection recommendations.  One of

12    the things that they would be reviewing them for is to

13    see whether or not the selection justification was

14    reasonable based on the duties of the position and that

15    kind of thing.

16         **Q    Okay.  Would it make a difference as to whose**

17    **initials would appear out there on the left if it were**

18    **a fact that Jo Rita Campbell had served on the**

19    **selection panel?**

20         A    If she had served on the selection --

21         **Q    The structured interview panel?**

22         A    It looks like those are her initials.  I could

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 49

1    be wrong, but --

2        Q    Would that be a problem if she initialed out

3    there, having served on the structured interview panel?

4        A    It wouldn't be a problem for me.

5        Q    Okay.  You had no policy within the Human

6    Resource Service Center about that?

7        A    No.

8        Q    And the FDIC didn't have any that you knew of?

9        A    No.

10        Q    Do you know what the duties of a Human

11    Resources Assistant are?

12        A    Yes.

13        Q    What are the duties of an HR Assistant?

14        A    There could be a variety of duties and not

15    every Human Resource Assistant's job description is

16    going to be exactly like another one.

17        Q    Why would they not be the same, job

18    description?  You are talking position description,

19    correct?

20        A    Yeah.  Position description and job

21    description are the same thing.

22            Why would they be different?  I had a young

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                    Page 50

1    lady who worked for me who was a Human Resource

2    Assistant and her primary role was to manage my

3    calendar, make sure that supplies were ordered for the

4    office.  She might do things like reference checks on

5    applications.  She may input application information

6    into the automation information system and have no role

7    related to personnel and payroll.  She could do time

8    and attendance and that kind of thing, so not every

9    description -- because it was an HR Assistant -- would

10   be necessarily exactly the same as another.

11           **Q  Do you know what career series the Human**

12   **Resources Assistant falls in?**

13           A  203

14           **Q  So there would be a position description**

15   **for an HR Assistant 203/07 and there would be different**

16   **position descriptions for a Human Resources Assistant**

17   **CG-0203/07?**

18           A    There could be, yes.

19           **Q    Do you know whether there existed --**

20           A    Yes, they did.  I just told you.

21           **Q    Position descriptions being different?**

22           A    Yes.

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 51

1       Q    Aren't position description requirements

2    managed by OPM?

3       A    OPM gives us a general framework in terms of

4    what kinds of duties could be in a position

5    description.

6       Q    Could be?

7       A    Yes.  It's just like all attorney positions

8    are not the same; all clerical positions are not the

9    exact same.

10      Q    Well, I can appreciate -- if we go back to say

11   Exhibit Three, which is the position description for

12   the HR Specialists Information Systems and

13   Compensation -- and tell me if my statement is accurate

14   or not -- there could be different position

15   descriptions for a Human Resources Specialist

16   (Information Systems and Compensation) CG-0201/07?

17      A    Yes.

18      Q    There could be?

19      A    Could be.

20      Q    When you were the Assistant Director of the

21   Human Resources Service Center, were there, that you

22   know of?

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 52

1          A     No, there was not.

2          **Q     But you do know for a fact that there were**

3    **different position descriptions for Human Resources**

4    **Assistant CG-0203/07?**

5          A     During my tenure in the HR branch, there was a

6    seven that was different.   There were two different

7    sevens.

8          **Q     Both HR Assistant CG-0203/07?**

9          A     That is correct.

10         **Q     Was there a parenthetical difference after the**

11   **assistant?**

12         A     No.

13         **Q     At least two -- and one of them worked for**

14   **you?**

15         A     Yes.

16         **Q     Did that type of position description match a**

17   **position anywhere else in FDIC?**

18         A     No.   There was probably an equivalent position

19   in our Labor Relations Office that was an HR Assistant

20   Grade-7 with different duties than my Grade-7 that

21   worked directly for me and different from the Grade-7

22   positions other HR Assistant Seven positions that I had

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                                    Page 53

1    working in my organization.

