# PLAINTIFF'S EXHIBIT (PX) 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

*ORIGINAL*

- - - - - - - - - - - - - - - - - -X

DOROTHY CHAPPELL-JOHNSON,            :

          Plaintiff            :

    v.                                  : Civil Action No.

                           : 06-0314 (RCL)

MARTIN J. GRUENBERG, VICE CHAIRMAN :

 FEDERAL DEPOSIT INSURANCE          :

 CORPORATION                         :

          Defendant.            :

- - - - - - - - - - - - - - - - - -X

       Washington, D.C., Monday, May 14, 2007

Deposition of

        SHIRLEY Y. PURNELL

a witness of lawful age, taken on behalf of the

Plaintiff, in the above-entitled action, before

KENYAN C. HOPCHAS, Notary Public in and for the

District of Columbia, in the offices of Swick &

Shapiro, 1225 Eye Street, N.W., Suite 1290,

Washington, D.C., commencing at 10:08 a.m.
 Diversified Reporting Services, Inc. (202) 467-9200

Page 2

Appearances:


On behalf of the Plaintiff:

JAMES E. SIMPSON, ESQ.

Swick & Shapiro, P.C.

1225 Eye Street, N.W., Suite 1290

Washington, D.C.  20005

(202) 842-0300


On behalf of the Federal Deposit

Insurance Corporation:

WILLIAM S. JONES, ESQ.

Legal Division

Corporate Operations Branch


Federal Deposit Insurance Corporation


3501 Fairfax Drive, Room E-6006


Arlington, Virginia  22226


(703) 562-2362

Page 173

1       A    Yes.  I remember a discussion with Miguel.

2       **Q    Where did that discussion take place?**

3       A    In Miguel's office.

4       **Q    Did that discussion include specific**

5    **settlement figures, calculations for settlement?**

6       A    Yes.

7       **Q    Who did those?**

8       A    My recollection is that Natalie prepared

9    the calculations.

10      **Q    Was Natalie with you when you met with**

11   **Miguel Torrado?**

12      A    Actually, it was not Natalie.

13      **Q    You prepared the calculations, didn't you?**

14      A    I may have prepared the calculations

15   because it involved an H.R. employee.  Typically,

16   when H.R. employees are involved, we try not to let

17   other employees in the organization know.

18      **Q    It was standard practice, wasn't it?**

19      A    Right.

20      **Q    For any settlement calculations involving**

21   **certainly someone in the H.R. Branch, you would work**

22   **those when you were the Operations' assistant**

Page 174

1    director; correct?

2        A    I would have been involved.  I remember

3    specifically that I was involved in the calculations

4    for Dorothy.  I can't say that was the case for every

5    employee in the H.R. Branch that a settlement was

6    done.

7        Q    **Did Miguel Torrado specifically ask you to**

8    **do those calculations in Dorothy Chappell-Johnson's**

9    **matter?**

10       A    I believe he did.

11       Q    **You had more than one discussion with**

12   **Miguel Torrado about possible settlement and**

13   **settlement calculations in a prior EEO case of**

14   **Dorothy Chappell-Johnson, didn't you?**

15       A    Yes.  I met with him to get the assignment.

16    I remember meeting with him to provide him data, and

17   then I met with him, as I recall, a third time for a

18   discussion.

19       Q    **What did you discuss the third time?**

20       A    The third time, initially the discussion I

21   had with Miguel related to a reassignment of Dorothy

22   to the Benefits organization.  The issue there was

1              (Witness reviewing document.)

2              BY MR. SIMPSON:

3         Q    Have you seen this before?

4         A    Yes.

5         Q    Were you involved in the approval process

6    for this PD?

7         A    I think this is when Carolyn was still

8    there.  When Carolyn Jordan-Smith had these position

9    descriptions re-done, I was involved; yes.

10        Q    Do you recall on page one up at the top,

11   area 4B, "Other," where it says "Previously, this

12   position was a payroll/personnel systems specialist,

13   CG-0301-09?"  Block 4B.  Did I read that right?

14        A    Yes.

15        Q    Did you have in the Operations Section

16   payroll/personnel systems specialist, CG-0301-09,

17   that worked for you?

