## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DOROTHY CHAPPELL-JOHNSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 06-1074 (RCL)** |
| **v.** ) | |
| ) | |
| **SHEILA M. BAIR,** ) | |
| **Chairman,** ) | |
| **Federal Deposit Insurance Corporation** ) | |
| ) | |
| **Defendant.** ) | |
| ————————————————— ) | |

## MEMORANDUM OPINION

Defendant Sheila M. Bair[1] ("Bair"), Chairman of the Federal Deposit Insurance

Corporation ("FDIC"), has moved [17] for summary judgment in her favor in this employment

discrimination suit. The Court has considered the parties' filings, the entire record herein, and

the applicable law. For the reasons explained below, defendant's motion shall be GRANTED.

## BACKGROUND[2]

Plaintiff Dorothy Chappell-Johnson ("Chappell-Johnson") has worked for FDIC and its

predecessor agency since the early 1990s. (Compl. ¶ 6.) Over the years, she has filed several

complaints with the agency's Equal Employment Opportunity ("EEO") office, the latest of which

led to this lawsuit. (EEO Counselor's Report, Ex. 11 to Def.'s Mot. for Summ. J., at 1)

That complaint concerned Chappell-Johnson's non-selection for a vacant position in the

---

[1] Plaintiff originally named then-Acting FDIC Chairman Martin J. Gruenberg, in his
official capacity. The Senate confirmed Bair as Chairman on August 17, 2006, at which time she
replaced Gruenberg as the official defendant in this action.

[2] Unless specifically indicated, the parties do not dispute the facts set out herein.

Administration Division.  (*See id.* at 1-2.)  Specifically, on August 24, 2004, FDIC posted a

vacancy announcement for a Human Resources Specialist (Information Systems and

Compensation) position ("the position").  (*See* Vacancy Announcement, Ex. 30 to Def. Mot. for

Summ. J., at 1.)  The announcement listed the following "Quality Ranking Factors (Desirable

Knowledge, Skills and Abilities)" against which applicants for the position would be evaluated:

> 1. Knowledge of the rules and regulations related to human resources processes and procedures, in order to provide technical assistance and factual information to HR Operations customers.

> 2. Ability to use personnel automated systems to process complex personnel actions, (i.e., retroactive personnel actions, garnishments, child support, alimony payment cases).

> 3. Ability to communicate orally to explain and provide assistance to employees and administrative staff on personnel procedures and processes.

> 4. Ability to communicate in writing to prepare reports and correspondence to employees.

(*Id.* at 2.)  It further described tasks the selectee would be expected to perform in relation to

certain data processing systems.[3]  (*Id.*)  While the announcement listed the position's "full

performance" grade level as CG-11, it also indicated that the position would be "entry-level" and

"designed to develop the employee selected to perform at the full performance level."  (*Id.*)

Thus, the selectee could also be hired at the CG-7 and CG-9 grade levels.  (*Id.*)

     Chappell-Johnson, then a Human Resources Specialist (Benefits) at the CG-9 grade level

---

[3] The announcement's "summary of duties" included the following: (1) "[a]ssists others regarding system processing problems with the National Finance Center (NFC), Entry Processing Inquiry & Correction System (EPIC), the Corporate Human Resource Information System (CHRIS), or other data systems"; (2) "[a]ssists in testing and implementation of system modifications and changes"; and (3) "[a]ssists in the development of standard operating procedures for use within the team for operating automated HR systems."  (Vacancy Announcement at 2.)

in the Administration Division, applied for the position.  (Chappell-Johnson Dep. at 1, Ex. 7 to

Def.'s Mot. for Summ. J.)  Seeking to hire from within its ranks, FDIC compiled a Merit

Promotion Roster listing six then-current employees, including Chappell-Johnson, whose

qualifications rendered them eligible for the position.  (*See* Merit Promotion Roster, Ex. 15 to

Def.'s Mot.)  Chappell-Johnson was eligible for appointment at all three grade levels, while the

other five were each eligible at the CG-7 and CG-9 grade levels.  (*See id.*)

The selecting official, Lorinda Potucek ("Potucek"), elected to follow FDIC's "best

business practice[s]" by conducting a "structured interview process."[4]  (Candidate Selection

Recommendation, Ex. 6 to Def.'s Mot.; Second Potucek Dep., Ex. 7 to Def.'s Mot., at 122-23;

FDIC Guidance, Ex. 13 to Def.'s Mot., at 1.)  In this process, a panel interviews each applicant,

---

[4] In her opposition, Chappell-Johnson claims genuine factual issues exist concerning the selecting official's identity.  (*See* Pl.'s Statement of Genuine Issues at 11-12.)  Potucek has made several statements on this subject, and as Chappell-Johnson correctly notes, these statements have not been entirely consistent.  (*Compare* First Potucek Aff., Ex. 18 to Def.'s Mot. for Summ. J., at 1 (referring to self as the "Recommending Official"), *with* Second Potucek Dep., Ex. 20 to Def.'s Mot., at 66 (referring to self as the "Selecting Official"), *and* Third Potucek Aff., Ex. 24 to Def.'s Mot., ¶ 5 (clarifying that she served as the "Selecting Official")).