2         **Q    Okay.  By the way, before you signed what has**

3    **been marked as Exhibit Four, did you discuss this with**

4    **Lorinda Potucek?**

5         A    I don't have a specific recall that I had a

6    discussion with her.  I remember doing two things that

7    relate to the selection recommendation, one is

8    reviewing the justification to see if it was

9    reasonable, whether or not it was job related and I

10   concurred in the selection -- that's what my signature

11   here is -- concurrence in the selection and signing off

12   for the HR officer saying that for Conanan purposes

13   that this selection justification is job related.

14        **Q   Okay. And in the justification, Ms. Potucek**

15   **cites the fact that the selectee had extensive**

16   **experience as a Payroll/Personnel Systems assistant,**

17   **correct?**

18             A   Yes.

19        **Q   And that would have been at some level,**

20   **CG-7 or even below, correct?**

21             A   That is correct.

22        **Q   Now were you provided anything other than**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 54

1    this piece of paper to sign when you were asked to

2    concur in this recommendation?

3             A   Probably --

4             Q   Were you?

5             A   I would get for approval a copy of the

6    selection recommendation.  I would have a copy of the

7    application on the individual selected and I would

8    probably have a position description -- at least one of

9    the position descriptions -- and a vacancy announcement

10   as a package.

11       Q       Would you be provided the applications for any

12   other candidate for that position?

13       A       Only if I requested them.

14       Q       Okay.  At any time up to the 27th of October,

15   were you aware that Dorothy Chappell-Johnson had

16   applied for this very position?

17       A       I don't think I knew who applied for the

18   position.

19       Q       No.  Did you ask?

20       A       I didn't have any reason to ask.

21       Q       Would you have seen a cert list at any point?

22       A       Not until they provided the selection

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 55

1    recommendation for me to sign off on .

2        **Q    All right, so the selection recommendation**

3    **form would come first and then the merit plan or the**

4    **cert list would follow?**

5        A    I would get a package that would have the

6    selecting recommendation.  I'd have a copy normally of

7    the position description, the vacancy announcement and

8    a copy of the certificate with all the names on it.

9        **Q    And somebody would have annotated either S or**

10   **NS, correct?**

11       A    Right.

12       **Q    All right and then you would have signed at**

13   **the bottom if you concurred and you would have signed**

14   **the cert list, the merit plan list?**

15       A    Are you talking about the actual certificate

16   itself?  I would not have signed the certificate.

17       **Q    Why would you not have signed the certificate,**

18   **if you are concurring with this?**

19       A    Lorinda was the selection official.  I don't

20   think I signed the certificate.  I don't think there

21   was a requirement to.

22       **Q    Okay.  You don't have a recollection of**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 56

1    signing off on cert lists for selections within the HR

2    Service Center?

3         A    On the selection --

4         Q    **The cert list?**

5         A    The actual cert.  I'm trying to think.  I

6    don't know.

7         Q    **Now, thinking back to the deposition that you**

8    **gave in May of '07, do you recall us going through**

9    **Dorothy Chappell-Johnson's application based on her**

10   **experience as a Payroll/Personnel System Specialist at**

11   **a supervisor level?**

12        A    Yes.

13        Q    **You remember that?**

14        A    And the fact that in the justification for

15   this selection that Ms. Potucek notes that Mr. Little

16   had Payroll/Personnel System Assistant experience,

17   would it reasonably count for more that an individual

18   had been a supervisor in a Payroll/Personnel System

19   Specialist job?

20        A    It depends on what the duties were.

21        Q    **All right, so a supervisor in the**

22   **Payroll/Personnel Systems field would not have more**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 57

1      experience than a Payroll/Personnel Systems Assistant?

2          A    I would again say it depends on what the

3      duties that were being supervised were.  If the work

4      was similar, the supervisor should have I would say a

5      knowledge of the full range of duties and

6      responsibilities required.

7          **Q    We are talking about a supervisor**

8      **Payroll/Personnel System Specialist?**

9          A    Mm-hmm.

10         **Q    Who would have Payroll/Personnel System**

11     **Assistants work for them?**

12         A    That's true.

13         **Q    Okay.  You would expect your managers to be**

14     **able to put those two dots together, wouldn't you?**

15         A    Yes.  I would also expect the manager to put

16     the dots together that this job also included

17     compensation.