18        A    Donna Saranno was a nine.

19        Q    So, you did; correct?

20        A    Yes.

21        Q    As I understand this particular position

22   description, this is now being classified as an H.R.

Page 179

1   specialist, Information Systems and Compensation, CG-

2   11, with a career series 201; correct?

3       A    That's correct.

4       Q    You would have been involved in the changes

5   from a CG-0301-09 position that worked for you in the

6   form of Donna Saranno to the development of this

7   position description; correct?

8       A    Yes.

9       Q    By the way, do you know whose initials

10  those are, "B.H.," right beside the CG-0201-11?  The

11  date, 11/27/02?  Do you know what office that person

12  would have been in?  Part of Operations; correct?

13      A    It could have been Operations but it could

14  have been the Compensation group.  If I remember

15  correctly, Dave Harrington was involved in the re-

16  write of the position descriptions.  The reason the

17  series changed from 301 to 201 is because OPM changed

18  the H.R. series, the 201, that encompassed the duties

19  of the payroll and personnel functions.

20      Q    Do you know whose initials "B.H." are?

21      A    I don't know.  That's what I was looking

22  at, to see if it was Dave Harrington.  I'm trying to

Page 180

1    think if there was anybody else around that had

2    "B.H."

3         Q    Look at Section 13, the signature right

4    under Carolyn Jordan-Smith, do you know whose

5    signature that is?

6              I'm sorry.  You're nodding your head.

7         A    No, I don't know whose signature that is.

8         Q    In Block 8C where it is talking about

9    organizational location, it says "Third Subdivision,

10   Operations."  That's your office; correct?

11        A    Right.  That would have been Operations.

12        Q    In November of 2002, you would have been

13   the assistant director for the Operations element for

14   a little over three years; correct?

15        A    Yes.

16        Q    Turning to page two of Exhibit 4, where it

17   says "Introduction."  It says "Serves as

18   troubleshooter" and "Super users" of "Human Resources

19   H.R. automated systems with responsibility for

20   performing a variety of professional and technical

21   duties in connection with the full range of

22   transactions relating to compensation."

Page 181

1              I read that correctly?

2         A    Yes.

3         Q    Do you know if that "Introduction" was

4    contained in the previous PD for the

5    payroll/personnel systems specialist, 09?

6         A    No, I don't have that kind of recall about

7    what was in the nine PD.

8         Q    You would agree that this is going from a

9    CG-09 level, payroll/personnel systems specialist to

10   a CG-11; correct?

11        A    Yes.

12        Q    If I read through the major duties,

13   Information Systems Administration, on page two,

14   talks about CHRIS.  In the first bullet, it talks

15   about CHRIS and processing issues with the National

16   Finance Center and its systems; correct?

17        A    Yes.

18        Q    That is pretty much captured in the Summary

19   of  Duties for the Vacancy Announcement that is at

20   Exhibit 3, isn't it?  In fact, that kind of coincides

21   with the first sentence and the second sentence and

22   the third sentence; doesn't it?

Page 182

1        A    The sentence in the Vacancy Announcement

2    talks about troubleshooting assignments involving

3    most difficult and sensitive issues.  It doesn't go

4    so far as to say that those issues are compensation

5    related.  It talks about payroll and --

6        Q    **The first bullet in the major duties of the**

7    **PD for the CG-11 says "Investigates, troubleshoot and**

8    **response to a variety of recurring and complex**

9    **inquiries regarding payroll and personnel matters."**

10       A    Yes.

11       Q    **That reads fairly close to the first**

12   **sentence, doesn't it, of the Summary of Duties?**

13       A    Fairly close; yes.

14       Q    **In that first bullet of the position**

15   **description, it talks about CHRIS, which is the**

16   **second sentence of the Summary of Duties; correct?**

17       A    The second sentence talks about CHRIS?

18       Q    **In the Summary of Duties; correct?**

19       A    Yes, it does talk about CHRIS.

20       Q    **In fact, in the first bullet of the PD for**

21   **a CG-11, it says "Serves as an expert resource and**

22   **authority on NFC and CHRIS processing and provides**

Page 183

1    information and guidance to support the staff."  That

2    is pretty much captured again, in the second sentence

3    of the Summary of Duties?