Nonetheless, Potucek signed the Candidate Selection Recommendation form as the selecting official, (*see* Ex. 6 to Def.'s Mot.), and whatever her title, it is undisputed that *she* elected to use a structured interview process to fill the position, (Second Potucek Dep. at 122-23).

Moreover – and in line with Chappell-Johnson's argument – whatever Potucek's title, it is also clear that concurrence from her supervisor, Shirley Purnell ("Purnell"), was needed before Potucek's recommendation would be forwarded to the approving official.  (*See* Candidate Selection Recommendation (bearing Purnell's signature as Concurring Human Resources Officer); Purnell Dep., Ex. 26 to Def.'s Mot., at 15-18 (describing how her subordinates' hiring choices required her concurrence to be considered "selections"); Def.'s Reply at 4-5 (failing to address Chappell-Johnson's assertion that Purnell approved Potucek's decision).)

On this motion for summary judgment, the Court must construe all facts in Chappell-Johnson's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Hence, the Court will assume herein that Purnell, who knew of Chappell-Johnson's prior EEO complaints, exercised veto power over Potucek's choice.

posing the same series of questions to each and measuring each against the same benchmarks, with questions and benchmarks based on the job requirements listed in the vacancy announcement. (*See* FDIC Guidance at 1.)  The selecting official then relies on documentation from these interviews, any discussions with panel members, and candidates' application materials in making a final selection.  (*Id.* at 3.)

Potucek tasked two other employees – Susan Boosinger ("Boosinger"), a 56 year-old female, and Jo Rita Campbell ("Campbell"), a 54 year-old female – to serve as interview panelists.  (*See* Boosinger Aff., Ex. 2 to Def.'s Mot., at 1; Campbell Aff., Ex. 5 to Def.'s Mot. at 1; First Potucek Dep., Ex. 19 to Def.'s Mot., at 44.)  Neither Boosinger nor Campbell had any knowledge of Chappell-Johnson's prior EEO complaints. (*See* Boosinger Aff. at 1.)[5]  Potucek, however, had once heard a supervisor mention that he needed to visit FDIC's legal division to discuss an EEO complaint "regarding" Chappell-Johnson.  (*See* First Potucek Dep. at 74-75.)

FDIC's structured interview process guidelines suggest that a Selecting Official "should participate in the interviews," (FDIC Guidance at 2), but Potucek did not do so in this instance, (Second Potucek Dep. at 67.)  During the interview process, Boosinger and Campbell briefly reviewed each candidate's application materials and then met with each of the six.  (Boosinger Dep., Ex. 3 to Def.'s Mot., at 58-59, 63-64.)  For each pre-formulated question, the panelists rated each applicant's response as "outstanding, satisfactory, not satisfactory, or unsatisfactory"

---

[5] In accordance with this Court's Local Rules, items in defendant's Statement of Undisputed Material Facts which Chappell-Johnson does not controvert (even indirectly) will be deemed admitted.  *See* Local Rule 7(h) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

according to the established benchmarks, and at some point, either between interviews or after the full round, they discussed overall ratings for each candidate. (*See id.* at 62-64.) After agreeing on the two top contenders, Roger Little ("Little") and Paula Foreman ("Foreman"), Boosinger and Campbell met with Potucek, who asked them how they had rated the candidates. (*Id.* at 64-65.) Boosinger and Campbell explained that Little and Foreman were "tied for first . . . for different reasons," (Second Potucek Dep. at 124), and the three women then discussed Little and Foreman's interviews, (Boosinger Dep. at 65-66).[6] Neither Boosinger nor Campbell believed Chappell-Johnson to be as qualified for the position as Little. (*See* Boosinger Aff. at 2 ("She was not recommended because she was not the best qualified candidate in our opinion. Roger Little was determined to be the best qualified . . . ."); Campbell Aff. at 1 ("[Chappell-Johnson] was not ranked as high as the Selectee as it relates to the interview process").)