18         **Q    So Payroll/Personnel and addition of**

19     **Compensation in this particular position.**

20         **Q    Compensation?**

21         A    Yes.

22         **Q    Okay and if I look at the first sentence of**

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                        Page 58

1   this justification, Roger is currently an HR Assistant

2   GC-7 providing services to DOA.  That's the Division of

3   Administration?

4        A    That is correct.

5        Q    And DOF, Division of Finance?

6        A    That is correct.

7        Q    And has responsibilities "for supporting HR

8   Specialists in the areas of applying federal laws and

9   regulations in the administration of personnel actions

10  pertaining to position classification and position

11  management, recruitment and staffing to resolve HR

12  issues."

13           There is nothing in there about compensation

14  in that first sentence, is there?

15       A    No.

16       Q    And then it talks about his experience as a

17  Payroll/Personnel Systems Assistant?

18       A    Mm-hmm.

19       Q    Which would involve compensation or not?  It

20  could.

21       A    Well, it says "responsibility for creating

22  Excel spreadsheets and access databases to calculate

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                        Page 59

1    pay, data for back pay," so here is where we get into

2    the compensation experience.

3        **Q    All right.**

4        A    Okay.

5        **Q    So there is some compensation experience**

6    **there?**

7        A    Yes.

8        **Q    A supervisor in that same series of**

9    **Payroll/Personnel Systems Specialist would have had**

10   **even more experience, wouldn't they?**

11       A    I can't say whether or not they would have had

12   more experience.

13       **Q    Now, continuing down towards the bottom, next**

14   **to the last sentence, in the sentence that begins with**

15   **"He has experience in HR systems including**

16   **NFC" -- that's National Finance Center?**

17       A    That is correct.

18       **Q    Chris -- that's the FDIC Human Resources**

19   **Personnel Automated System, correct?**

20       A    It's Corporate Human Resource Information

21   System.

22       **Q    Right, EPIC.  That's a sub-element of the**

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                          Page 60

1   National Finance Center System?

2        A    It is.

3        Q    But there is no equivalent within CHRIS, is

4   there?

5        A    No.

6        Q    So in fact, EPIC still falls under NFC,

7   correct?

8        A    That is correct.

9        Q    So that is kind of redundant, isn't it, if he

10  has experience with NFC, okay?  And CERTS, are you

11  familiar with C-E-R-T-S stands for?

12       A    CERTS is the new automated system they use for

13  entry of applications and that kind of thing and for

14  whatever reason -- I can't think of the new name that

15  they give it but it is the People Soft System.

16       Q    Is that an NFC system?

17       A    No, People Soft is not an NFC system.

18       Q    But that is not an FDIC unique system, is it?

19       A    It is not FDIC unique in that People Soft is

20  in other fellow agencies, but FDIC has adapted it very,

21  very differently from other fellow agencies.

22       Q    And who made the changes to that system, was

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                      Page 61

1    that done by contract?

2         A    Done by a contract.

3         **Q    Not by FDIC employees?**

4         A    Well, FDIC employees were involved in

5    developing the unique systems requirements that they

6    wanted.

7         **Q    But FDIC employees did not develop the system,**

8    **CERTS, or its successor?**

9         A    No.

10        **Q    Okay.  Let's mark as Five.**

11                         **(Purnell Deposition Exhibit**

12                         **No. 5 was marked for**

13                         **identification.)**

14             **Ms. Purnell, the court reporter is handing you**

15    **Exhibit Five, have you seen this before?**

16        A    I would think that -- there is nothing on here

17    that has my signature on there that indicates that I

18    had it in my hand, but I believe that it would have

19    come with the package including the selection

20    recommendation.

21        **Q    Do you have a recollection of seeing the**

22    **document before today?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 62

1        A    Yes, I've seen it.

2        Q    **And did you see this document in connection**

3   **with candidate selection recommendation and the packet**

4   **that Ms. Potucek provided to you?**

5        A    It is my belief that I saw it then.

6        Q    **Okay. Down in the lower left-hand there**

7   **appears to be some initials and some numbers, do you**

8   **know what those are?**

9        A    I have not a clue.  The initials look like

10  Yolanda -- what is Yolanda's -- I don't know.  It may

11  not.