4        A    Uh-huh; yes.

5        Q    The last sentence "Participates in the

6    testing and implementation of system modifications

7    and changes."  What is your understanding of that

8    sentence with respect to the paragraph?

9        A    "Participates in the testing and

10   implementation of system modifications and changes."

11    That would be the kinds of duties that I described

12   as user acceptance.

13       Q    What "system?"

14       A    CHRIS.

15       Q    And NFC, too; right?

16       A    Yes.  It could be NFC; yes.

17       Q    Again, that's kind of captured in the third

18   sentence of the Summary of Duties as well?

19       A    Yes.

20       Q    The third bullet at the bottom of the PD,

21   that kind of captures the interface between CHRIS and

22   NFC and reports that are generated and audits;

Page 184

1   correct?

2       A    Yes.

3       Q    On page three of the PD, under

4   "Compensation Program Administration," the first

5   bullet, "Investigates and responds to a variety of

6   questions and problems raised by employees and

7   administrative personnel involving compensation and

8   payroll matters, makes complex pay calculations and

9   resolves technical discrepancies that arise in

10  connection with personnel and payroll processing."

11          Have I read that correctly?

12      A    Yes, you did.

13      Q    That dove tails very well with information

14  in the Summary of Duties for the CG-201-11 human

15  resources specialist, Information Systems and

16  Compensation, doesn't it?

17      A    Are you talking --

18      Q    Under Summary of Duties; yes, ma'am.

19      A    Under GS-11?

20      Q    No, under Summary of Duties.  If you look

21  at the sentence that begins with "Responds to

22  inquiries from employees, management officials and

Page 185

1    others concerning H.R. systems and compensation

2    related issues."

3         A    It's similar.

4         Q    Very similar, isn't it?

5         A    It's similar.

6         Q    Contains a lot of the same language,

7    doesn't it?

8         A    Yes.

9         Q    Of course, in the Summary of Duties, on

10   Exhibit 2, "Reviews and approves salary advances and

11   authorizes payments," up to the point it talks about

12   retroactive payments resulting from lawsuits and

13   discrimination complaints, but the first part of that

14   sentence "Reviews and approves salary advances and

15   authorizes payments for corrections to NFC system

16   errors," is that kind of the same thing as the second

17   bullet under "Compensation Program?"

18        MR. JONES:  I'm sorry.  I think you said

19   Exhibit 2 and you mean to say Exhibit 3.

20        BY MR. SIMPSON:

21        Q    Part of that sentence in Exhibit 2 and the

22   second bullet in Exhibit 3 on page three.

Page 186

1          MR. JONES:  It is actually Exhibit 3.

2          MR. SIMPSON:  I'm sorry.  Exhibit 3 and

3      Exhibit 4.

4          THE WITNESS:  The sentences are similar;

5      yes.

6          BY MR. SIMPSON:

7      Q    Very similar, aren't they?

8      A    Yes.

9      Q    In fact, the next several bullets on that

10     page of Exhibit 4, "Serves as a Washington contact

11     representative with NFC, discuss and resolve day to

12     day problems and activities, coordinates resolution,

13     advises senior management, recommends system

14     changes."

15          The next bullet "Coordinates and processes

16     waiver for overpayments, technical assistance and

17     guidance to staff members."

18          The next bullet "Maintains records of

19     payments."

20          That is all encompassed -- those duties are

21     all encompassed in the Summary of Duties as well,

22     aren't they?

1     A    Yes.

2     Q    Going to the next page, five -- page four

3 of the PD, the next to last bullet "Serves as the

4 unemployment compensation program coordinator."  It

5 is right above "Knowledge Required by the position."

6 It is the second bullet up.

7     A    Uh-huh.

8     Q    Does that mean that any CG-201-11, human

9 resources specialist, Information Systems and

10 Compensation, should be able to perform that, if it's

11 required in the PD?

12     A    If it's required in the PD -- let me see.

13 If it's required in the PD, the person should be able

14 to perform that responsibility.