After learning from her panelists that Foreman and Little were the top two contenders, Potucek reviewed Foreman and Little's applications, examined the interviewers' notes and the response benchmarks, and took into account her own past experiences with Little, a former subordinate.[7] (Second Potucek Dep. at 145-46, 177; First Potucek Aff. at 2.) Specifically, she

---

[6] Chappell-Johnson insists a factual dispute exists concerning whether Boosinger and Campbell gave "recommendations" to Potucek. (*See* Pl.'s Statement of Genuine Issues at 14-15.) But semantics aside, it is clear from the affidavits and depositions on which Chappell-Johnson relies that Boosinger and Campbell communicated to Potucek that Little and Foreman had achieved the highest ratings among the six applicants. (*See* Boosinger Dep. at 66, 90-91 (stating that she and Campbell "gave [Potucek] the ratings" and told her "Roger Little appear[ed] to be the top performer"); Boosinger Aff. at 1 (stating that she and Campbell "made [their] recommendation as to who [they] believed to be the strongest candidate worthy of selection").

[7] Again, Chappell-Johnson claims a factual dispute exists regarding the basis for Potucek's decision. (*See* Pl.'s Statement of Genuine Issues at 19-20.) Yet she fails to identify any such substantive dispute, arguing only that Potucek's decision-making process may not have comported with FDIC "best practices" guidelines. (*See id.*)

considered Little's quite recent experience with various database systems as well as his "extraordinary communications skills" and extensive software knowledge. (Second Potucek Dep. at 170-71; First Potucek Aff. at 2.) Potucek ultimately selected Little to fill the vacancy at the lowest possible grade level, CG-7. (*See* Pl.'s Statement of Genuine Issues at 18 (admitting these facts).)

On November 3, 2004, Chappell-Johnson learned she had not been selected to fill the position. (*See* EEOC Counselor's Report at 3.) She contacted an EEO Counselor on December 17, 2004, and after mediation proved unsuccessful, she filed a formal discrimination complaint on April 12, 2005. (*Id.* at 1; Acceptance of Formal Discrimination Complaint, Ex. 1 to Def.'s Mot. for Summ. J., at 1.) Chappell-Johnson contended she was more qualified than Little and blamed her non-selection on sex and age discrimination and reprisal, but after a formal investigation, FDIC concluded no discrimination or retaliation had occurred. (*See* Final Agency Decision, Ex. 12 to Def.'s Mot. at 2, 8.)

Dissatisfied with FDIC's findings, Chappell-Johnson filed this suit on June 12, 2006. Her complaint raises claims for sex discrimination, in violation of 42 U.S.C. section 2000e-16(a) ("Title VII"), age discrimination, in violation of 29 U.S.C. section 633a ("ADEA"), and retaliation based on her prior EEO activity, also in violation of Title VII.[8] (*See* Compl. ¶¶ 9b, 10b-14.) Bair, the official defendant, now seeks summary judgment on each of these claims.

---

[8] Her complaint also alleged race discrimination, (*see* Compl. ¶¶ 9a, 10a), but Chappell-Johnson, an African-American, abandoned this claim on learning Little, the selectee, shares her ethnicity, (*see* Pl.'s Answers to Def.'s First Set of Interrogatories, Ex. 17 to Def.'s Mot. for Summ. J., at 8).

# DISCUSSION

## I.    Summary Judgment Standard

As a general matter, a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial.  FED. R. CIV. P. 56(c).  To ascertain whether an issue involves "material" facts, a court must look to the substantive law on which the claim or defense rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense.  *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  The court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ."  *Id.* at 255.  Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Id.* at 252.  This standard is "'very close' to the 'reasonable jury' directed verdict standard," and despite their distinct procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 250-51.

For employment discrimination cases such as this one, the Supreme Court has established a burden-shifting approach that applies when the plaintiff lacks direct evidence of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This approach, the *McDonnell Douglas* framework, applies to both Title VII and ADEA claims.  *Chappell-Johnson v. Powell*,

440 F.3d 484, 487 (D.C. Cir. 2006) (citing *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).  To proceed under the *McDonnell Douglas* standard, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of . . . sex [or age] discrimination."  *McDonnell Douglas,* 411 U.S. at 802.

On a defendant's motion for summary judgment, however, the Court need not evaluate whether the plaintiff has carried this burden.  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Judge Kavanaugh's opinion in *Brady*, written for a unanimous panel of our Court of Appeals, sets out this Court's task quite succinctly:

> Lest there be any lingering uncertainty, we state the rule clearly:  In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.  Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 511 (1993), and *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983)).  *See also Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1344, 1346-47 (D.C. Cir. 2008) (applying *Brady* to review of district court's grant of summary judgment on Title VII retaliation claim).  Thus, the Court must first determine whether defendant has articulated a legitimate non-discriminatory reason for Chappell-Johnson's non-selection.  *See id.*; *McDonnell Douglas*, 411 U.S. at 802.  If so, the Court must then examine the evidence to determine whether a reasonable jury could deem this asserted

reason mere pretext, designed to conceal intentional sex and/or age[9] discrimination and/or retaliation.