12       Q    **Those are not your initials?**

13       A    They are not mine.

14       Q    **But you have seen this document before?**

15       A    I have seen it.  I don't have a clue what that

16  is.

17       Q    **All right.**

18            MR. SIMPSON:  Why don't we go off for a few

19  minutes.

20            (Off the record.)

21            BY MR. SIMPSON:

22       Q    **Ms. Purnell, you have indicated that prior to**

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                           Page 63

1    the development of position descriptions for this

2    vacancy and the vacancy announcement that an individual

3    who had been a Human Resources Specialist Grade-11 had

4    left?

5        A    Yes.

6        Q    Who was that?

7        A    Donna Serrano.

8        Q    And where did Donna Serrano go?

9        A    She retired.

10       Q    Do you remember when she retired?

11       A    I don't.

12       Q    And she had been a CG-11?

13       A    Yes.

14       Q    A Human Resources Specialist?

15       A    Yes.  It was a parenthetical but I don't

16   remember the exact parenthetical.

17       Q    Okay.

18       A    I wanted to correct something, too.  I had

19   mentioned that I thought that all of the applications

20   were submitted electronically.  This looks like it was

21   done before our electronic system, Quick Hire, was

22   implemented because this certificate in Quick Hire

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 64

1    looks very different than this one.

2        **Q    All right.  Thank you.**

3        A    This may be my signature or initials on this

4    Merit Promotion Roster over here in the corner but if

5    it is, it has got a piece missing.  You were asking the

6    question about this lower left-hand corner.

7        **Q    Yes, ma'am.**

8        A    That might be my initials of concurrence but

9    it has the "S" missing, so it looks like this is a bad

10   copy.

11           MR. JONES:  We'll see if we can get a better

12   copy of that one.

13           MR. SIMPSON:  That's fair.

14           THE WITNESS:  It looks like it is a little

15   tilted on the page, too.  It might have cutoff that

16   margin.

17           MR. SIMPSON:  And I'll save an editorial

18   comment for off the record in the sense of --

19           MR. JONES:  I will say that is the only copy I

20   have in my possession.

21           MR. SIMPSON:  No, I fully understand and I

22   appreciate that.  Let's mark as Exhibit Six.

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                          Page 65

1                              (Purnell Deposition Exhibit

2                              No. 6 was marked for

3                              identification.)

4          BY MR. SIMPSON:

5          Q     It turns out she hands to me and I hand to you

6    what has been marked as Exhibit Six.  I'd like you to

7    take a look at it and do you recognize this document?

8          A     Yes.

9          Q     Okay.  This in fact is the affidavit that you

10   provided during the investigation of Dorothy

11   Chappell-Johnson's EEO complaint into this matter,

12   correct?

13         A     That's right, that's correct.

14         Q     And what you have been handed is a three-page

15   affidavit and I ask you to turn to the third page and

16   is that your signature on the third page?

17         A     That is my signature.

18         Q     And you executed that signature on August 29,

19   2005, correct?

20         A     That is correct.

21         Q     And you are attesting the fact that everything

22   in this affidavit is true and complete to the best of

EXHIBIT 26
CHAPPELL-JOHNSON v. BAIR
(No. 06-1074-RCL)                                         Page 66

1      your knowledge and belief?

2          A    That is correct.

3          Q    And you would agree, Ms. Purnell, that your

4      recollection of these facts and circumstances

5      surrounding this matter was better, more clear in

6      August of 2005 than it is today; is that correct?

7          A    I would certainly say yes.

8          Q    Thank you, ma'am.

9          A    I'd like to call your attention to page two,

10     number seven and your response that "Ms. Potucek

11     advised me of the panel interview process she had used

12     to identify the top candidates," and I read the first

13     part of that sentence correct?

14         A    That's correct.

15         Q    What exactly did Ms. Potucek advise you about

16     the panel interview process?

17         A    My recollection is that she told me she was

18     not personally involved in the interview panel, that

19     she had selected three individuals to interview the

20     candidates.

21         Q    Three individuals?

22         A    Three.

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 67

1       Q    Did she tell you who they were?

2       A    I don't remember.

3       Q    What else did she tell you about the panel

4    results?