15     Q    Again, this is a transition from a CG-9,

16 formerly a payroll/personnel systems specialist, to

17 now a CG-11, H.R. specialist, Information Systems and

18 Compensation.

19     If this position description for an 11,

20 H.R. specialist, Information Systems and

21 Compensation, was previously designated as a CG-9,

22 payroll/personnel systems specialist, would you have

1    an expectation of someone who served as a CG-11

2    payroll/personnel systems specialist would be

3    responsible to do the same things that a CG-9 would

4    do only more?

5        A    The grade 11 should have higher level

6    duties than the grade nine.

7        Q    And the full range of duties that are

8    listed in this PD, what used to be a CG-9; correct?

9        A    I have not seen the nine PD, but they said

10   this was an outgrowth of the nine PD.  It does not

11   mean that there aren't some duties in this position

12   that are higher level than the jobs that existed in

13   the nine.

14       Q    This particular position used to function

15   as a CG-9; didn't it?  That is now being classified

16   as a CG-11?  Isn't that what this tells me?

17       A    It tells you that the forerunner to this

18   position was a grade nine.

19       Q    That's right.  If a nine was performing the

20   duties in the position description for the

21   payroll/personnel systems specialist, 09, would that

22   person do an 11 here, as contained in this PD?

Page 189

1      A     We're not doing a side by side comparison

2    of what the nine --

3      Q     **I'm asking you, could a nine perform the**

4    **duties that are listed here for an 11 on the current**

5    **PD?**

6          MR. JONES:  Objection; calls for

7    speculation.

8          BY MR. SIMPSON:

9      Q     **You had CG-9 payroll/personnel systems**

10   **specialists work for you; correct?**

11     A     Yes, I did.  One of the things that is my

12   recollection, the time frames run together, it's

13   difficult to keep all the time frames in my head, but

14   one of the things that I remember is the person who

15   did a lot of the nine duties was promoted to an 11,

16   and after they were promoted to an 11, they didn't

17   stay long after they were promoted to the grade 11.

18     Q     **What do you mean "they didn't stay long?"**

19   **They went somewhere else?**

20     A     If this is the PD I think it is, if this is

21   the Donna Saranno PD, Donna Saranno retired shortly

22   after.

Page 190

1      Q     She was selected to fill that position,

2  wasn't she?

3      A     Right.

4      Q     Who selected her?

5      A     I certainly would have been involved as the

6  approving official or the actual selectee.

7      Q     But you don't recall specifically, do you,

8  whether you selected her or approved her selection?

9      A     I don't recall.

10     Q     She was selected to serve as a CG-201-11;

11 correct?

12     A     Yes.

13     Q     It was decided she could perform the duties

14 and the functions as a CG-11; correct?

15     A     Right.

16     Q     She had been doing the nine work prior to

17 that?

18     A     Yes.

19           MR. SIMPSON:  Let's mark this as No. 5.

20                (Purnell Deposition Exhibit No. 5

21                was marked for identification.)

22           BY MR. SIMPSON:

Page 197

1      A      Yes.

2      Q      You certainly would expect to see duties of

3  this CG-0201-12 position encaptured in the Summary of

4  Duties for this Vacancy Announcement, CG-11/12;

5  correct?

6      A      Yes.

7      Q      By the way, did you ever review the Report

8  of Investigation involved in this issue of the

9  complaint of discrimination that Dorothy Chappell-

10 Johnson filed?

11     A      No.

12            MR. SIMPSON:  Let's mark this as No. 6.

13            (Purnell Deposition Exhibit No. 6

14            was marked for identification.)

15            BY MR. SIMPSON:

16     Q      Have you seen this position description

17 before?

18     A      I believe I have seen this description

19 before.

20     Q      What makes you think you have seen this

21 position description before?

22     A      I believe that in a prior EEO case in some

Page 198

1    documentation that I provided that this position

2    description was among documents that were submitted.

3        Q    In a prior EEO case?  Whose prior EEO case?

4        A    Dorothy Chappell-Johnson's.

5        Q    How would you have been privy to that

6    information in a prior EEO complaint?

7        A    My office as the operational unit was

8    responsible for providing documentation to the Office

9    of Diversity and Equal Opportunity or directly to an

10    EEO investigator about what were official position

11    descriptions.