## II.    Defendant's Proffered Non-Discriminatory Reason

FDIC's explanation for Chappell-Johnson's non-selection is refreshingly straightforward: after a series of structured interviews in which each applicant answered the same questions and was measured against the same benchmarks, *neither interviewer believed Chappell-Johnson to be the best candidate for the job*. (*See* Boosinger Dep., Ex. 3 to Def.'s Mot. for Summ. J., at 58-59, 62-64; Boosinger Aff., Ex. 2 to Def.'s Mot., at 2; Campbell Aff., Ex. 5 to Def.'s Mot., at 1.) Indeed, both believed the selectee was better qualified for the position. (*See* Boosinger Aff. at 2; Campbell Aff. at 1.) Further, neither was aware of Chappell-Johnson's prior EEO complaints. (*See* Boosinger Aff. at 1.) These two interviewers reported their ratings to the Selecting Official, Potucek, who focused her subsequent decision-making process *only* on Little and Foreman, whom the interviewers had rated as the top two candidates. (Second Potucek Dep. at 145-46, 177; First Potucek Aff. at 2.) FDIC has thus presented evidence of a legitimate, non-discriminatory reason for Chappell-Johnson's non-selection: no one involved in the selection

---

[9]*Brady* does not expressly hold that courts ruling on employer motions for summary judgment *in ADEA cases* should refrain from first assessing whether the plaintiff has made out a prima facie case. *See* 520 F.3d at 494 (mentioning only Title VII cases, involving alleged discrimination based on "race, color, religion, sex, or national origin"). Yet other courts in this district have nonetheless applied *Brady*'s rule to age discrimination cases. *See Simpson v. Leavitt*, 557 F. Supp. 2d 118, 126-27 (D.D.C. 2008) (Friedman, J.); *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.D.C. 2008) (Urbina, J.); *Daniels v. Tapella*, No. 05-2455, 2008 U.S. Dist. LEXIS 62768, at *12 (D.D.C. Aug. 18, 2008) (Kessler, J.); *Brantley v. Kempthorne*, No. 06-1137, 2008 U.S. Dist. LEXIS 38406, at *12-13 (D.D.C. May 13, 2008) (Huvelle, J.). This Court agrees that *Brady* should apply equally to a plaintiff's age discrimination claims as to her sex discrimination claims.

process identified her as the best qualified candidate.

### III.    Plaintiff's Evidence of Discrimination/Retaliation

Because defendant has articulated an ostensibly legitimate, non-discriminatory reason

for plaintiff's non-selection, "'the sole remaining issue is discrimination *vel non*.'"  *Waterhouse*

*v. District of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002) (quoting *Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 142-43 (2000)).

When a plaintiff such as Chappell-Johnson seeks to demonstrate that her employer's

stated reason for an adverse employment action is mere pretext, several evidentiary options are

available to her.  *Brady*, 520 F.3d at 495.  She may present, *inter alia*: (1) "evidence suggesting

the employer treated other employees of a different [age or sex] . . . more favorably in the same

factual circumstances"; (2) evidence of "changes and inconsistencies in the stated reasons for the

adverse action"; (3) evidence that the employer "fail[ed] to follow established procedures or

criteria"; or (4) evidence "that the employer is making up or lying about the underlying facts that

formed the predicate for the employment decision."[10] *Id.* & n.3.  When a plaintiff offers evidence

of this last variety, however, the Court must take care to distinguish between evidence of

prevarication and evidence of honest misjudgment:  "an employer's action may be justified by a

*reasonable* belief in the validity of the reason given *even though that reason may turn out to be*

*false*."  *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (emphasis added).

With this guidance in mind, the Court turns to the evidence of discrimination or

---

[10] *See also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)
(courts should also consider "any evidence of discriminatory statements or attitudes on the part of
the employer," and "any contrary evidence," such as "a strong track record in equal opportunity
employment").

10

retaliation offered by Chappell-Johnson.  She argues that a reasonable jury could reject FDIC's

explanation for her non-selection on any of several bases.  First, she contends a jury could infer

from discrepancies among Potucek's affidavits and depositions that Potucek has lied to conceal

discriminatory motives.[11]  (Pl.'s Opp'n at 18.)  Second, she cites Potucek's reliance on

"subjective factors" as a possible basis for an inference of discrimination.[12]  (*Id.* at 24-25.)   Third,

Chappell-Johnson argues a jury could find she was more qualified than Little.  (*Id.* at 20-22.)