5       A    She said that the panel had identified Roger

6    Little as the top candidate for the --

7       Q    All right so when your affidavit says, "She

8    advised you of the panel interview process she had used

9    to identify the top candidates," do you have a

10   recollection of candidates?

11      A    No.

12      Q    Okay.  Anything else she told you about the

13   panel interview process and the results?

14      A    Nothing additional I can recall.

15      Q    And again, she didn't advise you that Dorothy

16   Chappell-Johnson was one of the interviewees at this

17   time?

18      A    I don't remember having a discussion at that

19   point with her about the candidates.  I don't remember

20   having a specific --

21      Q    But you remember reviewing the cert list at

22   the time that she sent you her recommendation?

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 68

1        A    Yes.

2        **Q    Okay.  Now, at any time during a discussion**

3   **with Ms. Potucek involving either the interview process**

4   **or the selection process, did she use the phrase**

5   **"expertise in software applications" in her**

6   **conversation with you?**

7        A    I have no recollection of that.

8        **Q    Did Lorinda Potucek advise you that she had**

9   **discussed the selection process for this position with**

10  **Greg Tally?**

11       A    No, I don't remember that.

12       **Q    Did Greg Tally ever discuss this position with**

13  **you?**

14       A    I don't remember having a conversation with

15  Greg Tally about this position.

16       **Q    And Lorinda Potucek didn't tell you of any**

17  **discussion she had with Greg Tally?**

18       A    No.

19       **Q    What is contained in your response to number**

20  **10 is basically what Lorinda Potucek told you; isn't**

21  **it?**

22       A    It's either because of what Lorinda Potucek

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**
Page 69

1    told me or my review of the selection recommendation

2    because those probably would have been the things she

3    put in the selection recommendation.

4        **Q    Her words on the selection recommendation?**

5        A    Mm-hmm.

6        **Q    So she is tell you in her words on the**

7    **selection -- those are her words, right?**

8        A    Yes.

9        **Q    She didn't tell you that she relied on**

10    **anything else in making the selection?**

11        A    No.

12        **Q    Did you ask her if she relied on anything**

13    **other than the results of the interview panel and what**

14    **she wrote in the justification?**

15        A    No, I did not.

16        **Q    And she didn't offer anything else?**

17        A    Not that I can recall.

18        **Q    Okay.  Now, in preparing for this deposition**

19    **today, did you review any documents?**

20        A    Yes.

21        **Q    What did you review?**

22        A    My affidavit. I looked at the Affidavit, a

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 70

1    copy of the Vacancy Announcement and I think I had a

2    copy of the Position Description.

3        **Q    And why would you have had a copy of that**

4    **Position Description?**

5        A    A copy of the position description -- I was

6    provided with a copy of documents that I had in a file.

7        **Q    Who provided those documents to you?**

8        A    I asked the attorney -- Mr. Jones -- to

9    provide me a copy.

10       **Q    All right.  So you reviewed your Affidavit;**

11   **you reviewed the Vacancy Announcement?**

12       A    Mm-hmm.

13       **Q    And when you say you had a copy of the PD that**

14   **is because it was part of the packet of information to**

15   **include the Vacancy Announcement, your Affidavit that**

16   **was provided by FDIC counsel?**

17       A    Yes.

18       **Q    Anything else?**

19       A    No.

20       **Q    You didn't review the complaint by --**

21       A    No, I don't have a copy --

22       **Q    You didn't review anyone else's affidavit?**

**EXHIBIT 26**
**CHAPPELL-JOHNSON v. BAIR**
**(No. 06-1074-RCL)**                                    Page 71

1          A    No, sir.

2          Q    Okay.  Did you speak with anyone other than

3    FDI legal counsel?

4          A    No.

5          Q    Prior to this deposition?

6          A    No.

7          Q    Okay.

8               MR. SIMPSON:  I don't have anything further.

9               MR. JONES:  We neither.  We will read and

10   sign.

11               (Whereupon, at 11:20 a.m., the deposition of

12   SHIRLEY Y. PURNELL was concluded.)

13

14               I have read the foregoing pages, which are a

15   correct transcript of the answers given by me to the

16   questions therein recorded.

17

18        Deponent_____

19

20        Date_____

21

22