12        Q    Did you review this position description?

13        A    I don't recall reviewing the position

14    description.

15        Q    You would agree it is for a supervisory

16    payroll/personnel systems specialist, CG-301-11;

17    correct?

18        A    Yes.

19        Q    Supervisory?

20        A    Yes.

21        Q    Payroll/personnel systems, that would be

22    somewhere between the CG-09 and the CG-12 position

Page 235

1    panel members who asked questions.

2        Q    No, the applicants.  When the applicants

3    asked questions, who answered the questions from the

4    panel?

5            For instance, when do you think you will

6    make a selection.

7        A    As the selecting official, I would answer

8    that question.

9        Q    And salary?

10       A    I would answer that question.

11       Q    Do you recall any of the applicants asking

12   a question that you did not answer?

13       A    I don't recall.

14           MR. SIMPSON:  Let's mark this as No. 7.

15               (Purnell Deposition Exhibit No. 7

16               was marked for identification.)

17           BY MR. SIMPSON:

18       Q    The Court Reporter has handed you what has

19   been marked as Exhibit 7.  Do you recall seeing this

20   document before?

21       A    Yes.

22       Q    That's Dorothy Chappell-Johnson's

Page 236

1    resume/application; is it not?

2        A    Yes.

3        Q    The first thing, going back to Exhibits 4,

4    5, and 6, the position descriptions that we had gone

5    over before, Exhibits 4 and 5 that represented the

6    H.R. specialist, Information Systems and

7    Compensation, at the grades 11 and 12, they were

8    previously payroll/personnel systems position

9    descriptions; correct?

10        A    Yes.

11        Q    Looking now at Exhibit 7, do you see

12    anything in Ms. Chappell-Johnson's resume on page one

13    that addresses payroll/personnel systems specialist?

14        A    Yes.

15        Q    Do you recall noting at the time that she

16    had performed the duties as a payroll/personnel

17    systems specialist?

18        A    Yes.

19        Q    In fact, on page two of her resume in bold,

20    it shows that for more than six years, she performed

21    duties as a CG-9 and as a CG-11 supervisor?

22        A    Yes.

1        Q    Did you make note of that?

2        A    Yes, I noted that.

3        Q    Did you make the connection between her

4   experience as listed here in her resume and the

5   position descriptions that had previously been for a

6   payroll/personnel specialist and supervisory

7   payroll/personnel specialist?

8        A    I noted there were similarities between

9   that and the grade 12 position description.

10       Q    What about the 11?  The 11 started off as a

11  CG-9 payroll/personnel specialist, did it not?

12       A    Yes.

13       Q    The same duties that had been required of

14  the CG-9, payroll/personnel specialist, that evolved

15  into the position description for the CG-201-11,

16  Dorothy Chappell-Johnson had performed those duties,

17  hadn't she?

18            MR. JONES:  Objection to the part of the

19  question that the 9 and 11 were the same.  Assumes

20  facts not in evidence.

21            BY MR. SIMPSON:

22       Q    You can still answer.

Page 238

1      A    As I previously stated, I don't know

2   exactly what was in the grade 9 PD.  I didn't go back

3   and look at a grade 9 PD for this job; no.  I looked

4   at Dorothy Chappell-Johnson's overall experience for

5   the position, and I did look at her application and

6   this information.

7      Q    **And you read it carefully?**

8      A    I read it.

9      Q    **Did you read it carefully?**

10     A    I read the application enough to determine

11  that Ms. Chappell-Johnson had description of the

12  duties she performed, some of the duties that were in

13  the position to be filled were also stated in her

14  application.

15     Q    **Why don't you go to Exhibit 3, the Vacancy**

16  **Announcement, and why don't you tell me, in the**

17  **Summary of Duties, on page two of Exhibit 3, why**

18  **don't you tell me what duties in the Summary of**

19  **Duties are not captured in her application/resume?**

20          MR. JONES:  Objection to the extent the

21  documents speak for themselves.  You can answer.

22          (Witness reviewing documents.)

Page 239

1          THE WITNESS:  Could you repeat the

2     question?