Fourth, and finally, Chappell-Johnson points out that documentation from the structured

---

[11] Relatedly, Chappell-Johnson also insists a jury could conclude that Potucek's claim that her selection of Little was consistent with the interview panel's recommendation "is a complete fabrication."  (Pl.'s Opp'n at 18-19.)  As explained above, regardless of whether the panelists "ma[d]e a recommendation" or "gave [Potucek] the ratings," and regardless of whether FDIC's "best practices" require that interviewers make recommendations to the selecting official, *the panelists in this case communicated to Potucek that Little and Foreman were the two top candidates*.  *See supra* note 6.  Chappell-Johnson has identified no contrary evidence, and this Court can find none in the record.  Hence, no reasonable jury could conclude Potucek lied.

[12] Chappell-Johnson further argues Potucek deviated from established FDIC hiring procedures, evincing discriminatory motive.  (Pl.'s Opp'n at 22-23.)  Our Court of Appeals has observed that an employer's "departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the [employer's] true motivation behind the hiring decision."  *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982).  Here, however, Chappell-Johnson points to no evidence of such departures.

While FDIC's guidelines state that selecting officials "should" participate in structured interviews, they do not require such participation.  (*See* FDIC Guidance, Ex. 13 to Def.'s Mot. for Summ. J., at 2.)  Thus, Potucek did not breach FDIC policy by not sitting on the structured interview panel.  Chappell-Johnson has not alleged that the *substance* of the interviews deviated in any way from FDIC's "best practices": it is undisputed that Boosinger and Campbell interviewed all applicants and posed the same questions each.  Finally, FDIC guidelines indicate that selecting officials "should" make their selections based on interview documentation, discussions with panelists, and application materials.  (*Id.* at 3.)  Here, Potucek examined the interview materials, discussed the interviews with Boosinger and Campbell, and reviewed Foreman and Little's applications. (Second Potucek Dep. at 177; First Potucek Aff. at 2.)  She also took into account her own past experiences with Little, (Second Potucek Dep. at 145-46), but nothing in the FDIC's guidelines forbids consideration of additional factors beyond those listed.  Hence, no *facts* support Chappell-Johnson's argument that Potucek "did not adhere to FDIC policy in making [her] selection."  (*See* Pl.'s Opp'n at 23.)

interview process in her case – including Boosinger and Campbell's notes and evaluation sheets for each applicant – is missing, and she asserts the jury could infer FDIC destroyed these records because they contained information favorable to her claims.  (*Id.* at 19-20.)  Yet even viewing the evidence in the light most favorable to Chappell-Johnson, and affording her the benefit of all reasonable inferences therefrom, she had not identified evidence that casts doubt on FDIC's explanation for her non-selection.

First, Chappell-Johnson points to an alleged inconsistency between two of Potucek's statements.  (*Id.* at 18.)  In an affidavit provided during the formal EEO investigation that preceded this lawsuit, Potucek responded to the following question: "At the time of your involvement in this matter were you aware of Complainant's prior EEO complaint activity?" (First Potucek Aff., Ex. 18 to Def.'s Mot. for Summ. J., at 1.)  Potucek answered that she "personally had no knowledge of the Complainant's prior EEO complaint activity."  (*Id.*)  In a deposition two years later, when asked whether she had conversed with anyone concerning Chappell-Johnson's prior EEO activity, Potucek "recall[ed] [her second-line supervisor] Miguel Torrado mentioning that he had to go to legal division to discuss an EEO complaint," and that when "someone asked [Torrado] who it was regarding . . . he said "Dorothy Chappell-Johnson." (First Potucek Dep., Ex. 19 to Def.'s Mot., at 74.)  Potucek could not remember when she overheard these offhand comments.  (*See id.* at 74-75.)  Nor could Potucek recall *any* conversations with Chappell-Johnson between fall 2001 and November 2007, (*see id.* at 73), let alone the "general conversation" in which Chappell-Johnson alleges she told Potucek about her "prior protected activity," (Chappell-Johnson Dep., Ex. 9 to Def.'s Mot., at 71-72; *see also* Chappell-Johnson Aff., Ex. 7 to Def.'s Mot., at 2).

Contrary to Chappell-Johnson's assertions, no reasonable juror could conclude Potucek intentionally misrepresented her knowledge of Chappell-Johnson's EEO activity.  Awareness that an EEO complaint "regarding" Chappell-Johnson might once have been filed does not reasonably constitute "personal knowledge" concerning the substance of Chappell-Johnson's past EEO complaints.  Nor would a "general conversation" in which Chappell-Johnson expressed frustration at not being promoted provide such "personal knowledge."[13]  In short, Potucek's statements are not inconsistent.