3          BY MR. SIMPSON:

4     Q     What in the Summary of Duties' expectations

5     here as listed in the Vacancy Announcement are not

6     captured in her resume?

7     A     She doesn't -- I haven't done a thorough

8     review, but I don't see any description mentioned of

9     CHRIS.  I do see the NFC experience.  The summary

10    description talks about being the senior technical

11    advisor on payroll matters.  I saw the

12    troubleshooting and that kind of thing.  I saw back

13    pay calculations and making retroactive payments.

14    Q     Look at page three of her resume, it starts

15    with "Resolved complex problems."  That is part of

16    what's required in here; right?

17    A     That's part of it; yes.

18    Q     The next one "Reviewed and approved salary

19    advances and other forms of pay."

20    A     Yes.

21    Q     Number four, "Served as a senior technical

22    advisor on payroll/personnel operations matters."  Do

Page 240

1    you see that?

2        A    But again --

3        Q    **She covers that, doesn't she?**

4        A    She covers it in a general way.  It doesn't

5    say she is handling the most complex and sensitive

6    issues.

7        Q    **Like what?**

8        A    It could be an issue involving a back pay

9    claim that was so sensitive that they wanted the

10   highest grade level that we had to be involved with

11   that.

12       Q    **Go down a couple of bullets, it says**

13   **"Resolved most difficult and sensitive issues**

14   **involving executive level appointees."**

15       A    Okay.

16       Q    **You see that; yes?**

17       A    "Involving executive level appointees."

18   That doesn't mean that was necessarily the most

19   complex issue that arose related to pay and

20   compensation.

21       Q    **Did you ask her any specific questions**

22   **about her resume?**

Page 241

1      A    During the interview, I only asked

2  questions related to the specific questions and

3  benchmarks, the questions and benchmarks.

4      Q    You still had a requirement to review the

5  resume/application of each applicant; yes?

6      A    Yes.

7      Q    You would agree she addresses the issues

8  that are in the Summary of Duties, doesn't she?

9      A    In her application, she does reference

10 those.

11     Q    At the bottom of page two, the last bullet,

12 "Served as liaison with the NFC and FDIC

13 payroll/personnel operations section conducting and

14 resolving broadband analyses of National Finance

15 Center and recommending solutions to complex

16 problems."

17     A    Yes.

18     Q    She did that.  If you look at page one.

19     A    Of her application?

20     Q    Yes, ma'am.  The fourth bullet down,

21 "Investigate and respond to a variety of recurring

22 and complex issues such as compensation, pay,

Page 242

1    overtime including FLSA and other pay related

2    problems."

3        A    Yes.

4        Q    "Resolve complex compensation and

5    payroll/personnel problems such as dual lump sum

6    payment, FLSA problems and back pay problems."

7        A    Uh-huh.

8        Q    She addresses them all, doesn't she?

9        A    Yes.  She states it in her application.

10       Q    Back over to page three of the resume,

11   about halfway down, "Prepared reinstatement,

12   discrimination cases and back pay settlement cases

13   against former and present employees as well as a

14   variety of garnishments, such as child support,

15   default on educational loans, bankruptcies, IRS

16   levies and private sector debts against employees'

17   wages," correct?

18       A    It's there.   Yes, sir.

19       Q    "Authorized retroactive payments to

20   employees resulting from discrimination complaints,

21   lawsuits and higher duty work claims and other

22   actions against corporation."

Page 243

1      A     Yes.

2         Q     It would seem her resume captured --

3      A     It seems she covered that in her resume;

4   yes.

5         Q     Did you believe she did all these things

6   she said she did?

7      A     I had reason to question the level of

8   detail of what she stated.

9         Q     And why did you have a reason to question

10  that?

11     A     Because of what I call her inability to

12  articulate what she did when she was asked in the

13  interview, specific questions, as it related to some

14  of these items.

15        Q     Did Natalie Tyce have a discussion with you

16  about Ms. Chappell-Johnson's capabilities to do the

17  job?

18     A     If I remember the discussion, I think the

19  discussion was that it was good, it was the consensus

20  of the group that any of the three candidates could

21  probably do the job.  The question was who we felt

22  had the requisite skills to perform the job the best.