Furthermore, regardless of whether Potucek knew that Chappell-Johnson had filed previous EEO complaints, it is undisputed that *Boosinger and Campbell*, not Potucek, screened out Chappell-Johnson as a candidate, and that neither interviewer knew of Chappell-Johnson's prior EEO activity.  Boosinger and Campbell communicated to Potucek that Little and Foreman had achieved the highest ratings among the six applicants.  *See supra* note 6.  Little and Foreman

---

[13] In her deposition, Chappell-Johnson remained vague as to what she had told Potucek in their "general conversation" about her prior EEO activity:

Q    . . . [W]hat do you remember about that general conversation?
A    We were just talking about things in general, of the agency, things in general.
Q    What did you tell her?
A    I was wondering why I'm not getting promoted.  So, you know, opportunities of not getting promoted.
Q    Okay.  And what about prior protected activity?  What did you tell her about that?
A    Protected activity? . . . We spoke of me not getting promoted, not getting positions that were available; things of that nature. . . . And just general conversation about ourselves and things like that; just general conversation.

(Chappell-Johnson Dep. at 71-72.)  Thus, Potucek's testimony is not inconsistent with Chappell-Johnson's.

13

– *not* Little and Chappell-Johnson – were "tied for first." (Second Potucek Dep., Ex. 21 to Def.'s

Mot., at 124.) The record is clear that whatever discretion Potucek may have possessed in

theory, she in fact made her choice only between Foreman and Little. (Second Potucek Dep. at

145-46, 177; First Potucek Aff., Ex. 18 to Def.'s Mot. at 2.) Thus, assuming Potucek had some

knowledge of Chappell-Johnson's prior EEO complaints, no reasonable jury could infer this

knowledge influenced her choice of Little over Foreman.[14]

Second, Chappell-Johnson argues that Potucek, Boosinger, and Campbell impermissibly

relied on "subjective factors," such as communication skills. (Pl.'s Opp'n at 24-25.) Our Court

of Appeals has cautioned that "an employer's asserted strong reliance on subjective feelings

about the candidates may mask discrimination." *Aka*, 156 F.3d at 1298. Yet it has also assured

that "employers may *of course* take subjective considerations into account in their employment

decisions." *Id.* (emphasis added). And most saliently, it recognizes that where "reliance [on

subjective factors] is modest, and the employer has other, well-founded reasons for the

employment decision, summary judgment for the defendant may be appropriate." *Id.*

Here, Potucek stated she used "software applications knowledge and expertise as [her]

focus" in making a selection. (*See* First Potucek Aff. at 2.) Because the selectee would

"constantly interface with customers," she "was *also* seeking a candidate who had excellent

communication skills." (*Id.* (emphasis added).) Potucek explained she chose Little because she

believed he had "broad[] software application knowledge" and was "an expert" in various

---

[14] Moreover, while Purnell's concurrence was required, there is no evidence she influenced the selection process in any way. Her role – simply validating Potucek's choice – was negligible.

database systems, and she considered his communication skills "extraordinary." (*Id.*)  She claimed Little's more "extensive" experience was the "main reason" she deemed him more qualified than other applicants.  (*See id.*)

Further, Boosinger and Campbell believed Little "to be the best qualified for the position . . . based . . . on the candidates' responses to the interview questions."  (Boosinger Aff., Ex. 2 to Def.'s Mot. at 2.)  While both women emphasized Little's superior communication skills in their affidavits, they did so in response to a query concerning the candidates' relative communicative abilities.  (*See id.*; Campbell Aff., Ex. 5 to Def.'s Mot. at 1.)  In her deposition, Boosinger, elaborated that she rated Little and Foreman highly because they "gave full and responsive answers, [and] were able to articulate their experience."  (Boosinger Dep., Ex. 3 to Def.'s Mot. at 65.)  She recalled that Little included "a lot of narrative, supporting narrative . . . for what his job experience had been," in his application.  (*Id.* at 88.)  By comparison, Boosinger recollected, Chappell-Johnson's application had not included "the same volume of information in terms of descriptions of the job."  (*Id.*)

Thus, the evidence does demonstrate *some* reliance on so-called subjective factors by Potucek, Boosinger, and Campbell, but this was entirely permissible.  *See Aka*, 156 F.3d at 1298.  Furthermore, though Chappell-Johnson insists references to candidates' "communication skills" are "inherently suspect," (Pl.'s Opp'n at 24), such skills were among the four Quality Ranking Factors listed for the position on the vacancy announcement: "3. Ability to communicate orally to explain and provide assistance to employees and administrative staff on personnel procedures and processes," (Vacancy Announcement, Ex. 30 to Def.'s Mot. at 2).  Hence, it was entirely appropriate for Potucek, Boosinger, and Campbell to consider whether the applicants could

15

effectively articulate their qualifications.  No reasonable jury could infer discrimination from these facts.

Third, Chappell-Johnson argues that a factual dispute exists concerning whether Little was the best qualified applicant.  (*Id.* at 20-22.)  Whether Little was *in fact* the best qualified applicant, however, is not the point – as Chappell-Johnson's citation to *Aka* makes clear: a jury may find discriminatory intent where it "can legitimately infer that the employer consciously selected a less-qualified candidate."  156 F.3d at 1294.  This Court readily concedes that simple, unquestioning deference to employer assessments of relative qualifications would preclude any employment discrimination case from proceeding beyond summary judgment.  *See id.*  But "an employer's action may be justified by a *reasonable* belief in the validity of the reason given *even though that reason may turn out to be false*."  *George*, 407 F.3d at 415 (emphasis added).  Thus, the material issue is whether Potucek and the interview panelists *reasonably believed* Little to be the more qualified applicant.

As an initial matter, Chappell-Johnson does not appear to contest that neither Boosinger, nor Campbell, nor Potucek considered her the best candidate for the position.  Instead, she attempts to demonstrate their assessments were unreasonable by offering evidence of her alleged superiority – evidence which consists primarily of her own assertions to that effect, coupled with the very application materials previously available to the interview panel.  Specifically, she asserts that: (1) she was "the only applicant eligible and qualified for the position at all three grade levels"; and (2) she "had more than six years of experience [successfully] performing the very duties that were required in the position at issue here" as well as other relevant experience. (Pl.'s Opp'n at 5, 21.)

As to the first contention, the vacancy announcement clearly indicated that the position was intended to be "entry-level" and was "designed to develop the employee selected to perform at the full performance level." (Vacancy Announcement, Ex. 30 to Def.'s Mot., at 2.) Thus, Chappell-Johnson's unique eligibility at the full performance level (grade CG-11) would not render her objectively more qualified.

To support the second contention, Chappell-Johnson points only to favorable comparisons between her application and the requirements listed in a vacancy announcement *for a different position*. (Pl.'s Opp'n at 21.) In fact, Chappell-Johnson's application for the position at issue here indicates she had most recently worked in the benefits area. (*See* Application, Ex. 1 to Pl.'s Opp'n, at 1.) Her "six years of experience" as a Payroll/Personnel Systems Specialist – the position in which she claims to have performed duties identical to those described in the vacancy announcement – occurred between 1990 and 1996, *eight to twelve years prior to the challenged selection*. (*See id.* at 3.) Given that the vacancy announcement emphasized familiarity with various computer programs and systems, *see supra* note 3, such distant experience hardly constitutes the sort of "vastly superior" qualification necessary to create a genuine factual issue, *see Hammond v. Chao*, 383 F.Supp.2d 47, 57 (D.D.C. 2005) (Bates, J.).[15] As Judge Bates explained in *Hammond*:

> [A] plaintiff cannot satisfy her burden of demonstrating pretext simply based on her own subjective assessment of her own performance. A plaintiff has the duty to put forth evidence of discrimination, not to quibble about the candidates' relative

_____

[15] *See also Stewart v. Ashcroft*, 352 F.3d 422, 429-30 (D.C. Cir. 2003) ("stark superiority of credentials," not mere "fine distinctions," is necessary "to give rise to suspicion of pretext or a jury finding of discrimination"); *Aka*, 156 F.3d at 1294 (non-selectee must be "significantly better qualified for the job" to raise an inference of discrimination).

qualifications.  In the absence of any other evidence that would allow a jury to infer that discrimination took place, slight questions of comparative qualifications do not warrant a jury trial.

*Hammond v. Chao*, 383 F.Supp.2d 47, 57 (D.D.C. 2005) (quotations and citations omitted).

Here, Chappell-Johnson essentially argues that a reasonable jury could have reached a different conclusion based on the applicants' interviews and application materials.  But "[t]itle VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'"  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)).  Moreover, "[e]ven if a court suspects that a job applicant 'was victimized by [] poor selection procedures' it may not 'second-guess an employer's personnel decision absent *demonstrably discriminatory motive*.'"  *Fischbach*, 86 F.3d at 1183 (emphasis added) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir.1982)).  Chappell-Johnson offers no evidence of such discriminatory motive – she has demonstrated, at most, that different individuals might reasonably have made a different selection.  It is undisputed, however, that neither Potucek nor the interviewers believed Chappell-Johnson to be the best qualified applicant, and nothing indicates their belief was *unreasonable*.  Consequently, Chappell-Johnson's third line of argument fails.

Fourth, and finally, Chappell-Johnson observes that documentation from the structured interview process – including Boosinger and Campbell's notes and evaluation sheets for each applicant – is missing, and she asserts the jury could infer FDIC purposefully lost or destroyed these records because they contained information favorable to her claims.  (*Id.* at 19-20.)  To support this argument, she cites a series of cases from the Second Circuit discussing parties'

obligations to preserve evidence for reasonably anticipated litigation, and when an adverse

inference against a party that destroys evidence is appropriate. (*Id.* at 19.) A common thread

runs through these authorities: for spoilation of evidence to raise an inference adverse to the

spoiler, the destruction must be, at the very least, negligent. *See Residential Funding Corp. v.

DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("a party seeking an adverse inference

instruction based on the destruction of [discoverable] evidence must establish that . . . the records

were destroyed with a 'culpable state of mind'" – at minimum, negligence). This principle

appears consistent with the law in this Circuit. *See*, *e.g.*, *Mazloum v. Dist. of Columbia Metro.

Police Dep't*, 530 F. Supp. 2d 282, 293 (D.D.C. 2008) (Bates, J.). *Cf. Shepherd v. ABC*, 62 F.3d

1469, 1481 (D.C. Cir. 1995) ("A sanction for failure to preserve evidence is appropriate only

when a party has consciously disregarded its obligation to do so."); *Synanon Church v. United

States*, 820 F.2d 421, 428 n.18 (D.C. Cir. 1987) ("Willful destruction of evidence by a party

properly raises the inference that the materials destroyed were adverse to the party which brings

about the destruction.").

    Here, neither party has submitted Boosinger and Campbell's notes and evaluation sheets

from the structured interviews because FDIC no longer has them. It has offered no plausible

explanation for their disappearance.[16] Assuming, for the moment, that FDIC destroyed the

---

[16] According to Potucek, Boosinger and Campbell gave her these documents during their post-interview meeting. (Second Potucek Dep. at 117-18.) Potucek placed them in her credenza, where she kept "other important documents," and claims they later vanished. (*Id.* at 118.) In her deposition and affidavit, Potucek appears to conflate this disappearance with that of "32 merit promotion case files . . . and other official documents," which she reported to FDIC's Inspector General on September 4, 2004. (*See id.* at 118-19; *see also* Third Potucek Aff., Ex. 24 to Def.'s Mot. for Summ. J., ¶¶ 11-13 & Ex. 4.) While the record does not make clear precisely when the structured interviews occurred, the vacancy announcement lists the position's closing date as September 8, 2004, and it seems unlikely that interviews would have occurred before this date.

materials, the record supports no greater degree of culpability than negligence, and "any adverse inference instruction grounded in negligence would be considerably weaker in both language and probative force than an instruction regarding deliberate destruction." *Mazloum*, 530 F. Supp. 2d at 293.

Even if such an instruction is warranted here, it will not permit Chappell-Johnson to withstand summary judgment. "[T]he destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence – or utterly inadequate evidence – in support of a given claim to survive summary judgment on that claim." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998), *overruled on other grounds by Rotella v. Wood*, 529 U.S. 549 (2000).

It is otherwise undisputed that neither interviewer believed Chappell-Johnson to be the best qualified candidate, and indeed, that both agreed Little was better qualified for the job. Chappell-Johnson has not shown these beliefs were unreasonable. It is also undisputed that they communicated their top ratings of Little and Foreman to Potucek, and that Potucek thus focused her selection only on Little and Foreman. Chappell-Johnson argues "the jury could infer that the lost evidence would support [her] claim that [] Potucek is attempting to cover up her discriminatory and/or retaliatory motives." (Pl.'s Opp'n at 20.) As a matter of logic, the Court cannot surmise how Boosinger and Campbell's interview notes could have contained evidence of Potucek's motives, and Chappell-Johnson does not elaborate on her theory. But the true obstacle to this theory is a much more fundamental, legal one: when all evidence in the record supports a

---

(*See* Vacancy Announcement, Ex. 30 to Def.'s Mot., at 1.) Thus, it is unclear that the documents at issue here were part of the missing batch that Potucek reported to the Inspector General and whose disappearance that office investigated.

legitimate, non-discriminatory reason for her non-selection, no reasonable jury could award damages against her employer based *solely* on *speculation* as to what *might* be contained in documents *not in evidence*.  Simply put, without any *evidence*, a generalized adverse inference, *alone*, will not support a jury verdict.

Consequently, the Court concludes Chappell-Johnson has not "produced sufficient evidence for a reasonable jury to find that [FDIC's] asserted non-discriminatory reason [for her non-selection] was not the actual reason[,] and that [FDIC] intentionally discriminated against" her based on her age, sex, and/or prior EEO activity.  *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

## CONCLUSION

For the reasons expressed above, the Court finds Chappell-Johnson has failed to present – and the record herein simply does not disclose – any evidence to refute FDIC's proffered non-discriminatory reason for her non-selection: no one involved in the competitive selection process identified her as the best qualified candidate.  Accordingly, defendant's motion for summary judgment on Chappell-Johnson's sex and age discrimination and retaliation claims shall be GRANTED.

A separate order shall issue this day.

SO ORDERED.


Signed by Royce C. Lamberth, Chief Judge, September 3, 2008.